# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| LEGACY CHURCH, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>SECRETARY OF STATE KATHYLEEN M. KUNKEL & THE STATE OF NEW MEXICO,<br><br>*Defendants*. | Civil No. 1:20-CV-00327-JB-SCY<br><br>Hon. James O. Browning<br><br>***AMICUS CURIAE* BRIEF OF PROPOSED *AMICUS* THE BECKET FUND FOR RELIGIOUS LIBERTY IN SUPPORT OF PLAINTIFF** |

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................................... ii

CORPORATE DISCLOSURE STATEMENT ............................................................ 1

INTEREST OF *AMICUS CURIAE* ............................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 1

I.    New Mexico concedes the immediate dispute about livestreams. .................... 4

II.    The remaining free exercise concerns require strict scrutiny. ......................... 6

CONCLUSION ............................................................................................................. 12

CERTIFICATE OF SERVICE ..................................................................................... 14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Abbott*,
  No. 20-50264, 2020 WL 1685929 (5th Cir. Apr. 7, 2020) ..................................... 10

*Axson-Flynn v. Johnson*,
  356 F.3d 1277 (10th Cir. 2004) ............................................................................ 8, 9

*Brown v. Entm't Merchs. Ass'n*,
  564 U.S. 786 (2011) ............................................................................................ 10-11

*Central Rabbinical Cong. v. N.Y.C. Dep't of Health & Mental Hygiene*,
  763 F.3d 183 (2d Cir. 2014) ................................................................................. 8, 10

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) ............................................................................................. *passim*

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*,
  170 F.3d 359 (3d Cir. 1999) ................................................................................. 7, 9

*Gonzales v. O Centro Benificente Uniao*,
  546 U.S. 418 (2006) ............................................................................................. 11-12

*Holt v. Hobbs*,
  574 U.S. 352 (2015) ............................................................................................. 12

*Hosanna-Tabor Evangelical Church & Sch. v. EEOC*,
  565 U.S. 171 (2012) ............................................................................................. 9

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church*,
  344 U.S. 94 (1952) ............................................................................................... 5

*McCullen v. Coakley*,
  573 U.S. 464 (2014) ............................................................................................. 11

*Prince v. Massachusetts*,
  321 U.S. 158 (1944) ............................................................................................. 2, 10

*Shrum v. City of Coweta*,
  449 F.3d 1132 (10th Cir. 2006) ........................................................................... 7, 10

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) ............................................................................................. 10

*Yellowbear v. Lampert*,
    741 F.3d 48 (10th Cir. 2014) ................................................................................. 7-8

**Other Authorities**

Douglas Laycock & Steven T. Collis, *Generally Applicable Law and the
    Free Exercise of Religion*, 95 Neb. L. Rev. 1 (2016) .................................................. 7

The Gospel of Luke ............................................................................................................. 9

Laurence H. Tribe, *Disentangling Symmetries: Speech, Association,
    Parenthood*, 28 Pepp. L. Rev. 641 (2001) .................................................................. 9

Nathan O'Neal, *In Court, Legacy Church Argues Mass Gatherings
    Should be Allowed in Places of Worship*, KOB 4
    (Apr. 16, 2020, 5:21 PM) ....................................................................................... 6, 7

## CORPORATE DISCLOSURE STATEMENT

The Becket Fund neither has a corporate parent nor issues stock, so no publicly held company owns 10% or more of any of its stock.

## INTEREST OF *AMICUS CURIAE*

The Becket Fund for Religious Liberty is a non-profit law firm dedicated to protecting the free exercise of all religious traditions. To that end, it has represented agnostics, Buddhists, Christians, Hindus, Jews, Muslims, Santeros, Sikhs, and Zoroastrians, among others, in lawsuits across the country and around the world. It has successfully litigated numerous religious liberty cases before the Supreme Court of the United States, and numerous federal and state courts. This includes cases in the Tenth Circuit and the Supreme Court of New Mexico.

