**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

LEGACY CHURCH, INC.,

        Plaintiff,

vs.                                    No. CIV 20-0327 JB\SCY

KATHYLEEN M. KUNKEL and the
STATE OF NEW MEXICO,

        Defendants.

## MEMORANDUM ORDER AND OPINION

**THIS MATTER** comes before the Court on the Motion for Temporary Restraining Order, filed April 14, 2020 (Doc. 8)("Motion"). The Court held hearings on April 13 and 16, 2020. The primary issues are: (i) whether Plaintiff Legacy Church, Inc. ("Legacy Church") is likely to succeed on the merits in demonstrating that Defendant Kathyleen M. Kunkel's Public Health Emergency Order (4-11-20-PHO)("Order"), which restricts places of worship from gathering more than five people within a single room or connected space, violates Plaintiff Legacy Church's rights under the Free Exercise Clause of the First Amendment to the Constitution of the United States of America; and (ii) whether Legacy Church is slikely to succeed on the merits in demonstrating that the Order violates Legacy Church's rights to peaceably assemble under the First Amendment. The Court concludes that: (i) the Order does not violate Legacy Church's First Amendment religious freedom rights, because the Order is neutral and generally applicable; and (ii) the Order is a reasonable time, place, and manner restriction, and so does not violate Legacy Church's First Amendment rights to assemble. Accordingly, the Court denies the Motion.

**FINDINGS OF FACT**

"A temporary restraining order requires the Court to make predictions about the plaintiff's likelihood of success." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1179 (D.N.M. 2011)(Browning, J.). Rule 52 of the Federal Rules of Civil Procedure states: "In granting or refusing an interlocutory injunction, the court must [] state the findings and conclusions that support its action." Fed. R. Civ. P. 52(a)(2). "'[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'" Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1179 (quoting Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009))(alteration in Herrera v. Santa Fe Public Schools only). See Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); Firebird Structures, LCC v. United Bhd. of Carpenters and Joiners of Am., Local Union No. 1505, 252 F. Supp. 3d 1132, 1140 (D.N.M. 2017)(Browning, J.). The United States Court of Appeals for the Tenth Circuit notes "that when a district court holds a hearing on a motion for preliminary injunction it is not conducting a trial on the merits." Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003). Moreover, "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings." Heideman v. S. Salt Lake City, 348 F.3d at 1188. Accordingly, the Court finds as follows:

1.      Legacy Church is a Christian church that provides church services at three locations in Bernalillo County and at one location in Santa Fe County. See Plaintiff's Original Complaint, Request for Temporary Restraining Order, and Permanent Injunction ¶ 1, at 1, filed April 11, 2020 (Doc. 1)("Complaint"); Locations/Times, Legacy Church, https://www.legacychurchnm.com/locations/times (last visited April 15, 2020).

2.      Legacy Church is a "mega church" with nearly 20,000 church members.  Legacy Church Profile, USA Churches, http://www.usachurches.org/church/legacy-church.htm (last visited April 14, 2020).  See Coronavirus updates, April 14, Albuquerque J., https://www. abqjournal.com/1443415/coronavirus-updates-april-14.html (last visited April 14, 2020).

3.      Legacy Church offers one to three church services each Sunday at its two locations in Albuquerque, New Mexico; at its one location in Rio Rancho, New Mexico; and at its one location in Edgewood, New Mexico.  See Locations/Times, Legacy Church, https://www. legacychurchnm.com/locations/times (last visited April 15, 2020).

4.      Legacy Church's location at 7201 Central Ave. NW, Albuquerque, New Mexico 87121 ("Central Campus") has an auditorium that is 31,000 square feet and that holds over 2,500 people.    Declaration of  Steve  Smothermon  ¶¶  5,  7,  at  1,  filed  April  14,  2020 (Doc. 15)("Smothermon Decl.").[1]

5.      Legacy Church's three Sunday services at the Central Campus are aired on broadcast television and live-streamed on Legacy Church's website.  See Smothermon Decl. ¶ 7, at 1; T.V. Broadcast, Legacy Church, https://www.legacychurchnm.com/tvbroadcast (last visited April 14, 2020); Live Stream, Legacy Church, https://www.legacychurchnm.com/livestream (last visited April 15, 2020).

6.      Legacy Church's location at 4701 Wyoming Blvd., Albuquerque, New Mexico 87109 ("East Campus") has an auditorium that is approximately 21,000 square feet.  Smothermon Decl. ¶ 11, at 2.

---

[1]The Motion's pages 14 and 15 contain the Smothermon Decl.

- 3 -

7.      Legacy Church's Central Campus also holds a church service on Wednesday nights, and the East Campus holds church services on Tuesday and Saturday nights.  <u>See</u> Smothermon Decl. ¶¶ 5-6, at 1.

8.      In 2006, Legacy Church established the Legacy Academy, which is a school serving preschool through high school students.  <u>See</u> Our Story, Legacy Church, https://www.legacychurchnm.com/our-story (last visited April 15, 2020).

9.      Kathyleen M. Kunkel is the Secretary for the New Mexico Department of Health ("Secretary Kunkel").  Complaint ¶ 2, at 1.  <u>See</u> Office of the Secretary, New Mexico Department of Health, https://nmhealth.org/about/asd/ots/ (last visited April 14, 2020).

10.     Michelle Lujan Grisham is the Governor of the State of New Mexico.  <u>See</u> About the Governor, Office of the Governor, https://www.governor.state.nm.us/ (last visited April 15, 2020).

11.     In early January, 2020, Wuhan, China experienced an outbreak of the coronavirus disease 2019, also known as COVID-19, which is caused by the severe acute respiratory syndrome coronavirus 2, also known as SARS-CoV-2.  <u>See</u> Coronavirus disease 2019 (COVID-19), Mayo Clinic,       https://www.mayoclinic.org/diseases-conditions/coronavirus/symptoms-causes/syc-20479963 (last visited April 15, 2020)("Mayo Clinic").

12.     The coronavirus is a contagious disease that is spread through respiratory droplets that are released when infected individuals cough, sneeze, or talk.  <u>See</u> Mayo Clinic.

13.     Symptoms of the coronavirus include fever, coughing, and shortness of breath.  <u>See</u> Symptoms   of   Coronavirus,   Centers   for   Disease   Control   and   Prevention, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html   (last   visited April 15, 2020).

- 4 -

14.     Approximately eighty percent of people who are infected with the coronavirus experience mild symptoms, but about twenty percent of people suffer more severe symptoms.  See Answers To Your Coronavirus Questions at 40, The New York Times, https://static01.nyt.com/files/2020/ebooks/corona-virus-questions/nyt-coronavirus-answers.pdf (last visited April 15, 2020)("NYT Answers").

15.     On January 11, 2020, China reported its first death caused by the coronavirus.  See NYT Answers at 6-7.

16.     In Wuhan, China, of the people who have been infected with coronavirus, the death rate is about two percent.  See NYT Answers at 32.

17.     On January 20, 2020, the United States Centers for Disease Control and Prevention ("CDC") reported the United States' first case of coronavirus in the State of Washington.  First Case of 2019 Novel Coronavirus in the United States, The New England Journal of Medicine (January 31, 2020), https://www.nejm.org/doi/full/10.1056/NEJMoa2001191 (last visited April 15, 2020).

18.     Throughout late January, 2020, and February, 2020, the coronavirus spread to countries throughout Asia, Europe, Africa, and Latin America.

19.     On February 29, 2020, the United States reported its first death caused by the coronavirus near Seattle, Washington.  See Derrick Bryson Taylor, A Timeline of the Coronavirus Pandemic, The New York Times (April 14, 2020), https://www.nytimes.com/article/coronavirus-timeline.html (last visited April 15, 2020)("NYT Timeline").

20.     On March 11, 2020, the New Mexico Department of Health reported the first case in which a New Mexico resident tested positive for the coronavirus.  See New Mexico Announces First Presumptive Positive COVID-19 Cases, New Mexico Department of Health (March 11,

2020), https://cv.nmhealth.org/2020/03/11/new-mexico-announces-first-presumptive-positive-covid-19-cases/ (last visited April 15, 2020).

21.   On March 11, 2020, Governor Lujan Grisham and the New Mexico Department of Health declared a state of emergency "to maximize the resources available to the state in order to fight the potential spread of the virus and minimize public health risks for New Mexicans." Updated: Governor, Department of Health announce first positive COVID-19 cases in New Mexico, Press Releases, Office of the Governor (March 11, 2020), https://www. governor.state.nm.us/2020/03/11/updated-governor-department-of-health-announce-first-positive-covid-19-cases-in-new-mexico/ (last visited April 15, 2020)("Emergency Declaration").

22.   Throughout March, 2020, Governor Lujan Grisham urged New Mexico residents to avoid public gatherings, avoid non-essential travel, and engage in social distancing.  See Emergency Declaration; Marjorie Childress, Celia Raney, and Trip Jennings, Officials predict dire consequences if state doesn't practice social distancing, New Mexico In Depth (March 31, 2020), http://nmindepth.com/2020/03/31/officials-predict-dire-consequences-if-state-doesnt-practice-social-distancing/ (last visited April 15, 2020).

23.   Social distancing "refers to measures that are taken to increase the physical space between people to slow the spread of the virus."  NYT Answers at 18.

24.   On March 11, 2020, "the World Health Organization declared the coronavirus outbreak a pandemic after it spread across six continents and more than 100 countries."  NYT Answers at 15.

25.   On March 13, 2020, President Donald J. Trump declared that the coronavirus outbreak in the United States constitutes a national emergency.  See Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (March

13, 2020), White House, https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last visited April 15, 2020).

26.     As of March 13, 2020, 1,896 people in the United States had been infected with the coronavirus.   <u>See</u> Cases in U.S., Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited April 17, 2020)("U.S. Statistics").

27.     In the United States, of the people who are infected with coronavirus, the death rate is about 4.1 percent.  <u>See</u> Aylin Woodward and Shayanne Gal, The US is the hardest-hit country in the coronavirus pandemic -- but its 4% death rate is far lower than that of many other countries, Business Insider (April 14, 2020), https://www.businessinsider.com/coronavirus-death-rate-in-us-uk-italy-china-compared-2020-4 (last visited April 15, 2020).

28.     On March 18, 2020, Legacy Church posted a message on its website telling its members "that the church was making its services available online, encouraging those who were traveling, not feeling well, or felt more comfortable at home, to continue worshipping online." Smothermon Decl. ¶ 14, at 2.  <u>See</u> Coronavirus (COVID-19) Updates, Legacy Church (March 18, 2020), https://www.legacychurchnm.com/coronavirus (last visited April 15, 2020).

29.     The Muslim holiday Lailat Al Miraj occurred on March 22, 2020. <u>See</u> Faith Communities of Victoria, http://www.faithvictoria.org.au/component/rseventspro/event/1430-lailat-al-miraj-islam (last visited April 17, 2020).

30.     On March 24, 2020, Secretary Kunkel issued the Public Health Order, New Mexico Department of Health (March 23, 2020), https://www.governor.state.nm.us/wp-content/ uploads/ 2020/03/COVID-19-DOH-Order-fv.pdf (last visited April 15, 2020)("March 24 Order"), which

- 7 -

ordered all non-essential businesses to close, ordered all of the state's non-essential workforce to work from home, and ordered New Mexico citizens to "stay at home and undertake only those outings absolutely necessary for their health, safety, or welfare."  March 24 Order at 5.

    31.    The March 24 Order prohibits all "mass gatherings," which it defines as

> any public or private gathering that brings together five (5) or more individuals in a single room or connected space, confined outdoor space or an open outdoor space where individuals are within six (6) feet of each other, but does not include the presence of five (5) or more individuals where those individuals regularly reside.

March 24 Order ¶ 6, at 4.  See March 24 Order ¶ 1, at 4.

    32.    The March 24 Order's prohibition of mass gatherings does not apply to "'individuals' congregated in a church, synagogue, mosque, or other place of worship." March 24 Order ¶ 6, at 4.

    33.    The March 24 Order allows essential businesses to remain open.  See March 24 Order ¶ 2, at 4.

    34.    The March 24 Order provides twenty-two categories of essential businesses, which are businesses that provide goods and services "related to health, safety and well-being, such as medical facilities, child care centers and any business that assists in the production, distribution or sale of food and medical products."  Tony Raap, Bike shops riding out virus storm, Santa Fe New Mexican (April 5, 2020), https://www. santafenewmexican.com/news/adventure/bike-shops-riding-out-virus-storm/article_f5c5b7b8-75d1-11ea-9fba-87f099306b93.html (last visited April 15, 2020)("Bike Article"); March 24 Order at 2-4.

    35.    The March 24 Order initially required bike repair shops to close, but after conversations with bike repair shop owners and Allen Webber, the Mayor of Santa Fe, Governor Lujan Grisham decided to allow bike repair shops to remain open for business.  See Bike Article.

36.     On March 25, 2020, the New Mexico Department of Health announced New Mexico's first death that coronavirus caused.  <u>See</u> New Mexico COVID-19 update: One death, New Mexico Department of Health (March 25, 2020), https://cv.nmhealth.org/2020/03/25/new-mexico-covid-19-update-one-death/ (last visited April 15, 2020).

37.     On March 27, 2020, Governor Lujan Grisham ordered individuals traveling to New Mexico through an airport to self-quarantine for a period of at least fourteen days.  <u>See</u> Executive Order 2020-013, Executive Orders, Office of the Governor (March 27, 2020), https://www. governor.state.nm.us/wp-content/uploads/2020/03/MLG_EO_2020_013.pdf (last visited April 15, 2020).

38.     Self-quarantine "refers to the separation and restriction of movement of people who were exposed to the virus to see if they become sick."  NYT Answers at 18.

39.     On Palm Sunday, April 5, 2020, over 13,000 people viewed Legacy Church's live-streaming of its church services.  <u>See</u> Complaint ¶ 19, at 3.

40.     On April 6, 2020, Secretary Kunkel issued the Public Health Order, New Mexico Department of Health (April 6, 2020), https://cv.nmhealth.org/wp-content/uploads/ 2020/04/PHO-4-6-2020.pdf (last visited April 14, 2020)("April 6 Order").[2]  <u>See</u> Complaint ¶ 6, at 2.

41.     The April 6 Order states: "All Mass Gatherings are hereby prohibited under the powers and authority set forth in the New Mexico Public Health Act, [N.M. Stat. Ann. §§ 24-1-1 to -40] and all regulations promulgated pursuant thereto."  April 6 Order ¶ 1, at 5.

42.     The April 6 Order defines mass gatherings as

any public or private gathering that brings together five (5) or more individuals in a single room or connected space, confined outdoor space or an open outdoor space

---

[2]The Complaint's Exhibit A is a copy of the April 6 Order.  <u>See</u> Complaint at 7-14.

>       where individuals are within six (6) feet of each other, but does not include the
>       presence of five (5) or more individuals where those individuals regularly reside.

April 6 Order ¶ 6, at 5.

43.     The April 6 Order's prohibition of mass gatherings does not apply to "individuals

congregated in a church, synagogue, mosque, or other place of worship."  April 6 Order ¶ 6, at 5.

See Complaint ¶ 6, at 2.

44.     As of April 6, 2020, 686 New Mexico residents had tested positive for COVID-19,

and twelve New Mexico resident had died from COVID-19.  See Coronavirus updates, April 6,

Albuquerque   J.,   https://www.abqjournal.com/1440588/coronavirus-updates-april-6.html   (last

visited April 15, 2020).

45.     On April 7, 2020, Governor Lujan Grisham and the New Mexico Department of

Health noted that Passover, Holy Week, and Ramadan were quickly approaching, and offered the

following guidance for faith-based communities:

>       Livestream your service and make sure members understand they should
> not attend in person.  Viewers can send a comment via the online/livestream
> platform or an email or text to let you know they were watching.  This also may
> involve permission or guidance about the use of electronic devices at times when
> that practice is usually not permitted, such as Jewish Sabbath.
>
>       Consider a "drive-in" service so people can participate separately, yet
> together.  Attendees can drive up in their cars, park and watch the video service on
> their cellphones or on a giant screen while listening via a radio station.

Governor, Department of Health answer questions from faith-based communities, New Mexico

Department of Health (April 7, 2020), https://cv.nmhealth.org/2020/04/07/governor-department-

of-health-answer-questions-from-faith-based-communities/ (last visited April 15, 2020).

46.     The New Mexico Department of Health reports the total number of coronavirus

cases and coronavirus-caused deaths in New Mexico over time:

- 10 -



Source: NM DOH, Chart by: Robert Browman, ABQJournal

Total reported COVID-19 cases in NM over time, Albuquerque J., https://www.abqjournal.com/coronavirus (last visited April 15, 2020)("N.M. Daily Totals Chart").

47.    The New Mexico Department of Health reports the number of New Mexico residents who test positive for coronavirus and who die from coronavirus each day:



Source: NM DOH, Chart by: Robert Browman, ABQJournal

New recorded COVID-19 cases in NM by day, Albuquerque J., Albuquerque J., https://www.abqjournal.com/coronavirus (last visited April 17, 2020)("N.M. Daily Increase Chart").

48.    On April 7, 2020, the New Mexico Department of Health reported that 108 New Mexico residents had tested positive for coronavirus, which was New Mexico's largest daily increase in coronavirus cases at that time.  See N.M. Daily Increase Chart.

49.    Passover, one of the most important festivals in Judaism, began the evening of Wednesday, April 8, 2020, and ended the evening of Thursday, April 16, 2020.  See What is Passover (Pesach)?, Chabad, https://www.chabad.org/holidays/passover/pesach_cdo/aid/871715/jewish/What-Is-Passover-Pesach.htm (last visited April 15, 2020).

- 12 -

50.     On April 9, 2020, the New Mexico Department of Health reported that 121 New Mexico residents had tested positive for coronavirus, which was New Mexico's largest daily increase in coronavirus cases at that time.  See N.M. Daily Increase Chart.

51.     On Holy Saturday, April 11, 2020, at around 5:00 p.m. Mountain Standard Time, Secretary Kunkel issued the Public Health Order, New Mexico Department of Health (April 11, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/04/04_11_20_PHO_Amended.pdf (last visited April 14, 2020)("April 11 Order").[3]  See Complaint ¶ 7, at 2.

52.     On April 11, 2020, at 5:15 p.m. Mountain Standard Time, Governor Lujan Grisham announced on her Twitter page that, pursuant to the April 11 Order, houses of worship would no longer be exempt from New Mexico's prohibition of mass gatherings.  See Michelle Lujan Grisham (@GovMLG), Twitter (April 11, 2020, 5:15 PM), https://twitter.com/GovMLG/status/1249113771076767744.

53.     As of April 11, 2020, 1,174 New Mexico residents had tested positive for COVID-19, and twenty New Mexico residents had died from COVID-19.  See Coronavirus updates, April 11, Albuquerque J., https://www.abqjournal.com/1442624/coronavirus-updates-april-11.html (last visited April 15, 2020).

54.     The April 11 Order prohibits mass gatherings of five or more individuals, but it does not include an exception for individuals gathering at houses of worship.  See April 11 Order ¶ 6, at 5; Complaint ¶ 8, at 2.

55.     The April 11 Order defines mass gatherings as

any public or private gathering that brings together five (5) or more individuals in a single room or connected space, confined outdoor space or an open outdoor space

------

[3]The Complaint's Exhibit B is a copy of the April 11 Order.  See Complaint at 15-22.

where individuals are within six (6) feet of each other, but does not include the
presence of five (5) or more individuals where those individuals regularly reside.

April 11 Order ¶ 6, at 5.

56.     The April 11 Order states: "Churches, synagogues, mosques, and all other houses
of worship shall adhere to this restriction, but nothing in this order is intended to preclude these
faith-based institutions from holding services through audiovisual means."  April 11 Order ¶ 1,
at 5.

57.     The April 11 Order states: "The maximum number of customers allowed in a retail
space at any given time shall be equal to 20% of the maximum occupancy of the retail space, as
determined by the relevant fire marshal or fire department."  April 11 Order ¶ 4, at 6.  See
Complaint ¶ 16, at 3 (internal quotation marks omitted).

58.     The April 11 Order defines "retail space" as an "essential business that sells goods
and services directly to consumers or end-users inside its place of business, such as a grocery store
or a hardware store[]."  April 11 Order ¶ 1, at 3 (internal quotation marks omitted).

59.     The New Mexico Department of Health's public health orders have never classified
houses of worship as essential businesses, because they do not sell goods or services.  See April 16
Tr. at 25:13-17 (Garcia).

60.     Until the April 11 Order, every public health order by the New Mexico Department
of Health exempted houses of worship from the mass gathering restrictions that previous public
health orders imposed on non-essential businesses.  See April 16 Tr. at 25:10-26:10 (Court,
Garcia).

- 14 -

61.     The April 11 Order does not exempt or permit gatherings at large venues that are similar in size to many houses of worship, such as theaters, concert halls, and stadiums.  See Kunkel Response at 16; April 11 Order ¶ 6, at 5.

62.     Around April 11, 2020, Governor Lujan Grisham told reporters that "many houses of worship already took action on their own" by cancelling in-person services, but "there have been a few outliers, putting New Mexicans at risk.  We were hearing additional ones planning on holding services (Sunday) . . . and we wanted to be crystal clear."  Coronavirus updates, April 11 (ellipsis in original).

63.     Approximately seventy-five percent of New Mexico residents identify as Christian of any denomination, approximately one percent of New Mexico residents identify as Buddhist, less than one percent of New Mexico residents identify as Jewish, less than one percent of New Mexico residents identify as Muslim, less than one percent of New Mexico residents identify as Hindu, and approximately twenty-one percent of New Mexico residents identify as religiously unaffiliated.  See Adults in New Mexico, Pew Research Center, https://www.pewforum.org/ religious-landscape-study/state/new-mexico/ (last visited April 15, 2020)("Pew Survey").

64.     Approximately thirty-six percent of New Mexico residents attend religious services at least once a week, thirty-one percent of New Mexico residents attend religious services once or twice a month or a few times a year, and thirty-three percent of New Mexico residents seldom or never attend religious services.  See Pew Survey.

- 15 -

65.     On April 12, 2020, Legacy Church live-streamed three Easter services online, but it did not prohibit parishioners from attending services in person.  See Complaint ¶¶ 9-11, at 2; Draft Transcript of Proceedings at 6:18-22, taken April 13, 2020 (Stern)("April 13 Tr.").[4]

66.     In addition to Legacy Church's staff members, fewer than forty parishioners attended the first Easter service, approximately ten parishioners attended the second Easter service, and approximately seven parishioners attended the third Easter service.  See Smothermon Decl. ¶ 15, at 2; April 13 Tr. at 7:13-18 (Stern).