A common thread runs through Becket's cases, and it shows why Becket's involvement here would assist the Court. All these cases required harmonizing interests asserted as truly important with the fundamental guarantee of religious liberty. So does this case. Becket's expertise can help guide the Court's First Amendment analysis.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Two of government's paramount obligations are at issue in this case: protecting citizens' lives and protecting their fundamental rights. When these obligations appear in conflict—such as when the government asserts the need to restrict religious exercise during a pandemic—courts must scrutinize the government's actions to ensure they are no more burdensome than justified by the emergency. Of course,

1

"[t]he right to practice religion freely does not include liberty to expose the community . . . to communicable disease." *Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944). But even then, the judicial approach consistent with our traditions is the "delicate" task of "mak[ing] accommodation between these freedoms and an exercise of state authority." *Id.* at 165. In such a situation, the Supreme Court instructs that "the safest and most objective recourse is . . . narrowing the no man's land where this battle has gone on." *Id*.

Sometimes that narrowing will be difficult, but not here—at least for Legacy Church's Temporary Restraining Order ("TRO") request. First, Legacy has repeatedly demonstrated its commitment to being a good neighbor to its community and to respecting all reasonable safety requirements. It ended in-person services and started online ones before New Mexico required social-distancing, and urges its members to protect public health by following CDC guidance. *See, e.g.*, Compl. at ¶ 20, ECF No. 1 ("Legacy plans to continue live-streaming its Sunday services after Easter Sunday, to continue its free exercise of its faith, to worship God, and to provide succor to its congregation during this difficult time."); *id.* at ¶¶ 18-19 ("Legacy has asked all of its congregation to join them online," and "[m]ore than thirteen thousand people worshipped with Legacy through the livestreaming" on Palm Sunday).

Second, over the past 36 hours, the New Mexico government essentially conceded that it could not identify a reason to stop Legacy from having approximately 30 safely-spaced people in its building for the purpose of creating a livestream worship service. This was confirmed during yesterday's hearing. In its briefing, New Mexico similarly

2

conceded that "houses of worship are still exempt from the 'mass gatherings' restriction to the extent necessary to provide remote services to their congregants, . . . ." Resp. to Mot. at 7, ECF No. 12. These concessions make sense here, given the large size of the church's building, *see* ECF No. 1 at ¶ 15 ("Legacy's building . . . is an auditorium that can accommodate 2,500 people."), the church's strong and public commitment to social distancing and following CDC safety guidelines, *id.* at ¶ 18 ("all" congregants asked to worship online), and the role that its livestream services play in allowing thousands of people to worship safely from home, *id.* at ¶ 19 (13,000 people worshipping via livestream with Legacy on Palm Sunday).

New Mexico's concession paves the way for a resolution of the TRO that advances both public health and religious liberty. Allowing an approximately 30-person gathering necessary to fulfill a livestream worship service, with proper social distancing, will safeguard livestream worshipping. When citizens are confined to their homes in a pandemic, such forms of spiritual communion are crucial, not least to mental health. And accommodating them serves public health interests by allowing thousands of New Mexico residents to obtain religious support from the safety of their own homes. While other issues in the case may be more fact-dependent and complicated—and therefore may be better left for the preliminary injunction hearing later this month—the livestream issue is now easy.

Furthermore, allowing Legacy to proceed with livestreams with approximately 30 people may also provide useful evidence when deciding remaining issues at the

3

preliminary injunction stage. Accordingly, *amicus* urges the Court to grant Legacy a TRO that allows it to conduct its livestreaming worship services by briefly gathering approximately 30 individuals once a week for a few hours to record and upload services, all safely practicing social distancing. The remaining questions should be left for the preliminary injunction stage, where—as *amicus* explains below—New Mexico will need to satisfy strict scrutiny.

I.   **New Mexico concedes the immediate dispute about livestreams.**

New Mexico now concedes that it does not seek to bar Legacy from gathering approximately 30 people to produce a livestream worship service. *See, e.g.*, ECF No. 12 at 7. Because of that concession, the Court should grant Legacy a TRO. This would allow Legacy to produce the livestream consistent with its worship practices, and with proper social distancing.

New Mexico's briefing acknowledges that houses of worship remain exempt from the "mass gatherings" restriction "to the extent necessary to provide remote services to their congregants." *Id.* In Legacy's case, the government understands that such production "uses a team of approximately thirty people." *Id.* Indeed, the government emphasizes that the order "allows for all manners of religious worship through audiovisual means" and "allows gatherings in houses of worship that include the people necessary to perform religious services and to make those available to remote congregants through audiovisual means." *Id.* at 12, 14-15.