67.     Legacy Church plans to continue live-streaming church services online.  See Complaint ¶ 12, at 2.

68.     Legacy Church plans to hold church services consisting of approximately thirty staff members.  See Complaint ¶¶ 12-14, 17, at 2-3; April 13 Tr. at 8:20-9:5 (Stern); Smothermon Decl. ¶ 10, at 2.

69.     The worship team members, band members, the pastor, and an assistant total about twelve to fourteen people, and the technical staff members total about sixteen people.  See Complaint ¶¶ 12, 14, at 2-3.

70.     Legacy Church's Tuesday night services at require about thirty staff members to conduct.  See Smothermon Decl. ¶ 10, at 2.

71.     Legacy Church "has a sincerely held religious belief that the service team used four [its] services is central to how [it and its members] worship God and how [they] connect [their] members to [their] religious belief."  Smothermon Decl. ¶ 12, at 2.

---

[4]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

- 16 -

72.     Legacy Church is willing to prohibit parishioners from attending church services in person.  See April 13 Tr. at 8:15-18 (Stern).

73.     Legacy Church is also capable of "abiding by the same guidelines for essential businesses" that Secretary Kunkel announced in the April 11 Order. Smothermon Decl. ¶ 16, at 2.

74.     Legacy Church plans to perform and record its church services in an auditorium that is approximately 31,000 square feet and that can accommodate 2,500 to 3,000 people.  See Complaint ¶ 16, at 3; April 13 Tr. at 7:18-21 (Stern).

75.     On April 15, 2020, the Catholic Bishop of Las Cruces, New Mexico, lifted a diocesan ban on Catholic Mass celebrations, and he issued guidelines to priests to limit the number of congregants in church buildings to five people and to ensure that congregants engage in social distancing in compliance with the April 11 Order. See Ed Condon, Las Cruces bishop first in US to resume public Masses amid pandemic, Angelus (April 15, 2020), https://angelusnews.com/ news/nation/las-cruces-resumes-public-masses-amid-pandemic/ (last visited April 17, 2020)("Las Cruces Resumes Public Masses Article"); Daniel Burke, A Catholic diocese is reopening for Mass despite a statewide stay-at-home order, CNN (April 16, 2020), https://www.cnn.com/ 2020/04/16/us/las-cruces-diocese-mass-open/index.html (last visited April 17, 2020).

76.     On April 16, 2020, eight New Mexicans died from the coronavirus, which was the highest daily increase in number of deaths as of that time. See N.M. Daily Increase Chart.

77.     As of April 16, 2020, about 632,548 people in the United States and 1,597 New Mexican residents had been infected with coronavirus, and about 31,071 Americans and forty-four New Mexican residents had died from coronavirus.  See U.S. Statistics; N.M. Daily Totals Chart.

Ramadan, one of the most important months of the Islamic calendar, will begin the evening of April 23, 2020, and will end the evening of May 23, 2020.   See Ramadan 2020, https://www.calendardate.com/ramadan_2020.htm (last visited April 15, 2020).

## PROCEDURAL BACKGROUND

1.   On Saturday, April 11, 2020, at 11:16 p.m. Mountain Standard Time, Legacy Church filed the Complaint. See Complaint at 1. In the Complaint, Legacy Church alleges claims for: (i) violation of the Free Exercise Clause of the First Amendment to the Constitution of the United States of America; and (ii) violation of the Freedom of Assembly Clause of the First Amendment. See Complaint ¶¶ 21-36, at 3-6. Legacy Church requests that the Court temporarily and permanently enjoin Kunkel and New Mexico from prohibiting Legacy Church "from physically gathering in its house of worship." Complaint ¶ c., at 6.

### 1.   **The Monday, April 13, 2020, Conference.**

2.   The Court held a scheduling conference on Monday, April 13, 2020. See April 13 Tr. at 1. The Court began by noting that Legacy Church is seeking to broadcast and live-stream its church services without opening its church services to the public. See April 13 Tr. at 3:1-3 (Court). The Court acknowledged that Legacy Church's church services would require "more than [] five" people, "but [] not two or three thousand" people to gather in one location. April 13 Tr. at 3:4-5 (Court). The Court suggested that the parties could "sit down and see if they could reach some accommodation and if that would resolve things." April 13 Tr. at 3:16-17 (Court). Legacy Church said that "there is a potential for compromise," and it told the Court that it would like a ruling on its request for a temporary restraining order by 3:00 p.m. on Friday, April 17, 2020. April 13 Tr. at 5:18-19 (Stern). See id. at 5:21-22 (Stern); id. at 6:1-2 (Stern).

3.   Legacy Church contended that "the essential facts that will dictate the legal decision

are really not in dispute." April 13 Tr. at 6:25-7:1 (Stern). Legacy Church said that their "request is to have the sufficient team available at the church" to organize church services. April 13 Tr. at 6:14-15 (Stern). Legacy Church argued that it takes more than five people to organize a church service in person, which the April 11 Order prohibits. See April 13 Tr. at 7:2-4 (Stern). Legacy Church also said that it allowed parishioners to attend its three Easter services. See April 13 Tr. at 7:6-8 (Stern). According to Legacy Church, about forty to one-hundred people attended the first Easter service, and about ten people attended the second service. See April 13 Tr. at 7:13-8:5 (Stern). Legacy Church was unsure how many people attended the third service and guessed that a "trickle" of people attended. April 13 Tr. at 8:9 (Stern). Legacy Church also noted that the building where church services would occur is 31,000 square feet and can hold between 2,500 and 3,000 people. See April 13 Tr. at 7:18-21 (Stern). Legacy Church added that it is willing "to turn parishioners away" and direct them to view church services online. April 13 Tr. at 8:17-18 (Stern). Legacy Church said that about thirty people -- including technical staff and the worship music team -- are necessary for producing a church service and live-streaming it online. See April 13 Tr. at 8:20-9:5 (Stern).

4.     Secretary Kunkel said that the Department of Health is "agreeable" to allowing Legacy Church to have more than five people in the building where its church services occur. April 13 Tr. at 13:14 (Garcia). Secretary Kunkel noted that the April 11 Order "says something to the effect of nothing in this restriction is intended to preclude religious institutions from putting on services through audio or audio visual means." April 13 Tr. at 13:10-13 (Garcia). The Court asked Secretary Kunkel if she could "live with a hard cap" of "no more than 30 in [the church] building to put on their production." April 13 Tr. at 13:25-14:2 (Court). Secretary Kunkel responded that the Department of Health likely could live with the hard cap as long "that number

- 19 -

were limited to folks who were actually putting on the service." April 13 Tr. at 14:12-13 (Garcia). Secretary Kunkel argued that the "only concern" is with "people coming in from different parts of the city or even the state to attend services." April 13 Tr. at 14:9-12 (Garcia). New Mexico then argued that its "position really is limited to the fact that we believe that the secretary's authority to issue public health orders like the one here is within her constitutional powers and her powers under state law." April 13 Tr. at 15:22-25 (Sydow). New Mexico also asserted that it is not a proper defendant and that "there are some jurisdictional obstacles to the claims against the state." April 13 Tr. at 16:2-4 (Sydow). Last, the parties agreed to hold a hearing on Thursday, April 16, 2020, see April 13 Tr. at 17:7-9 (Court), and the Court set the end of the business day on Tuesday, April 14, 2020, as the deadline for Legacy Church to file a motion in support of its request for a temporary restraining order, see April 13 Tr. at 18:4-16 (Court, Stern, Sydow).

        2.      **The Motion.**

     5.      On April 14, 2020, Legacy Church filed the Motion, which requests that the Court grant a temporary restraining order so that Legacy Church "can freely exercise its religion, by conducting services in accordance with its sincerely held religious beliefs." Motion at 3. Legacy Church argues that it will suffer irreparable harm if the Court does not grant a temporary restraining order. See Motion at 4. Legacy Church asserts that it is substantially likely to succeed on the merits of its Free Exercise claim and Freedom of Assembly claim. See Motion at 5. With respect to its Free Exercise claim, Legacy Church argues that "'a law burdening religious practice [that] is not neutral or not of general application must undergo the most rigorous of scrutiny.'" Motion at 6 (quoting Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 546 (1993)("Lukumi")). According to Legacy Church, the April 11 Order "restricts houses of worship from a gathering of more than four people within a single room or connected space, regardless of

- 20 -

the size of that space or distancing taking place within the house of worship, significantly

burdening Legacy's exercise of religion." Motion at 6. Legacy Church argues that the April 11

Order "specifically targets houses of worship," because the April 11 Order does not prohibit groups

of five or more people from gathering at retail stores, funeral homes, media outlets, and other

essential businesses. Motion at 6. Legacy Church notes, for example, that the April 11 Order

allows retail stores to accommodate more than four shoppers "so long as they maintain a distance

of six feet from one another" while shopping. Motion at 6. Legacy Church asserts that the

distinction between how the April 11 Order treats gatherings at essential businesses and how it

treats gatherings at houses of worship shows that the New Mexico Department of Health and New

Mexico can further the state's public health interests through less restrictive means. See Motion

at 6.

6. Legacy Church argues that Secretary Kunkel's decision to prohibit religious

services on the evening before Easter is "facially discriminatory and not neutral." Motion at 7.

According to Legacy Church, government actions that "burden religious practice and are either

not neutral or not generally applicable must satisfy a compelling governmental interest and be

narrowly tailored to achieve that end." Motion at 7 (citing Lukumi, 508 U.S. at 546). Legacy

Church does not dispute that preventing the spread of coronavirus is a compelling governmental

interest. See Motion at 7. Legacy Church asserts, however, that the state "undermines its interest

and exceeds its constitutionally permissible powers when the state withholds allowances to a

religious group following its belief, while bestowing those allowances to others, but there is no

pandemic exception to fundamental liberties of the Constitution." Motion at 7 (citing Little Sisters

of the Poor Home for the Aged, Denver, Colo. v. Burwell, 794 F.3d 1151 (10th Cir. 2015)).

7. Legacy Church argues that the April 11 Order's prohibition of mass gatherings is

not narrowly tailored, because "it fails to afford the same narrowly tailored restrictions to Legacy as it does essential businesses, both retail and non-retail." Motion at 8. Legacy Church contends that the state can achieve its public health interests by less restrictive means, because Legacy Church's thirty-member staff can perform and live-stream church services while "comply[ing] with social distancing guidelines promulgated for essential businesses" Motion at 8. Legacy Church also notes that it can "comply with the distancing measures to accommodate those few Legacy members who may show up to be physically present at the service." Motion at 8. Legacy Church asserts that the April 11 Order prohibits mass gatherings for some organizations while "exempting a litany of others," and, therefore, the April 11 Order is not generally applicable or narrowly tailored to achieve the state's public health interests. Motion at 8.

8.     Legacy Church also argues that the April 11 Order burdens its freedom of assembly. See Motion at 8. Legacy Church asserts that freedom of assembly is a "'fundamental right[].'" Motion at 9 (quoting Whitney v. California, 274 U.S. 357, 373 (1927)(Brandeis, J., concurring)). According to Legacy Church, "[w]hen a government practice restricts fundamental rights, it is subject to strict scrutiny and can be justified only if it furthers a compelling government purpose and, even then, only if no less restrictive alternative is available." Motion at 9 (citing San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 16-17 (1973); Dunn v. Blumstein, 405 U.S. 330 (1972)). Legacy Church reiterates that the April 11 Order is not narrowly tailored to achieve the state's compelling interests, and thus the April 11 Order violates its freedom of assembly. See Motion at 9.

9.     Legacy Church next argues that it will suffer irreparable harm if the Court denies injunctive relief. See Motion at 9. According to Legacy Church, "'[t]he loss of First Amendment freedoms, *for even minimal periods of time*, unquestionably constitutes irreparable injury.'"

- 22 -

Motion at 9 (quoting <u>Heideman v. S. Salt Lake City</u>, 348 F.3d at 1188 (quoting <u>Elrod v. Burns</u>, 427 U.S. 347, 376 (1976)), and citing <u>Utah Licensed Beverage Ass'n v. Leavitt</u>, 256 F.3d 1061, 1076 (10th Cir. 2001); <u>Homans v. City of Albuquerque</u>, 264 F.3d 1240, 1243 & n.2 (10th Cir. 2001); <u>Am. Civil Liberties Union v. Johnson</u>, 194 F.3d 1149, 1163 (10th Cir. 1999); <u>Cmty. Commc'ns Co. v. City of Boulder</u>, 660 F.2d 1370, 1380 (10th Cir. 1080))(emphasis in Motion but not in <u>Heideman v. S. Salt Lake City</u>).   Legacy Church contends that the April 11 Order's burdening and chilling of its First Amendment rights establishes that "irreparable injury has occurred and will continue to occur until an injunction issues."   Motion at 9-10 (citing <u>Utah Licensed Beverage Ass'n v. Leavitt</u>, 256 F.3d at 1076; <u>Kikumura v. Hurley</u>, 242 F.3d 950, 963 (10th Cir. 2001)).   Legacy Church argues that, if the Court does not issue a temporary restraining order, then it will continue to suffer irreparable harm, because the April 11 Order "prohibit[s] Legacy from carrying out its religious mission in accordance with the manner dictated by their strictly held religious belief."   Motion at 10.

10.   Legacy Church asserts that the "balance of harms tips" in its favor.   Motion at 10. According to Legacy Church, "'the [government's] potential harm must be weighed against [plaintiffs'] actual First Amendment injury.'"   Motion at 10 (quoting <u>Summum v. Pleasant Grove City</u>, 483 F.3d 1044, 1056 (10th Cir. 2007), <u>rev'd on other grounds</u>, 555 U.S. 460 (2009))(alterations in Motion only).   Legacy Church contends that, because the state's "perception of harm is speculative" and the state allows such speculative harm to occur "in other places," the harm to the government cannot outweigh Legacy Church's First Amendment injuries.   Motion at 10.   Legacy Church says that "there is no pandemic exception to the fundamental liberties of the Constitution."   Motion at 10.   Legacy Church argues that, while the state will not suffer more than "speculative harm" if the Court grants a temporary restraining order, Legacy Church "will suffer

certain harm." Motion at 11. Legacy Church further contends that "the Court should presume that the balance of harms tips in their favor," because Legacy Church alleges violations of its First Amendment rights. Motion at 11. Last, Legacy Church argues that granting a temporary restraining order is in the public's interest, because "'[v]indicating First Amendment freedoms is clearly in the public interest.'" Motion at 11 (quoting Pac. Frontier v. Pleasant Grove City, 414 F.3d 1221, 1237 (10th Cir. 2005), and citing Utah Licensed Beverage Ass'n v. Leavitt, 256 F.3d at 1076; Elam Constr., Inc. v. Reg'l Transp. Dist., 129 F.3d 1343, 1347 (10th Cir. 1997))(alteration in Motion only).

11.     Legacy Church requests a temporary restraining order with the following characteristics:

> Legacy requests the Court grant a Temporary Restraining Order that prohibits the Secretary from now enforcing mass gathering restrictions on places of worship, including Legacy's four New Mexico campuses. The least restrictive means available to further the state's public health interest are those social distancing guidelines applicable to non-retail space essential businesses identified in the definitions section of the [April 11 Order]. While Legacy continues to encourage its members to worship with them through their online services, the Secretary cannot require them to lock out parishioners if Legacy can provide the same socially distant measures used by essential businesses. In the alternative, Legacy requests that restrictions on gathering be no-less than those imposed on retail spaces in the state. Further in the alternative, Legacy requests the Court enjoin the Secretary and the State from enforcing the [April 11 Order's] mass gathering restriction of five people or more in a connected space, as it specifically targets people freely exercising their religious beliefs.

Motion at 11-12.

**3.     The NM Response.**

12.     New Mexico responded to the Motion on Wednesday, April 15, 2020. See State of New Mexico's Response to Plaintiff's Motion for Temporary Restraining Order, filed April 15, 2020 (Doc. 11)("NM Response"). New Mexico argues that the April 11 Order is a constitutional

- 24 -

exercise of New Mexico's police power, and that the April 11 Order does not single out or disfavor religion.  See NM Response at 1.  New Mexico contends that Legacy Church has not "shown that it cannot accommodate the production and broadcast of its religious services to comply with the Secretary's restrictions."  NM Response at 1.  New Mexico also asserts that it has sovereign immunity under 42 U.S.C. § 1983, because it "is not a 'person' subject to suit under Section 1983 nor has the State as an entity taken an action that may be enjoined by this Court."  NM Response at 2 (quoting 42 U.S.C. § 1983).

13.     New Mexico argues that public health orders like the April 11 Order "are at the heart of the powers reserved to New Mexico in the Constitution's federalist structure so that the State can keep New Mexicans safe and alive."  NM Response at 3.  New Mexico notes that New Mexico law authorizes Secretary Kunkel to issue public health orders to protect New Mexicans' health and lives.  See NM Response at 3 (citing N.M. Stat. Ann. §§ 9-7-6(B)(5), 24-1-3(E)).  New Mexico further contends that the Tenth Amendment to the Constitution of the United States "reserves to the States all powers 'not delegated to the United States by the Constitution, nor prohibited by it.'"  NM Response at 3 (quoting U.S. Const. amend. X).  New Mexico also argues that courts have upheld quarantine laws and other laws that protect the public from infectious diseases.  See NM Response at 3-4 (citing Jacobson v. Massachusetts, 197 U.S. 11, 25 (1905); Compagnie Francaise de Navigation a Vapeur v. State Bd. of Health, La., 186 U.S. 380, 387 (1902); Hickox v. Christie, 205 F. Supp. 3d 579 (D.N.J. 2016)(McNulty, J.); United States ex rel. Siegel v. Shinnick, 219 F. Supp. 789 (E.D.N.Y. 1963)(Dooling, J.)).

14.     New Mexico asserts that the April 10 Order is a neutral law of general applicability and, thus, is subject to rational basis review, not strict scrutiny.  See NM Response at 4 (citing Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC, 565 U.S. 171, 190 (2012); Taylor

- 25 -

v. Roswell Indep. Sch. Dist., 713 F.3d 25, 52 (10th Cir. 2013)).  According to New Mexico, a "'law is neutral so long as its object is something other than the infringement or restriction of religious practices.'"  NM Response at 5 (quoting Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 649-50 (10th Cir. 2006)).  New Mexico notes that the April 11 Order provides houses of worship a limited exemption to "'hold[] services through audiovisual means.'"  NM Response at 5 (quoting April 11 Order ¶ 1, at 5)(alteration in NM Response only).  New Mexico argues that Legacy Church's assertion that this exemption is not broad enough "does not establish that the law specifically targets religious practices, which . . . are subject to the generally-applicable restriction on mass gathering."  NM Response at 5-6.  New Mexico next argues that Legacy Church has not shown that it will suffer irreparable harm if the Court does not grant a temporary restraining order, because Legacy Church "does not explain how the public health order's restrictions prevent its members' religious practice" and "provides no explanation of why it cannot adapt its services."  NM Response at 6.

15.    Last, New Mexico argues that it has sovereign immunity under § 1983.  See NM Response at 6.  New Mexico notes that the Eleventh Amendment to the Constitution of the United States recognizes each state's sovereign immunity.  See NM Response at 6-7 (citing U.S. Const. amend. XI; Alden v. Maine, 527 U.S. 706, 713 (1999); Peterson v. Martinez, 707 F.3d 1197, 1205 (10th Cir. 2013)).  New Mexico contends that the limited exception to sovereign immunity that the Supreme Court recognized in Ex Parte Young, 209 U.S. 113 (1905), does not apply to Legacy Church's claims, because: (i) "the State is not an individual officer subject to suit for prospective injunctive relief"; (ii) Legacy Church's § 1983 claim "cannot be brought against a State"; (iii) "the Declaratory Judgment Act[, 28 U.S.C. §§ 2201-02] alone cannot provide jurisdiction over a claim against the State where none otherwise exists."  Motion at 7-8 (citing Arizonans for Official

- 26 -

English v. Arizona, 520 U.S. 43, 69 (1997); Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989); Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984); Hill v. Kemp, 478 F.3d 1236, 1257 (10th Cir. 2007); Prier v. Steed, 456 F.3d 1209, 1212 (10th Cir. 2006)).

      **4.**    **The Kunkel Response.**

     16.    Secretary Kunkel responded to the Motion on Wednesday, April 15, 2020.  See Response to Verified Emergency Motion for a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunctive Relief, filed April 15, 2020 (Doc. 12)("Kunkel Response"). Secretary Kunkel argues that the exercise of fundamental constitutional rights does not "justify significantly jeopardizing statewide public health."  Kunkel Response at 1 (citing Kennedy v. Mendoza-Martinez, 372 U.S. 144, 160 (1963); Prince v. Massachusetts, 321 U.S. 158, 166-67 (1944)).  Secretary Kunkel says that "the exemption that has been granted to all houses of worship has been specifically tailored to allow them to provide services to their congregants via remote electronic means or through drive-in services without the significant risk of exposing those congregants to an infectious disease through person-to-person contact."  Kunkel Response at 2. Secretary Kunkel argues that Legacy Church has not demonstrated that allowing houses of worship to provide religious services through audiovisual means while prohibiting in-person attendance at religious service infringes upon Legacy Church's rights under the Free Exercise and Freedom of Assembly clauses.  See Kunkel Response at 2.

     17.    Secretary Kunkel says that coronavirus is a contagious disease that is spread through person-to-person contact.  See Kunkel Response at 2.  She notes that the number of individuals in the United States who have tested positive for coronavirus has grown rapidly in the past two months: from twelve confirmed cases on February 11, 2020, to 1,215 confirmed cases on March 11, 2020, to 525,704 confirmed cases on April 11, 2020.  See Kunkel Response at 2-3.

According to Secretary Kunkel, the "ease and rapidity with which COVID-19 spreads and its severe and sometimes fatal symptoms in a certain percentage of the population create a real potential for mass deaths and a severely overloaded health care system."  Kunkel Response at 3. Secretary Kunkel argues that the only effective way to limit coronavirus' spread is "to limit person-to-person contact and to close down public spaces and gatherings to the greatest extent possible." Kunkel Response at 3.   Secretary Kunkel maintains that the purpose of the New Mexico Department of Health's recent public health orders is "to encourage New Mexicans to stay in their homes to the greatest extent possible and to practice all possible precautions when they are required to enter public spaces."  Kunkel Response at 3-4.