4

Nor did New Mexico walk back these concessions at the TRO hearing. In fact, when the Court pressed New Mexico on whether there was any problem with live music for Legacy's livestream worship, the government could not produce an answer.

These concessions provide a clear path for the Court to enter a TRO making clear that the five-person limitation in New Mexico's latest Public Health Order (the "Order") does not apply to Legacy's production of livestream worship events. Rather, the individuals Legacy identified as necessary to facilitate the livestream worship service should be free to participate, with proper social distancing.

Entering such relief would provide several benefits. First, it would protect public health. New Mexico's latest Order confirms it does not seek to frustrate livestream worship (Ex. 6 at 5, ECF No. 12-6)—nor should it, because that service helps thousands of other worshipers stay home while still fulfilling their religious commitments.

Second, this relief allows Legacy to continue operating the livestream worship service it sought to facilitate for its congregants given the public health crisis.

Third, not granting this relief risks a constitutionally fraught course. As the Court observed at the hearing, governments should not be "dissecting" a worship service to determine whether—in the government's eyes—a particular activity is "necessary." Such a course raises needless tension with the First Amendment's "spirit of freedom for religious organizations," and their "independence from secular control or manipulation" on "matters of church government as well as those of faith and doctrine." *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church,* 344 U.S.

94, 116 (1952). These are all ample reasons to grant Legacy a TRO to facilitate its livestream.

## II. The remaining free exercise concerns require strict scrutiny.

The parties' briefing and presentations to the Court raise other disputed factual questions not covered by New Mexico's concessions. Those include how many congregants could safely attend services in person while keeping appropriate social distance, and whether the latest Public Health Order—modified to rescind the exemption given to worship services the night before Easter Sunday—targeted religious groups for disfavored treatment. *See* Nathan O'Neal, *In Court, Legacy Church Argues Mass Gatherings Should be Allowed in Places of Worship*, KOB 4 (Apr. 16, 2020, 5:21 PM), https://perma.cc/FFR2-LDUN (New Mexico Governor: "We did that because we had more than a handful of churches who were going to have Easter services and knowing the risk . . . , we made that an explicit prohibition."). While these issues may require further evidence and argument at the preliminary injunction stage, the legal standard the Court should apply is clear: strict scrutiny. That does not mean that the government must lose, because the government may yet be able to show that it can satisfy strict scrutiny considering the pandemic. But, it does mean that the government must meet a very high bar to justify continuing these restrictions on religious exercise. At a minimum, strict scrutiny is required here due to the Order's general applicability problems.

***General applicability.*** General applicability is its own free-exercise requirement—it does not depend on whether a law is neutral toward religion. *See*

6

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993) (general applicability "a second requirement of the Free Exercise Clause," separate from neutrality analysis); *Shrum v. City of Coweta*, 449 F.3d 1132, 1144 (10th Cir. 2006) (Free Exercise Clause not limited to acts motivated by overt religious hostility or prejudice); Douglas Laycock & Steven T. Collis, *Generally Applicable Law and the Free Exercise of Religion*, 95 Neb. L. Rev. 1, 7 (2016) ("General applicability . . . does not depend on targeting, gerrymandering, discrimination, legislative motives, or the object of laws."). Nor is general applicability satisfied because the Order treats all religions, or all non-"essential services," the same. *See id.* at 16 (this is circular reasoning; "[e]very law applies to everything it applies to" and "is a generally applicable prohibition of whatever it prohibits").