18.      Secretary Kunkel says that the April 11 Order's primary message is that "'all New Mexican should be staying in their homes for all but the most essential activities and services.'" Kunkel Response at 5 (quoting April 11 Order at 1)(emphasis omitted).  Secretary Kunkel notes that "the term 'essential business' is not meant as a value judgment that some businesses are more important than others; it is intended to identify categories of businesses and services that are life-sustaining and may be required on an immediate in-person basis."   Kunkel Response at 5. Secretary further notes that, before the April 11 Order, the New Mexico Department of Health's public health orders exempted houses of worship from restrictions on mass gatherings and non-essential businesses.  See Kunkel Response at 6 (citing April 6 Order at 5).  Secretary Kunkel said that the public health orders placed restrictions on other large venues -- such as movie theaters, concert venues, and casinos -- before the April 11 Order extended the restrictions to houses of worship.  See Kunkel Response at 6.  Secretary Kunkel argues that the April 11 Order "narrowed the special exemption provided to houses of worship by requiring them to adhere to generally applicable restrictions on private and public 'mass gatherings,' but stating that nothing in the order

was intended to preclude them from operating to the extent necessary to hold services through audiovisual means." Kunkel Response at 6 (quoting April 11 Order at 5). Secretary Kunkel clarifies that "houses of worship are still exempt from the 'mass gatherings' restriction to the extent necessary to provide remote services to their congregants, but they are no longer exempt with respect to in-person services. Kunkel Response at 7 (quoting April 11 Order at 5).

19.     Secretary Kunkel notes that Legacy Church argues that its temporary inability to allow people to attend its church services in person violates Legacy Church's First Amendment rights, even though Legacy Church: (i) is capable of live-streaming its church services online; (ii) has live-streamed its services to over 10,000 online viewers; and (iii) has asked its members to stay home during church services. See Kunkel Response at 7. Secretary Kunkel says that, after Legacy Church filed its Complaint, her counsel told Legacy Counsel that the April 11 Order allows them "to have the minimum number of people physically present to celebrate their service and to broadcast it online and encouraged Legacy to consider whether a full live band was necessary." Kunkel Response at 8. According to Secretary Kunkel, Legacy Church rejected this suggestion and "now seeks a ruling that would allow an unnamed number of congregants to be physically present, so long as they followed social distancing protocols." Kunkel Response at 8.

20.     Secretary Kunkel disagrees with Legacy Church's characterization of the April 11 Order as "one that 'specifically targets houses of worship.'" Kunkel Response at 9 (quoting Motion at 6). Secretary Kunkel avers that the April 11 Order applies to all public and private gatherings -- including houses of worship -- of five or more people, it also "provide[s] provide religious institutions with leeway to allow for persons necessary to conduct services through audiovisual means." Kunkel Response at 9. Secretary Kunkel argues that the April 11 Order's "even-handed restrictions" do not target or single out religious institutions, and thus "the concerns

- 29 -

attendant to governmental infringement on the free exercise of religion are not implicated." Kunkel Response at 9 (citing Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 649). Secretary Kunkel says that she need only show that the restrictions placed on houses of worship are "rationally related to a legitimate state interest even if, arguendo, those restrictions burden Plaintiff's ability to conduct religious services." Kunkel Response at 9 (citing Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 649; Swanson v. Guthrie Indep. Sch. Dist. No. I-L, 135 F.3d 694, 697-98 (10th Cir. 1998)).

        21.     Secretary Kunkel asserts that the Free Exercise Clause does not require her to carve out special exemptions for religious institutions from a generally applicable restriction on gatherings. See Kunkel Response at 10 (citing Swanson v. Guthrie Indep. Sch. Dist. No. I-L, 135 F.3d at 702; Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet, 512 U.S. 687, 696 (1994); Comm. for Pub. Educ. & Religious Liberty v. Nyquist, 413 U.S. 756, 792-93 (1973)). She notes that New Mexico and the Department of Health have a compelling interest in ensuring the public's health. See Kunkel Response at 11. According to Secretary Kunkel, "'[t]he right to practice religion freely does not include liberty to expose the community . . . to communicable disease or the latter to ill health or death.'" Kunkel Response at 11 (quoting Prince v. Massachusetts, 321 U.S. at 167)(alteration added)(ellipsis in Kunkel Response only). In response to Legacy Church's argument that April 11 Order does not use the least restrictive means available, Secretary Kunkel asserts that the Free Exercise Clause is not designed "'to allow an individual to exact special treatment from the government.'" Kunkel Response at 12 (quoting Swanson v. Guthrie Indep. Sch. Dist. No. I-L, 135 F.3d at 702).

        22.     Secretary Kunkel next argues that the First Amendment does not guarantee a "categorical right" for people to gather in person at a particular location. Kunkel Response at 13

- 30 -

(citing <u>San Jose Christian Coll. v. City of Morgan Hill</u>, 360 F.3d 1024, 1033 (9th Cir. 2004)). Secretary Kunkel avers that Legacy Church has not shown how disallowing physical gatherings while allowing houses of worship to provide religious services through audiovisual means infringes Legacy Church's First Amendment rights. <u>See</u> Kunkel Response at 13. Secretary Kunkel further argues that the April 11 Order also survives strict scrutiny, because New Mexico and the New Mexico Department of Health have a compelling interest in mitigating coronavirus' spread. <u>See</u> Kunkel Response at 14. Secretary Kunkel also asserts that the April 11 Order's restriction on gatherings is narrowly tailored, because it allows houses of worship to perform and live-stream religious services online. <u>See</u> Kunkel Response at 14. Secretary Kunkel warns that Legacy Church's "proposed least restrictive means" would "very likely spread the virus to Plaintiff's congregants and in their local communities." Kunkel Response at 15.

23.       Secretary Kunkel asserts that the balance of harms does not favor Legacy Church. <u>See</u> Kunkel Response at 15. Secretary Kunkel emphasizes that there is "nothing speculative" about coronavirus' harms or about "the possibility of substantially increasing the number of infections through public gatherings simultaneously bringing together hundreds of people in a public space." Kunkel Response at 15-16. Secretary Kunkel argues that Legacy Church's alleged harms are speculative, because Legacy Church "has never received a citation under a public health order" and is "already conducting its services in a manner that is very close to complying with the Order and could easily be adjusted to do so." Kunkel Response at 16. Secretary Kunkel avers that the April 11 Order does not permit gatherings similar to those that Legacy Church seeks to have in similar places, such as theaters, concert halls, and stadiums. <u>See</u> Kunkel Response at 16. Last, Secretary Kunkel argues that the public interest favors denying Legacy Church's request for injunctive relief. <u>See</u> Kunkel Response at 16. Secretary Kunkel notes that state and local

governments throughout New Mexico and the United States "have adopted temporary rules that encourage or require people to stay in their homes and avoid physical proximity to others to the greatest extent possible." Kunkel Response at 16. She argues that allowing public gatherings at Legacy Church could lead to a coronavirus outbreak that would further exacerbate the public health problems that New Mexico is currently facing. See Kunkel Response at 16-17.

### 5.     The Thursday, April 16, 2020, Hearing.

24.     The Court held a hearing on Thursday, April 16, 2020. See Draft Transcript of Hearing at 1 (held April 16, 2020)("April 16 Tr.").[5] Legacy Church conceded "without question" that New Mexico's interest in protecting public health is a compelling interest. April 16 Tr. at 6:5-6 (Hunter). Legacy Church argued that it has met the four factors for granting a temporary restraining order: (i) likelihood of success on the merits; (ii) irreparable harm; (iii) balancing of harms to Legacy against harms to the state; and (iv) the public interest. See April 16 Tr. at 6:14-16 (Hunter). Legacy Church said that "there is no pandemic exception the fundamental liberties that the constitution safeguards." April 16 Tr. at 6:23-25 (Hunter).

25.     The Court said that, on page seven of the Kunkel Response, Secretary Kunkel says that houses or worship are still exempt from restrictions on gatherings to the extent necessary to provide and live-stream church services, but congregants are not longer exempt and cannot appear in person. See April 16 Tr. at 7:18-22 (Court). The Court asked Legacy Church what its concern is if the April 11 Order does restrict Legacy Church's ability to provide and live-stream its church services online. See April 16 Tr. at 7:22-8:4 (Court). Legacy Church responded that it does not interpret the April 11 Order as providing "sufficient protection" to conduct audiovisual services in

---

[5]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

the manner that it seeks.  See April 16 Tr. at 8:14-19 (Hunter).  Legacy Church confirmed that it

is not asking parishioners to attend church services in person like it did on Easter.  See April 16

Tr. at 10:4-9 (Court, Hunter).  Legacy said, however, that there "would be certain circumstances

where it's possible that parishioners can't stream or don't have access" to internet, and Legacy

Church would like to allow such individuals to attend church services in person.  April 16 Tr.

at 10:13-15 (Hunter).  Legacy Church said that it would comply with the CDC's guidelines and

ensure that parishioners who attend church services engage in social distancing.  See April 16 Tr.

at 11:1-3 (Hunter).  The Court asked whether Legacy Church's church services also air on

broadcast television, and Legacy Church answered affirmatively.  See April 16 Tr. at 11:4-7

(Court, Hunter).  The Court expressed that it is difficult to imagine that congregants cannot view

church services online or on television.  See April 16 Tr. at 11:14-18 (Court).  Legacy Church

asked if the Court would allow its pastor, Steve Smotherman, to speak about the "real life

situations" that Legacy Church faces, but Secretary Kunkel objected and argued that the parties

had agreed that they would argue only their briefs at the hearing.  11:19-12:9 (Hunter, Court,

Garcia).

        26.     Legacy Church argued that it is in the best position to determine how to conduct its

church services in a manner consistent with the CDC's guidelines.  See April 16 Tr. at 12:17-20

(Hunter).  Legacy Church asserted that Constitution does not allow New Mexico and the New

Mexico Department of Health to limit houses of worships to the extent that the April 11 Order

restricts religious gatherings.  See April 16 Tr. at 12:21-13:4 (Hunter).  Legacy Church said that it

"a determination by this Court that the April 11 order is unenforceable with respect to Legacy

Church."   April 16 Tr. at 13:7-8 (Hunter).  Legacy Church argued that, "under a heightened

scrutiny standard or a strict [scrutiny] standard," the April 11 Order "is not the least restrictive

- 33 -

means available to protect the compelling Government interest at stake." April 16 Tr. at 13:13-17 (Hunter). Legacy Church contended that "there is no fundamental difference between what Legacy Church intends to do and what the state in this case is allowing" stores such as Wal-Mart, Home Depot, and liquor stores to do. April 16 Tr. at 13:22-24 (Hunter). Legacy Church argued that the April 11 Order is not "applied equally across the board." April 16 Tr. at 14:6-7 (Hunter). Legacy Church asserted that the Court should apply strict scrutiny review, but if said that under either strict scrutiny or a "heightened scrutiny standard," the Court should enjoin New Mexico and the New Mexico Department of Health from enforcing the April 11 Order against it. April 16 Tr. at 14:14 (Hunter).

27.     The Court asked Legacy Church why it should apply strict scrutiny review based on the opinion in <u>Employment Division, Department of Human Resources of Oregon v. Smith</u>, 494 U.S. 872 (1990), by the Honorable Antonin Scalia, then-Associate Justice for the Supreme Court of the United States. <u>See</u> April 16 Tr. at 14:20-24 (Court). Legacy Church responded that the April 11 Order is not neutral or generally applicable. <u>See</u> April 16 Tr. at 14:1-15:3 (Hunter). Legacy Church conceded, however, that the April 11 Order does not discriminate between religions or elevate one religion over another religion. <u>See</u> April 16 Tr. at 15:4:-20 (Court, Hunter). Legacy Church reiterated that the April 11 Order deems some businesses as essential and other businesses non-essential, but there is "no rational difference between the conduct going on" at essential businesses and the conduct at Legacy Church's church services. April 16 Tr. at 16:1-2 (Hunter). The Court stated that, if Legacy Church argues that there is must be a rational basis for the April 11 Order's restrictions, then the government "probably can come up with a rational reason." April 16 Tr. at 16:14 (Court).

28.     Legacy Church noted that the right of free exercise is enshrined in the First

Amendment and is "why thousands and hundreds of thousands of people have come to this country since its founding." April 16 Tr. at 17:2-4 (Hunter). Legacy Church then argued that, "by not declaring religious [] services as essential, that in itself was treating them unequal." April 16 Tr. at 17:4-6 (Hunter). Legacy Church also noted that the April 6 Order's restriction on mass gatherings exempted houses of worship, and then, at 5:00 p.m. on the day before Easter, the New Mexico Department of Health issued the April 11 Order, which does not exempt houses of worship. See April 16 Tr. at 18:4-7 (Hunter). According to Legacy Church, "that by itself . . . is unequal treatment." April 16 Tr. at 18:7-8 (Hunter). Legacy Church reiterated that "the treatment of Legacy should be no different than the treatment of Wal-Mart or Home Depot or any other entity [on] the long list of essential services." April 16 Tr. at 19:22-25 (Hunter).

29.     Legacy Church declined to make oral arguments on its freedom of assembly claim. See April 16 Tr. at 20:1-6 (Court, Hunter). Legacy Church again conceded that the government has articulated a compelling state interest and that it is arguing that the April 11 Order is not narrowly tailored to promote that compelling state interest. See April 16 Tr. at 20:20-21:2 (Court, Hunter). The Court asked whether strict scrutiny still applies. See April 16 Tr. at 21:3-4 (Court). Legacy Church responded that, even if the Court applied heightened scrutiny, it would be entitled to a temporary restraining order under Lukumi. See April 16 Tr. at 21:5-16 (Hunter).

30.     Secretary Kunkel began by providing background about the coronavirus pandemic. See April 16 Tr. at 21:25-22:2 (Garcia). Secretary Kunkel explained that New Mexico experience its first three confirmed cases of coronavirus about one month ago and, as of April 15, 2020, New Mexico had reported about 1,500 confirmed cases, thirty-six deaths caused by coronavirus, and that ninety people are currently seeking treatment in New Mexico hospitals. See April 16 Tr. at 22:2-8 (Garcia). Secretary Kunkel stressed that the coronavirus' infection rate is increasing and

- 35 -

that "the only means [for] stemming the spread of the virus is through social distancing."  April 16
Tr. at 22:18-20 (Garcia).  Secretary Kunkel argued that "there is no safe space" for gatherings,
because "[a]ny time people are together in a group there is a heightened risk of transmission."
April 16 Tr. at 22:22-24 (Garcia).  Secretary Kunkel noted that the New Mexico Department of
Health has issued multiple public health orders and that, until the April 11 Order, houses of worship
"received a favorable position with respect to other" entities, because previous public health orders
exempted houses of worship from complying with restrictions.  April 16 Tr. at 23:11-12 (Garcia).
See April 16 Tr. at 23:20-25 (Court, Garcia).  Secretary Kunkel explained that previous public
health orders exempted houses of worship because of the important function that religion plays in
New Mexico communities and because houses of worship provide comfort during difficult times.
See April 16 Tr. at 24:4-9 (Garcia).  Secretary Kunkel said that religious institutions have been
voluntarily complying with directives to limit activities outside the home, and as the coronavirus
has progressed, the New Mexico Department of Health has imposed additional restrictions.  See
April 16 Tr. at 24:9-21 (Garcia).  Secretary Kunkel argued that the new restrictions placed on
houses of worship are more favorable than the restrictions placed on other entities that often
organize mass gatherings, such as sports teams.  See April 16 Tr. at 24:12-17 (Garcia).

     31.     The Court asked whether the New Mexico Department of Health classified houses
of worship as essential businesses and then re-classified them as non-essential businesses and
whether such governmental discretion move houses of worship "back and forth" is permissible
under the First Amendment.  April 16 Tr. at 25:8 (Court).  Secretary Kunkel clarified that the New
Mexico Department of Health's public health orders have never classified houses of worship as
essential businesses, because they do not sell goods or services.  See April 16 Tr. at 25:13-17
(Garcia).  Secretary Kunkel explained that, until the April 11 Order, houses of worship always had

- 36 -

been exempted from the mass gathering restrictions that previous public health orders imposed on

non-essential businesses.  See April 16 Tr. at 25:10-26:10 (Court, Garcia).  The Court stated:

> But I guess my question still stands.  If the state has almost unlimited
> discretion to determine who gets the exemption and who doesn't get the exemption
> I guess that gives me some pause under the First Amendment of saying that it's
> neutral and there is some limitation on the Government's ability to move people
> from list to list.

April 16 Tr. at 26:11-17 (Court).  Secretary Kunkel responded that the New Mexico Department

of Health is not moving people from list to list, because houses of worship are not businesses, so

they never qualified as essential businesses.  See April 16 Tr. at 26:18-24 (Garcia).  Secretary

Kunkel reiterated that the public health order's mass gathering restriction has remained "largely

unchanged" and that houses of worship have been "given [a] favorable position throughout the

pendency of this health emergency."  April 16 Tr. at 26:25-27:2 (Garcia).

32.     The Court asked Secretary Kunkel why she waited until 5:00 p.m. on the day before

Easter to impose new mass gathering restrictions on houses of worship.  See April 16 Tr. at 27:3-

4 (Court).  Secretary Kunkel responded that it was also Passover the same weekend as Easter, and

she noted that the police did not show up at Legacy Church or enforce the April 11 Order against

it.  See April 16 Tr. at 27:5-8 (Garcia).  The Court said that the fact that the police did not show

up at Legacy Church "goes perhaps to some equities here," and it asked Secretary Kunkel whether

she believes that Legacy Church violated the April 11 Order.  See April 16 Tr. at 27:12-13 (Court).

Secretary Kunkel argued that Legacy Church violated the April 11 Order on Easter, because it

believes that more than five people gathered in the church.  See April 16 Tr. at 27:16-20 (Garcia,

Court).

33.     The Court asked whether Legacy Church violated the April 11 Order by having

fourteen people -- the music worship team, the pastor, and the assistant -- present in the church.

- 37 -

<u>See</u> April 16 Tr. at 27:21-24 (Court).  Secretary Kunkel's counsel said that he drafted the public health orders, and that this is "a gray area" that he did not contemplate when he drafted the order. April 16 Tr. at 28:11 (Garcia).  The Court told Secretary Kunkel to take a position on whether Legacy Church violates the April 11 Order by having fourteen staff members present at the same time.  <u>See</u> April 16 Tr. at 28:22-24 (Court).  Secretary Kunkel said that having fourteen people would not be necessary, and the Court expressed concern that the government is determining who is essential and who is not essential to produce a church service.  <u>See</u> April 16 Tr. at 29:3-30:3 (Garcia, Court).  Secretary Kunkel responded that the government is not deciding what aspects of worship are essential and argued that, if music, for example, is a core part of the worship service, then the music worship team or band could perform in a different building and record the performance separately.  <u>See</u> April 16 Tr. at 30:4-13 (Garcia).  Secretary Kunkel added, however, that the New Mexico Department of Health is willing to accommodate Legacy Church's need for its worship team to perform in the space where the rest of the church service occurs.  <u>See</u> April 16 Tr. at 30:24-31:2 (Garcia).  The Court recapitulated Secretary Kunkel's position: "So your position is that the band did not comply with the order, but you would have been willing to overlook that and allow them to go ahead and have the 14 people there to conduct the worship."  April 16 Tr. at 31:3-7 (Court).  Secretary Kunkel confirmed that the Court's summary is correct.  <u>See</u> April 16 Tr. at 31:8 (Garcia).  Secretary Kunkel also confirmed that Legacy Church can have sixteen technical staff members present for church services as well.  <u>See</u> April 16 Tr. at 31:9-22 (Court, Garcia).

34.     The Court again asked Secretary Kunkel why the New Mexico Department of Health waited until 5:00 p.m. on the day before Easter to issue the April 11 Order.  <u>See</u> April 16 Tr. at 33:13-16 (Court).  Secretary Kunkel's counsel said that he was busy in the morning and that

- 38 -

the timing of the April 11 Order "was not intended to preclude religious services," which is "why you didn't see State Police or any law enforcement agency out at any church in the state regulating the conduct of Easter services."  April 16 Tr. at 33:19-23 (Garcia).  The Court asked if something occurred the day before Easter that triggered the April 11 Order.  See April 16 Tr. at 33:24-34:4 (Court).  Secretary Kunkel responded:

> Your Honor some of it again was just part of my schedule.  Some of it was that the governor had asked me to do it.  Some of it was you know just a function of the way the disease has progressed.  But again I point to you no enforcement action was taken on Easter.  And so to try and say that we did this in order to stop Easter services there is nothing to support that.  If we had really wanted to stop Easter services we would have issued the directive and then sent State Police out to enforce it.  That didn't happen.

April 16 Tr. at 34:5-15 (Garcia).

35.     Secretary Kunkel next argued that the mass gathering restriction is a "rule of general applicability," so the Court should apply rational basis review under Lukumi.  April 16 Tr. at 34:20-21 (Garcia).  The Court pressed Secretary Kunkel to explain what the rational basis was for distinguishing between scattered parishioners in a massive church and shoppers at a large hardware store "who may be there to buy flowers."  April 16 Tr. at 35:15-16 (Court).  Secretary Kunkel responded that the relationship between the customer and a business is largely transactional, and customers do not come in to sit, congregate, and stay for an extended period of time.  See April 16 Tr. 35:20-36:9 (Garcia).  She added that "thousands of businesses are closed" and -- unlike churches -- not allowed to operate in any manner.  April 16 Tr. at 36:9-15 (Garcia).  She concluded on this point that, while the Court should apply rational basis, the state has surpassed a heightened standard of review, because the interest is compelling and allowing churches to stream or broadcast services is the least restrictive means.  See April 16 Tr. at 36:20-37:6 (Garcia).

- 39 -

36.     Secretary Kunkel then discussed the other elements in the preliminary injunction analysis.  <u>See</u> April 16 Tr. at 37:21-22 (Garcia).  She argued that Legacy Church would not suffer irreparable harm, because it is still conducting services and is carrying its message to its constituents.  <u>See</u> April 16 Tr. at 38:6-16 (Garcia).  She stated that the balance of equities and the public interest factors also weigh against Legacy Church, because "ensur[ing] the strictest of social distancing measures during the next several weeks" is the only way to slow COVID-19's spread. April 16 Tr. at 38:22-24 (Garcia).

37.     New Mexico then presented its argument.  <u>See</u> April 16 Tr. at 40:1-10 (Court, Sydow).  It argued first that, under <u>Employment Division v. Smith</u>, the April 11, 2020, Public Health Order is a rule of general applicability and thus is constitutional.  <u>See</u> April 16 Tr. at 41:22-5 (Sydow).  The Court noted its hesitancy to call a rule with so many exemptions "generally applicable," April 16 Tr. at 42:10-11 (Court), and New Mexico directed the Court to <u>Axson-Flynn v. Johnson</u>, 356 F.3d 1277, 1298 (10th Cir. 2004), and <u>Swanson by & Through Swanson v. Guthrie Indep. Sch. Dist. No. I-L</u>, 135 F.3d 694 (10th Cir. 1998), which it said held that laws with categorical exemptions were still generally applicable so long as they did not require case-by-case determinations.  <u>See</u> April 16 Tr. at 42:22-44:9 (Sydow).