A law is not generally applicable when it "fail[s] to prohibit nonreligious conduct that endangers" the government's regulatory interest "in a similar or greater degree" than the prohibited religious conduct. *Lukumi*, 508 U.S. at 543. This was the case in *Lukumi*, where the City identified "improper disposal" of animal carcasses as "a general problem that causes substantial health risks," but the City notably excluded "restaurants" from "the scope of the ordinances." *Id.* at 544-45. A law's exemptions often evidence "a value judgment" that "secular" motivations for certain conduct "are important enough to overcome [the government's] general interest in uniformity but that religious motivations are not." *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999) (Alito, J.); *see also Yellowbear v. Lampert*, 741 F.3d 48, 60 (10th Cir. 2014) (Gorsuch, J.) ("Evidence that the prison

7

grants secular exceptions more readily than religious exemptions to a putatively compelling policy can raise the inference, too, that its most compelling interest may actually be discrimination against, or at least indifference to, the religious liberties of incarcerated persons."); *Central Rabbinical Cong. v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 197 (2d Cir. 2014) ("A law is therefore not generally applicable if it is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it.") (citing *Lukumi*, 508 U.S. at 535-538); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1297-99 (10th Cir. 2004) (exemptions for other students to observe religious holidays, and earlier religious exemptions given to plaintiff for same conduct, suggests defendants possessed a system of individualized assessments—requiring strict scrutiny).

Here, the Order is not generally applicable and is rife with value judgments. The Order states that COVID-19 "poses an imminent threat of substantial harm to the population of New Mexico." ECF No. 12-6 at 3. This threat is said to justify prohibiting "mass" gatherings—defined as "five (5) or more individuals in a single room or connected space, confined outdoor space, or an open outdoor space where individuals are within six (6) feet of each other, . . . ." *Id.* at 5. Nevertheless, the Order exempts no fewer than 23 categories of "essential businesses" from the mass-gathering ban. This is facially underinclusive.

The Secretary nevertheless claims those "essential businesses" are exempt because they provide "life-sustaining items like food and medication and . . . are

crucial to the infrastructure and economy of the state." ECF No. 12 at 6. It is precisely when the government takes sides over "competing images of 'the good life'" that it "is making an intrinsically contestable statement about the rightness or wrongness" of certain ideals. Laurence H. Tribe, *Disentangling Symmetries: Speech, Association, Parenthood*, 28 Pepp. L. Rev. 641, 651-53 (2001). Privileging certain economic actors over going to church is an "intrinsically contestable" conception of what makes life worth living. *Cf.* Luke 4:4 ("Man shall not live by bread alone."). And defining "life-sustaining" solely in materialist terms is, at a minimum, a value judgment. Thus, when government exempts "local breweries or distillers," ECF No. 12-6 at 5, "[r]eal estate services," *id.*, and "bike repair facilities," *id.* at 4, but not religious worship, the government's value choice is plain: certain secular activities are important to preserve; religious worship is less favored.

General applicability guards precisely against this privileging of "secular . . . motivations" over "religious motivations." *Fraternal Order of Police*, 170 F.3d at 366. This is for good reason. As Justices Alito and Kagan put it, "the autonomy of religious groups, both here in the United States and abroad, has often served as a shield against oppressive civil laws." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 199 (2012) (Alito, J., concurring). If that crucial social function can be erased with the stroke of a governor's pen while other secular functions are favored, that choice—at a minimum—demands strict scrutiny. *See Axson-Flynn*, 356 F.3d at 1301 ("if a defendant has in place a system of individualized exemptions, it must extend that system to religious exemptions or face strict scrutiny review").

9

***Strict scrutiny.*** Finding that New Mexico's April 11 Order lacks general applicability does not necessarily mean that Legacy will prevail. *See Central Rabbinical Cong.*, 763 F.3d at 198 ("strict scrutiny is not invariably fatal in the context of free exercise claims"). But the Order "must undergo the most rigorous of scrutiny." *Lukumi*, 508 U.S. at 546. "To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance 'interests of the highest order' and must be narrowly tailored in pursuit of those interests." *Id.* (quoting, *inter alia*, *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)).

Here, no one disputes that New Mexico possesses a compelling government interest in protecting public health. The Supreme Court confirmed long ago that "[t]he right to practice religion freely does not include the liberty to expose the community . . . to communicable disease." *Prince*, 321 U.S. at 166-67. But even in *Prince*, strict scrutiny applied, *id.* at 165-67, rather than the rational basis standard New Mexico seeks here. This is for good reason. "[I]ndividual rights secured by the Constitution do not disappear during a public health crisis." *In re Abbott*, No. 20-50264, 2020 WL 1685929, at *6 (5th Cir. Apr. 7, 2020). Indeed, "the animating ideal of the constitutional provision is to protect the 'free exercise of religion' from unwarranted governmental inhibition whatever its source." *Shrum*, 449 F.3d at 1144.