38.     The Court then asked New Mexico whether it was bothered that "we're setting up a situation where churches are either bargaining with the state or the state's order is so fuzzy that [] churches can't figure out what they can do and can't do."  April 16 Tr. at 45:4-8 (Court).  New Mexico responded that incomplete enforcement is inevitable, <u>see</u> April 16 Tr. at 45:9-14 (Court), and the Court pressed again whether this suggested that perhaps the Order was not narrowly tailored, <u>see</u> April 16 Tr. at 45:15-20 (Court).  New Mexico stated that, assuming strict scrutiny applies, it was trying to accommodate free exercise of religion and left to churches and other places

- 40 -

of worship the determination of what is necessary for their religious services.  See April 16 Tr. at 45:21-46:5 (Sydow).  It agreed with the Court's characterization of its argument that it should not be penalized because it si "bending over backwards" to accommodate religion.  See Tr. at 46:6-10 (Court, Sydow).

39.      New Mexico then argued that Legacy Church has not shown it satisfied the other requirements for a preliminary injunction.  See April 16 Tr. at 46:12 (Sydow).  It stated that Legacy Church has not articulated "how essential parts of their religious practice are hamstrung by the public health order, and how they cannot accommodate that religious practice."  April 16 Tr. at 46:17-21 (Sydow).  It added that, even at the oral argument, Legacy Church had not shown how the Order had prevented parishioners from attending services.  See April 16 Tr. at 47:8-11 (Sydow).

40.      Next, New Mexico argued that it was not a proper defendant in the case.  See April 16 Tr. at 47:12-15 (Sydow).  It stated that Ex Parte Young did not provide a waiver of sovereign immunity for a situation such as this, and that it did not fall into the definition of a "person" capable of suit under 42 U.S.C. § 1983.  See April 16 Tr. at 47:20-48:4 (Sydow).  The Court asked whether Legacy Church could still win an injunction against the state, see April 16 Tr. at 48:5-12 (Court), and New Mexico clarified that, while "it may be a matter of semantics," Legacy Church could get injunctive relief against individual state actors but not the state itself.  April 16 Tr. at 48:16-17 (Sydow).

41.      Legacy Church then made rebuttal arguments.  See April 16 Tr. at 49:9 (Hunter).  It stated that language from Prince v. Massachusetts is not a vaccination case but instead concerned child welfare and child labor laws.  See April 16 Tr. at 49:12-20 (Hunter).  It argued that the line "[t]he right to practice religion freely does not include liberty to expose the community . . . to

- 41 -

communicable disease," 321 U.S. at 160, was out of context, and the situation the Supreme Court was discussing "has no similarities to the factual circumstances that we have in the case before [the] Court." April 16 Tr. at 50:19-20 (Hunter). Next, Legacy Church agreed with the Court that its showing of irreparable harm depended on whether it could prove a likely success on the merits. See April 16 Tr. at 50:22-52:4 (Hunter). It stated that it met this showing, because the state was defining which businesses were essential and making discretionary calls about who its Order applies to. See April 16 Tr. at 52:4-10 (Hunter). It stated that, although general rules can have exceptions to them and still constitute rules of general applicability, Secretary Kunkel's Order fails, because of its "complete arbitrariness of what they determined to be essential and the fluidness of how that process has come about." April 16 Tr. at 53:5-7 (Hunter).

42. The Court then asked why the Order should be treated differently than a statute passed by the legislature "in the calm of the moment." April 16 Tr. at 53:8-9 (Court). The Court noted that legislatures do not have to explain their reasoning. See April 16 Tr. at 54:6-13 (Court). Legacy Church replied that the number of exemptions and their arbitrariness was troubling, and that if Secretary Kunkel has the power to deem arbitrarily deem hundreds of activities essential and hundreds of other non-essential, the Order was not generally applicable. See April 16 Tr. at 54:17-55:7 (Hunter). Legacy Church added that, contrary to the state's contention, it did not have the ability to broadcast live services. See April 16 Tr. at 55:22-56:3 (Hunter). Legacy Church then summed up its argument and stated that the New Mexico allows certain commercial activities to occur, but makes no distinction for religious services and, in fact, excludes them all together. See April 16 Tr. at 56:16-57:15 (Hunter). Legacy Church noted that instead of providing an exemption, New Mexico invites churches to negotiate with them "and then have the state dictate to them what is an essential part of the service and what is a nonessential part of the service." April

16 Tr. at 57:15-18 (Hunter).  It argued it is not the state's job to determine what is an essential part of a religious service, and this makes the Order not a rule of general applicability.  See April 16 Tr. at 57:18-58:2 (Hunter).  The parties then agreed that they were before the Court on a motion for a temporary restraining order, and they set a hearing on the preliminary injunction for April 30, 2020, at 8:30 a.m.  See April 16 Tr. at 58:5-59:23 (Court, Garcia, Hunter, Sydow).

## LAW REGARDING REQUESTS FOR A TEMPORARY RESTRAINING ORDER

The requirements for a TRO issuance are essentially the same as those for a preliminary injunction order.  See People's Trust Fed. Credit Union v. Nat'l Credit Union Admin. Bd., 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018)(Browning, J.); 13 Moore's Federal Practice ¶ 65.36(1), at 65-83 (3d ed. 2004).  The primary differences between a TRO and a preliminary injunction are that a TRO may issue without notice to the opposing party and that TROs are limited in duration to fourteen days.  See Fed. R. Civ. P. 65(b)(1)-(2).  In both cases, however, injunctive relief is an "extraordinary remedy," and the movant must demonstrate a "clear and unequivocal right" to have a request granted.  Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1256 (10th Cir. 2003)).  See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1181.  The Supreme Court of the United States and the United States Court of Appeals for the Tenth Circuit have explained that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981). See Keirnan v. Utah Transit Auth., 339 F.3d 1217, 1220 (10th Cir. 2003)("'In issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits.'")(quoting Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d 351, 355 (10th Cir. 1986)).

- 43 -

To establish its right to a temporary restraining order under rule 65(b), a moving party must demonstrate that "immediate and irreparable injury, loss, or damage will result" unless a court issues the order.  Fed. R. Civ. P. 65(b).  "[I]rreparable injury" is "harm that cannot be undone, such as by an award of compensatory damages or otherwise."  Salt Lake Tribune Pub. Co., LLC v. AT & T Corp., 320 F.3d 1081, 1105 (10th Cir. 2003)(citing Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d at 355).  A moving party must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)("Winter")(citing Munaf v. Geren, 553 U.S. 674, 689-90 (2008)); Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987); Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-12 (1982)).

The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis.  Nken v. Holder, 556 U.S. 418, 434 (2009).  It is insufficient, moreover, that a moving party demonstrate that there is only a "possibility" of either success on the merits or irreparable harm.   Diné Citizens Against Ruining Our Env't v. Jewell, 839 F.3d 1276 (10th Cir. 2016)("Diné").  In Diné, the Tenth Circuit held that a relaxed test for preliminary relief is "inconsistent with the Supreme Court's recent decision in *Winter v. Natural Resources Defense Council*," which "overruled the [United States Court of Appeals for the] Ninth Circuit's application of a modified preliminary injunction test under which plaintiffs . . . could receive a preliminary injunction based only on a possibility, rather than a likelihood, of irreparable harm."  Diné, 839 F.3d at 1282 (citing Winter, 555 U.S. at 22).  The Tenth Circuit concluded that, although the standard overruled in Winter v. Natural Resources Defense Council, Inc. dealt with the irreparable-harm factor, "*Winter's* rationale seems to apply with equal force" to the likelihood-of-

- 44 -

success factor.  Diné, 839 F.3d at 1282.  Accordingly, the Tenth Circuit held that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible."  Diné, 839 F.3d at 1282.

Under rule 65(c), the Court may issue a temporary restraining order "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The United States and its officers and agencies are exempt from this requirement.  See Fed. R. Civ. P. 65(c).  The Court must consider whether a bond is necessary.  See Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir. 1987)(concluding that, where a trial court does not "contemplate the imposition of the bond, its order granting a preliminary injunction is unsupportable.").  See also Flood v. ClearOne Comm'ns, 618 F.3 1100, 1126 n.4 (10th Cir. 2010).  Courts in the Tenth Circuit "have 'wide discretion under Rule 65(c) in determining whether to require security,'" and may, therefore, impose no bond requirement.  RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1215 (10th Cir. 2009)(quoting Winnebago Tribe of Nebraska v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)).

The Court has written several times on the topic of TROs and preliminary injunctions.  In O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d 1239 (D.N.M. 2017)("O Centro"), the Court issued a preliminary injunction requiring the United States Citizen and Immigration Services ("USCIS") to reconsider the I-129 nonimmigrant R-1 petition to a religious minister to the O Centro Espirita Beneficiente Uniao Do De Vegetal Christian spiritualist religious organization ("UDV").  See O Centro, 286 F. Supp. 3d at 1269.  The Court issued that relief, in part because it was substantially likely that the USCIS' first denial of the minister's R-1 petition violated the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1 ("RFRA").  See O

- 45 -

Centro, 286 F. Supp. 3d at 1263-64.  USCIS had denied the petition, because the minister made no money and because the minister was not part of an established missionary program.  See 286 F. Supp. 3d at 1264.  UDV theology precluded its ministers from making money, and an established missionary program requires that at least one religious worker, at some point, be compensated.  See 286 F. Supp. 3d at 1264.  The Court reasoned, accordingly, that DHS had substantially burdened the minister's right to exercise his religion, because, in effect, the R-1 petition review required the minister to make money to preach his liturgy in the United States, even though his religion forbade him from making money.  See 286 F. Supp. 3d at 1264.  The minister also met a preliminary injunction's other three prongs, so the Court granted the relief requested.  See 286 F. Supp. 3d at 1265-66.  The Court has also issued a TRO, prohibiting the Santa Fe Public Schools from suspicionless pat-down searches of its students before prom and graduation.  See Herrera v. Santa Fe Pub. Schs., 792 F. Supp. 2d at 1200.  It concluded that: (i) a violation of the Fourth Amendment of the Constitution of the United States "standing alone" constitutes irreparable injury; (ii) suspicionless pat-down searches involving "touching of students' bodies" including "cupping and shaking girls' breasts" were unreasonably and unconstitutionally intrusive, even if those type of searches were likely effective in apprehending students with drugs, weapons, alcohol, or "distracting contraband"; (iii) the threatened injury outweighed the damage of the TRO; and (iv) the TRO was not adverse to the public, because it would protect other students' constitutional rights who attended prom and graduation.  Herrera v. Santa Fe Pub. Schs., 792 F. Supp. 2d at 1194-98.  The Court denied a request for injunctive relief in Salazar v. San Juan County Detention Center, No. CIV 15-0417 JB/LF, 2016 WL 335447 (D.N.M. Jan. 15, 2016)(Browning, J.), after concluding that, although the defendants faced irreparable harm, the balance of equities favored them, and an injunction was not adverse to the

public interest, the plaintiffs were unlikely to succeed on the merits.  See Salazar v. San Juan Cty.

Detention Ctr., 2016 WL 335447, at *43-52.

## RELEVANT LAW REGARDING THE FREE EXERCISE CLAUSE

The First Amendment's Religion Clause states: "Congress shall make no law respecting

an establishment of religion, or prohibiting the free exercise thereof[.]"  U.S. Const. amend. I.

From its earliest decision on the Free Exercise Clause, the Supreme Court has recognized that

religious freedom does not act as an absolute shield against generally applicable laws.  The

Supreme Court of the United States first addressed the Free Exercise Clause's meaning in

Reynolds v. United States, 98 U.S. 145 (1879), in which George Reynolds, an adherent of the

Church of Latter Day Saints, challenged his conviction under a federal statute prohibiting bigamy

in United States Territories.  See 98 U.S. at 146-47.  Reynolds argued that his religious beliefs

mandated polygamy, and that his prosecution violated the Free Exercise Clause.  See 98 U.S.

at 147.  The Supreme Court framed the issue as inquiring into "the guilt of one who knowingly

violates a law which has been properly enacted, if he entertains a religious belief that the law is

wrong."  98 U.S. at 162.  The Honorable Morris Waite, then-Chief Justice of the Supreme Court

of the United States, weighed Reynolds' religious freedom against government's interest in

regulating marriage and concluded that the Free Exercise Clause does not provide such a shield,

holding: "[I]t is impossible to believe that the constitutional guaranty of religious freedom was

intended to prohibit legislation in respect to this most important feature of social life.  Marriage,

while from its very nature a sacred obligation, is nevertheless, in most civilized nations, a civil

contract, and usually regulated by law."  98 U.S. at 165.  Chief Justice Waite concluded that, while

freedom of religious belief is absolute, freedom of religious practice is subject to restraint.  See 98

U.S. at 166.  To permit such freedom, the Chief Justice asserted, "would be to make the professed

doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself.  Government could exist only in name under such circumstances."  98 U.S. at 167.

So stood the law of religious freedom until the mid-20th century, when the Supreme Court expanded its interpretation of the Free Exercise Clause.  In Cantwell v. Connecticut, 310 U.S. 296 (1940), the Supreme Court held that an ordinance which operated to prevent two Jehovah's Witnesses from proselytizing on a street corner, including denouncing the Catholic faith, violated the Free Exercise Clause.  310 U.S. at 303.  "No one would contest the proposition that a state may not, by statute, wholly deny the right to preach or to disseminate religious views.  Plainly such a previous and absolute restraint would violate the terms of the guarantee."  310 U.S. at 304.  The Supreme Court nonetheless maintained Reynolds v. United States' belief/practice duality, and held that the First Amendment "embraces two concepts[] -- freedom to believe and freedom to act.  The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society."  310 U.S. at 303-04.  The Supreme Court further noted that "[e]ven the exercise of religion may be at some slight convenience in order that the state may protect its citizens from injury." 310 U.S. at 306.

Religious freedom continued to expand under the Warren and Burger Courts.  The Supreme Court recognized, among other rights, freedom of religious ministers to serve as elected officials, see McDaniel v. Paty, 435 U.S. 618 (1978), freedom to abstain from a school's pledge of allegiance ritual, see West Va. State Bd. of Ed. v. Barnette, 319 U.S. 624 (1943), freedom from compelled affirmation of religious belief, see Torcaso v. Watkins, 367 U.S. 488 (1961), and freedom from compulsory school attendance laws, see Wisconsin v. Yoder, 406 U.S. 205 (1972).  The Supreme Court typically subjected burdens on the free exercise of religion to strict scrutiny.  See, e.g.,

- 48 -

<u>Sherber v. Verner</u>, 374 U.S. 398, 404 (1963). At the high-water mark, the Supreme Court held that the Free Exercise Clause acts as a sword to mandate that government accommodate religious belief in employment contexts. Thus, a compelling governmental purpose must justify a law which imposes special disability on religious groups or individuals because of their religion. <u>See</u>, <u>e.g.</u>, <u>Sherbert v. Verner</u>, 374 U.S. at 404. In <u>Sherbert v. Verner</u>, the Supreme Court held that states may not withhold unemployment benefits to an individual who was terminated from her job because her religious beliefs dictated that she could not work on Saturdays. <u>See</u> 374 U.S. at 406. During this high-water period, the Supreme Court also held that government may not condition receipt of public benefits on conduct that one's religion proscribes. <u>See</u> <u>Thomas v. Review Bd. of Indiana Emp't</u>, 450 U.S. 707, 717-18 (1981).

Nonetheless, despite the view that religious freedom has eroded since the Warren and Burger Courts, some principles from <u>Reynolds v. United States</u> remain consistent to this day. The Burger Court recognized that the Free Exercise Clause does not protect against every burden on religious practice incident to living in a well-ordered society. In <u>United States v. Lee</u>, 455 U.S. 252 (1982), the Supreme Court held that the Free Exercise Clause does not entitle an Old Order Amish employer to forgo filing federal tax returns because of his religious beliefs. <u>See</u> 455 U.S. at 260. The Supreme Court noted that it had "been sensitive to the needs flowing from the Free Exercise Clause, but every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs." 455 U.S. at 261. Similarly, in <u>Bowen v. Roy</u>, 476 U.S. 693 (1986), the Supreme Court held that the Free Exercise Clause does not compel the United States to accommodate a religious objection to statutory requirements that the government use Social Security numbers for applicants seeking welfare benefits. <u>See</u> 476 U.S. at 699-700. The Supreme Court concluded that the First Amendment does not "require the

- 49 -

Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family."  455 U.S. at 699 (emphasis in original).  Similarly, in Lyng v. Northwest Indian Cemetery Protective Association, 485 U.S. 439 (1988), the Supreme Court held that the Free Exercise Clause did not require the United States to accommodate Native Americans' religious objections to a planned road through a section of a national forest which they held sacred.  See 485 U.S. at 449.  The Supreme Court held that not all governmental actions which "make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, require government to bring forward a compelling justification for its otherwise lawful actions."  485 U.S. at 450-51.  The First Amendment's key word, the Supreme Court concluded, is "'prohibit," because the "'Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from government.'"  485 U.S. at 451 (first quoting U.S. Const. amend. I and then quoting Sherbert v. Verner, 374 U.S. at 412 (Douglas, J., concurring)).

Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990)("Smith") shapes contemporary Free Exercise law.  In Smith, the Supreme Court addressed whether Oregon could deny unemployment benefits to two adherents of the Native American Church who were terminated from private employment for ingesting peyote, which Oregon defines as a controlled substance.  See 494 U.S. at 874.  The Honorable Antonin Scalia, then-Associate Justice of the Supreme Court, answered that question in the affirmative.  See 494 U.S. at 882. Citing Reynolds v. United States, the Supreme Court noted that freedom to believe and profess is absolute, but concluded that to permit individuals to use their religious beliefs to circumvent neutral and generally applicable laws would "'permit every citizen to become a law unto himself.'"

- 50 -

494 U.S. at 879 (quoting <u>Reynolds v. United States</u>, 98 U.S. at 167).   Justice Scalia first

distinguished the Supreme Court's precedent.  He asserted that cases like <u>Cantwell v. Connecticut</u>,

<u>Yoder v. Wisconsin</u>, and <u>Barnette v. West Virginia Board of Education</u> used strict scrutiny,

because those cases involved plaintiffs who asserted more than one constitutional right.  <u>See</u> 494

U.S. at 881.  Justice Scalia then contended that <u>Sherbert v. Verner</u> and <u>Thomas v. Review Board

of Indiana Employment Security Division</u>'s use of strict scrutiny is unique to employment

discrimination cases involving statutes with preexisting exemptions that could not be limited

without discriminating against religion.  <u>See</u> 494 U.S. at 882-84.  Instead, the Supreme Court held

that generally applicable, neutrally applied laws that incidentally restrict religious exercise need

be only rational and legitimate exercises of governmental power.  <u>See</u> 494 U.S. at 885.  To require

strict scrutiny to such laws, the Supreme Court held, would endanger myriad important legislation

in the nation's cosmopolitan, religiously diverse society.  <u>See</u> 494 U.S. at 888-89.  Accordingly,

the religious adherent holds the burden to demonstrate that across-the-board, neutrally applied

laws are irrational or beyond the government's authority.

An otherwise valid law may be discriminatory when its purpose is to burden religion.  In

<u>Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah</u>, 508 U.S. 520 (1993)("<u>Lukumi</u>"), the

Supreme Court addressed city ordinances that prohibited the sacrificing of animals for religious

purposes.  <u>See</u> 508 U.S. at 527-28.  A new Santería[6] church in the city motivated the laws'

---

[6]Santería, or la Religión Lucumí, is a pantheistic Afro-Cuban religion developed from the beliefs and customs of the Yoruban peoples of West Africa, who were brought to Cuba as slaves, and which incorporates some elements of Catholicism.  <u>See</u> Encyclopaedia Britannica, "Santería," https://www.britannica.com/topic/Santeria (last accessed April 16, 2020).   The name "Santería" derives from the belief in communications between Yoruban Yoruba deities -- called orishas -- and Roman Catholic saints.  <u>See</u> Encyclopaedia Britannica, "Santería."  Santería religious practice involves developing personal relationships with these divinities and saints through divination, sacrifice, and initiation, well as mediumship between Santería adherents and the orisha deities,

enactment, and the city expressed its belief that Santería's practice of sacrificing animals is "inconsistent with public morals." 508 U.S. at 528. Although the ordinances were facially neutral -- they prohibited animal sacrifice without singling out the Santeria church or using exclusively religious language -- the Supreme Court concluded that the ordinances were neither neutral nor generally applicable, in part because the Santería church members' religious conduct was "almost the only conduct subject to" the ordinances. 508 U.S. at 535. Unlike Smith's treatment of the Oregon drug law, the city's ordinances evinced sufficient animus to justify the Supreme Court's extended examination of the ordinance's motivations. See 508 U.S. at 540-45. That examination revealed that the laws were not neutral, because the ordinances' legislative history revealed that "they were enacted because of, not merely in spite of, their suppression of Santeria religious practice." 508 U.S. at 540. The Supreme Court also concluded that the ordinances were not generally applicable, because they were under-inclusive in serving the defendant city's stated goals of protecting public health and preventing animal cruelty. See 508 U.S. at 543. The ordinances did not prohibit irreligious conduct that endangered these interests to a greater extent than did Santeria religious practice. See 508 U.S. at 543. The Supreme Court accordingly concluded that the ordinances served only the defendant city's animus against Santería, and asserted that the general applicability requirement is designed to prevent precisely such animus. See 508 U.S. at 546. The Supreme Court accordingly subjected the ordinances to a form of strict scrutiny and found them lacking. See 508 U.S. at 547.

The Supreme Court also continues to hold -- albeit in a strengthened form -- that laws cannot impose special disability based on one's status as religious. In Trinity Lutheran Church of

---

who protect the adherents and give guidance, wisdom, and success. See Encyclopaedia Britannica, "Santería."