Even with New Mexico's compelling interest in preventing pandemic, the state has an uphill climb. It must prove why restricting religious worship services is "actually necessary to the solution" of ending the pandemic when it previously exempted religious worship services from the mass-gathering ban. *Brown v. Entm't*

10

*Merchs. Ass'n*, 564 U.S. 786, 799 (2011); *see also McCullen v. Coakley*, 573 U.S. 464, 482 (2014) ("When selecting among various options for combating a particular problem, legislatures should be encouraged to choose the one that restricts less speech, not more."). New Mexico has yet to identify the facts that supported the withdrawal of the pre-existing exemption for religious worship, which was in place as recently as Saturday evening. *Compare* ECF No. 12-5 at 5 (exemption for places of worship) *with* ECF No. 12-6 at 5 (exemption gone). Strict scrutiny demands an explanation.

Further, New Mexico must explain why none of the 23 categories of "essential businesses" exempt from the mass-gathering ban "leave[] appreciable damage to" the "vital interest" of preventing pandemic while religious worship services must, nevertheless, be subject to the ban. *Lukumi*, 508 U.S. at 547 (citation omitted). When New Mexico's latest Order still treats breweries, distilleries, real estate services and bike repairs as too-important-to-close, the exclusion of religion with proper social distancing seems hard to fathom. Indeed, excluding 23 categories of "essential" businesses (some of which are vaguely defined) is difficult to square with the Secretary's assertion that "*every* foray by a person into a public space with other people carries some risk of infection of the individual and that individual's community members." ECF No. 12 at 4 (emphasis added).

Moreover, the Secretary must move past "broadly formulated" arguments and instead meet its burden to prove the "asserted harm of granting specific exemptions to particular religious claimants." *Gonzales v. O Centro Benificente Uniao do Vegetal*,

11

546 U.S. 418, 431 (2006). Here, Legacy has repeatedly re-affirmed its commitment to abide by the same safety standards that New Mexico requires of other public assemblies. *Supra* p. 2. The government has not shown that accommodating Legacy specifically will harm the state's reasonable interests in public health.

Finally, it is no answer—as New Mexico suggests (*e.g.*, ECF No. 12 at 2)—to claim that restricting religious worship to four or fewer people is a narrowly tailored solution. Concluding otherwise not only raises the constitutionally fraught question of "dissecting" what is "necessary" in a worship service. It also defies the Supreme Court's direction that a burden on religious exercise is no less a burden because the government can identify "other forms of religious exercise" that are, for the moment, still acceptable. *Holt v. Hobbs*, 574 U.S. 352, 362 (2015).

## CONCLUSION

For the foregoing reasons, *amicus* respectfully requests the Court grant Legacy a TRO to carry out its livestream worship services, and subject the Order to strict scrutiny when evaluating the remaining claims at the preliminary injunction stage.

Respectfully submitted,

WESTERN AGRICULTURE, RESOURCE AND BUSINESS ADVOCATES, LLP

/s/ *A. Blair Dunn*
A. Blair Dunn, Esq.
400 Gold Ave. SW, Suite 1000
Albuquerque, NM 87102
(505) 750-3060
abdunn@ablairdunn-esq.com

*Local Counsel*


/s/ *Mark L. Rienzi*
Mark L. Rienzi*
William J. Haun*
Peter M. Torstensen, Jr.*
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW
Suite 700
Washington, DC 20036
mrienzi@becketlaw.org
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

*Counsel for Amicus Curiae*

**\*****Pro hac vice motions forthcoming*

13

**CERTIFICATE OF SERVICE**

I hereby certify that on April 17, 2020, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which sends an electronic notification to all counsel who have entered an appearance on the Docket.

/s/ *A. Blair Dunn*
A. Blair Dunn, Esq.
Western Agricultural Resource and Business Advocates, LLP
400 Gold Ave. SW, Suite 1000
Albuquerque, NM 87102
(505) 750-3060
abdunn@ablairdunn-esq.com