Columbia, Inc. v. Comer, 137 S. Ct. 2012 (2017)("Trinity Lutheran"), the Supreme Court

addressed a Missouri state constitutional probision that prohibited the state from giving public

benefits to religious institutions.  See 137 S. Ct. at 2017.  The plaintiff-church applied to participate

in a state program that gave grants to non-profit organizations that repaved surfaces with material

made from recycled tires.  See 137 S. Ct. at 2017.  The state pointed out the declining to issue the

grant to the plaintiff-church did not in any way infringe upon the plaintiff-church's religious

exercise and noted that it had no duty to give the grant in the first place.  See 137 S. Ct. at 2021-

22.  Chief Justice Roberts, writing for the majority, disagreed:

But Chief Justice Roberts disagreed:

> [T]he . . . policy puts Trinity Lutheran to a choice: It may participate in an otherwise
> available benefit program or remain a religious institution.  Of course, Trinity
> Lutheran is free to continue operating as a church . . . .  But that freedom comes at
> the cost of automatic and absolute exclusion from the benefits of a public program
> for which the Center is otherwise fully qualified.  And when the State conditions a
> benefit in this way . . . the State has punished the free exercise of religion: "To
> condition the availability of benefits . . . upon [a recipient's] willingness to . . .
> surrender[] his religiously impelled [status] effectively penalizes the free exercise
> of his constitutional liberties."

137 S. Ct. at 2021-22 (quoting McDaniel v. Paty, 435 U.S. at 626).  On a narrow reading, Trinity

Lutheran merely continues well-established precedent that government may not impose special

disability or withhold government benefits on the basis of one's religion.  See McDaniel v. Paty,

435 U.S. at 626; Sherbert v. Verner, 374 U.S. at 406.  The Supreme Court noted that it has

repeatedly held that only compelling governmental interests justify withholding generally

available services on the basis of religion.  See 137 S. Ct. at 2019.  On a broader reading, however,

Trinity Lutheran provides that the Free Exercise Clause now protecs individuals' and institutions'

status as religious.  Trinity Lutheran, under this broader reading, thus erases the distinction

between what a religious institution is and what a religious institution does for the governmental

- 53 -

services' purposes, because there was no actual conflict between Missouri's policy and the plaintiff-church's religious beliefs.  See 137 S. Ct. at 2020.  In other words, Trinity Lutheran provides that the fact of having beliefs cannot be a setback where government services and benefits are concerned.

A law also may violate the Free Exercise Clause if it is not applied neutrally.   In Masterpiece Cakeshop, LLC v. Colorado Civil Rights Commission, 138 S. Ct. 1719 (2018)("Masterpiece Cakeshop"), a baker, citing his religious beliefs, refused to make a cake for a same-sex couple's wedding, defying a Colorado anti-discrimination statute.  See 138 S. Ct. at 1723-25.  He was cited for violating the Colorado statute, and in arguing his case before the Colorado Civil Rights Commission, one commissioner stated:

> Freedom of religion and religion has been used to justify all kinds of discrimination throughout history, whether it be slavery, whether it be the [H]olocaust . . . --we can list hundreds of situations where freedom of religion has been used to justify discrimination.  And to me it is one of the most despicable pieces of rhetoric that people can use to -- to use their religion to hurt others.

138 S. Ct. at 1729.  The Supreme Court did not ultimately decide whether anti-discrimination laws that conflict with religious beliefs violate the First Amendment.   Instead, the Supreme Court concluded that the Colorado Civil Rights Commission's treatment of the baker's appeal violated the First Amendment's command that government may not "base laws or regulations on hostility to a religion or religious viewpoint." 138 S. Ct. at 1731.  Justice Kagan summarized in a concurring opinion:

> "[I]t is a general rule that [religious and philosophical] objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral  and generally applicable public accommodations law."  But in upholding that principle, state actors cannot show hostility to religious views; rather, they must give those views neutral and respectful consideration.

138 S. Ct. at 1732 (Kagan, J., concurring)(quoting <u>Masterpiece Cakeshop</u>, 138 S. Ct. at 1727)(alterations in concurring opinion).

      In this way, <u>Masterpiece Cakeshop</u> reflects the Supreme Court's longstanding aversion to laws and regulations that allow officials' subjective, case-by-case determinations. <u>See</u>, <u>e.g.</u>, <u>Sherbert v. Verner</u>, 374 U.S. at 401 (invalidating denial of unemployment benefits where statute allowed officials to evaluate, on a case-by-case basis, whether an individual's termination from employment was for "good cause"); <u>Cantwell v. Connecticut</u>, 310 U.S. at 305 (invalidating a statute that prohibited solicitation for religious or charitable causes without a designated official's approval, and authorizing the official to determine whether the cause is genuinely religious or charitable). Similarly, a law may not be generally applicable where it has built-in exemptions that it does not extend to accommodate religious exercise. <u>See</u>, <u>e.g.</u>, <u>Smith</u>, 494 U.S. at 884-85 (citing cases). "[W]here the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." <u>Smith</u>, 494 U.S. at 884 (quoting <u>Bowen v. Roy</u>, 476 U.S. at 708). Such instances require government to weigh religious freedom against governmental interest, a process that <u>Smith</u> expressly decries. <u>See</u> <u>Smith</u>, 494 U.S. at 887. Accordingly, where government regulates within its prerogative, it may enact general laws and apply them neutrally without inquiry into the extent to which the law incidentally burdens religious exercise. Only where the government acts with religious animus or requires case-by-case determination of the merits or sincerity of religious beliefs as a condition of governmental benefits or exemption from legal requirements will the government violate the First Amendment.

## LAW REGARDING THE ASSEMBLY CLAUSE

The First Amendment to the Constitution of the United States guarantees that "Congress shall make no law . . . abridging . . . the  right of the people peaceably to assemble." U.S. Const. amend. I.   The Supreme Court concluded in De Jonge v. Oregon, 299 U.S. 353 (1937), that the right to assemble is applicable to state action, because the Due Process Clause of the Fourteenth Amendment incorporates the right to assemble.   See John D. Inazu, The Forgotten Freedom of Assembly, 84 Tul. L. Rev. 565, 599 (2010)("Forgotten Freedom").   The Supreme Court emphasized the importance of the right to assemble, declaring that it "cannot be denied without violating those fundamental principles which lie at the base of all civil and political institutions." De Jonge v. Oregon, 299 U.S. at 364 (citing Herbert v. Louisiana, 272 U.S. 312, 216 (1926); Powell v. Alabama, 287 U.S. 45, 67 (1932)).

Despite the importance of the right to assemble, it, like other constitutional rights, is still subject to restrictions. The Supreme Court in Jacobson v. Massachusetts, 197 U.S. 11 (1905), stated that constitutional rights "may at times, under the pressure of great dangers" be restricted "as the safety of the general public may demand." 197 U.S. at 29.  The Court of Appeals for the Fifth Circuit has noted that this "settled rule allows the state to restrict, for example, one's right to assemble." In re Abbott, 2020 WL 1685929, at *1.

The Supreme Court has all but forgotten the right to assemble in the modern era. See Forgotten Freedom at 610-11 (noting that, as of 2010, the Supreme Court had not heard a right-to-assemble claim in over twenty years); Emmanuel Hiram Arnaud, Note, The Dismantling of Dissent: Militarization and the Right to Peaceably Assemble, 101 Cornell L. Rev. 777, 812 (2016)("Dismantling of Dissent")(noting that, as of 2016, the Supreme Court had not heard a right-to-assemble claim in over thirty years).  Instead, the freedom of association has largely subsumed

- 56 -

the freedom of assembly.  See Timothy Zick, Recovering the Assembly Clause, 91 Tex. L. Rev.

375, 377 (2012)("[T]he freedom of assembly was transformed into a right of association.")(citing

John D. Inazu, Liberty's Refuge: The Forgotten Freedom of Assembly, (2010)).  In the 1980s, the

Supreme Court "swept the remnants of association within the ambit of free speech law,"

culminating in its opinion about a freedom-of-assembly claim that did not include any reference

to the freedom of assembly, but included several references to freedom of association. Recovering

the Assembly Clause at 396 (quoting John D. Inazu, Liberty's Refuge: The Forgotten Freedom).

See Forgotten Freedom at 611 (citing Boos v. Barry, 485 U.S. 312 (1985)).  Since then, the

Supreme Court has applied the freedom-of-association standard to freedom of assemblies cases,

rendering them one and the same.  See Dismantling of Dissent (noting that "the standard for

assessing freedom of assembly cases is now the one applies for freedom of association" and that

"freedom of assembly is standardless because the [Supreme] Court conflates the two freedoms")

      The Tenth Circuit similarly has conflated the freedom of association with the freedom of

assembly by generally treating them as a single claim and analyzing them together.  See, e.g.,

McCook v. Spriner Sch. Dist., 44 F. App'x 896, 910 (10th Cir. 2002)(unpublished)(repeating

throughout the opinion that the plaintiffs brought a "freedom of assembly and association claim");

Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 658 (stating that "[t]he First

Amendment protects associational and assembly rights in two distinct ways," and then quoting a

Supreme Court case that mentions only freedom of association)(citing Bd. of Dirs. of Rotary Int'l

v. Rotary Club of Duarte, 481 U.S. 537, 544 (1987)).  In the past thirty-two years, the Tenth

Circuit's lengthiest discussion of freedom of assembly is a dissent analogizing churches in the free

exercise context to public forums in the free speech context.  See Messiah Baptist Church v. Cty.

of Jefferson, State of Colo., 859 F.2d 820, 830 (10th Cir. 1988)(McKay, J., dissenting).  The

- 57 -

dissent, discussing a zoning ordinance's restriction of buildings for religious worship, notes that "the right to assemble or speak in a public forum cannot be absolutely prohibited, and may only be infringed by narrowly-drawn time, place, and manner restrictions." Messiah Baptist Church v. Cty. of Jefferson, State of Colo., 859 F.2d at 830.  Beyond that case, the Tenth Circuit generally has folded freedom of assembly into freedom of association[7] -- specifically expressive association. See Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 658.

Expressive association is the "'right to associate for the purpose of engaging in those activities protected by the First Amendment -- speech, assembly, petition for the redress of grievances, and the exercise of religion.'" Schalk v. Gallemore, 906 F.2d at 498 (quoting Roberts v. United States Jaycees, 468 U.S. at 617-18.).  The First Amendment protects political expression manifested through conduct as well as through speech.  See Texas v. Johnson, 491 U.S. 397, 406 (1989)(holding that the burning of an American flag is conduct "sufficiently imbued with elements of communication to implicate the First Amendment")(citation omitted)(internal quotation marks omitted).  Expressive association is not, however, an absolute right, because "'there may be countervailing principles that prevail over the right of association.'" Grace v. United States v. City

---

[7]The Tenth Circuit uses different terminology for expressive association in different cases. In Grace v. United Methodist Church v. City of Cheyenne, 451 F.3d 643, 658 (2006), and Schalk v. Gallemore, 906 F.2d 491, 499 (1990), the Tenth Circuit appears to label "freedom of association" as "freedom of expressive association," which it breaks down into "intimate association" and "political association."  What it calls "political association" is actually "expressive association."  It corrects the labels in Vigil v. South Valley Academy, 247 F. App'x 982, 988 (10th Cir. 2007)(unpublished)("treating the "freedom of expressive association" and "the right to familial association" as two separate freedoms, as opposed to treating the right of familial association as a subtype of freedom of expressive association).  The Court relies on this case for the appropriate labels, because it accords with generally accepted terms.  John D. Inazu, The Unsettling "Well-Settled" Law of Freedom of Association, 43 Ct. L. Rev. 149, 149 (2010)(noting that the Supreme Court stated two categories -- expressive association and intimate association – in Roberts v. United States Jaycees, 468 U.S. 609 (1984)).

- 58 -

of Cheyenne, 451 F.3d at 658 (quoting Walker v. City of Kansas City, 911 F.2d 80, 89 n.11 (8th Cir. 1990)).  The Supreme Court has cautioned that "[i]nfringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." Roberts v. United States Jaycees, 468 U.S. at 623.  See Nat'l Commodity & Barter Ass'n v. Archer, 31 F.3d 1521, 1531 (10th Cir. 1994)(quoting Roberts v. United States Jaycees, 468 U.S. at 623). Although an opportunity "might be described as 'associational' in the common parlance," it does not necessarily follow that it involves "the sort of expressive association that the First Amendment has been held to protect." City of Dallas v. Stanglin, 490 U.S. 19, 24 (1989). Because "there is no generalized right of free association," courts only "recognize[] a right to associate for the purpose of engaging in those activities protected by the First Amendment -- speech, assembly, petition for the redress of grievances, and the exercise of religion." Roberts v. United States Jaycees, 468 U.S. at 618.

        In Roberts v. United States Jaycees, the Supreme Court extended First Amendment protection to the United States Jaycees, a civic organization, because it engaged in "the advocacy of political and public causes." Roberts v. United States Jaycees, 468 U.S. at 622.  The Boy Scouts of America similarly qualified for First Amendment protection, because the organization "engaged in instilling its system of values in young people." Boy Scouts of Am. v. Dale, 530 U.S. at 643. In addition to civic or political causes, courts also often recognize the freedom of expressive association for organizations that "'associate for the purpose of engaging in . . . religious

- 59 -

activities.'"  <u>Grace United Methodist Church v. City of Cheyenne</u>, 451 F.3d at 658 (quoting <u>Bd. of Dirs. v. Rotary Club of Duarte</u>, 481 U.S. at 544).[8]

Although "[i]t is possible to find some kernel of expression in almost every activity a person undertakes . . . such a kernel is not sufficient to bring the activity within the protection of the First Amendment." <u>City of Dallas v. Stanglin</u>, 490 U.S. at 25.  Courts generally refuse to extend First Amendment protection to individuals or organizations that assert the freedom of association in a context that does not include the assertion of a separate First Amendment right.  See <u>City of Dallas v. Stanglin</u>, 490 U.S. at 24.  In <u>City of Dallas v. Stanglin</u>, the Supreme Court declined to recognize a First Amendment right of association for dance-hall patrons seeking to overturn a municipal regulation creating age-restricted dance halls.  See 490 U.S. at 24.  The Supreme Court listed four reasons that "chance encounters in dance halls" do not involve "the sort of expressive association that the First Amendment has been held to protect": (i) the dance hall patrons were not

---

[8]Professor Eugene Volokh has noted that:

[i]n addition to the general First Amendment expressive association right that [<u>Boy Scouts of Am. v. ]Dale</u> recognized, religious groups might have a special "freedom of religious association" right under the Free Exercise Clause. This could either be a narrow church autonomy right recognized even after <u>Employment Division v. Smith</u>, 494 U.S. 872 (1990), <u>see</u> Eugene Volokh, <u>A Common-Law Model for Religious Exemptions</u>, 46 UCLA L. Rev. 1465, 1506-07 (1999)(so suggesting), or a "hybrid" of the expressive association right and the Free Exercise Clause right, <u>compare</u> <u>Smith</u>, 494 U.S. at 881-82 (so suggesting), <u>with</u> <u>Kissinger v. Bd. of Trs. of the Ohio State Univ.</u>, 5 F.3d 177, 180 (6th Cir. 1993) (criticizing the hybrid rights doctrine, in my view persuasively), <u>Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah</u>, 508 U.S. 520 (1993)(Souter, J., concurring) (likewise), and Bertrand Fry, Note, <u>Breeding Constitutional Doctrine: The Provenance and Progeny of the "Hybrid Situation" in Current Free Exercise Jurisprudence</u>, 71 Tex. L. Rev. 833 (1993)(likewise).

Eugene Volokh, <u>Freedom of Expressive Association and Government Subsidies</u>, 58 Stan. L. Rev. 1919, 1968 (2006)

"members of any organized association"; (ii) "most [were] strangers to one another"; (iii) the dance

hall admitted all who paid the admission fee; and (iv) "[t]here [was] no suggestion that these

patrons take positions on public questions."  City of Dallas v. Stanglin, 490 U.S. at 24-25.

> "To determine whether a group is protected by the First Amendment's
> expressive associational right, we must determine whether the group engages in
> 'expressive association.' The First Amendment's protection of expressive
> association is not reserved for advocacy groups. But to come within its ambit, a
> group must engage in some form of expression, whether it be public or private."

A.M. ex rel. Youngers v. NM Dep't of Health, 117 F. Supp. 3d 1220, 1258 (D.N.M. 2015)(quoting

Boy Scouts of Am. v. Dale, 530 U.S. at 648).  If the First Amendment's expressive associational

right protectsthe group, courts next determine whether "'[i]nfringements on that right [are]

justified by regulations adopted to serve compelling state interests, unrelated to the suppression of

ideas, that cannot be achieved through means significantly less restrictive of associational

freedoms.'"  Roberts v. United States Jaycees, 468 U.S. at 623.

## ANALYSIS

The Court denies the Motion.  The Court concludes, first, that the Eleventh Amendment

prohibits Legacy Church's suit insofar as it seeks relief against the state of New Mexico.  Second,

the Court concludes that Legacy Church is not substantially likely to succeed on the merits of its

Free Exercise claim.  Specifically, the April 11 Order is both neutral and generally applicable, and

there is no evidence of animus against Christianity in particular or against religion in general.

Accordingly, the April 11 Order is subject to rational basis review, which it satisfies.  Third, the

Court concludes that Legacy Church is not likely to succeed on its assembly claim, because the

April 11 Order not only is narrowly tailored with sufficient alternatives for Legacy Church to

assemble and mitigating a state pandemic is a compelling interest.  Fourth, the Court concludes

that Legacy Church has not demonstrated that it will suffer irreparable harm in a TRO's absence,

it has not demonstrated that the equities weigh in a TRO's favor, and it has not demonstrated that a TRO is in the public interest.  Accordingly, the Court denies the TRO.

## I.    THE ELEVENTH AMENDMENT PROHIBIT'S LEGACY CHURCH'S SUIT INSOFAR AS IT SEEKS RELIEF AGAINST NEW MEXICO.

Legacy Church names New Mexico as a defendant.  See Complaint at 1.  In the Complaint's jurisdiction and venue section, Legacy Church refers to Secretary Kunkel's status as New Mexico's Secretary of the Department of Health, but Legacy Church does not assert the Court's jurisdiction over New Mexico as a defendant.  See Complaint ¶¶ 1-3, at 1.  New Mexico contends that it is immune from § 1983 suit, because it has not waived the immunity that the Eleventh Amendment grants it.  See NM Response at 6.

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any foreign state."  U.S. Const. amend. XI.  The Supreme Court has interpreted state sovereign immunity broadly.  As Justice Kennedy, writing for the Supreme Court in Alden v. Maine, 527 U.S. 706 (1999), asserted: "[S]overeign immunity derives not from the Eleventh Amendment but from the structure of the original Constitution itself."  527 U.S. at 728.  The Supreme Court has also interpreted the Eleventh Amendment's text broadly, concluding, despite the Eleventh Amendment's text, that states are immune from suit in federal courts that their own citizens bring, see Hans v. Louisiana, 134 U.S. 1, 15 (1890), and suits by their own citizens in their own courts without their consent, see Alden v. Maine, 527 U.S. 706.  Accordingly, the Supreme Court has articulated only three ways for private plaintiffs to circumvent sovereign immunity: (i) suits against state officials for injunctive relief, see Ex parte Young, 209 U.S. 123 (1908), and, in some cases, money damages, see Kentucky

- 62 -

v. Graham, 473 U.S. 159 (1985); (ii) suits to which states consent; and (iii) suits invoking Congressional statutes pursuant to the Fourteenth Amendment.  The Eleventh Amendment permits federal courts to grant injunctions against state officials, even when compliance will cost the state great expense in the future.  See, e.g., Quern v. Jordan, 440 U.S. 332 (1979).

New Mexico has not waived its immunity.  An explicit waiver requires the state to expressly agree to be sued in federal court.  New Mexico's consent to be sued in its own courts is not enough.  See Fla. Dep't of Health and Rehabilitative Servs. v. Fla. Nursing Home Ass'n, 450 U.S. 299, 305-06 (1990).  Nor is a general waiver enough; for a state statute or constitutional provision to validly waive Eleventh Amendment immunity, "it must specify the State's intention to subject itself to suit in *federal court*."  Atascadero Copper Corp. v. State Tax Comm'n, 473 U.S. 241, 241 (1990)(emphasis in original).  For example, in Port Authority Trans-Hudson Corp. v. Feeney, 495 U.S. 299 (1990), the Supreme Court concluded that New Jersey and New York consented to suit in federal court via a statute that consented to suit "on the condition that venue . . . shall be within a county or judicial district, established by one of said States or by the United States . . ." 495 U.S. at 307 (quoting N.J. Stat. Ann. § 32:1-162, N.Y. Unconsol. Laws § 7106 (1979)).  The Supreme Court has also indicated that constructive consent, such as by failing to object to a federal court's jurisdiction, is not enough.  See Edelman v. Jordan, 415 U.S. 651, 653 (1974).

Nor does § 1983 or any other potential avenue for relief waive New Mexico's immunity.  Here, Legacy Church sues New Mexico to vindicate its First Amendment rights pursuant to a Congressional statute -- § 1983.  See Complaint at 3-5.  The Supreme Court has concluded, however, that Congress may authorize suits against states only when it acts pursuant to § 5 of the Fourteenth Amendment.   Although  Congress  enacted  § 1983  pursuant  to  the  Fourteenth

- 63 -

Amendment, the Supreme Court has concluded that § 1983 provides insufficient indication that

Congress intended to override state sovereign immunity:

> [Section] 1983 does not explicitly and by clear language indicate on its face an
> intent to sweep away the immunity of the States; nor does it have a history which
> focuses directly on the question of state liability and which shows that Congress
> considered and firmly decided to abrogate the Eleventh Amendment immunity of
> the States.

Quern v. Jordan, 440 U.S. at 345.  Additionally, because states have concurrent jurisdiction over

§ 1983 suits, see Maine v. Thiboutot, 448 U.S. 1, 3 n.1 (1980), the Supreme Court has interpreted

§ 1983 to conclude that states are not persons for § 1983's purposes, see Will v. Michigan Dep't

of State Police, 491 U.S. 58, 66-67 (1989).  Accordingly, the Eleventh Amendment bars Legacy

Church's suit insofar as Legacy Church seeks relief against the State of New Mexico.

## II.   LEGACY CHURCH'S REQUESTED RELIEF FALLS INTO A CATEGORY OF DISFAVORED INJUNCTIONS.

The Tenth Circuit disfavors some injunctive relief and requires "more of the parties who

request them."  Mrs. Fields Franchising, LLC v. MFGPC, 941 F.3d 1221, 1232 (10th Cir.

2019)(citing Shrier v. Univ. of Colo., 427 F.3d at 1258-59 (10th Cir. 2005)).   There are three

disfavored injunctions: (i) mandatory (rather than prohibitory) injunctions; (ii) injunctions that

change the status quo; and (iii) injunctions that grant all the relief that the moving party could

expect to win at trial.  See Mrs. Fields Franchising, LLC v. MFGPC, 941 F.3d at 1232; Logan v.

Pub. Emps. Retirement Ass'n, 163 F. Supp. 3d 1007, 1026 (D.N.M. 2016)(Browning, J.).  Movants

for these injunctions need not make their showing "heavily and compellingly," but the district

court should "more closely scrutinize[] to assure that the exigencies of the case support the granting

of a remedy that is extraordinary even in the normal course."  O Centro Espirita Beneficiente Uniao

Do Vegetal v. Ashcroft, 389 F.3d 973, 975 (10th Cir. 2004)("O Centro"), affd and remanded sub

nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418 (2006). A district court can determine whether a requested injunction is disfavored by looking at the relief it seeks. See O Centro, 389 F.3d at 1003. Although Legacy Church's requested injunctive relief is prohibitory and does not change the status quo, granting the request would provide Legacy Church with all the relief it could expect to win at trial.

The first disfavored category is "mandatory preliminary injunctions." Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting O Centro, 389 F.3d at 977)(internal quotation marks omitted). The Tenth Circuit "characterize[s] an injunction as mandatory if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.'" Schrier v. Univ. of Colorado, 427 F.3d at 1261 (all alterations but first in Schrier v. Univ. of Colo.)(quoting O Centro, 389 F.3d at 979). The Tenth Circuit has thus disclaimed -- or at least augmented -- the simpler and more intuitive way of defining these terms, i.e., that a prohibitory injunction is one in which the court orders the enjoined party not to act in some manner, and a mandatory injunction is one in which the court orders the enjoined party to act. See Schrier v. Univ. of Co., 427 F.3d at 1261. It does so because a creative enough lawyer can present any injunction in either prohibitory or mandatory terms, depending on whether the lawyer is requesting or opposing it. See O Centro, 389 F.3d at 1006 (Seymour, J., dissenting)("There is no doubt that determining whether an injunction is mandatory as opposed to prohibitory can be vexing."). An injunction directing a party to act is not fundamentally different from an injunction prohibiting action -- if everyone can agree on and understand exactly what the court is ordering and exactly what conduct would violate the injunction. On the other hand, vague injunctions enjoining parties to "depopulate the jail system to constitutionally compliant levels,"

or to "perform on its promise to continue manufacturing and delivering conforming goods to the buyer," are a recipe for bogging the court down into the role of monitor.  <u>Dine Citizens Against Ruining Our Env't v. Jewell</u>, No. CIV 15-0209 JB/SCY, 2015 WL 4997207, at *33 (D.N.M. Aug. 14, 2015)(Browning, J.).

Legacy Church's requested injunction is prohibitory rather than mandatory.  It seeks an Order that "prohibits the Secretary from now enforcing mass gathering restrictions on places of worship, including Legacy's four New Mexico campuses."  Motion at 11.  Were the Court to grant Legacy Church's request, New Mexico would only have to refrain from enforcing the April 11 Order against churches and other places of worship.  It would not be ordered to affirmatively act. <u>See</u> <u>Schrier v. Univ. of Colo.</u>, 427 F.3d at 1261 (noting that requiring a University to rehire a professor where future monitoring is possible constitutes a mandatory injunction).  Granting the injunction would also not require the Court to extensively monitor New Mexico's compliance; enforcement of the April 11 Order is a black-and-white issue that would not require legal review or continuous supervision.

The second disfavored category is "preliminary injunctions that alter the status quo." <u>Schrier v. Univ. of Colo.</u>, 427 F.3d at 1258 (quoting <u>O Centro</u>, 389 F.3d at 977)(internal quotation marks omitted).  The status quo is "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing."  <u>Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.</u>, 269 F.3d at 1155.  When evaluating whether the issuance of a requested injunction would alter the status quo between the parties, the court should look at "the reality of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights."

SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1100 (10th Cir. 1991), overruled on other grounds by O Centro, 389 F.3d at 975.

Legacy Church's requested injunction also does not alter the status quo.  It asks the Court to forbid New Mexico from enforcing the April 11 Public Health Order, and to effectively return churches and other places of worship to the state of affairs existing under the April 6 Public Health Order.  Under the April 6 Order, churches were explicitly excluded from the definition of "mass gathering."  April 6 Order at 4.  This is the "last peaceable uncontested status existing between the parties before the dispute developed," 11A Fed. Prac. & Proc. Civ. § 2948 Grounds for Granting or Denying a Preliminary Injunction, (3d ed.), and granting an injunction to return to it would therefore not alter the status quo, see Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d at 1155.

The third and final disfavored category is "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits."  Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting O Centro, 389 F.3d at 977)(internal quotation marks omitted).  The Tenth Circuit has stated that this sort of preliminary injunction is "similar to the 'Sentence first -- Verdict Afterwards' type of procedure parodied in Alice in Wonderland, which is an anathema to our system of jurisprudence."  SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1099 (10th Cir. 1991).  See GTE Corp. v. Williams, 731 F.2d 676, 679 (10th Cir. 1984)(stating in a copyright case that, "[t]he burden on the party seeking a preliminary injunction is especially heavy when the relief sought would in effect grant plaintiff a substantial part of the relief it would obtain after a trial on the merits.").

The injunction Legacy Church seeks would supply it with all the relief could hope to win from a full trial.  In the Complaint, Legacy Church asks that the Court declare that the Defendants

have unlawfully burdened its constitutional rights, and "[t]emporarily and permanently enjoin[]

Defendants from prohibiting Plaintiff from physically gathering in its house of worship."

Complaint at 6.  It also asks for "costs and reasonable attorneys' fees and expenses," Complaint at

6, but these are incidental to the injunction as they would not exist on their own without the

injunction request.  Accordingly, the Court will "more closely scrutinize[]" Legacy Church's case

"to assure that the exigencies of the case support the granting of a remedy that is extraordinary

even in the normal course."  O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389

F.3d at 975.


**III.   THE APRIL 11 ORDER DOES NOT VIOLATE LEGACY CHURCH'S FREE EXERCISE RIGHTS, BECAUSE THE ORDER IS A NEUTRAL AND GENERALLY APPLICABLE LAW, AND THERE IS NO EVIDENCE OF RELIGIOUS ANIMUS.**

The Court's analysis is broadly framed by the fact that, when the state faces a major public

health threat, as New Mexico now does, its Tenth Amendment police and public health powers are

at a maximum.  "The right to practice religion freely does not include liberty to expose the

community . . . to communicable disease or the latter to ill health or death."   Prince v.

Massachusetts, 321 U.S. at 166-67.  Nonetheless, no matter how grave the emergency, individual

constitutional freedoms -- such as the free exercise of religion, one of the United States' most

treasured and closely guarded liberties -- constrain state action.  The Court thus examines closely

the April 11 Order to deteremine whether it infringes upon Legacy Church's First Amendment

Rights.  The Court concludes that the April 11 Order does not violate Legacy Church's Free

Exercise rights.  The April 11 Order is neutral and generally applicable, and important government

interests having nothing to do with religion motivate the April 11 Order.  Although the April 11

- 68 -

Order's timing concerns the Court -- the April 11 Order prohibited religious gatherings on Easter's eve -- the April 11 Order nonetheless is constitutional, because Secretary Kunkel justifies the April 11 Order without reference to prohibited activity's religious nature.  See Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984).  Similarly, although New Mexico's process for determining what businesses are essential toes the line of constitutional permissibility, that calculus does not violate Lukumi and Smith, because New Mexico's process does not involve the government's subjective, case-by-case judgment of religious activity's merits, but rather an across-the-board prohibition against mass gatherings.  See Smith, 494 U.S. at 884.

The Court first examines whether the April 11 Order is neutral and generally applicable. If the April 11 Order is non-neutral or not generally applicable, it must serve compelling governmental interests to be valid.  See Lukumi, 508 U.S. at 547.  Smith provides that the First Amendment does not require the state to exempt religious practitioners from compliance with an "across-the-board criminal prohibition on a particular form of conduct," even if sincere religious faith mandates the prohibited conduct.  Smith, 494 U.S. at 884.  To hold otherwise -- to allow the religious practitioner veto power on neutral, generally applicable prohibitions -- "would open the prospect of constitutionally required religious exemptions from civic obligations of almost every conceivable kind."  Smith, 494 U.S. at  884.

Concurring in Lukumi, Justice Scalia elaborated on Smith's neutrality and general applicability principles:

> The terms "neutrality" and "general applicability" are not to be found within the First Amendment itself, of course, but are used in [Smith] and earlier cases to describe those characteristics which cause a law that prohibits an activity a particular individual wishes to engage in for religious reasons nonetheless not to constitute a "law . . . prohibiting the free exercise" of religion within the meaning of the First Amendment.  In my view, the defect of lack of neutrality applies primarily to those laws that by their terms impose disabilities on the basis of

- 69 -

> religion (e.g., a law excluding members of a certain sect from public benefits, *cf. McDaniel v. Paty*, . . . , *see Bowen v. Roy*, . . . ; whereas the defect of lack of general applicability applies primarily to those laws which, though neutral in their terms, through their design, construction, or enforcement target the practices of a particular religion for discriminatory treatment, *see Fowler v. Rhode Island*, 345 U.S. 67 (1953).  But certainly a law that is not of general applicability (in the sense I have described) can be considered "nonneutral"; and certainly no law that is nonneutral (in the relevant sense) can be thought to be of general applicability.

Lukumi, 508 U.S. at 557-58 (Scalia, J., concurring in part and concurring in the judgment, joined by Rehnquist, C.J.).  Justice Scalia there criticizes Justice Kennedy's inquiry into lawmakers' subjective intent to determine whether a law is neutral and generally applicable.  See 508 U.S. at 557-58.  Justice Scalia added that Smith and the precedent on which it is based focus, as the primary examination, not on lawmakers' subjective intentions, but rather on the "object of the *laws* at issue."  Lukumi, 508 U.S. at 558 (Scalia, J., concurring, joined by Rehnquist, C.J.)(emphasis in original).  Justice Kennedy's inquiry into the city-defendant's subjective intent in passing the ordinances at issue in Lukumi thus did not convince a majority of the Supreme Court's justices.  See Lukumi, 508 U.S. at 523 n.* ("THE CHIEF JUSTICE, Justice SCALIA, and Justice THOMAS join all but Part II-A-2 of this opinion. Justice WHITE joins all but Part II-A of this opinion. Justice SOUTER joins only Parts I, III, and IV of this opinion.").

The Court nonetheless examines whether the April 11 Order's language and circumstances to determine whether the April 11 Order manifests religious animus.  Although such an inquiry did not carry the majority in Lukumi, the Supreme Court's analysis in Masterpiece Cakeshop suggests that lawmakers' religious bigotry or animus may violate the First Amendment, even where an underlying law may be facially neutral and generally applicable.  See Masterpiece

- 70 -

Cakeshop, 138 S. Ct. at 1731-32.[9]  The Court examines first the timeline of events leading up to

the April 11 Order.  The April 6 Order restricted myriad commercial and secular activity, but

permitted religious activity.  See April 6 Order ¶ 6, at 5.  On April 11, as the COVID-19 crisis

continued to escalate, and on Easter's eve, New Mexico rescinded the April 6 Order insofar as it

permitted religious services, thus effectively prohibiting in-person Easter services across New

Mexico.  See April 11 Order ¶ 6, at 5.

Legacy Church does not challenge the April 11 Order as discriminating against Christianity

in favor of other religions.  Passover began on April 8, 2020, and ends on April 16, 2020.[10]  The

only Muslim holiday that appears to have occurred during New Mexico's COVID-19 restrictions,

and whose celebration Secretary Kunkel permitted, is Lailat Al Miraj, which landed on March 22,

2020.  The April 11 Order will restrict, however, services and gatherings in observation of one of

Islam's most important months -- Ramadan -- which begins on April 23, 2020.  Accordingly, the

April 11 Order's mass gathering restrictions burden several different religions and do not shift the

burden for its justification to Secretary Kunkel.

The April 11 Order's timing nonetheless troubles the Court.  COVID-19 has been an

ongoing health emergency in New Mexico for well over a month.  The Governor declared a state

of emergency on March 11, 2020, the day New Mexico announced its first confirmed COVID-19

---

[9]The Court notes that, while Lukumi provides that courts subject nonneutral laws to strict scrutiny, see Lukumi, 508 U.S. at 546, nowhere is such an analysis found in Justice Kennedy's opinion for the Supreme Court in Masterpiece Cakeshop.  After concluding that the defendant Colorado Civil Rights Commissioner's comments expressed hostility to religion, Justice Kennedy concluded that the defendant's actions violated the plaintiff's Free Exercise rights without any strict scrutiny analysis.  See 138 S. Ct. at 1731-32.

[10]The Court notes that the April 6 Order permitted celebration and gatherings in observance of two Seders, which occurred on April 8 and 9, 2020.

case.  See FOF ¶ 20, at 5-6.  Secretary Kunkel announced further restrictions on mass gatherings on April 6, 2020, two days before Passover began, but permitted religious gatherings.  See April 6 Order at 5-6.  On the evening of April 11, the night before Easter, Secretary Kunkel removed the exemption for religious services, prohibiting Easter services.  The Court notes, however, that the COVID-19 situation had escalated dramatically between April 6 and 11.  On April 6th, the state had 685 confirmed cases and twelve deaths.  On April 11th, New Mexico had 1,174 confirmed cases, and deaths had more than doubled to twenty-six.  See FOF ¶ 52, at 13.  On April 10, the state announced 106 new cases of COVID-19 and two additional deaths.  See Albuquerque J., "Coronavirus Updates: April 10", April 10, 2020, https://www.abqjournal.com/1442108/coronavirus-updates-april-10.html (last accessed April 15, 2020).  On April 11, the state recorded eighty-six new cases and an additional death.  See Albuquerque J., "Coronavirus Updates: April 11", April 11, 2020, https://www.abqjournal.com/1442624/coronavirus-updates-april-11.html (last accessed April 15, 2020).  Amid this escalation, the Governor sought to justify the restrictions on religious services:

> We're incredibly grateful that so many houses of worship already took action of their own . . . .  However, there have been a few outliers, putting New Mexicans at risk.  We were hearing additional ones planning on holding services (Sunday) . . . and we wanted to be crystal clear.

Albuquerque J., "Coronavirus Updates: April 11."  See FOF ¶ 62, at 15.  Secretary Kunkel thus contends that anti-Christian animus does not motivate the April 11 Order's timing, but rather churches' last-minute decisions to hold in-person services despite the escalating public health emergency.  This justification is more plausible than the Governor's desire to thwart Christianity's most sacred holiday.  As officials received word of churches' plans to push forward, which would lead to dozens of gatherings of dozens, perhaps hundreds of people across the state, the state took

- 72 -

action to "be crystal clear" that it viewed mass gatherings as a public health threat. Albuquerque J., "Coronavirus Updates: April 11." See FOF ¶ 62, at 15. These churches' plans, in Secretary Kunkel's view, endangered public health, not because of their religious nature, but because they involved masses of people in closed spaces and in close proximity. As Secretary Kunkel has asserted a plausible, religion-neutral justification for the April 11 Order's timing, the Court sees no animus or overt discrimination in the April 11 Order's timing.

That Secretary Kunkel appears to have discretion to categorize and recategorize activities as essential or nonessential gives the Court pause. See, e.g., Sherbert v. Verner, 374 U.S. at 401 (invalidating denial of unemployment benefits where statute allowed officials to evaluate, on a case-by-case basis, whether an individual's termination from employment was for "good cause"); Cantwell v. Connecticut, 310 U.S. at 305 (invalidating a statute that prohibited solicitation for religious or charitable causes without a designated official's approval, and authorizing the official to determine whether the cause is genuinely religious or charitable). Secretary Kunkel notes, however, that her categorization has remained largely constant through each public health order. See April 16 Tr. at 26:18-23. Similarly, it should not surprise that each public health order might grow more restrictive as time passes and the pandemic worsens. In other words, mass gatherings and activities involving close physical proximity grow more threatening as COVID-19 spreads through the community. The Supreme Court's cases contemplate, as Free Exercise violations, individualized determinations of what religious activity is preferable or amounts to a good cause, and what religious activity falls short of meriting governmental protection. See Cantwell v. Connecticut, 310 U.S. at 305. Here, religious activity's recategorization did not result from individualized assessment as to whether certain religious activity is more important than other religious activity. Instead, that recategorization resulted from increased danger that some religious

- 73 -

activity -- mass gatherings -- caused.  This is not the kind of individualized assessment that the First Amendment prohibits.   Similarly, Secretary Kunkel points out that religious activity's relatively late recategorization stemmed not from hostility toward religion, but rather solicitousness towards religion.   Secretary Kunkel sought to preserve religious organizations' leeway to conduct services as long as possible until COVID-19 became too severe to continue affording such latitude.

Legacy Church focuses instead on the April 11 Order's distinction between religious gatherings and secular gathering.  Legacy Church contends that the April 11 Order is not neutral, because it

> specifically targets houses of worship.  The Secretary does not restrict the number of people who may gather at funeral homes, media outlets, and other essential businesses.  Walmart, Home Depot, and other big box retailers continue to welcome patrons.  Shoppers may roam the aisles of retail establishments with no barriers between them so long as they maintain a distance of six feet from one another while they purchase house plants, fishing rods and DVDs. The Secretary's treatment of those essential businesses, as well as retailers, shows least restrictive means are available to further the state's public health interest.  Defendants, however, chose to specifically target church services and other places of worship, taking them from exempt to banned on a weekend night before Legacy's most important religious holiday.

Motion at 6.  Legacy Church also contends that the April 11 Order is not generally applicable, because it is underinclusive with regards to secular conduct that might cause the same harm that the prohibition against religious gatherings is supposed to prevent.  See Motion at 7.  Legacy Church contends that courts apply strict scrutiny where the government exempts non-religious entities from the burdens associated with government action but withholds such exemptions from religious entities.  See Motion at 7.  Legacy Church accordingly argues that the April 11 Order is

- 74 -

facially discriminatory, and so the Court must subject it to "'the most rigorous scrutiny.'"  Motion at 6 (quoting <u>Lukumi</u>, 508 U.S. at 546).

 <u>Lukumi</u>'s majority opinion incorporates into its holding <u>Smith</u>'s dictum that, when the government provides exemptions for secular conduct, it must assert a compelling justification for refusing exemptions for analogous religious conduct.  <u>See</u> <u>Lukumi</u>, 508 U.S. at 537.  <u>Lukumi</u> and <u>Smith</u> require the Court, however, to compare analogous exemptions.  <u>See</u> <u>Lukumi</u>, 508 U.S. at 538-40.  The April 11 Order does not prohibit religious conduct only; it prohibits a host of secular activities, both commercial and recreational.  <u>See</u> April 11 Order at 4-5.  Accordingly, to determine the April 11 Order's neutrality,  the Court must compare not only the April 11 Order's essential-business exemptions against religious-activity prohibitions, but also its religious-activity prohibitions against its secular-activity prohibitions.  <u>See</u> <u>Lukumi</u>, 508 U.S. at 543-45 (comparing permitted and restricted activity that involves animal slaughter).  Framed as such, the April 11 Order is neutral.  The April 11 Order severely restricts myriad secular activities.  <u>See</u> April 11 Order at 3-6.  By omission from its list of essential businesses, the April 11 Order restricts secular gatherings like sporting events, conferences, and conventions.  <u>See</u> April 11 Order at 3-5 (defining essential businesses).  For example, the April 11 Order maintains the April 6 Order's closure of non-Indian casinos and horse racing facilities, directs all non-essential businesses to reduce their in-person staffing by 100 percent, and restricts hotels and other lodging operations to twenty-five-percent capacity.  <u>See</u> April 11 Order ¶¶ 2-6, at 5-6.  Nor does the April 11 Order reserve unbridled freedom for secular activities that it deems essential.  <u>See</u> April 11 Order at 6.  For example, it allows essential businesses to remain open, "provided they minimize their operations and staff to the greatest extent possible."  April 11 Order at 5-6.  It also restricts such businesses to twenty percent of their maximum occupancies.  <u>See</u> April 11 Order ¶ 4, at 6.  The April 11 Order does not

impose special disability on the basis of religion.  Cf. Sherbert v. Verner, 374 U.S. at 404

(invalidating statutory scheme that allowed denial of unemployment benefits to an applicant who

was terminated from employment for refusing to act contrary to her religion).  The April 11 Order,

accordingly, is neutral, because its "object is something other than the infringement or restriction

of religious practices."  Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 649-

50 (10th Cir. 2006).

The April 11 Order is also generally applicable.  Legacy Church contends that the April 11

Order violates the First Amendment because it is underinclusive; it exempts certain secular

activities that also entail large gatherings.  See Motion at 7.  The April 6 Order and the April 11

Order provide a set of activities that Secretary Kunkel deems essential.  See April 6 Order at 3-5;

April 11 Order at 3-5.  Those enterprises include, among others, hospitals, farms, media services,

funeral homes, automobile and bicycle mechanics, and business that generate the majority of their

revenue by selling "canned food, dry goods, fresh fruits and vegetables, pet food, feed, and other

animal supply stores, fresh meats, fish, and poultry, and any other household consumer products."

April 11 Order at 3-5.  Legacy Church contends that the April 11 Order is not generally applicable,

because it allows "big box retailers to continue to welcome patrons" while prohibiting church

services.  Motion at 6.

Since its earliest decisions addressing religious freedom, the Supreme Court has recognized

that, if religious conduct is defined broadly enough, and its protections afforded too much bite

against government regulation, "most activities of the modern regulatory state are thrown into

chaos."  Steven G. Gey, Why is Religion Special: Reconsidering the Accomodation of Religion

under the Religion Clauses of the First Amendment, 52 U. Pitt. L. Rev. 75, 78 (1990).  See

Reynolds v. United States, 98 U.S. at 166-67 (noting that, while laws cannot interfere with

- 76 -

religious belief, "[t]o permit [a religious veto against generally applicable prohibitions] would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself").   "The government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, 'cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development.'"  Smith, 494 U.S. at 885 (quoting Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. at 451).   First Amendment caselaw thus recognizes and allows that "[a]ll laws are selective to some extent."  Lukumi, 508 U.S. at 542.  Instead, the Free Exercise Clause "'protect[s] religious observers against unequal treatment,'"  Lukumi, 508 U.S. at 542 (quoting Hobbie v. Unemployment Appeals Comm'n of Fla., 480 U.S. 136, 148 (1987)(Stevens, J., concurring in judgment)).  Impermissible "inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation."  Lukumi, 508 U.S. at 543.

Here, Secretary Kunkel may distinguish between certain classes of activity, grouping religious gatherings in with a host of secular conduct, to achieve what she determines is a balance between maintaining community needs and protecting public health.  Secretary Kunkel does not pursue this aim "only against conduct with a religious motivation."  Lukumi, 508 U.S. at 543. Although public health risks may arise in allowing say, Wal-Mart, to continue its operations, the April 11 Order does not leave such business untouched.  See April 11 Order at 4-5.  In furtherance of its goal of minimizing social proximity, the April 11 Order directs all essential businesses to reduce occupancy, enforce social distancing, and reduce staffing.  See April 11 Order at 3-7.  The April 11 Order reflects Secretary Kunkel's judgment that certain activities -- namely, large gatherings -- present the greatest risk to public health.  See April 11 Order at 2.  Accordingly,

- 77 -

contrary to Legacy Church's contention, the April 11 Order does not irrationally allow mass gatherings in retail stores while prohibiting them in churches, mosques, and synagogues.   The April 6 Order and the April 11 Order instead prohibit all mass gatherings, religious and secular alike.   See April 6 Order at 5; April 11 Order at 5.   The April 11 Order is thus generally applicable.

The Court notes that the Honorable Justin R. Walker, United States District Judge for the United States District Court for the Western District of Kentucky, recently concluded that a similar restriction in Louisville, Kentucky, is unconstitutional.   See On Fire Christian Ctr., Inc. v. Fischer, No. 3:20-CV-264-JRW, 2020 WL 1820249, at *6 (W.D. Ky. Apr. 11, 2020)(Walker, J.)("On Fire Christian Ctr.").   Although important facts differ between that case and this case, the Court respectfully declines to follow Judge Walker's reasoning.   In that case, the mayor of Louisville, on the Thursday before Easter Sunday, prohibited religious services, including services in which congregants remained in their cars in church parking lots.   See On Fire Christian Ctr., 2020 WL 1820249, at *4.   As Judge Walker put it, "an American mayor criminalized the communal celebration of Easter," an action that Judge Walker thought would fit right in in a "dystopian novel, or perhaps the pages of *The Onion*."   2020 WL 1820249, at *1.   The defendant-Mayor stated that, while he would not use the city's police to enforce the prohibition, police would be present at any services to distribute information about the dangers of social gatherings.   See 2020 WL 1820249, at *4.   The plaintiff, a Christian church, sought a temporary restraining order against the Mayor's prohibition.   See 2020 WL 1820249, at *1.   Judge Walker noted that "society has the strongest of interests in curbing the growth of a deadly disease," but concluded that the defendant-Mayor's prohibition violated the Free Exercise Clause "'beyond all question.'"   2020 WL 1820249, at *6 (quoting In re Abbott, 954 F.3d 728, 2020 WL 1685929, at *7 (5th Cir. 2020)).   Judge Walker concluded that the defendant-Mayor's order was neither neutral nor generally applicable, because

- 78 -

it prohibited drive-through religious services while permitting, among other activities, drive-through liquor stores or parking in parking lots. See 2020 WL 1820249, at *6. Judge Walker also determined that the defendant-Mayor's order was both under- and over-inclusive:

> They're underinclusive because they don't prohibit a host of equally dangerous (or equally harmless) activities that Louisville has permitted on the basis that they are essential. Those essential activities include driving through a liquor store's pick-up window, parking in a liquor store's parking lot, or walking into a liquor store where other customers are shopping. The Court does not mean to impugn the perfectly legal business of selling alcohol, nor the legal and widely enjoyed activity of drinking it. But if beer is essential, so is Easter.

2020 WL 1820249, at *7 (internal quotation marks omitted).

Significant factual differences exist between the Louisville Mayor's order and the April 11 Order. As the Court has discussed, the April 11 Order does not permit secular activities analogous to mass gatherings at religious services. See April 11 Order at 3-6. Similarly, the April 11 Order does not specifically prohibit drive-through religious services -- and Secretary Kunkel asserts that it does not -- provided that people maintain social distancing. See April 16 Tr. at 32:20-25 (Garcia). Further, Legacy Church requests to undertake church services in a manner that the April 11 Order does not generally permit in secular activity and which Secretary Kunkel has concluded is harmful without regard to its religious nature. Specifically, Legacy Church wishes to invite parishioners to its services. See Complaint ¶ 17, at 3. The Court identifies no analogous secular conduct that the April 11 Order permits -- namely, instances in which secular institutions may invite individuals to witness in person what the institution may broadcast remotely. Further, Judge Walker's injunction applied only to the plaintiff-church's drive-in services. See 2020 WL 1820249, at *7. Legacy Church requests, however, that "the Court enjoin the Secretary and the State from enforcing the [April 11 Order's] mass gathering restriction of five people or more in a connected space." Motion at 12. Finally, Judge Walker focused almost exclusively on the

defendant-Mayor's permission for liquors to continue operations, including drive-through operations.  Judge Walker's analysis thus left unanswered whether the defendant-Mayor's order would be valid if it had also closed liquor stores, and so that Court has difficulty extrapolating Judge Walker's logic and applying it here.  The April 6 Order and the April 11 Order permit breweries and distilleries to remain open for curbside carry-out services, see April 6 Order ¶ 2.u, at 4, April 11 Order ¶ 2.u, at 4, but both orders omit liquor stores from the list of essential businesses, effectively closing them, see April 6 Order at 2-5, April 11 Order at 2-5.[11]  Accordingly, the April 11 Order presents the reverse situation from the Louisville Mayor's order: in Kentucky, stores remained open, but drive-in church services were prohibited; here, drive-in church services are permitted, but liquour stores are shuttered.

The Court also disagrees that strict scrutiny applies in this case.  Legacy Church contends that the April 11 Order is subject to strict scrutiny.  As justification, Legacy Church argues that the April 11 Order is not the least restrictive means of achieving what it concedes is New Mexico's compelling interest in protecting the public health.  See April 16 Tr. at 13:14-17 (Hunter).  But the generally-applicable and neutral standards cannot equal a least-restrictive-means standard, else Smith's rational basis prescription -- and its "'parade of horribles'" that would result from subjecting generally applicable, neutral laws to strict scrutiny, see Smith, 494 U.S. at 889 n.5 (quoting Smith, 494 U.S. at 902 (O'Connor, J., concurring) -- would amount to semantics.  Asserting that government action that burdens religions is subject to rational basis unless it the

_____

[11]Although not necessary for the Motion's purposes, the Court notes that the sale of alcohol may rationally be deemed essential as necessary to prevent death from sudden alcohol withdrawal.  See Scientific American, "Yes, Liqour Stores are Essential," April 7, 2020, https://blogs.scientificamerican.com/observations/yes-liquor-stores-are-essential-businesses/ (last accessed April 17, 2020)("Because so few people have access to medications for [alcohol use disorder], access to alcohol becomes a matter of life or death").

action is not the least restrictive means towards achieving the government's stated end is a tautology, one that erases the distinction between the standards of review.  The Court's review of governmental action's constitutionality requires that it apply the correct standard of review, and that application requires criteria beyond the test that the standard of review prescribes.  For example, strict scrutiny applies when the government, among other presumptively impermissible actions, discriminates on the basis of race, and the Court asks whether that discrimination is narrowly tailored after identifying racial discrimination.  See, e.g., Adarand Constructors v. Peña, 515 U.S. 200 (1995).  Here, the April 11 Order is subject to rational basis review unless it is nonneutral or not generally applicable.  As the Court has discussed, the April 11 Order is both neutral with respect to religion and generally applicable without regard to religion.  Accordingly, the April 11 Order is subject to rational basis review.[12]

_____

[12]Even if strict scrutiny were applicable, the April 11 Order is constitutional.  To satisfy strict scrutiny, Secretary Kunkel must demonstrate that the April 11 Order is narrowly tailored to further a compelling government interest.  See Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 649 (10th Cir. 2006).  Typically, "'a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.'"  Lukumi, 508 U.S. at 520 (quoting Florida Star v. B.J.F., 491 U.S. 524, 541-542 (1989)(Scalia, J., concurring in part and concurring in judgment)).  Here, Legacy Church concedes "without question" that the April 11 order furthers a compelling governmental interest.  See April 16 Tr. at 6:5-8 (Hunter).  The Court agrees.  When "faced with a society-threatening epidemic," In re Abbott, WL 1685929, at *7, state governments, pursuant to their Tenth Amendment police and public health powers, have an interest of the highest order in taking measures to protect the populace.  See, e.g., C. M. v. Urbina, 640 F. App'x 825, 831 (10th Cir. 2016)(unpublished).  "The right to practice religion freely does not include liberty to expose the community . . . to communicable disease or the latter to ill health or death."  Prince v. Massachusetts, 321 U.S. 158, 167(1944).

The April 11 Order is narrowly tailored.  First, the April 11 Order does not restrict religious activity beyond what is necessary to achieve this compelling interest.  Secretary Kunkel interprets the April 11 Order as allowing religious organizations like Legacy Church to broadcast their services to followers via the internet and over television.  See April 16 Tr. at 26:3-11.  Legacy Church is thus free to staff its services to the extent needed to worship and broadcast its worship.

Regarding its categorization of essential and nonessential enterprises, the April 11 Order does not leave "appreciable damage to [this] vital interest unprohibited."  Lukumi, 508 U.S. at 520.

- 81 -

Legacy Church says that the April 11 Order "discriminates equally against religions across the board."  April 16 Tr. at 15:8-9 (Hunter).  Accordingly, instead of arguing that the April 11 Order discriminates against Christianity, Legacy Church argues that, because the April 11 Order broadly categorizes all religious activity as nonessential, the April 11 Order is not generally applicable.  See April 16 Tr. at 15:24-16:3 (Hunter).  But the Establishment Clause likely prevents the government from picking religious winners and losers.  Legacy Church does not assert an Establishment Clause violation, and, likely, such a claim would not be viable.  Although there is no definitive test for Establishment Clause violations, the closest thing to it comes from Lemon v. Kurtzman, 403 U.S. 602 (1971).  In that case, the Supreme Court concluded that the Establishment Clause requires that laws have a secular purpose, that they neither inhibit nor advance religion, and that they do not foster excessive entanglement with religion.  See Lemon v. Kurtzman, 403 U.S. at 612-13.  Other tests have been suggested and discarded in cases since Lemon v. Kurtzman,

---

First, there is no exempted activity analogous to religious mass gatherings.  Although, as Legacy Church points out, the April 11 Order classifies a range of activity as essential, it does not leave that activity unregulated.  Instead, the April 11 Order restricts essential businesses to the greatest extent possible while still leaving those businesses practicable.  See April 11 Order at 4-5.  Further, those activities are unique in that, unlike Legacy Church's services, they cannot be conducted remotely.  To name a few examples, grocery store cashiers and baggers cannot do their jobs, and farmers cannot grow their crops, via teleworking.  That the April 11 Order permits some enterprises to carry on -- albeit subject to restrictions -- does not render the April 11 Order too loosely restrictive.  The government need not choose between doing nothing in the face of a pandemic and closing all of society.  It may choose a middle ground, provided that it does so "'without reference to the content of the regulated" activity.  City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48 (1986)(quoting Va. Pharmacy Bd. v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 771 (1976)).  The April 11 Order satisfies that test.  It prohibits mass gatherings without reference to those gatherings' content.  In other words, the April 11 Order prohibits in-person religious services not because of those services' religious nature, but rather because those services entail bringing large groups of people into close proximity -- precisely the environment in which a highly contagious disease proliferates.  Accordingly, even if the April 11 Order were subject to strict scrutiny, Legacy Church is nonetheless unlikely to succeed on its Free Exercise claim's merits.

- 82 -

such as the test that laws must not endorse or disapprove of religion, see, e.g., Lynch v. Donnelly, 465 U.S. 668, 688, (1984)(O'Connor, J., concurring), or that government may not coerce religious orthodoxy or compel financial support for particular religions, see, e.g., Lee v. Weisman, 505 U.S. 577, 641, (1992)(Scalia, J., dissenting).   Nonetheless, despite broad disagreement over the Establishment Clause's meaning, Supreme Court justices over the years have typically agreed that government may not pick and choose religious winners and religious losers.  See, e.g., Van Orden v. Perry, 545 U.S. 677, 685 (2005)(Breyer, J.); id. at 709-10 (Stevens, J., dissenting)("The first and most fundamental of these principles, one that a majority of this Court today affirms, is that the Establishment Clause demands religious neutrality -- government may not exercise a preference for one religious faith over another."); Zelman v. Simmons-Harris, 536 U.S. 639, 652 (2002)(Rehnquist, C.J.); Mitchell v. Helms, 530 U.S. 793, 809 (2000)(Thomas, J.); Lynch v. Donnelly, 465 U.S. at 688 (O'Connor, J., concurring); Everson v. Bd. of Ed. of Ewing Twp., 330 U.S. 1, 16 (1947)(Black, J.).  Accordingly, were Secretary Kunkel to determine which religious activity is essential and which is not -- by, say, determining that Christian churches could hold Easter services but Muslim mosques could not hold Ramadan services -- such an order would violate the Establishment Clause.   While fear of violating the Establishment Clause is not a compelling interest that justifies infringing Free Exercise rights, see McDaniel v. Paty, 435 U.S. at 628-29, as discussed, the April 11 Order does not run impermissibly infringe upon Legacy Church's Free Exercise rights in attempt to prevent an Establishment Clause violation.  Instead, the April 11 Order is a neutral, generally applicable rule.[13]

---

[13]Although Legacy Church does not assert a hybrid-rights entitlement to strict scrutiny -- Legacy Church does not cite Smith in the Complaint or in the Motion -- the Court pauses to note that such an assertion would not be viable.  In Smith, Justice Scalia attempted to distinguish Yoder v. Wisconsin and West Virginia Board of Education v. Barnette, among other cases, by asserting

that those cases involved special solicitousness to the plaintiffs' claims because the plaintiffs asserted multiple constitutional rights. See 494 U.S. at 880-81. Critics have panned the hybrid-rights theory, arguing, for example, that Justice Scalia's "use of precedent borders on fiction." William P. Marshall, Correspondence on Free Exercise Revisionism; In Defense of Smith and Free Exercise Revisionism, 58 U. CHI. L. REV. 308, 309 (1991). The Court agrees that, at least in some of the precedent that Justice Scalia cites in support of the hybrid-right theory, those cases contradict Justice Scalia's explanation. In Wisconsin v. Yoder, for example, the Supreme Court held that parents who belonged to the Old Order Amish faith have a constitutional right to withdraw their fourteen and fifteen-year old children from school despite a state statute compelling school attendance until the age of sixteen. See 406 U.S. at 210. The Supreme Court thus extended First Amendment protections to the broader, perhaps secular, consequences of the plaintiffs' faith. The Supreme Court noted that the Old Order Amish "religion pervades and determines the entire mode of life of its adherents," and imbued with constitutional significance the plaintiffs' refusal to educate their children beyond the eighth grade. 406 U.S. at 210. The Supreme Court also expressly refused to extend such protection to hypothetical plaintiffs whose refusal is based on political or other secular considerations. See 406 U.S. at 215 ("A way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations; to have the protection of the Religion Clauses, the claims must be rooted in religious belief."). Accordingly, Wisconsin v. Yoder does not involve broad parental rights to "direct the education of their children," Smith, 494 U.S. at 881, but rather the narrower concept of "parental control over the religious upbringing and education of their minor children," Wisconsin v. Yoder, 406 U.S. at 231. Further, as Justice Douglas pointed out in his dissent in Wisconsin v. Yoder, the only testimony regarding the children's wishes showed that the children did not want to stay in school. See Yoder, 406 U.S. at 211; id. at 241-42 (Douglas, J., dissenting in part). The parents, as criminal defendants, thus asserted their children's free exercise rights, rather than their broader rights to direct their children's upbringing: "Our holding in no way determines the proper resolution of the competing interests of parents, children, and the State . . . ." Wisconsin v. Yoder, 406 U.S. at 231. Similarly, the language from Cantwell v. Connecticut that Justice Scalia cites in support of the hybrid-rights theory involved the Supreme Court's treatment of the plaintiff's second, separately asserted right. See Smith, 494 U.S. at 881 n. 1 (citing Cantwell v. Connecticut, 310 U.S. at 307.

The hybrid-rights theory also presents functional problems, such as whether the theory requires independently viable rights, or whether it somehow operates to produce a whole greater than its parts. Neither approach is tenable. First, if asserting multiple rights creates greater protections than individual rights on their own, then Smith's ruling itself would not make sense. As Justice Souter noted, concurring in Lukumi, if the hybrid-rights exception requires implication of multiple, although not independently viable, rights, then the exception would "swallow the Smith rule," because the Smith plaintiffs' asserted activity involved religious and associational rights. Lukumi, 508 U.S. at 567 (Souter, J., concurring). As the United States Court of Appeals for the Third Circuit noted in Salvation Army v. Department of Community Affairs, 919 F.2d 183, 185 (3d Cir. 1990), associational freedom derives from either the expression of ideas or the exercise of religion. See 919 F.2d at 199. Those two rights, the Third Circuit commented, involve "different contours." 919 F.2d at 199. As the Third Circuit explained, "[w]e would not expect a derivative right to receive greater protection than the right from which it was derived." 919 F.2d

- 84 -

As the Supreme Court noted in Smith, the First Amendment does not require the courts to invalidate legislation where courts would prefer more solicitous treatment of religious freedom. See Smith, 494 U.S. at 890. "But to say that a nondiscriminatory religious-practice exemption is permitted, or even that it is desirable, is not to say that it is constitutionally required, and that the appropriate occasions for its creation can be discerned by the courts." Smith, 494 U.S. at 890. The April 11 Order, in short, does not single out religious activity or impose special disability on the basis of religious status and so does not violate Legacy Church's Free Exercise rights.[14]

_____

at 199. Alternatively, if a hybrid claim is one in which in which the plaintiff must assert an additional, independently viable right, then the Free Exercise right becomes superfluous, and the hybrid-rights theory produces no different outcome than the plaintiff would otherwise wholly receive on the alternative right. See Lukumi, 508 U.S. at 567 (Souter, J., concurring).

Here, because the Court concludes that neither of Legacy Church's asserted rights are independently viable, only the former approach could potentially save Legacy Church's claims. But, as discussed, if two separate and independently unviable rights did not win the day for the Smith plaintiffs, Legacy Church's Free Exercise and Assembly rights, working together, do not compel a different result than either produces independently. Accordingly, were Legacy Church to assert a hybrid-rights claim, it would likely not produce a result different from the Courts conclusions in this opinion.

[14]The examination that Legacy Church's Motion requires, in a worldwide pandemic, and the differing results among three federal district judges and two state supreme courts suggest that the Supreme Court owes the nation a better free exercise jurisprudence than it has yet provided. Its occasional focus on subjective intent, balancing of competing interest, and lack of clarity on the level of scrutiny has created a lack of principled analysis and irreconcilable precedent in its own opinions. Its "modern" broad interpretation of the Free Exercise Clause has manufactured an unnecessary "conflict" with the other First Amendment religious clause, the Establishment Clause. The Supreme Court has thus created its own exemptions and invalidated Congress' exemptions. See, e.g., NLRB v. Catholic Bishops, 440 U.S. 490, 506-07 (1979)(Burger, C.J.)(holding that Church-operated schools teaching both religious and non-religious students are not within the National Labor Review Board's jurisdiction, as Congress granted it in the National Labor Relations Act, 29 U.S.C. §§ 151-169 (1976)); id. at 508-18 (Brennan, J., dissenting)(criticizing the majority for its evasive statutory construction, and arguing that the Supreme Court should have reached the constitutional issues). All that could have and can be avoided. Reynolds v. United States was the high point of free exercise analysis, and the Supreme Court's jurisprudence has resulted in confusion and muddled thinking. Justice Scalia's majority opinion in Smith was a valiant effort to right the ship. But the Supreme Court since then has not resisted its urge to focus on subjective intent and balancing interests. The Supreme Court should make clear that the Free

- 85 -

IV.     **THE APRIL 11 ORDER DOES NOT VIOLATE LEGACY CHURCH'S RIGHT TO FREEDOM OF ASSEMBLY AND EXPRESSIVE ASSOCIATION.**

The Court concludes that the April 11 Order does not Legacy Church's freedom of assembly right, which it treats as a freedom of expressive association right to accord with Tenth Circuit and Supreme Court caselaw.  The April 11 Order is reasonably related to the demands of the public health crisis, coronavirus.  Moreover, if the April 11 Order was subject to a strict scrutiny analysis, the Court would conclude that it meets strict scrutiny and uphold the April 11 Order.  Thus, the Court concludes that Legacy Church is not likely to win on the merits of its freedom of assembly, or expressive association, claim.

A.     **LEGACY CHURCH HAS A RIGHT OF EXPRESSIVE ASSOCIATION.**

Parties bringing an expressive-association claim under the First Amendment must demonstrate that they are asserting their right to associate "for the purpose of engaging in those activities protected by the First Amendment -- speech, assembly, petition for the redress of grievances, and the exercise of religion."  Roberts v. United States Jaycees, 468 U.S. at 618.  The Tenth Circuit recognizes religious gatherings in which individuals come together "'for the purpose of engaging in . . . religious activities,'" see Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 658 (quoting Bd. of Dirs. v. Rotary Club of Duarte, 481 U.S. at 544), as an activity protected by the First Amendment.  Legacy Church, Inc. wants the Court to allow members of its congregation, technical team, and staff to come together to "conduct[] services in accordance with

---

Exercise protects belief and thought only, and let the First Amendment's speech clauses protect speech, and let the political branches in the federalist system regulate actions and conduct. Religious organizations -- particularly the Catholic Church in New Mexico, enjoy majority support and do not lack political clout, and they do not have much to fear from New Mexico.  No sound constitutional theory of majority / minority rights can support well a different interpretation of Free Exercise rights.

its sincerely held religious beliefs." Motion at 3. Thus, Legacy Church, Inc. is asserting its right to associate for the purpose of engaging in religious exercise, which is an activity protected by the First Amendment.

**B.   THE APRIL 11 ORDER IS NOT ONLY IS RATIONALLY RELATED TO PUBLIC HEALTH DURING A TIME OF PUBLIC HEALTH CRISIS, BUT IT IS ALSO NARROWLY TAILORED TO MEET A COMPELLING GOVERNMENT INTEREST.**

The right to expressive association is not an absolute right and can be infringed upon if that infringement is (i) unrelated to the suppression of expressive association; (ii) due to a compelling government interest; and (iii) narrowly tailored . See Roberts v. United States Jaycees, 468 U.S. at 623. The Court first concludes that New Mexico's infringement on Legacy Church's right to expressive association is not related to the suppression of Legacy Church's expression of its ideas. There is no doubt that the April 11 Order infringes on the right of Legacy Church to gather together to exercise their right of expressive association -- the April 11 Order, which New Mexico announced only a day "before Legacy's most important religious holiday," Motion at 6 restricts the manner in which Legacy can worship. When announcing the April 11 Order, Governor Lujan Grisham noted that the April 11 Order, which includes the restriction on number of individuals at a gathering, would place a "tremendous social and spiritual burden . . . on New Mexicans." Press Release, Mass gathering ban expanded to include houses of worship, Office of the Governor of the State of New Mexico, https://www.governor.state.nm.us/2020/04/11/mass-gathering-ban-expanded-to-include-houses-of-worship/ (last visited April 15, 2020)("Press Release"). Legacy Church's right to assemble may not have been eviscerated, because it still can assemble virtually or in cars , but the manner in which it can assemble is restricted. But see Irshad Learning Ctr. v. Cty. of DuPage, 804 F.Supp. 2d 697, 718 (N.D. Ill. 2011)(Pallmeyer, J.)("The First Amendment

- 87 -

right to freedom of association, however, is not abridged merely because a religious group cannot assemble at a particular location of property."). There is also no doubt, however, that New Mexico did not impose the April 11 Order to suppress the ideas Legacy Church wished to express during its Easter service gathering. Legacy Church does not contend that the April 11 Order's purpose was to suppress their message. See Motion at 7 ("Plaintiff does not dispute that the state has a compelling governmental interest in its response to COVID-19."). The April 11 Order's purpose is to "further restrict business operations and public gatherings to mitigate the spread of the Novel Coronavirus Disease 2019." April 11 Order at 1. Moreover, with the April 11 Order's announcement, New Mexico joined twenty-eight other states whose stay-at-home orders did not exempt religious gatherings from their restrictions on group-meeting size. See Press Release. The Court would be concerned if, unlike twenty-eight other states, New Mexico implemented its order to suppress religious houses' expressive association. The Court concludes that New Mexico's interest in the April 11 Order was unrelated to the suppression of religious expression.

As discussed supra, a global pandemic and its local outbreak amount to a compelling state interest. Thus, the Court must determine whether the infringement is narrowly tailored. See Roberts v. United States Jaycees, 468 U.S. at 623. Legacy Church suggests that the restriction is not narrowly tailored for two reasons: (i) a less restrictive alternative is available in which Legacy Church requires the members of its congregation that attend services to stay at a physical distance from each other; and (ii) New Mexico permits "commercial shoppers and others" to gather despite ordering churches to stop hosting gatherings. Motion at 9. Neither of these arguments is compelling.

First, the proffered "less restrictive" alternative in which congregation members attend services but stay physically distant from each other does not further the compelling state interest

- 88 -

in escalating social distancing measures to mitigate COVID-19.  Motion at 9.  In its March 23, 2020 order, the State of New Mexico ordered all essential businesses exempt from the stay-at-home order to "adhere to social distancing protocol and maintain at least a six-foot social distancing from other individuals [and] avoid person-to-person contact."  March 23 Order at 4. Although the physical distancing likely helped mitigate the initial spread of disease, under these measures the number of deaths still doubled.  If applied to houses of worship, this physical-distancing restriction, under which the death rate doubled in four days, may not advance mitigation efforts further, but instead merely sustain them.  With the number of deaths in New Mexico almost doubling between the April 6 Order and the April 11 Order, it is reasonable that New Mexico and the Secretary would escalate social distancing measures.[15]  The Court concludes, therefore, that applying social distancing measures that were unable to contain the drastic increase in New Mexico COVID-19 cases is not a less restrictive alternative to the cap on gatherings, because it would sustain, rather than increase, New Mexico's social distancing measures.  See Burson v. Freeman, 504 U.S. 191, 206 (1992)(concluding, in a case about restricted zones around voting areas, that the law does not require the government to select a less restrictive alternative that "fall[s] short of serving a State's compelling interests").

      The Court further concludes that Legacy Church's argument that the restriction is underinclusive, because it does not ban mass gatherings at essential businesses, incorrectly equates

---

[15]The Court declines to substitute its judgment for that of subject-area experts because "'[i]t is no part of the function of a court" to decide which measures are "likely to be the most effective for the protection of the public against disease.'"  In re Abbott, No. 20-50264, 2020 WL 1685929, at *1 (quoting Jacobson v. Massachusetts, 197 U.S. at 30).

its religious services,[16] with the essential businesses that are permitted to stay open.  Legacy

Church specifically draws attention to the following businesses that are permitted to stay open:

media outlets, Home Depot, Wal-Mart, grocery stores, automobile repair shops, and funeral

homes.  See Motion at  2, 6, 9.  Each and every business mentioned by Legacy Church either sells

items necessary for everyday life or to facilitate the mitigation of COVID-19.  While, as Legacy

Church noted, some people may take advantage of the exemption and purchase frivolous items,

these are open for good New Mexico citizens to use them judiciously.  As the Secretary Kunkel

noted, Home Depot sells items for emergency home repairs, as does Wal-Mart.  See Secretary

Response at 6 n.9.  Wal*mart also sells thermometers, acetaminophen, and food.  Grocery stores,

obviously, sell food.  All these stores facilitate the purchase of necessary items that help treat ill

individuals who are staying at home, or that make a house habitable, or that feed people so they

can stay alive.  And, of course, people will continue to die, because of COVID-19.  Although the

Court wishes that it could pretend these deaths would not occur, it recognizes that as long as people

die, "funeral homes, crematoriums, and cemeteries" will need to stay open to take care of and give

dignity to the deceased.  Further, in contrast to Legacy Church's contention, nothing in the April

11 Order suggests that funeral homes can host mass gatherings.   See April 11 Order at 6.

Automobile repair shops are necessary so that essential workers -- emergency room physicians,

grocery store workers, police officers – will be able to work on the frontlines unhampered by a

broken engine.  Finally, media services permit the dissemination of crucial COVID-19-related

---

[16]The Court does not want its Memorandum Opinion to be read to minimize the importance
of faith in people's lives.  Certainly religion is the centerpiece of many people's lives, and many
individuals may feel as if religion saved their life. But essential services focus on the public as a
whole -- essential businesses are essential for the lives of everyone, because they are necessary to
ensure public health and welfare.

information to citizens.  Secretary Kunkel has deemed these entities essential, and the Court is not in a position to second-guess expert decisions on which restrictions will be most effective at saving lives during an epidemic when those restrictions are based not on suppression of religion but suppression of a epidemic.  See In re Abbott, No. 20-50264, 2020 WL 1685929, at *1 (quoting Jacobson v. Massachusetts, 197 U.S. at 30).  The Court recognizes that, to many individuals, religious worship is equally essential and important to life.  See Las Cruces Resumes Public Mass Article (quoting Las Cruces Bishop Peter Baldacchino as saying that "while we run a daily count of the physical deaths, we are overlooking those who are dead interiorly.").  Importantly, however, none of the April 11 Order's listed essential businesses can operate remotely, while religious services can be broadcast to congregation members.  The broadcast, of course, may be dissatisfying for some parishioners, but they will still be able to access the services remotely, regardless of their satisfaction.  The entities that Legacy Church named are not comparable to houses of worship; all of these services are necessary to everyday life and to fighting the epidemic, and none of these services can be done remotely, in contrast to religious worship, which, while important, does not facilitate survival of the public and has the ability to be conducted remotely.

Moreover, religious organizations have received preferential treatment relative to their closest comparators -- in terms of physical set-up and risk, not necessarily meaning.   Movie theatres and concert halls are spaces where people gather and sit together for a period of time similar to Legacy Church's auditorium.  On March 23, New Mexico shuttered movie theatres and concert halls See Secretary Response at 8 (citing March 23 Order at 3-4).  Meanwhile, places of worship were kept open, perhaps because New Mexico acknowledge religious worship's importance to many individuals.  Cf.  Swanson By & Through Swanson v. Guthrie Indep. Sch. Dist. No. I-L, 135 F.3d 694, 702 (10th Cir. 1998)(stating that the Free Exercise Clause provides

protection, not special treatment)(citing <u>Snyder v. Murray City Corp.</u>, 124 F.3d 1348, 1353 (10th Cir. 1997).  Thus, the April 11 Order is not underinclusive even though it has different restrictions for places of religious worship than it does for essential services necessary for everyday life and survival that cannot be done remotely.  <u>Yellowbear v. Lampert</u>, 741 F.3d 48, 60 (10th Cir. 2014)(stating that a law is underinclusive when it "fail[s] to cover significant tracts of conduct implicating the law's animating and putatively compelling interest").

Nor is the April 11 overbroad.  It allows Legacy Church and other religious organizations to broadcast services.  <u>See</u> April 11 Order at 6.  It does not mention a ban on drive-through services.  <u>See</u> April 11 Order at 6.  <u>See also</u> Secretary Response at 2 (stating that the Order "has been specifically tailored to allow [places of worship] to provide services to their congregants via electronic means or through drive-in services").  <u>Lukumi</u>, 508 U.S. at 522.  Presumably, based on the Secretary's Response, Legacy Church can still assemble for worship services, albeit in their cars in a parking lot. Thus, the Court concludes that Legacy Church likely will not succeed on the merits for its freedom-of-assembly claim.

The Court need not even go so far to determine that Legacy Church will not succeed on the merits.  The Supreme Court has a "settled rule," <u>In re Abbott</u>, 2020 WL 1685929, at *1, that "under the pressure of great dangers," constitutional rights may be restricted "as the safety of the general public may demand." 197 U.S. at 29.  Thus, because the Court has determined that the April 11 Order meets strict scrutiny, the Court concludes that it also meets this lesser standard of being related to the safety of the general public.

IV.    **OTHER FACTORS IN THE PRELIMINARY INJUNCTION ANALYSIS DO NOT WEIGH IN LEGACY CHURCH'S FAVOR.**

Legacy Church has not established a likely success on the merits of its First Amendment claims.  It must also show that it will suffer irreparable harm without the temporary restraining order, that the balace of equities weighs in its favor, and that the restraining order is in the public interest.  See Winter v. Nat. Res. Def. Council, 555 U.S. at 20.  Without showing a likely success on the merits, Legacy Church is unable to show any of the remaining three factors support a temporary restraining order.

A.    **THE ORDER DOES NOT IRREPARABLY HARM LEGACY CHURCH.**

Legacy Church first argues that it faces irreparable harm, because "'[t]he loss of First Amendment freedoms, *for even minimal periods of time*, unquestionably constitutes irreparable injury.'"  Motion at 9 (quoting Heideman v. S. Salt Lake City, 348 F.3d at 1190 (emphasis in Motion but not in Heideman v. S. Salt Lake City)).  Legacy Church also argues that the state's threatened actions "will deny Legacy and its members the right to practice their faith as they feel compelled to practice," and "prohibit Legacy from carrying out its religious mission in accordance with the manner dictated by their strictly held religious belief."  Motion at 10.

The Court has concluded above that Legacy Church is unlikely to succeed in showing that Kunkel violated its First Amendment rights.  The Tenth Circuit has not spoken clearly to the effect of concluding that a movant is not likely to succeed on the merits.  It has stated, for example, that "when an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary," suggesting that merely alleging a constitutional violation satisfies the irreparable harm factor per se.  Planned Parenthood Ass'n of Utah v. Herbert, 828 F.3d 1245, 1263 (10th Cir. 2016)(citing Kikumura v. Hurley, 242 F.3d 950, 963 (10th Cir. 2001); 11A Charles

Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995)).  See O Centro Espirita Beneficente Uniao Do Vegetal Ashcroft, 342 F.3d 1170, 1187 (10th Cir. 2003)("Because 'a plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA,' we conclude the irreparable harm requirement for a preliminary injunction is satisfied." (quoting Kikumura v. Hurley, 242 F.3d at 963)).

On the other hand, in a 2013 case, Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114 (10th Cir. 2013), aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682 (2014), the Tenth Circuit characterized its precedent as holding "that establishing a *likely* RFRA violation satisfies the irreparable harm factor." 723 F.3d at 1146 (emphasis added)).  Several other courts appear to require a plaintiff to allege a likelihood of success on the merits before concluding that it has shown irreparable harm.  See, e.g., Powell v. Noble, 798 F.3d 690 (8th Cir. 2015)(concluding that the plaintiff did not show irreparable harm where he did not show that his First Amendment rights were violated); Hohe v. Casey, 868 F.2d 69, 72-73 (3d Cir. 1989)("[T]he assertion of First Amendment rights does not automatically require a finding of irreparable injury . . . .  Rather the plaintiffs must show 'a chilling effect on free expression.'" (quoting Dombrowski v. Pfister, 380 U.S. 479, 487 (1965)); Myers v. Gant, 49 F. Supp. 3d 658, 668 (D.S.D. 2014)(Piersol, J.)("Once a constitutional injury has been demonstrated, the Court assumes that Myers has satisfied the irreparable harm prong.").  The Tenth Circuit has also reversed district courts for failing to consider how the movant's likelihood of success affects the other three preliminary injunction factors.  See Derma Pen, LLC v. 4EverYoung Ltd., 773 F.3d 1117, 1121-22 (10th Cir. 2014); Amoco Oil Co. v. Rainbow Snow, 748 F.2d 556, 559 (10th Cir. 1984).

The United States Court of Appeals for the District of Columbia indirectly addressed this issue in Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290 (D.C. Cir. 2006).  It

- 94 -

distinguished conflicting caselaw in the area as it noted that, although in freedom-of-expression cases, the plaintiffs must "also establish they are or will be engaging in constitutionally protected behavior to demonstrate that the allegedly impermissible government action would chill allowable individual conduct," 454 F.3d at 301, the law does not impose the same requirement when alleging Establishment Clause violations, because the constitutional violation occurs at the moment the government acts "without any concomitant protected conduct on the movants' part," 454 F.3d at 302.   The D.C. Circuit noted that irreparable harm analysis assumes that the movant has demonstrated a likelihood that the non-movant violated the law and only asks whether "that violation, if true, inflicts irremediable injury."   454 F.3d at 303 (citing Elrod v. Burns, 427 U.S. at 373).

Winter v. Natural Resources Defense Council supersedes the D.C. Circuit's analysis.   The Supreme Court stated that the preliminary injunction standard "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction" and that "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."   Winter v. Nat. Res. Def. Council, Inc., 555 U.S. at 22 (citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997))(emphasis in original).   The Supreme Court's reasoning, therefore, suggests that courts should interpret the "irreparable harm" factor in conjunction with whether the movant is likely to succeed on the merits.   See also Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d at 1145 ("In addition, 'in First Amendment cases, the likelihood of success on the merits will often be the determinative factor.'" (quoting ACLU of Illinois v. Alvarez, 679 F.3d 583, 589 (7th Cir. 2012)). This test has entirely reversed course from earlier Tenth Circuit doctrine that allowed movants to

make a lesser showing of their likely success when the other preliminary injunction factors strongly weighed in their favor.  See Dine Citizens Against Ruining Our Environment v. Jewell, 839 F.3d 1276 (10th Cir. 1276)(overruling Davis v. Mineta, 302 F.3d 1104, 1111 (10th Cir. 2002)); Dine Citizens Against Ruining Our Environment v. Jewell, No. CIV 15-0209 JB/SCY, 2015 WL 4997207, at *35-38 (D.N.M. Aug. 14, 2015)(Browning, J.).

The harms Legacy Church alleges are incapable of calculation and not redressable with money damages, but are also not likely to rise to constitutional violations.  Without a constitutional violation to point to, Legacy Church has not presented "actual or significant" injury.  See Schrier v. Univ. of Colo., 427 F.3d 1253, 1267 (10th Cir. 2005).  The Court concludes, therefore, that the church has not demonstrated that "irreparable injury is *likely* in the absence of an injunction," Winter v. Nat. Res. Def. Council, Inc., 555 U.S. at 22 (emphasis in original).

## B.   THE BALANCE OF EQUITIES WEIGHS IN NEW MEXICO'S FAVOR.

The third factor to consider is whether the "balance of equities tips in [the movant's] favor." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. at 20.  In analyzing whether a movant satisfies this fact, he or she must show that the "threatened injury outweighs any injury to [non-movants] caused by granting the injunction."  Awad v. Ziriax, 670 F.3d 1111, 1131 (10th Cir. 2012).  Legacy Church relies on its claims' constitutional nature; it argues that the balance of equities weighs in its favor, because "[w]here the government's perception of harm is speculative and when the state permits the same speculative harm in other places, as it does here, such speculative harm cannot outweigh an injury to the First Amendment rights of plaintiffs who have established a substantial likelihood of success on the merits."  Motion at 10.  It argues that the Defendants "will not suffer more than speculative harm if an injunction is granted, and the Plaintiffs will suffer certain harm

in the absence of injunctive relief." Motion at 11. Finally, it asserts that the Court should presume that the balance of harms weighs in its favor, because it has raised First Amendment issues. See Motion at 11 (citing Sammartano v. First Judicial District Court, 303 F.3d 959, 973 (9th Cir. 2002).

New Mexico's Secretary of State argues that there is nothing speculative "about the harms caused by COVID-19" and "the possibility of substantially increasing the number of infections through public gatherings simultaneously bringing together hundreds of people in a public space." Motion at 14-15. The Secretary of State instead argues that Legacy Church's asserted injuries are speculative, because it "has never received a citation under a public health order or otherwise been prevented from delivering religious services to its congregants." Motion at 15.

As in the irreparable harm analysis, district courts in the Tenth Circuit must consider the likelihood of success when analyzing potential harm. See Planned Parenthood Ass'n of Utah v. Herbert, 828 F.3d at 1265 ("The threshold, and ultimately critical, flaw in the district court's [balance of equities] analysis is that it failed to take into account PPAU's likelihood of success on the merits of its unconstitutional conditions claim and the resulting likelihood of irreparable harm to PPAU."). In First Amendment cases in the Tenth Circuit, likelihood of success on the merits "will often be . . . determinative" in this analysis. See Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d at 1145 (citing Awad v. Ziriax, 670 F.3d at 1114). The Court has already concluded that Legacy Church is not likely to succeed on the merits of its First Amendment claims, and Legacy Church framed the harms it suffered for this fact exclusively in terms of a First Amendment violation. Without a likely First Amendment violation, Legacy Church has alleged no harm. New Mexico's stated harms -- a potential escalation in COVID-19 cases are not insignificant. Accordingly, when weighed against each other, the balance of equities favors New Mexico.

C.     THE  PUBLIC'S  INTEREST  IN  DENYING  THE  PRELIMINARY
INJUNCTION IS STRONG.

The last issue to consider is whether the preliminary injunction is in the public's interest.

Winter v. Nat. Res. Def. Council, Inc., 555 U.S. at 20.  This factor "is another way of inquiring

whether there are policy considerations that bear on whether the order should issue."  11A Fed.

Prac. & Proc. Civ., § 2948.4 Grounds for Granting or Denying a Preliminary Injunction -- Public

Interest, (3d ed.).  Legacy Church argues that an injunction is in the public's interest, because the

Tenth Circuit "recognizes that '[v]indicating First Amendment freedoms is clearly in the public

interest.'"  Motion at 11 (quoting Pac. Frontier v. Pleasant Grove City, 414 F.3d 1221, 1237 (10th

Cir. 2005) and citing Utah Licensed Bev., 256 F.3d 1061, 1076 (10th Cir. 2001); Elam Constr.,

Inc. v. Regional Transp. Dist., 129 F.3d 1343, 1347 (10th Cir. 1997)).  Legacy Church also argues

that its "religious exercise and the right to assemble -- and the rights of others like them in the

State of New Mexico -- are burdened beyond the narrowly tailored means the Constitution

requires."  Motion at 11.  New Mexico argues in response that the state is "in the midst of a public

health crisis of a scale and severity unprecedented in modern times," and that "the most potent

weapon that the State and local communities can wield against this significant health threat is

through individuals choosing to stay in their homes as much as possible and avoiding physical

proximity to other people and to public spaces."  Motion at 16.

In  evaluating  the  public's  interest,  the  Court  must  consider  whether  the  movant  has

demonstrated a likelihood of success on the merits.  Planned Parenthood Ass'n of Utah v. Herbert,

828 F.3d at 1265-66.  Where a movant has demonstrated that the non-movant has violated the law,

Coal.  of  Concerned  Citizens  To  Make  Art  Smart  v.  Fed.  Transit  Admin.  of  U.S.  Dep't  of

Transportation, 843 F.3d 886, 915 (10th Cir. 2016), or constitutional rights, Verlo v. Martinez, 820

F.3d 1113, 1127-28 (10th Cir. 2016), the public interest weighs in favor of granting an injunction. See Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d at 1147. Awad v. Ziriax, 670 F.3d 1111, 1132 (10th Cir. 2012)(stating that "'it is always in the public interest to prevent the violation of a party's constitutional rights.'" (quoting G&V Lounge, Inc. v Mich. Liquor Control Comm'n 23 F.3d 1071, 1079 (6th Cir. 1994)). Again, Legacy Church relies on vindicating its constitutional rights as the interest at stake. See Motion at 11. Had it demonstrated likely success on the merits of its constitutional claims, Legacy Church could point to weighty public interests that could overcome the public's interests in enforcing social distancing. It has not demonstrated likely success, however. Without a constitutional right to rely on, Legacy Church must therefore rely on the public interest inherent in bringing together members and staff within its doors, and in this light, the law views Legacy Church's Easter service as just another gathering with as much right to protection as any other. The public's interest in limiting the COVID-19 outbreak in the state, a compelling interest, outweighs the right to gather. As this factor and the three discussed before all weigh in favor of the Defendants and against Legacy Church, the Court will not grant the requested relief.

**IT IS ORDERED** that (i) the Plaintiff's Complaint, Request for Temporary Restraining Order, and Permanent Injunction, filed April 11, 2020 (Doc. 1), is dismissed as to Defendant State of New Mexico; and (ii) the Verified Emergency Motion for a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunctive Relief, April 14, 2020 (Doc. 9), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Colin Hunter
Jordy Stern
The Barnett Law Firm, P.A.
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Nicholas M. Sydow
   Civil Appellate Chief
Office of the New Mexico Attorney General
Albuquerque, New Mexico

   *Attorneys for Defendant State of New Mexico*

Matthew L. Garcia,
   Chief General Counsel to Governor Michelle Lujan Grisham
Jonathan J. Guss
   Deputy General Counsel to Governor Michelle Lujan Grisham
Santa Fe, New Mexico

   *Attorneys for Defendant Kathyleen Kunkel*


A. Blair Dunn
Western Agricultural Resource and Business Advocates, LLP
Albuquerque, New Mexico

--and--

Mark L. Rienzi
William J. Haun
Peter M. Torstensen, Jr.
The Becket Fund for Religious Liberty
Washington, D.C.

Counsel for Amicus Curiae