**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

LEGACY CHURCH, INC.,

        Plaintiff,

vs.                                          No. CIV 20-0327 JB\SCY

KATHYLEEN M. KUNKEL and the
STATE OF NEW MEXICO,

        Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

**THIS MATTER** comes before the Court on: (i) the Verified Emergency Motion for a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunctive Relief, filed April 14, 2020 (Doc. 9)("PI Motion"); (ii) the Motion for Leave to File Amicus Curiae Brief and Proposed Amicus Curiae by Proposed Amicus the Becket Fund for Religious Liberty in Support of Plaintiff, filed April 17, 2020 (Doc. 17)("Becket Fund Amicus Motion"); (iii) the Motion to Dismiss Plaintiff's Original Complaint, Request for Temporary Restraining Order, and Permanent Injunction, filed April 27, 2020 (Doc. 33)("MTD"); (iv) the Unopposed Motion of Americans United for Separation of Church and State for Leave to File Amicus Curiae Brief in Opposing to Plaintiff's Motion for Preliminary Injunction and in Support of Defendant's Motion to Dismiss, filed May 6, 2020 (Doc. 44)("Americans United Amicus Motion"); and (v) the Opposed Motion Seeking Leave to Allow Secretary Kunkel to Testify Telephonically or Through Audiovisual Means at the July 10, 2020 Preliminary Injunction Hearing, filed July 8, 2020 (Doc. 75)("Witness Motion"). The Court held an evidentiary hearing on July 10, 2020, and argumentative hearings in April, May, and July, 2020. The primary issues are: (i) whether Plaintiff Legacy Church, Inc. ("Legacy Church") is entitled to a preliminary injunction against Defendant Secretary of the New

Mexico Department of Health Kathyleen Kunkel's Public Health Emergency Orders[1] ("Public Health Orders") on the grounds that the Public Health Orders impermissibly burden Legacy Church's rights under the Free Exercise Clause of the First Amendment to the Constitution of the United States; (ii) whether Legacy Church is entitled to a preliminary injunction against the Public Health Orders on the grounds that they impermissibly infringe on Legacy Church's rights under the Freedom of Assembly Clause of the First Amendment; (iii) whether Legacy Church has stated a plausible claim that Secretary Kunkel's Public Health Orders, which have imposed varying degrees of restriction on religious mass gatherings, among other activities, violate Legacy Church's asserted rights under the Free Exercise Clause; (iv) whether Legacy Church has stated a plausible claim that the Public Health Orders violate Legacy Church's rights under the Freedom of Assembly Clause; (v) whether the Court should permit proposed amici curiae The Becket Fund for Religious Liberty  ("Becket Fund") and Americans United for Separation of Church and State ("Americans United") to submit amicus briefs; and (vi) whether the Court should permit Secretary Kunkel to testify telephonically or through audiovisual means at the hearing on the PI Motion. The Court concludes that: (i) Legacy Church is not substantially likely to succeed on the merits of its claim that the Public Health Orders violate Legacy Church's Free Exercise rights, because the Public Health Orders are neutral with respect to religion and generally applicable; (ii) Legacy Church is not substantially likely to succeed on the merits of its claim that the Public Health Orders violate its Assembly Clause rights, because the Public Health Orders are unrelated to the suppression of speech or religion, serve a compelling state interest, and significantly less restrictive

---

[1]As the Court discusses below, Secretary Kunkel has issued several Public Health Orders that vary in their restrictiveness regarding religious gatherings.  The Court evaluates each substantive Public Health Order to evaluate Legacy Church's entitlement to a preliminary injunction.

alternatives are not available; (iii) Legacy Church has not stated a plausible claim that the Public

Health Orders violate its Free Exercise rights, because the Public Health Orders are generally

applicable and neutral with respect to religion; (iv) Legacy Church does not state a plausible claim

that the Public Health Orders violate its rights to assemble, because the Public Health Orders are

unrelated to the suppression of speech or religion, serve a compelling state interest, and

significantly less restrictive alternatives are not available; (v) the Court grants the Becket Fund

and Americans United leave to submit amicus briefs, because both have expertise in First

Amendment law that will aid the Court in determining the issues before it; and (vi) Secretary

Kunkel may testify through audiovisual means at the hearing on the PI Motion, because Secretary

Kunkel cites valid health concerns and her audiovisual testimony will not prejudice the parties.

The Court thus denies the PI Motion, grants the Becket Fund Amicus Motion, grants the MTD,

grants the Americans United Amicus Motion, and grants the Witness Motion.   Because the

coronavirus pandemic -- and the public health threat that it presents to the State of New Mexico -

- is evolving rapidly, and several intervening Public Health Orders have superseded the Public

Health Emergency Order (PHO 4-11-20)("April 11 Order") against which Legacy Church filed its

Complaint, Request for Temporary Restraining Order, and Permanent Injunction, filed April 11,

2020 (Doc. 1)("Complaint"), the Court evaluates each substantive Public Health Order.  In doing

so, the Court concludes that Legacy Church cannot state a plausible First Amendment claim.

Accordingly, the Court denies Legacy Church leave to amend the Complaint, because amendment

would be futile.

## FACTUAL BACKGROUND

Because the Court addresses two separate motions that challenge separate Public Health

Orders and which are subject to separate standards, the Court includes two factual sections.  First,

the Court provides the undisputed facts that govern the PI Motion.  Second, the Court provides the

facts that Legacy Church alleges in its Complaint which govern the MTD.[2]

### 1.    **The PI Motion.**

A motion for a preliminary injunction "requires the Court to make predictions about the

plaintiff's likelihood of success."  Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1179

(D.N.M. 2011)(Browning, J.).  Rule 52 of the Federal Rules of Civil Procedure states: "In granting

or refusing an interlocutory injunction, the court must [] state the findings and conclusions that

support its action." Fed. R. Civ. P. 52(a)(2).  "'[T]he findings of fact and conclusions of law made

by a court granting a preliminary injunction are not binding at trial on the merits.'"  Herrera v.

Santa Fe Pub. Sch., 792 F. Supp. 2d at 1179 (quoting Attorney Gen. of Okla. v. Tyson Foods, Inc.,

565 F.3d 769, 776 (10th Cir. 2009))(alteration in Herrera v. Santa Fe Public Schools only).  See

Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)("[A] preliminary injunction is customarily

granted on the basis of procedures that are less formal and evidence that is less complete than in a

trial on the merits."); Firebird Structures, LCC v. United Bhd. of Carpenters and Joiners of Am.,

---

[2]The Complaint is scant in its factual allegations.  See Complaint ¶¶ 1-20, at 2-3.  Both Legacy Church and Secretary Kunkel assert facts that the Complaint does not allege or incorporate by reference.  See, e.g., Motion at 6-7 (describing the COVID-19 pandemic and summarizing Secretary Kunkel's decision-making regarding the Order); Plaintiff's Response to Defendant Secretary Kunkel's Motion to Dismiss at 2-3, filed May 13, 2020 (Doc. 57)(discussing more recent Public Health Orders and providing a "Response to [Secretary Kunkel's] factual background"); Reply in Support of Motion to Dismiss Plaintiff's Original Complaint, Request for Temporary Restraining Order, and Permanent Injunction at 2-3, filed May 22, 2020 (Doc. 65)(asserting that Legacy Church raises new arguments in its Response).  As the Court will make clear in this Memorandum Opinion and Order's Analysis section, the Court relies only on the facts that the Complaint alleges or that fall under the narrow exceptions to the rule that a district court, when ruling on a motion to dismiss, "must examine only the plaintiff's complaint."  Carter v. Daniels, 91 F. App'x 83, 85 (10th Cir. 2004)(unpublished).  Nonetheless, to determine whether Legacy Church may amend the Complaint, the Court evaluates each Public Health Order's constitutionality.

Local Union  No. 1505, 252 F. Supp. 3d 1132, 1140 (D.N.M. 2017)(Browning, J.).  The United States Court of Appeals for the Tenth Circuit notes "that when a district court holds a hearing on a motion for preliminary injunction it is not conducting a trial on the merits."  Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003).  Moreover, "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings."  Heideman v. S. Salt Lake City, 348 F.3d at 1188.  Accordingly, the Court finds as follows:

1.      Legacy Church is a Christian church that provides church services at three locations in Bernalillo County, New Mexico; one location in Santa Fe County, New Mexico; and one location in Collin County, Texas.  See Complaint ¶ 1, at 1; Locations/Times, Legacy Church, https://www.legacychurchnm.com/ locations/times (last visited July 7, 2020).

2.      Legacy Church is a "mega church" with nearly 20,000 church members.  Legacy Church  Profile,  USA  Churches,  http://www.usachurches.org/church/legacy-church.htm  (last visited  July  7,  2020).   See  Coronavirus  updates,  April  14,  Albuquerque J., https://www. abqjournal.com/1443415/coronavirus-updates-april-14.html (last visited July 7, 2020).

3.      Legacy Church offers one to three church services each Sunday at its two locations in Albuquerque, New Mexico; at its one location in Rio Rancho, New Mexico; and at its one location  in  Edgewood,  New  Mexico.   See  Locations/Times,  Legacy  Church,  https://www. legacychurchnm.com/locations/times (last visited July 7, 2020).

4.      Legacy Church's location at 7201 Central Ave. NW, Albuquerque, New Mexico 87121 ("Central Campus") has an auditorium that is 31,000 square feet and that holds over 2,500

people.   Declaration of Steve Smothermon ¶¶ 5, 7, at 1, filed April 14, 2020 (Doc. 15)("Smothermon Decl.").[3]

5.     Legacy Church's three Sunday services at the Central Campus are aired on broadcast television and live-streamed on Legacy Church's website.  See Smothermon Decl. ¶ 7, at 1; T.V. Broadcast, Legacy Church, https://www.legacychurchnm.com/tvbroadcast (last visited July 7, 2020); Live Stream, Legacy Church, https://www.legacychurchnm.com/livestream (last visited July 7, 2020).

6.     Legacy Church's location at 4701 Wyoming Blvd., Albuquerque, New Mexico 87109 ("East Campus") has an auditorium that is approximately 21,000 square feet.  Smothermon Decl. ¶ 11, at 2.

7.     Legacy Church's Central Campus also holds a church service on Wednesday nights, and the East Campus holds church services on Tuesday and Saturday nights.   See Smothermon Decl. ¶¶ 5-6, at 1.

8.     In 2006, Legacy Church established the Legacy Academy, which is a school serving preschool through high school students.   See Our Story, Legacy Church, https://www.legacychurchnm.com/our-story (last visited July 7, 2020).

9.     Kathyleen M. Kunkel is the Secretary for the New Mexico Department of Health ("Secretary Kunkel").  Complaint ¶ 2, at 1.  See Office of the Secretary, New Mexico Department of Health, https://nmhealth.org/about/asd/ots/ (last visited July 7, 2020).

---

[3]The PI Motion's pages 14 and 15 contain the Smothermon Decl.

10.     Michelle Lujan Grisham is the Governor of the State of New Mexico.  See About the Governor, Office of the Governor, https://www.governor.state.nm.us/ (last visited July 7, 2020).

11.     Secretary Kunkel announced on July 3, 2020, that she will be retiring, but she says that she will remain Secretary for the New Mexico Department of Health until Governor Lujan Grisham appoints a person to replace her.  See State health secretary to retire, will remain till replacement found, Albuquerque J. (dated July 3, 2020), https://www.abqjournal.com/ 1472314/state-health-secretary-to-retire-will-remain-until-replacement-is-found.html        (last accessed July 7, 2020).

12.     In early January, 2020, Wuhan, China experienced an outbreak of the coronavirus disease 2019, also known as COVID-19, which is caused by the severe acute respiratory syndrome coronavirus 2, also known as SARS-CoV-2.  See Coronavirus disease 2019 (COVID-19), Mayo Clinic,       https://www.mayoclinic.org/diseases-conditions/coronavirus/symptoms-causes/syc-20479963 (last visited July 7, 2020)("Mayo Clinic").

13.     The coronavirus is a contagious disease that is spread through respiratory droplets that are released when infected individuals cough, sneeze, or talk.  See Mayo Clinic.

14.     Symptoms of the coronavirus include fever or chills, coughing, shortness of breath, fatigue, muscle or body aches, headaches, loss of taste or smell, sore throat, congestion or runny nose, nausea or vomiting, and diarrhea.  See Symptoms of Coronavirus, Centers for Disease Control    and    Prevention,    https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited July 7, 2020).

15.     Approximately eighty percent of people who are infected with the coronavirus experience mild symptoms, but about twenty percent of people suffer more severe symptoms.  See

Answers   To   Your   Coronavirus   Questions   at   40,   The   New   York   Times, https://static01.nyt.com/files/2020/ebooks/corona-virus-questions/nyt-coronavirus-answers.pdf (last visited July 7, 2020)("NYT Answers").

16.     On January 11, 2020, China reported its first death caused by the coronavirus.  See NYT Answers at 6-7.

17.     In Wuhan, China, of the people who have been infected with coronavirus, the death rate is about two percent.  See NYT Answers at 32.

18.     On January 20, 2020, the United States Centers for Disease Control and Prevention ("CDC") reported the United States' first case of coronavirus in the State of Washington.  First Case of 2019 Novel Coronavirus in the United States, The New England Journal of Medicine (January 31, 2020), https://www.nejm.org/doi/full/10.1056/NEJMoa2001191 (last visited July 7, 2020).

19.     Throughout late January, 2020, and February, 2020, the coronavirus spread to countries throughout Asia, Europe, Africa, and Latin America.  See NYT Answers at 7-13.

20.     On February 29, 2020, the United States reported its first death caused by the coronavirus near Seattle, Washington.  See Derrick Bryson Taylor, A Timeline of the Coronavirus Pandemic,   The   New   York   Times   (last   updated   July   2,   2020), https://www.nytimes.com/article/coronavirus-timeline.html (last visited July 7, 2020)("NYT Timeline").

21.     On March 11, 2020, the New Mexico Department of Health reported the first case in which a New Mexico resident tested positive for the coronavirus.  See New Mexico Announces First Presumptive Positive COVID-19 Cases, New Mexico Department of Health (March 11,

2020), https://cv.nmhealth.org/2020/03/11/new-mexico-announces-first-presumptive-positive-covid-19-cases/ (last visited July 7, 2020).

22.     On March 11, 2020, Governor Lujan Grisham and the New Mexico Department of Health declared a state of emergency "to maximize the resources available to the state in order to fight the potential spread of the virus and minimize public health risks for New Mexicans." Updated: Governor, Department of Health announce first positive COVID-19 cases in New Mexico, Press Releases, Office of the Governor (March 11, 2020), https://www.governor.state.nm.us/2020/03/11/updated-governor-department-of-health-announce-first-positive-covid-19-cases-in-new-mexico/ (last visited July 7, 2020)("Emergency Declaration").

23.     Throughout March, 2020, Governor Lujan Grisham urged New Mexico residents to avoid public gatherings, avoid non-essential travel, and engage in social distancing.  See Emergency Declaration; Marjorie Childress, Celia Raney, and Trip Jennings, Officials predict dire consequences if state doesn't practice social distancing, New Mexico In Depth (March 31, 2020), http://nmindepth.com/2020/03/31/officials-predict-dire-consequences-if-state-doesnt-practice-social-distancing/ (last visited July 7, 2020).

24.     Social distancing "refers to measures that are taken to increase the physical space between people to slow the spread of the virus."  NYT Answers at 18.

25.     On March 11, 2020, "the World Health Organization declared the coronavirus outbreak a pandemic after it spread across six continents and more than 100 countries."  NYT Answers at 15.

26.     On March 13, 2020, President Donald J. Trump declared that the coronavirus outbreak in the United States constitutes a national emergency.  See Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (March

13, 2020), White House, https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last visited July 7, 2020).

27.     As of March 13, 2020, 1,896 people in the United States had been infected with the coronavirus. <u>See</u> Previous U.S. COVID-19 Case Data, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/previouscases.html (last visited July 7, 2020)("Early U.S. Statistics").

28.     In the United States, of the people who are infected with coronavirus, the death rate is about 4.1 percent. <u>See</u> Aylin Woodward and Shayanne Gal, The US is the hardest-hit country in the coronavirus pandemic -- but its 4% death rate is far lower than that of many other countries, Business Insider (April 14, 2020), https://www.businessinsider.com/coronavirus-death-rate-in-us-uk-italy-china-compared-2020-4 (last visited July 7, 2020).

29.     On March 18, 2020, Legacy Church posted a message on its website telling its members "that the church was making its services available online, encouraging those who were traveling, not feeling well, or felt more comfortable at home, to continue worshipping online." Smothermon Decl. ¶ 14, at 2. <u>See</u> Coronavirus (COVID-19) Updates, Legacy Church (last updated June 5, 2020), https://www.legacychurchnm.com/coronavirus (last visited July 7, 2020).

30.     The Muslim holiday Lailat Al Miraj occurred on March 22, 2020. <u>See</u> Faith Communities of Victoria, http://www.faithvictoria.org.au/component/rseventspro/event/1430-lailat-al-miraj-islam (last visited July 7, 2020).

31.     On March 24, 2020, Secretary Kunkel issued the Public Health Order, New Mexico Department of Health (March 23, 2020), https://www.governor.state.nm.us/wp-content/uploads/2020/03/COVID-19-DOH-Order-fv.pdf (last visited July 7, 2020)("March 24 Order"), which

ordered all non-essential businesses to close, ordered all of the state's non-essential workforce to work from home, and ordered New Mexico citizens to "stay at home and undertake only those outings absolutely necessary for their health, safety, or welfare." March 24 Order at 5.

32.     The March 24 Order prohibits all "mass gatherings," which it defines as

> any public or private gathering that brings together five (5) or more individuals in a single room or connected space, confined outdoor space or an open outdoor space where individuals are within six (6) feet of each other, but does not include the presence of five (5) or more individuals where those individuals regularly reside.

March 24 Order ¶ 6, at 4.  See March 24 Order ¶ 1, at 4.

33.     The March 24 Order's prohibition of mass gatherings does not apply to "'individuals' congregated in a church, synagogue, mosque, or other place of worship." March 24 Order ¶ 6, at 4.

34.     The March 24 Order allows essential businesses to remain open.  See March 24 Order ¶ 2, at 4.

35.     The March 24 Order provides twenty-two categories of essential businesses, which are businesses that provide goods and services "related to health, safety and well-being, such as medical facilities, child care centers and any business that assists in the production, distribution or sale of food and medical products."  Tony Raap, Bike shops riding out virus storm, Santa Fe New Mexican (April 5, 2020), https://www.santafenewmexican.com/news/adventure/bike-shops-riding-out-virus-storm/article_f5c5b7b8-75d1-11ea-9fba-87f099306b93.html (last visited July 7, 2020)("Bike Article"); March 24 Order at 2-4.

36.     The March 24 Order initially required bike repair shops to close, but after conversations with bike repair shop owners and Allen Webber, the Mayor of Santa Fe, Governor Lujan Grisham decided to allow bike repair shops to remain open for business.  See Bike Article.

37.     On March 25, 2020, the New Mexico Department of Health announced New Mexico's first death that coronavirus caused.  <u>See</u> New Mexico COVID-19 update: One death, New Mexico Department of Health (March 25, 2020), https://cv.nmhealth.org/2020/03/25/new-mexico-covid-19-update-one-death/ (last visited July 7, 2020).

38.     On March 27, 2020, Governor Lujan Grisham ordered individuals traveling to New Mexico through an airport to self-quarantine for a period of at least fourteen days.  <u>See</u> Executive Order 2020-013, Executive Orders, Office of the Governor (March 27, 2020), https://www.governor.state.nm.us/wp-content/uploads/2020/03/MLG_EO_2020_013.pdf (last visited July 7, 2020).

39.     Self-quarantine "refers to the separation and restriction of movement of people who were exposed to the virus to see if they become sick."  NYT Answers at 18.

40.     On Palm Sunday, April 5, 2020, over 13,000 people viewed Legacy Church's live-streaming of its church services.  <u>See</u> Complaint ¶ 19, at 3.

41.     On April 6, 2020, Secretary Kunkel issued the Public Health Order, New Mexico Department of Health (April 6, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/04/PHO-4-6-2020.pdf (last visited April 14, 2020)("April 6 Order").[4]  <u>See</u> Complaint ¶ 6, at 2.

42.     The April 6 Order states: "All Mass Gatherings are hereby prohibited under the powers and authority set forth in the New Mexico Public Health Act, [N.M. Stat. Ann. §§ 24-1-1 to -40] and all regulations promulgated pursuant thereto."  April 6 Order ¶ 1, at 5.

43.     The April 6 Order defines mass gatherings as

        any public or private gathering that brings together five (5) or more individuals in a single room or connected space, confined outdoor space or an open

_____

    [4]The Complaint's Exhibit A is a copy of the April 6 Order.  <u>See</u> Complaint at 7-14.

outdoor space where individuals are within six (6) feet of each other, but does not include the presence of five (5) or more individuals where those individuals regularly reside.

April 6 Order ¶ 6, at 5.

44.     The April 6 Order's prohibition of mass gatherings does not apply to "individuals congregated in a church, synagogue, mosque, or other place of worship."  April 6 Order ¶ 6, at 5. See Complaint ¶ 6, at 2.

45.     As of April 6, 2020, 686 New Mexico residents had tested positive for COVID-19, and twelve New Mexico residents had died from COVID-19.  See Coronavirus updates, April 6, Albuquerque J. (April 6, 2020), https://www.abqjournal.com/1440588/coronavirus-updates-april-6.html (last visited July 7, 2020).

46.     On April 7, 2020, Governor Lujan Grisham and the New Mexico Department of Health noted that Passover, Holy Week, and Ramadan were quickly approaching, and offered the following guidance for faith-based communities:

> Livestream your service and make sure members understand they should not attend in person.  Viewers can send a comment via the online/livestream platform or an email or text to let you know they were watching.  This also may involve permission or guidance about the use of electronic devices at times when that practice is usually not permitted, such as Jewish Sabbath.
>
> Consider a "drive-in" service so people can participate separately, yet together.  Attendees can drive up in their cars, park and watch the video service on their cellphones or on a giant screen while listening via a radio station.

Governor, Department of Health answer questions from faith-based communities, New Mexico Department of Health (April 7, 2020), https://cv.nmhealth.org/2020/04/07/governor-department-of-health-answer-questions-from-faith-based-communities/ (last visited July 7, 2020).

47.     The New Mexico Department of Health reports the total number of coronavirus cases and coronavirus-caused deaths in New Mexico up to April 16, 2020, in the following graph:



Source: NM DOH, Chart by: Robert Browman, ABQJournal

Total reported COVID-19 cases in NM over time, Albuquerque J., https://www.abqjournal.com/coronavirus (last visited April 17, 2020)("April 16 N.M. Daily Totals Chart").

48. The New Mexico Department of Health reports the number of New Mexico residents who have tested positive for coronavirus and who have died from coronavirus each day, up to April 16, 2020, in the following graph:



Source: NM DOH, Chart by: Robert Browman, ABQJournal

New recorded COVID-19 cases in NM by day, Albuquerque J., Albuquerque J., https://www.abqjournal.com/coronavirus (last visited April 17, 2020)("April 16 N.M. Daily Increase Chart").

49.     On April 7, 2020, the New Mexico Department of Health reported that 108 New Mexico residents had tested positive for coronavirus, which was New Mexico's largest daily increase in coronavirus cases at that time.  See April 16 N.M. Daily Increase Chart.

50.     Passover, one of the most important festivals in Judaism, began the evening of Wednesday, April 8, 2020, and ended the evening of Thursday, April 16, 2020.  See What is

Passover (Pesach)?, Chabad, https://www.chabad.org/holidays/passover/pesach_cdo/aid/871715/jewish/What-Is-Passover-Pesach.htm (last visited July 7, 2020).

51.     On April 9, 2020, the New Mexico Department of Health reported that 121 New Mexico residents had tested positive for coronavirus, which was New Mexico's largest daily increase in coronavirus cases at that time.  See April 16 N.M. Daily Increase Chart.

52.     On Holy Saturday, April 11, 2020, at around 5:00 p.m. Mountain Standard Time, Secretary Kunkel issued the Public Health Order, New Mexico Department of Health (April 11, 2020),  https://cv.nmhealth.org/wp-content/uploads/2020/04/04_11_20_PHO_Amended.pdf  (last visited July 7, 2020)("April 11 Order").[5]  See Complaint ¶ 7, at 2.

53.     On April 11, 2020, at 5:15 p.m. Mountain Standard Time, Governor Lujan Grisham announced on her Twitter page that, pursuant to the April 11 Order, houses of worship would no longer be exempt from New Mexico's prohibition of mass gatherings.  See Michelle Lujan Grisham  (@GovMLG),  Twitter  (April  11,  2020,  5:15  PM),  https://twitter.com/GovMLG/status/1249113771076767744.

54.     As of April 11, 2020, 1,174 New Mexico residents had tested positive for COVID-19, and twenty New Mexico residents had died from COVID-19.  See Coronavirus updates, April 11, Albuquerque J. (April 11, 2020), https://www.abqjournal.com/1442624/coronavirus-updates-april-11.html (last visited July 7, 2020).

55.     The April 11 Order prohibits mass gatherings of five or more individuals, but it does not include an exception for individuals gathering at houses of worship.  See April 11 Order ¶ 6, at 5; Complaint ¶ 8, at 2.

---

[5]The Complaint's Exhibit B is a copy of the April 11 Order.  See Complaint at 15-22.

56.     The April 11 Order defines mass gatherings as

> any public or private gathering that brings together five (5) or more individuals in a single room or connected space, confined outdoor space or an open outdoor space where individuals are within six (6) feet of each other, but does not include the presence of five (5) or more individuals where those individuals regularly reside.

April 11 Order ¶ 6, at 5.

57.     The April 11 Order states: "Churches, synagogues, mosques, and all other houses of worship shall adhere to this restriction, but nothing in this order is intended to preclude these faith-based institutions from holding services through audiovisual means."  April 11 Order ¶ 1, at 5.

58.     The April 11 Order states: "The maximum number of customers allowed in a retail space at any given time shall be equal to 20% of the maximum occupancy of the retail space, as determined by the relevant fire marshal or fire department."  April 11 Order ¶ 4, at 6.  See Complaint ¶ 16, at 3 (internal quotation marks omitted).

59.     The April 11 Order defines "retail space" as an "essential business that sells goods and services directly to consumers or end-users inside its place of business, such as a grocery store or a hardware store[]."  April 11 Order ¶ 1, at 3 (internal quotation marks omitted).

60.     The New Mexico Department of Health's Public Health Orders have never classified houses of worship as essential businesses, because they do not sell goods or services.  See Draft Transcript of Hearing (held April 16, 2020) at 25:13-17 (Garcia)("April 16 Tr.").[6]

61.     Until the April 11 Order, every public health order by the New Mexico Department of Health exempted houses of worship from the mass gathering restrictions that previous Public

---

[6]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Health Orders imposed on non-essential businesses.  See April 16 Tr. at 25:10-26:10 (Court, Garcia).

62.     The April 11 Order does not exempt or permit gatherings at large venues that are similar in size to many houses of worship, such as theaters, concert halls, and stadiums.  See Kunkel Response at 16; April 11 Order ¶ 6, at 5.

63.     Around April 11, 2020, Governor Lujan Grisham told reporters that "many houses of worship already took action on their own" by cancelling in-person services, but "there have been a few outliers, putting New Mexicans at risk.  We were hearing additional ones planning on holding services (Sunday) . . . and we wanted to be crystal clear."  Coronavirus updates, April 11.

64.     On Sunday, April 12, 2020, Legacy Church live-streamed three Easter services online, but it did not prohibit members from attending services in person.  See Complaint ¶¶ 9-11, at 2; Draft Transcript of Proceedings at 6:18-22, taken April 13, 2020 (Stern)("April 13 Tr.").[7]

65.     In addition to Legacy Church's staff members, fewer than forty members attended the first Easter service, approximately ten members attended the second Easter service, and approximately seven members attended the third Easter service.  See Smothermon Decl. ¶ 15, at 2; April 13 Tr. at 7:13-18 (Stern).

66.     Legacy Church plans to continue live-streaming church services online.  See Complaint ¶ 12, at 2.

67.     Legacy Church "has a sincerely held religious belief that the service team used for [its] services is central to how [it and its members] worship God and how [they] connect [their] members to [their] religious belief."  Smothermon Decl. ¶ 12, at 2.

---

[7]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

68.     On April 13, 2020, Legacy Church stated that it was willing to prohibit members from attending church services in person.  See April 13 Tr. at 8:15-18 (Stern).

69.     Legacy Church is also capable of "abiding by the same guidelines for essential businesses" that Secretary Kunkel announced in the April 11 Order. Smothermon Decl. ¶ 16, at 2.

70.     Legacy Church plans to perform and record its church services in an auditorium that is approximately 31,000 square feet and that can accommodate 2,500 to 3,000 people.  See Complaint ¶ 16, at 3; April 13 Tr. at 7:18-21 (Stern).

71.     On April 15, 2020, the Catholic Bishop of Las Cruces, New Mexico, lifted a diocesan ban on Catholic Mass celebrations, and he issued guidelines to priests to limit the number of congregants in church buildings to five people and to ensure that congregants engage in social distancing in compliance with the April 11 Order. See Ed Condon, Las Cruces bishop first in US to resume public Masses amid pandemic, Angelus (April 15, 2020), https://angelusnews.com/news/nation/las-cruces-resumes-public-masses-amid-pandemic/ (last visited July 7, 2020)("Las Cruces Resumes Public Masses Article"); Daniel Burke, A Catholic diocese is reopening for Mass despite a statewide stay-at-home order, CNN (April 16, 2020), https://www.cnn.com/2020/04/16/us/las-cruces-diocese-mass-open/index.html (last visited July 7, 2020).

72.     On April 16, 2020, eight New Mexicans died from the coronavirus, which was the highest daily increase in number of deaths as of that time. See April 16 N.M. Daily Increase Chart.

73.     As of April 16, 2020, about 632,548 people in the United States and 1,597 New Mexican residents had been infected with coronavirus, and about 31,071 Americans and forty-four New Mexican residents had died from coronavirus.  See Early U.S. Statistics; April 16 N.M. Daily Totals Chart.

74.     By April 30, 2020, the coronavirus situation in much of New Mexico had improved, but a severe outbreak escalated in Santa Rosa and McKinley Counties.  See Coronavirus Updates, April 30, Albuquerque J. (April 30, 2020), https://www.abqjournal.com/1449270/coronavirus-updates-april-30.html (last visited July 7, 2020).

75.     On April 30, 2020, Secretary Kunkel issued the Public Health Order, New Mexico Department of Health (April 30, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/05/04.30.20-mass-gathering-and-essential-business-PHO.pdf (last visited July 7, 2020)("April 30 Order"), which maintained the April 11 Order's restrictions.  See April 30 Order at 3-6.

76.     Approximately seventy-five percent of New Mexico residents identify as Christian of any denomination, approximately one percent of New Mexico residents identify as Buddhist, less than one percent of New Mexico residents identify as Jewish, less than one percent of New Mexico residents identify as Muslim, less than one percent of New Mexico residents identify as Hindu, and approximately twenty-one percent of New Mexico residents identify as religiously unaffiliated.  See Adults in New Mexico, Pew Research Center, https://www.pewforum.org/religious-landscape-study/state/new-mexico/ (last visited July 7, 2020)("Pew Survey").

77.     Approximately thirty-six percent of New Mexico residents attend religious services at least once a week, thirty-one percent of New Mexico residents attend religious services once or twice a month or a few times a year, and thirty-three percent of New Mexico residents seldom or never attend religious services.  See Pew Survey.

78.     Ramadan, one of the most important months of the Islamic calendar, began on the evening of April 23, 2020, and ended the evening of May 23, 2020.  See Ramadan 2020, https://www.calendardate.com/ramadan_2020.htm (last visited July 7, 2020).

79.     Since the Court issued the Memorandum Opinion and Order, filed April 17, 2020 (Doc. 29)("TRO MOO"), the COVID-19 outbreak has worsened in parts of New Mexico, particularly on Indian Reservations in New Mexico's western portion, but New Mexico saw an overall improvement from early to mid-June.  See Coronavirus Updates, June 27, Albuquerque J. (June 27, 2020), https://www.abqjournal.com/1470598/209-new-covid19-2-more-deaths-reported-saturday.html (last visited July 7, 2020).

80.     Throughout May and June, 2020, Secretary Kunkel issued several additional Public Health Orders, many of which lifted restrictions on business and activities, including religious gatherings.  See, e.g., Public Health Order, New Mexico Department of Health (May 5, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/05/GovernorsOffice@state.nm_.us_ 20200505_150440.pdf (last visited July 7, 2020)("May 5 Order"); Public Health Order, New Mexico Department of Health (May 15, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/05/5-15-2020-PHO.pdf (last visited July 7, 2020)("May 15 Order"); Public Health Order, New Mexico Department of Health (May 27, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/05/PHO-5-26-2020.pdf (last visited July 7, 2020)("May 27 Order"); Public Health Order, New Mexico Department of Health (June 1, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/06/ 060120-PHO.pdf (last visited July 7, 2020)("June 1 Order"); Public Health Order, New Mexico Department of Health (June 12, 2020), https://cv.nmhealth.org/wp-content/uploads/ 2020/06/GovernorsOffice@state.nm_.us_20200612_082914.pdf (last visited July 7, 2020)("June 12 Order"); Public Health Order, New Mexico Department of Health (June 15, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/06/DOH-PHO-6-15-essential-businesses-mass-gatherings.pdf (last visited July 7, 2020)("June 15 Order"); Public Health Order,

New Mexico Department of Health (June 30, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/ 07/063020-PHO-1.pdf (last visited July 7, 2020)("June 30 Order").

81. The May 5 Order reinstates the April 11 Order's mass gathering restrictions, and, like the April 11 Order, it states that "[c]hurches, synagogues, mosques, and all other houses of worship shall adhere to [the mass gathering] restriction, but nothing in this order is intended to preclude these faith-based institutions from holding services through audiovisual means." May 5 Order at 5-6.

82. Like the April 11 Order, the May 5 Order includes restaurants as "essential businesses," "but only for delivery or carry out and local breweries or distillers but only for carry out." May 5 Order ¶ 2.u, at 5.

83. As of May 5, 2020, about 1,193,813 people in the United States and 4,138 New Mexico residents had tested positive for COVID-19, and 68,934 Americans and 162 New Mexico residents had died from COVID-19. See Coronavirus in New Mexico, Albuquerque J., https://www.abqjournal.com/coronavirus (last visited July 7, 2020); United States: Coronavirus Pandemic, Our World in Data, University of Oxford (last updated July 7, 2020), https://ourworldindata.org/coronavirus/country/united-states?country=~USA#what-is-the-daily-number-of-confirmed-deaths (last visited July 7, 2020)("Total U.S. Deaths"); CDC COVID Data Tracker, CDC (last updated July 7, 2020), https://www.cdc.gov/covid-data-tracker/index.html#trends (last visited July 7, 2020)("CDC COVID Tracker").

84. The May 15 Order slightly changes the mass gathering definition in prior Public Health Orders by removing limiting language indicating that mass gatherings are prohibited in open outdoor spaces only where individuals are within six feet of each other. Compare April 11 Order ¶ 6, at 5, and May 5 Order ¶ 6, at 5, with May 15 Order ¶ 4, at 5.

85.     The May 15 Order defines mass gathering as:

> "Mass gathering" means any public gathering, private gathering, organized event, ceremony, or other grouping that brings together five (5) or more individuals in a single room or connected space, confined outdoor space or an open outdoor space.   "Mass gathering" does not include the presence of five (5) or more individuals where those individuals regularly reside.   "Mass gathering" does not include individuals who are public officials or public employees in the course and scope of their employment.

May 15 Order ¶ 4, at 5.

86.     The May 15 Order allowed non-essential businesses to open "provided that the total number of persons situated within the business does not exceed 25% of the maximum occupancy of any enclosed space on the business's premises, as determined by the relevant fire marshal or fire department."  May 15 Order ¶ 4, at 6.

87.     The May 15 Order also allows houses of worship to hold in-person services, as long as services do "not exceed 25% of the maximum occupancy of any enclosed building, as determined by the relevant fire marshal or fire department."  May 15 Order ¶ 5, at 6.

88.     Like the May 5 Order, the May 15 Order includes restaurants as "essential business," "but only for delivery or carry out and local breweries, wineries, or distillers but only for carry out."  May 15 Order ¶ 1.u, at 5.

89.     Unlike previous Public Health Orders, the May 15 Order states: "Unless a healthcare provider instructs otherwise, all individuals shall wear a mask or multilayer cloth face covering in public settings except when eating, drinking, or exercising."  May 15 Order ¶ 7, at 6.

90.     As of May 15, 2020, about 1,435,098 people in the United States and 5,662 New Mexico residents had tested positive for COVID-19, and 85,906 Americans and 253 New Mexico residents had died from COVID-19.  See Coronavirus in New Mexico; Total U.S. Deaths; CDC COVID Tracker.

91.     On May 25, 2020, a police officer in Minneapolis, Minnesota, killed George Floyd, sparking a wave of protests against racism and police brutality in Minneapolis and many cities across the country.  See Derrick Bryson Taylor, George Floyd Protests: A Timeline, The New York Times (June 22, 2020), https://www.nytimes.com/article/george-floyd-protests-timeline.html (last visited July 8, 2020)("NYT Protest Timeline").

92.     On May 27, 2020, protestors gathered in Memphis, Tennessee, and Los Angeles, California, in response to Floyd's death, and the deaths of Breonna Taylor, who was killed by police in Louisville, Kentucky, and Ahmaud Arbery, who was killed by police in Brunswick, Georgia.  See NYT Protest Timeline.

93.     The May 27 Order reinstates the May 15 Order's mass gatherings restriction and the twenty-five percent occupancy restriction for non-essential businesses and houses of worship.  See May 27 Order ¶¶ 4, 7, at 5-7.

94.     Like the May 15 Order, the May 27 Order includes restaurants as "essential business," "but only for delivery or carry out and local breweries, wineries, or distillers but only for carry out."  May 15 Order ¶ 1.u, at 5.

95.     The May 27 Order also allowed restaurants to permit dine-in services in outdoor seating areas:

> Restaurants, but not Bars, may also offer dine-in service in outdoor seating areas only at up to 50% of their outdoor area fire code occupancy, if applicable.  No dine-in service may be provided in indoor seating areas.  Outdoor dine-in service may only be provided to patrons who are seated.  Tables must be placed with at least six feet of distance between tables.  No more than six patrons may be seated at any single table.  No bar or counter seating is permitted.

May 27 Order ¶ 1.u, at 5.

96.     Like the May 15 Order, the May 27 Order requires individuals to wear a "mask or multilayer cloth face covering in public settings except when eating, drinking, or exercising." May 27 Order ¶ 9, at 7.

97.     As of May 27, 2020, about 1,698,523 people in the United States and 7,256 New Mexico residents had tested positive for COVID-19, and 98,916 Americans and 329 New Mexico residents had died from COVID-19.  <u>See</u> Coronavirus in New Mexico; Total U.S. Deaths; CDC COVID Tracker.

98.     On May 29, 2020, protests against racism and police brutality erupted in Atlanta, Georgia, New York City, New York, Detroit, Michigan, and Washington, D.C.  <u>See</u> NYT Protest Timeline.

99.     Throughout late May and all of June, 2020, demonstrators continued to protest against racism and police brutality in cities across America.  <u>See</u> NYT Protest Timeline; Michael T. Heaney, The George Floyd protests generated more media coverage than any protest in 50 years, The Washington Post (July 6, 2020), https://www.washingtonpost.com/politics/2020/07/06/george-floyd-protests-generated-more-media-coverage-than-any-protest-50-years/ (last visited July 8, 2020).

100.    The June 1 Order reinstates the May 27 Order's mass gatherings restriction and the twenty-five percent occupancy restriction for non-essential businesses and houses of worship.  <u>See</u> June 1 Order ¶¶ 2, 4, 5, at 5-7.

101.    Like the May 27 Order, the June 1 Order includes restaurants as "essential business."  May 27 Order ¶ 1.u, at 5.

102.    The June 1 Order also allows restaurants to permit dine-in services in indoor seating areas:

> Restaurants may provide dine-in service, but they may not exceed more than 50% occupancy of the maximum occupancy of any enclosed space on the restaurant's premises, as determined by the relevant fire marshal or fire department. Restaurants choosing to open must ensure that there is at least six feet of distance between tables.  No more than six patrons may be seated at any single table.  No bar or counter seating is permitted.  Dine-in services shall be provided only to patrons who are seated at tables, and patrons may not consume food or beverages while standing. . . .  Local breweries, wineries, or distillers may operate but only for carry out service.

June 1 Order ¶ 1.u, at 5.

103.    Like the May 27 Order, the June 1 Order requires individuals to wear a "mask or multilayer cloth face covering in public settings except when eating, drinking, or exercising." June 1 Order ¶ 13, at 7-8.

104.    Unlike previous Public Health Orders, the June 1 Order allows "[g]yms and similar exercise facilities [to] operate at up to 50% of the maximum occupancy of any enclosed space on the business's premises, as determined by the relevant fire marshal or fire department, but may not conduct group fitness classes."  June 1 Order ¶ 8, at 7.

105.    Unlike previous Public Health Orders, the June 1 Order allows "[p]ublic swimming pools [to] open but such facilities are limited to lane-swimming and lessons with up to two students only.  Play and splash areas shall be closed.  Public swimming pools may not exceed 50% of their maximum occupancy."  June 1 Order ¶ 9, at 7.

106.    As of June 1, 2020, about 1,802,470 people in the United States and 7,797 New Mexico residents had tested positive for COVID-19, and 104,383 Americans and 362 New Mexico residents had died from COVID-19.  See Coronavirus in New Mexico; Total U.S. Deaths; CDC COVID Tracker.

107.    The June 12 Order reinstates the June 1 Order's mass gatherings restriction and the twenty-five percent occupancy restriction for non-essential businesses and houses of worship.  See June 1 Order ¶¶ 2, 4, 5, at 5-7.

108.    The June 12 Order also reinstates the June 1 Order's fifty percent occupancy restriction for restaurants.  See June 12 Order ¶ 1.u, at 5.

109.    Like the June 1 Order, the June 12 Order requires individuals to wear a "mask or multilayer cloth face covering in public settings except when eating, drinking, or exercising." June 12 Order ¶ 13, at 8.

110.    The June 12 Order reinstates the June 1 Order's fifty percent occupancy restrictions for gyms and exercise facilities and the June 1 Order's restrictions on public swimming pools.  See June 12 Order ¶¶ 8-9, at 7.

111.    As of June 12, 2020, about 2,038,344 people in the United States and 9,519 New Mexico residents had tested positive for COVID-19, and 113,820 Americans and 426 New Mexico residents had died from COVID-19.  See Coronavirus in New Mexico; Total U.S. Deaths; CDC COVID Tracker.

112.    In mid-June, 2020, protestors gathered in Albuquerque and demanded the removal of statues of Juan de Oñate, a Spanish colonial conquistador who governed New Mexico in the sixteenth century.  See Simon Romero, Man Is Shot at Protest Over Statue of New Mexico's Conquistador, The New York Times (June 15, 2020), https://www.nytimes.com/ 2020/06/15/us/conquistador-onate-albuquerque-new-mexico-unrest.html (last visited July 8, 2020).

113.    The June 15 Order reinstates the June 12 Order's mass gatherings restriction and the twenty-five percent occupancy restriction for non-essential businesses and houses of worship. See June 15 Order ¶¶ 2, 4, 5, at 5-7.

114.    The June 15 Order reinstates the June 12 Order's fifty percent occupancy restriction for restaurants.  See June 15 Order ¶ 1.u, at 5.

115.    Like the June 12 Order, the June 15 Order requires individuals to wear a "mask or multilayer cloth face covering in public settings except when eating, drinking, or exercising." June 15 Order ¶ 13, at 7-8.

116.    The June 15 Order reinstates the June 12 Order's fifty percent occupancy restrictions for gyms and exercise facilities and the June 12 Order's restrictions on public swimming pools.  See June 12 Order ¶¶ 8-9, at 7.

117.    As of June 15, 2020, about 2,104,346 people in the United States and 9,845 New Mexico residents had tested positive for COVID-19, and 115,732 Americans and 440 New Mexico residents had died from COVID-19.  See Coronavirus in New Mexico; Total U.S. Deaths; CDC COVID Tracker.

118.    The June 30 Order reinstates the June 15 Order's mass gatherings restriction and the twenty-five percent occupancy restriction for non-essential businesses and houses of worship. See June 30 Order ¶¶ 2, 4, 5, at 5-7.

119.    The June 30 Order reinstates the June 15 Order's fifty percent occupancy restriction for restaurants.  See June 15 Order ¶ 1.u, at 5.

120.    Like the June 15 Order, the June 30 Order requires individuals to wear a "mask or multilayer cloth face covering in public settings except when eating, drinking, or exercising." June 30 Order ¶ 13, at 8.

121.    The June 30 Order reinstates the June 15 Order's fifty percent occupancy restrictions for gyms and exercise facilities and the June 15 Order's restrictions on public swimming pools.  See June 30 Order ¶¶ 8-9, at 7.

122.    As of June 30, 2020, about 2,624,873 people in the United States and 12,146 New Mexico residents had tested positive for COVID-19, and 126,140 Americans and 497 New Mexico residents had died from COVID-19.  See Coronavirus in New Mexico; Total U.S. Deaths; CDC COVID Tracker.

123.    On July 1, 2020, Governor Lujan Grisham issued Executive Order 2020-054, Executive Order, Office of the Governor (July 1, 2020), https://www.governor.state.nm.us/wp-content/uploads/2020/07/Executive-Order-2020-054-2.pdf  (last visited July 7, 2020)("July 1 EO").

124.    The July 1 EO requires that "all persons who have arrived in New Mexico from a location outside of the State must self-isolate or self-quarantine for a period of 14 days from the date of their entry into the State of New Mexico or for the duration of their presence in the State, whichever is shorter."  July 1 EO ¶ 1, at 2.

125.    The July 1 EO's self-quarantine requirement does not apply to

persons employed by airlines, those performing public safety or public health functions, military personnel, federal employees, those employed by a federal agency or national defense contractor, emergency first responders, health care workers, those arriving in the State pursuant to a Court order, and persons who are employed or contracted by an "essential business" . . . and who are traveling into New Mexico to conduct business activities.

July 1 EO ¶ 3, at 3.

126.    The July 1 EO states that "[i]ndividuals who do not comply with the self-isolation and self-quarantine directives . . . shall be subject to involuntary isolation or quarantine by the New Mexico Department of Health."  July 1 EO ¶ 4, at 3.

127.    On July 1, 2020, Governor Lujan Grisham announced that the "state will aggressively enforce the mandatory face-covering requirement for all residents in public places. In accordance with state law, violators will be subject to a $100 fine.  In addition, retailers will now be required to ensure that their customers are wearing face coverings in order to enter store premises."  State extends emergency public health order, Press Room, New Mexico Department of Health (July 1, 2020), https://cv.nmhealth.org/2020/07/01/state-extends-emergency-public-health-order/ (last visited July 7, 2020).

128.    Many experts agree that the national protests against racism and police brutality in late May and June, 2020, did not cause a significant increase in coronavirus infections, which experts attribute to the fact that protests took place outdoors and most protestors wore masks.  See Joseph Goldstein, Did Floyd Protests Lead to a Virus Surge? Here's What We Know, The New York Times (July 1, 2020), https://www.nytimes.com/2020/07/01/nyregion/nyc-coronavirus-protests.html (last visited July 8, 2020); Tommy Beer, Research Determines Protests Did Not Cause Spike in Coronavirus Cases, Forbes (July 1, 2020), https://www.forbes.com/sites/tommybeer/2020/07/01/research-determines-protests-did-not-cause-spike-in-coronavirus-cases/#38df5aaa7dac (last visited July 8, 2020); Hilary Brueck and Ruobing Su, Charts show which major US cities are winning and losing against the coronavirus, Business Insider (June 26, 2020), https://www.businessinsider.com/coronavirus-rates-are-dropping-in-us-cities-with-protests-2020-6 (last visited July 8, 2020); Sean Philip Cotter, Coronavirus tests suggest low infection rates from protests: Marty Walsh, Boston Herald (June 18,

2020), https://www.bostonherald.com/2020/06/18/coronavirus-tests-suggest-low-infection-rates-from-protests-walsh/ (last visited July 9, 2020).

129.    In New Mexico, Governor Lujan Grisham has stated that protests in the state have not caused significant increases in coronavirus infection rates:

> "NMDOH (New Mexico Department of Health) has not found any connection between protests and COVID-19 cases here in New Mexico.  We have seen cases directly increase as a result of people gathering in homes, i.e. graduation parties, holiday parties, friends hanging out, where people feel comfortable and casual and are not wearing masks.  Gathering in groups remains unsafe and will remain unsafe for the duration of the pandemic," a spokesperson for the governor said.

Patrick Hayes, Governor's office: Current data shows no connection between rise of COVID-19 and protests, KOB 4 (July 7, 2020), https://www.kob.com/new-mexico-news/governors-office-current-data-shows-no-connection-between-rise-of-covid-19-and-protests/5785379/?cat=500 (last visited July 8, 2020).

130.    By late June and early July, 2020, the coronavirus infection and death rates began to rise dramatically in Arizona, Florida, and Texas.  See Caitlin Owens, Coronavirus deaths are rising in hotspots, Axios (July 8, 2020), https://www.axios.com/coronavirus-deaths-rising-hotspots-b4c6863f-b733-42e5-a9be-7f4e66f38667.html (last visited July 8, 2020); Derek Hawkins, et al, Arizona, Florida, Texas are latest coronavirus epicenters, The Washington Post (June 29, 2020), http://www.washingtonpost.com/nation/2020/06/28/coronavirus-live-updates-us/ (last visited July 8, 2020).

131.    As of July 6, 2020, about 2,932,596 people in the United States and 13,507 New Mexico residents had tested positive for COVID-19, and 129,947 Americans and 515 New Mexico residents had died from COVID-19.  See Coronavirus in New Mexico; Total U.S. Deaths; CDC COVID Tracker.

132.    Between July 5 and July 10, 2020, the seven-day average positivity rate for COVID-19 tests in New Mexico increased from 2.9% to 4.4%.  See Johns Hopkins University, Daily Testing Trends: Rate of Positive Tests in the U.S. and in States Over Time -- New Mexico, https://coronavirus.jhu.edu/testing/individual-states/new-mexico (last visited July 10, 2020).

133.    Between June 27 and July 10, 2020, the seven-day average number of daily new COVID-19 cases increased from 184 to 286.2.  See Coronavirus in New Mexico; Total U.S. Deaths; CDC COVID Tracker.

134.    On the afternoon of July 9, 2020, Governor Lujan-Grisham held a press conference at which she announced that a new Public Health Order would take effect on July 13, 2020, that would rescind permission for restaurants to hold dine-in services.  See State to re-enact certain public health restrictions, Press Room, New Mexico Department of Health (July 9, 2020), https://cv.nmhealth.org/2020/07/09/state-to-re-enact-certain-public-health-restrictions/       (last visited July 10, 2020)("July 9 Public Health Announcement"). .

135.    The Public Health Order announced on July 9, 2020, permits restaurants and breweries to "operate outdoor seating at 50 percent of the maximum occupancy as determined by fire code."  July 9 Public Health Announcement

136.    The Public Health Order announced on July 9, 2020, also "strengthen[s]" the mask requirement to "require individuals to wear face-coverings while exercising."  July 9 Public Health Announcement.

137.    Secretary Kunkel has the authority to sign Public Health Orders, but she, Governor Lujan Grisham, and relevant experts collectively determine the restrictions to include in each Public Health Order.  See July 10 Tr. at 4:11-15 (Kunkel).

138.     In early March, 2020, the New Mexico Department of Health established a medical advisory team, which is comprised of over one hundred experts divided into six teams: (i) the medical team; (ii) the operations team; (iii) the transportation team; (iv) the ethics team; (v) the legal team; and (vi) the media team.  See July 10 Tr. at 5:21-25 (Kunkel).

139.     Secretary Kunkel relies on the expertise of three epidemiologists, each of whom reports directly to her.  See July 10 Tr. at 5:1-7 (Kunkel, Esquibel).

140.     Governor Lujan Grisham and the New Mexico Governor's Office do not collect data separately from the data that the New Mexico Department of Health and the six medical advisory teams collect.  See July 10 Tr. at 7:4-15 (Kunkel).

141.     The New Mexico Governor's Office and Governor Lujan Grisham's general counsel draft the Public Health Orders.  See July 10 Tr. at 7:16-20 (Esquibel, Kunkel).

142.     Secretary Kunkel participates in discussions about restrictions to include in each Public Health Order, and these discussions sometimes "go on for days."  July 10 Tr. at 7:24 (Kunkel).

143.     After these discussions, Governor Lujan Grisham's general counsel drafts the Public Health Order, Secretary Kunkel and the general counsel meet to discuss additional considerations, and then Secretary Kunkel signs the new Public Health Order.  See July 10 Tr. at 7:23-8:4 (Kunkel).

144.     After Secretary Kunkel signs a new Public Health Order, she sends it to the New Mexico Secretary of State, who "put[s] her mark on the document," July 10 Tr. at 8:21 (Esquibel), but Secretary Kunkel is the final signatory for each Public Health Order, see July 10 Tr. at 8:18-25 (Esquibel, Kunkel).

- 33 -

145.     Governor Lujan Grisham has a "strong influence" on the restrictions that the Public Health Order ultimately includes, but all decisions regarding restrictions are the result of the general "consensus" that Secretary Kunkel, Governor Lujan Grisham, and their advisors reach. July 10 Tr. at 9:7-16 (Kunkel).

146.     Secretary Kunkel, Governor Lujan Grisham, and their advisors do not always "agree[] 100 percent," but, before issuing a new Public Health Order, "there is a consensus as to the best approach to take with difficult decisions that are then reflected in the public health order." July 10 Tr. at 10:11-16 (Kunkel).

147.     The "medical advisory team doesn't weigh in on the public health orders," but "[t]hey provide input to the department of health that informs [its] decisions." July 10 Tr. at 10:7-10 (Kunkel).

148.     Governor Lujan Grisham has never "stated that she wants something particular in an order" that Secretary Kunkel has then "signed off on," regardless whether she, her experts and advisors, the experts and advisors in the New Mexico Governor's Office agree.  July 10 Tr. at 10:18-20 (Esquibel).  See July 10 Tr. at 10:17-21 (Esquibel, Kunkel).

149.     Secretary Kunkel and the New Mexico Department of Health do not consult with community stakeholders whom each Public Health Order might affect before discussing, drafting, and issuing each Public Health Order.  See July 10 Tr. at 11:5-20 (Esquibel, Kunkel).

150.     Governor Lujan Grisham, the New Mexico Governor's Office, and some experts "may have talked to churches" to gather information.  July 10 Tr. at 12:16-17 (Kunkel).

151.     The New Mexico Department of Health has "the overriding responsibility" to enforce Public Health Orders, but, "when there's a complaint," such as a complaint about a

business, the complaint "goes to the state police law enforcement." July 10 Tr. at 12:20-24 (Kunkel).

152.   Individuals can file a complaint on the New Mexico Department of Health's website, and the New Mexico Department of Health processes complaints and issues a "cease and desist" letter or a "notice" when necessary. July 10 Tr. at 13:14-21 (Kunkel).

153.   The New Mexico Department of Health has received approximately 9,800 complaints. See July 10 Tr. at 79:10-16 (Guss, Kunkel).

154.   The New Mexico Department of Health Office of General Counsel, "in collaboration with" the New Mexico Department of Public Safety and the New Mexico Department of the Environment, enforces each Public Health Order's rules, such as rules about wearing masks and not holding mass gatherings. July 10 Tr. at 14:8-11 (Kunkel).

155.   The March 19 Order was the first Public Health Order that designated some businesses and entities as providers of "essential services." July 10 Tr. at 17:6 (Esquibel). See id. at 17:3-7 (Esquibel, Kunkel).

156.   The March 19 Order includes places of worship in its definition of providers of "essential services." July 10 Tr. at 17:9 (Esquibel). See id. at 17:8-21 (Esquibel, Kunkel); March 19 Order ¶ 3, at 2.

157.   Secretary Kunkel believes that faith is "essential to people's mental [] health and well-being." July 10 Tr. at 18:17-18 (Kunkel).

158.   The March 23 Order defines some businesses as "essential businesses," but it does not use the term essential services. July 10 Tr. at 20:11 (Esquibel). See id. at 20:5-12 (Esquibel, Kunkel); March 23 Order ¶ 3, at 2-4.

159.    Subsequent Public Health Orders include such businesses as auto body shops, storage facilities, and dry-cleaning businesses in their definition of essential businesses.  See July 10 Tr. at 20:18-24 (Esquibel, Kunkel).

160.    Essential businesses are businesses that serve "critical life functions, like heating or people who have to go to work, medical care," and the definition for essential businesses has evolved over time.  July 10 Tr. at 21:5-12 (Kunkel).

161.    The New Mexico Department of Health's experts compose the list of essential businesses.  See July 10 Tr. at 22:24-23:1 (Esquibel, Kunkel).

162.    Secretary Kunkel signed off on the lists of essential businesses that experts created and presented to her, the New Mexico Department of Health, Governor Lujan Grisham, and the New Mexico Governor's Office.  See July 10 Tr. at 23:5-14 (Esquibel, Guss, Court, Kunkel).

163.    The list of essential businesses is "unique to New Mexico," and other states make their own decisions about which businesses may remain open.  July 10 Tr. at 23:25 (Kunkel).  See id. at 24:15-19 (Esquibel, Kunkel).

164.    New Mexico determines its own rules about which businesses are essential and which businesses must close, and "[t]here is nothing forcing the state to adopt [the] list [of essential businesses]."  July 10 Tr. at 24:28-19 (Kunkel).

165.    When Secretary Kunkel, Governor Lujan Grisham, and their advisors make decisions about a Public Health Order, they conduct a "risk assessment" from the "public health perspective," and they consider "what is the risk of transmission of the virus and what are potential consequences" for each decision.  July 10 Tr. at 25:12-17 (Kunkel).

166.    The New Mexico Department of Health's medical advisory team has a "modeling team" that provides data which informs Secretary Kunkel, Governor Lujan Grisham, and their advisors' risk assessments.  July 10 Tr. at 26:8-10 (Kunkel).

167.    Although the medical advisory team provides data about risk factors and transmission rates in New Mexico -- and where in the state faces the greatest risk of transmission -- the medical advisory team "doesn't weigh in on public health orders."  July 10 Tr. at 26:19-20 (Kunkel).

168.    Secretary Kunkel, Governor Lujan Grisham, and their advisors "meet every single day for two hours and review the data, the number of cases, the number of deaths, [and] things happening in the state."  July 10 Tr. at 27:4-10 (Kunkel).

169.    As of the end of July 9, 2020, the total number of unique coronavirus cases in New Mexico was approximately 14,200.  See July Tr. at 27:15-21 (Esquibel, Kunkel).

170.    If a person tests positive for the coronavirus multiple times, the New Mexico Department of Health only includes the first positive test in its data of total positive tests.  See July 10 Tr. at 27:22-28:4 (Esquibel, Kunkel).

171.    The Public Health Orders generally apply to the entire state and not to specific counties, but, initially, Northwest New Mexico was "significantly impacted," while other regions of the state were less impacted by the coronavirus, and, thus, when the New Mexico Department of Health began relaxing restrictions in new Public Health Orders, Northwest New Mexico "did not get a relaxation of the restrictions [and] the rest of the state was allowed to . . . relax [restrictions] somewhat, but the northwest caught up quickly."  July 10 Tr. at 28:9-20 (Kunkel).  See July 10 Tr. at 28:21-29:4 (Esquibel, Kunkel).

172.    The March 23 Order does not define houses of worship as a provider of essential services or as an essential business, but it does exempt houses of worship from abiding by the mass gathering rule.  See July 10 Tr. at 29:12-17 (Esquibel, Kunkel); March 23 Order ¶ 6, at 4.

173.    The New Mexico Department of Health does not "consider churches businesses," so it treats places of worship differently from other businesses, and, when the New Mexico Department of Health issued the March 23 Order, places of worship "were exempted deliberately to try to provide people access to something that was really important to them." July 10 Tr. at 30:1-4 (Kunkel).

174.    The April 6 Order's mass gathering rule does not apply to places of worship or to "individuals who are public officials and public employees in the course and scope of their employment." July 10 Tr. at 31:1-3 (Esquibel).  See id. at 30:20-31:5 (Esquibel, Kunkel); April 6 Order ¶ 6, at 5.

175.    The April 6 Order was the first Public Health Order to include a twenty-percent occupancy limit for retail spaces.  See July 10 Tr. at 31:23-32:4 (Esquibel, Kunkel); April 6 Order ¶ 4, at 6.

176.    The April 11 Order changed the mass gathering rule in previous Public Health Orders by removing the exemption for houses of worship.   See July 10 Tr. at 33:23-34:12 (Esquibel, Kunkel); April 6 Order ¶ 6, at 5.

177.    The decision to remove the house-of-worship exemption from the April 11 Order's mass gathering rule "began with . . . information that the governor was receiving" concerning the possibility of "large groups in churches" the following day, April 12, 2020, which is Easter Sunday. July 10 Tr. at 34:13-35:1 (Esquibel, Kunkel).

178.    When the New Mexico Department of Health issued the April 11 Order, it took effect immediately.  See July 10 Tr. at 35:2-10 (Esquibel, Kunel); April 11 Order ¶ 4, at 7.

179.    By April, 2020, epidemiology experts began to report about "super spreader events in other churches around the word," and the New Mexico Department of Health began "hav[ing] concerns about reports super spreader events in churches generally," but it did not "have as much information as we have now."  July 10 Tr. at 35:19-24 (Kunkel).

180.    When Secretary Kunkel issued the April 6 Order, the New Mexico Department of Health was concerned about coronavirus transmission in retail stores and in houses of worship, but the April 6 Order implemented occupancy restrictions for retail stores and not for houses of worship.  See July 10 Tr. at 36:19-24 (Esquibel, Kunkel).

181.    The April 11 Order says that the mass gathering rule applies to houses of worship, but not to the extent needed for houses of worship to provide religious services through audiovisual means, and the April 11 Order does not contain much guidance about how houses of worship should conduct and provide audiovisual services.  See July 10 Tr. at 37:6-15 (Esquibel, Kunkel); April 11 Order ¶ 1, at 5.

182.    The April 11 Order does not limit its mass gathering rule to Sunday services that houses of worship provide, but rather, the restriction applies more broadly to all services that houses of worship provide throughout a given week.  See July 10 Tr. at 37:16-38:4 (Esquibel, Kunkel); April 11 Order ¶ 1, at 5.

183.    The April 11 Order's provision about houses of worship providing services through audiovisual means allows "people to participate in their . . . particular worship services."  July 11 Tr. at 39:3-5 (Kunkel).

184.    The April 11 Order does not prohibit "drive-in services, services where congregants are in their vehicles, and . . . worshipping together in a parking lot or other area with vehicles." July 10 Tr. at 75:10-14 (Guss, Kunkel).

185.    The Public Health Orders do not define "worship services."  July 10 Tr. at 39:21-25 (Kunkel).

186.    When Secretary Kunkel signed the April 11 Order, she, Governor Lujan Grisham, and their advisors had not discussed religious services such as study groups and religious summer camps for children, but since she signed the April 11 Order, they have discussed these topics.  See July 10 Tr. at 41:15-20 (Esquibel, Kunkel).

187.    The New Mexico Department of Health did not take action against any houses of worship on Easter Sunday, April 12, 2020.  See July 10 Tr. at 76:10-16 (Guss, Kunkel).

188.    The April 30 Order added carwash businesses and businesses related to adopting, grooming, and boarding pets to its list of essential businesses, see July 10 Tr. at 42:10-23 (Esquibel, Kunkel); April 30 Order ¶¶ 2.j, 2.l, at 4, and the decision to include these businesses resulted from "extensive discussions" about how opening these businesses might affect coronavirus' risk of transmission, July 10 Tr. at 43:3-44:1 (Kunkel).

189.    The May 15 Order is the first Public Health Order that includes a definition for "COVID-Safe Practices" ("CSP"), July 10 Tr. at 45:22-24 (Esquibel, Kunkel), and it provides the following definition:

> "COVID-Safe Practices" ("CSP") are those directives, guidelines, and recommendations for businesses and other public operations that are set out and memorialized in the document titled "All Together New Mexico: COVID-Safe Practices for Individuals and Employers".  That document may be obtained at the following link http://cv.nmhealth.org/covid-save-practices/.

May 15 Order ¶ 8, at 5.

190.    The CSP applies to houses of worship.   <u>See</u> July 10 Tr. at 46:1-3 (Esquibel, Kunkel).

191.    The Economic Recovery Council created the CSP, and the CSP "incorporates all the information [it] gather[s] from the CDC, from around the country, and [] epidemiology." July 10 Tr. at 46:13-15 (Kunkel).

192.    The Economic Recovery Council is "a multidisciplinary committee looking at how to safely reopen New Mexico, and they were responsible for the production of the COVID safe practices."   July 10 Tr. at 48:9-12 (Kunkel).   <u>See</u> All Together New Mexico, COVID-Safe Practices for Individuals and Employers at 5, Economic Recovery Council (last updated June 11, 2020),   https://indd.adobe.com/view/3f732e94-0164-424d-9ac6-a0ace27e70c8   (last visited July 11, 2020)("CSP Handbook").

193.    The May 15 Order allows houses of worship to provide in-person services that comply with the CSP and do not exceed twenty-five percent of an enclosed building's maximum occupancy.  <u>See</u> July 10 Tr. at 47:6-48:4 (Kunkel, Esquibel); May 15 Order ¶ 5, at 6.

194.    Secretary did not "sign-off" on the CSP Handbook.  July 10 Tr. at 48:17 (Esquibel). <u>See</u> <u>id.</u> at 48:14-19 (Esquibel, Kunkel).

195.    The CSP Handbook contains a message to the State of New Mexico.  <u>See</u> CSP Handbook at 3; July 10 Tr. at 48:20-50:1 (Esquibel, Kunkel).

196.    Several advisors and doctors who work for the New Mexico Department of Health contributed to the CSP Handbook's creation, but Secretary Kunkel did not contribute to it.  <u>See</u> July 10 Tr. at 49:6-15 (Kunkel).

197.    When Secretary Kunkel signed the May 15 Order, she had read and reviewed the CSP Handbook, which the May 15 Order incorporates.  See July 10 Tr. at 49:21-50:6 (Esquibel, Kunkel).

198.    Secretary Kunkel says that "it would be unlikely that a COVID safe practice would change without [her] knowledge.  It would be highly unlikely, because this something that [she and her advisors] would discuss with the governor, with her experts, in the meetings that we have on safe reopening, challenges, risks to the public."  July 10 Tr. at 50:22-51:2 (Kunkel).

199.    Secretary Kunkel, Governor Lujan Grisham, and their advisors conducted separate analyses for houses or worship, non-essential businesses, and places of lodging when they decided to allow each of these entity categories to reopen at twenty-five percent occupancy.  See July 10 Tr. at 52:2-15 (Kunkel, Esquibel).

200.    The May 27 Order categorizes restaurants as essential businesses, and it allows restaurants to provide outdoor dining services at up to fifty percent occupancy of outdoor seating areas.  See July 10 Tr. at 52:24-53:3 (Esquibel, Kunkel); May 27 Order ¶ 1.u, at 5.

201.    The May 27 Order does not allow restaurants to provide any indoor dining services.  See May 27 Order ¶ 1.u, at 5; July 10 Tr. at 77:5-15 (Guss, Kunkel).

202.    The May 27 Order allows non-essential businesses and houses of worship to remain open at only twenty-five percent occupancy of their indoor spaces.  See July 10 Tr. at 53:11-14 (Esquibel, Kunkel); May 27 Order ¶¶ 4, 7 at 6-7.

203.    The June 1 Order permits: (i) restaurants to provide indoor dining services at up to fifty percent occupancy, see June 1 Order ¶ 1.u, at 5; (ii) houses of worship to provide in-person services at up to twenty-five percent of an enclosed building's occupancy, see June 1 Order ¶ 2, at 6; (iii) indoor shopping malls to open at twenty-five percent of a premises' occupancy, see

June 1 Order ¶ 7, at 7; (iv) gyms to operate at up to fifty percent of an enclosed space's occupancy, see June 1 Order ¶ 8, at 7; and (v) pools to open at up to fifty percent of their maximum occupancy, but only for lane-swimming and swimming less with up to two students, see June 1 Order ¶ 9, at 7. See July 10 Tr. at 53:18-22 (Esquibel, Kunkel); id. at 77:20-79:9 (Guss, Kunkel).

204.    The June 1 Order prohibits gyms from offering group fitness classes.  See July 10 Tr. at 78:20-23 (Kunkel); June 1 Order ¶ 8, at 7.

205.    When Secretary Kunkel signed the June 1 Order, she was not aware of any "published information about super spreader events at restaurants or malls, but there was growing evidence of super spreader events in different churches across the world and the United States." July 10 Tr. at 54:17-21 (Kunkel).

206.    When Secretary Kunkel signed the June 1 Order, she said that she had information indicating that people are at a lower risk of coronavirus transmission when they are outdoors than when they are indoors, but her information also indicated that congregating outdoors "was not without danger."  July 10 Tr. at 55:10 (Kunkel).

207.    When people walk around in a grocery store or a mall, they typically pass by each other for brief moments, which are called "transitory event[s]," but, inside a house of worship, people are typically "seated in one place," and are thus "in close proximity for a longer period of time in an enclosed space."  July 10 Tr. at 55:18-56:2 (Kunkel).

208.    Secretary Kunkel's understanding of the mass gathering rule is that the rule does not apply to houses of worship, which are instead restricted to services that exceed twenty-five percent of an enclosed building's occupancy limit.  See July 10 Tr. at 56:13-57:24 (Esquibel, Kunkel).

209.    The June 1 Order's provision pertaining to houses or worship contains "no specific language precluding outdoor services."  July 10 Tr. at 59:3-4 (Kunkel).  See June 1 Order ¶ 2, at 6.

210.    Secretary Kunkel interprets the June 1 Order as permitting houses of worship to hold "an open gathering" outdoors.  July 10 Tr. at 59:20 (Kunkel).

211.    Secretary Kunkel is not aware of any houses of worship asking the New Mexico Department of Health if a particular Public Health Order permits houses of worship to provide outdoor services.  See July 10 Tr. at 76:2-9 (Guss, Kunkel).

212.    The June 1 Order and subsequent Public Health Orders place different restrictions on houses of worship and gyms, because Secretary Kunkel, Governor Lujan Grisham, and their advisors received information indicating that gyms and houses of worship have different risks of transmission, because, in a gym, people "can be separated by ten feet" on different machines and people "don't talk, [] don't sing, don't greet one another," and are "never in one place."  July 10 Tr. at 63:18-64:11 (Kunkel).

213.    The varying percentages placed on different businesses and entities, such as gyms, retail stores, swimming pools, and houses of worship, correspond to the risk of transmission that each business or entity poses.  See July 10 Tr. at 65:5-7 (Esquibel, Kunkel).

214.    The Public Health Orders apply to protests.  See July 10 Tr. at 65:9-20 (Esquibel, Kunkel).

215.    On May 29, 2020, Governor Lujan Grisham posted the following message on the social media website Twitter: "I encourage all protestors to be safe and to remember the urgent health risks.  Our nation is hurting -- a pain generations deep.  Only justice can heal it.  Only by truly hearing one another, by reckoning with the suffering of long-oppressed communities can we move forward."  Michelle Lujan Grisham (@GovMLG), Twitter (May 29, 2020, 1:10 PM),

https://twitter.com/GovMLG/status/ 1266446768247410688?s=21.  See July 10 Tr. at 67:21-68:2

(Esquibel).

216.   Secretary Kunkel does not have a Twitter account and has not seen Governor Lujan

Grisham's Twitter page.  See July 10 Tr. at 79:17-21 (Guss, Kunkel).

217.   Secretary Kunkel and the New Mexico Department of Health have no role in

writing Governor Lujan Grisham's Twitter posts ("tweets") or in reviewing Governor Lujan

Grisham's tweets before she posts them on her Twitter page.  July 10 Tr. at 79:22-80:4 (Guss,

Kunkel).

218.   On June 1, 2020, Governor Lujan Grisham issued the following statement

concerning protests:

> I want to wholeheartedly commend the thousands of New Mexicans who
> peacefully protested in Albuquerque last night. Freedom of speech is an undeniable
> right of every American and every New Mexican, and in moments of crisis, in
> expressing anger at long-standing injustice and racism, that right is all the more
> important. These protesters were part of an exemplary demonstration.
>
> Later in the night, a small group took a wrong turn, and this is greatly
> concerning. We have received reports of shots fired at or in the direction of public
> safety officers – and this is flatly unacceptable. That sort of behavior is an attempt
> to distort the important work of the peaceful protesters – who have every right to
> demonstrate in peace – and puts both the protesters and public safety officers at
> risk. Those individuals, I have complete confidence, will be held accountable.
> There is no place in this moment for hijacking the protesters' message of justice
> and non-violence.
>
> The president's comments this morning were a dangerous step in this wrong
> direction. His effort to militarize the response to these protests will only serve to
> inflame the feelings of anger and injustice – and will give rise to additional
> opportunity for violence and chaos. I unequivocally reject his notion that physical
> or military force is the only worthwhile or effective response to these protests.
>
> The state of New Mexico will stand ready to assist local governments in
> facilitating peaceful protests. These protesters are giving voice to powerful and
> deep feelings about the unacceptable inequity and injustice woven into this country;

their stand against racism is a worthy one; and I encourage them to continue demonstrating in a peaceful and safe fashion, remembering the urgent health risks of this moment. Lastly it is essential that I underscore the importance of not allowing that message to be distorted by the harmful actions of a few bad actors.

Governor issues statement on peaceful protests, president stoking escalation, Press Releases, Office of the Governor (June 1, 2020), https://www.governor.state.nm.us/2020/06/01/governor-issues-statement-on-peaceful-protests-president-stoking-escalation/ (last visited July 11, 2020). See July 10 Tr. at 68:12-22 (Esquibel).

219.   The New Mexico Department of Health does not write any press releases for Governor Lujan Grisham or the Governor's Office.  See July 10 Tr. at 80:5-10 (Guss, Kunkel).

220.   Secretary Kunkel did not know about Governor Lujan Grisham's statements concerning protests, but she believes that Governor Lujan Grisham wanted to remind people to be safe if they protest and that Governor Lujan Grisham "did not support protests but she supported their message."  July 10 Tr. at 67:12-13 (Kunkel).  See id. at 67:14-69:8 (Kunkel).

221.   None of the Public Health Orders specifically addresses protesting.  See July 10 Tr. at 69:23-70:9 (Esquibel, Kunkel).

222.   Secretary Kunkel is not aware of the New Mexico Department of Health taking any actions against protests or protestors, but the New Mexico Department of Health taking actions against Martin Hicks, the Mayor of Grants, New Mexico, because he wanted to have a Fourth of July parade.  See July 11 Tr. at 70:24-71:13 (Kunkel, Esquibel).  See State fines Grants mayor $5,000 for holding 4th of July parade, KRQE (July 9, 2020), https://www.krqe.com/health/coronavirus-new-mexico/state-fines-grants-mayor-5000-for-holding-4th-of-july-parade/ (last visited July 11, 2020).

223.    One church has received a notice from the New Mexico Department of Health for violating a Public Health Order.  See July 10 Tr. at 71:25-72:9 (Esquibel, Kunkel).

224.    The New Mexico Department of Health's general counsel investigates complaints of Public Health Order violations and decides whether to issue a citation.  See July 10 Tr. at 73:1-5 (Kunkel).

225.    The Governor's Office can submit complaints about Public Health Order violations to the New Mexico Department of Health.  See July 10 Tr. at 73:14-17 (Kunkel).

226.    The Department of Health issues press releases and tweets for Department of Health issues, and not on behalf of Governor Lujan Grisham.  See July 10 Tr. at 80:3-10 (Guss, Kunkel).

227.    Secretary Kunkel and the State of New Mexico have discretion regarding actions taken to enforce the Orders.  See July 10 Tr. at 84:12-25 (Kunkel, Esquibel).

228.    Secretary Kunkel was aware of protests happening, and although she did not discuss the protests with Governor Lujan Grisham, "[t]here were discussions within the department of health and members of the governor's staff on our concerns generally about the protests." July 10 Tr. at 86:14-16 (Kunkel).  See July 10 Tr. at 85:19-86:18.

229.    As head of the New Mexico Department of Health, Secretary Kunkel directs her general counsel.  See July 10 Tr. at 88:20-24 (Esquibel, Kunkel).

230.    The New Mexico Department of Health did not take any official action "to reiterate the importance of social distancing" and not gathering en masse with regards to protests. July 10 Tr. at 90:5-6 (Esquibel).  See July 10 Tr. at 90:2-8 (Esquibel, Kunkel).

231.    Governor Lujan Grisham's office created a council to "intervene" with protests, but the Department of Health did not. July 10 Tr. at 90:18 (Kunkel).  See July 10 Tr. at 90:12-19 (Esquibel, Kunkel).

232.    Secretary Kunkel does not have authority to direct State Police or city police regarding how the police departments are handling protests.  See July 10 Tr. at 92:17-25 (Guss, Kunkel).

233.    Pastor Smothermon has been a pastor at Legacy Church for eighteen years and seven months.  See July 10 Tr. at 94:21 (Smothermon).

234.    Currently, there is no "real[] touching activity" where physical contact is made during worship at Legacy Church. July 10 Tr. at 96:8 (Smothermon).  See July 10 Tr. at 96:6-10 (Smothermon).

235.    Since the lockdown began, Legacy Church has given communion on one occasion, in which they had parishioners drive by and pick up communion materials from the office.  See July 10 Tr. at 96:12-17 (Smothermon).

236.    Approximately 23,000 people belong to Legacy Church in New Mexico.  See July 10 Tr. at 97:13 (Smothermon).

237.    Some members of Legacy Church in New Mexico cannot access the Sunday worship service through the internet, because the "lack audiovisual capability." July 10 Tr. at 97:23-24 (Stern).  See July 10 Tr. at 97:23-98:3 (Stern, Smothermon).

238.    In addition to its worship services, Legacy Church provides pastoral care to its members.  See July 10 Tr. at 98:15-99:9 (Smothermon).

239.    Many Legacy Church members would prefer to attend services in-person rather than attend services online.  See July 10 Tr. at 99:21-100:4 (Smothermon).

240.     Since COVID-19 began, many more Legacy Church members have sought communication with and help from Legacy Church's pastoral team.  See July 10 Tr. at 100:13-101:1 (Stern, Smothermon).

241.     Someone named Katherine from Governor Lujan Grisham's office called to inquire whether Legacy Church would hold in-person services on April 12, and Legacy Church assured her they would not have in-person services and instead conduct services online.  See July 10 Tr. at 102:21-103:9 (Smothermon, Stern).

242.     Legacy Church did not believe it could hold online services on April 12 based on the April 11 order, because it needed more than five people to be in its building at once to run its online service.  See July 10 Tr. at 105:25-106-12 (Smothermon).

243.     Legacy Church held one drive-in "fun" family night, in which they handed out popcorn as families drove into the service; the evening cost them approximately $20,000.  July 10 Tr. at 108:5 (Smothermon).  See July 10 Tr. at 109:2-14 (Smothermon, Stern).

244.     Legacy Church did not engage in any protests during the week of May 25, 2020.  See July 10 Tr. at 110:3-8 (Smothermon, Stern).

245.     Legacy Church held services on April 12, 2020, that many congregants attended online and some congregants attended in person.  See July 10 Tr. at 121:7-18 (Guss, Smothermon).

246.     Approximately 1700 members attended online Legacy church's July 5, 2020, service, which is traditionally one of the least attended services of the year.  See July 10 Tr. at 123:2-5 (Smothermon).

247.     Approximately 3,000-5,000 members attended in-person Legacy church's July 5, 2020, service, across all campuses combined.  See July 10 Tr. at 125:13-126:11 (Hunter, Smothermon).

248.    Although some church members have reported not attended services in-person for fear of being turned away, as of the hearing, Legacy Church has "not turned anybody away [for in-person services] and said you cannot come in because of the amount of people coming." July 10 Tr. at 127:6-8 (Smothermon).  See July 10 Tr. at 126:18-127:9 (Hunter, Smothermon).

249.    One Legacy Church member attended church services while infected with COVID-10, and Legacy Church "called everybody that we knew he was around" to notify them of his infection, although no one reported getting tested due to the incident. July 10 Tr. at 130:4-5 (Smothermon).  See July 10 Tr. at 129:23-12 (Hunter, Smothermon).

250.    Some of Legacy Church's efforts to combat COVID-19 include wiping down each seat between every service and taking temperatures of attendants at the children's services.  See July 10 Tr. at 130:17-24 (Smothermon).

251.    Legacy Church's Sunday services comprise only a small percentage of its offerings. See July 10 Tr. at 138:20-23 (Smothermon).

252.    Other Legacy Church offerings, such as its youth ministries, do not require members to sit sedentary for over an hour at a time.  See July 10 Tr. at 139:12-140:8 (Smothermon).

253.    The Department of Health received 9,800 violations of the Orders from March, 2020, through July 10, 2020.  See July 10 Tr. at 150:1-6 (Guss, Kunkel).

254.    If the state police cannot resolve the issue after receiving a complaint, DPS issues two cease and desist letters.  If these letters do not resolve the complaint, the complaint is transferred to the Department of Health, which may provide the party notice of contemplated action.  See July 10 Tr. at 150:10-20 (Kunkel).

255.    Fewer than fifty cease and desist letters and approximately six notice of contemplated action letters have been issued from March, 2020, through July 10, 2020.  See July 10 Tr. at 150:21-151:13 (Guss, Kunkel).

256.    Only one house of worship has received a cease and desist letter and no houses of worship has received a notice of contemplated action.  See July 10 Tr. at 150:21-151:13 (Guss, Kunkel).

257.    At least five or six churches, including Legacy Church, have had a congregant who tested positive for COVID-19 and attended church services while contagious.  See July 10 Tr. at 151:23-152:10 (Guss, Kunkel).

258.    The Legacy Church member with COVID-19's contact tracing revealed other individuals who tested positive for COVID-19, although it is unclear whether any are Legacy Church members.  See July 10 Tr. at 152:10-25 (Guss, Kunkel).

259.    There was an "active decision" made to not enforce the April 11 Order on April 12.  July 10 Tr. at 158:11 (Guss).  See July 10 Tr. at 158:11-16 (Guss, Kunkel).

260.    The Department of Health did not cite anyone for engaging in protests.  See July 10 Tr. at 159:9-24 (Guss, Kunkel).

261.    The one house of worship that received a cease and desist letter received the letter, because it violated the mass gathering ban.  See July 10 Tr. at 160:16-17 (Kunkel).

262.    According to the Bloomberg School of Public Health at Johns Hopkins University, movie theaters, museums, and concert venues involve high contact intensity and high number of contacts, and thus present relatively severe public health risks.  See Caitlin Rivers, et al, "Public Health Principles for a Phased Reopening During COVID-19: Guidance for Governors, Center for Health Security, Bloomberg School of Public Health at 12 (April 17, 2020),

https://www.centerforhealthsecurity.org/our-work/publications/public-health-principles-for-a-phased-reopening-during-covid-19-guidance-for-governors (last visited July 13, 2020)("Public Guidance").

263.    According to the Bloomberg School of Public Health at Johns Hopkins University, indoor services at places of worship also involve high contact intensity and a high number of contacts, and thus pose severe public health risks.  See Public Guidance at 16.

264.    According to the Bloomberg School of Public Health at Johns Hopkins University, restaurants and gyms present a medium level of both contact intensity and number of contacts and thus pose moderate public health risks.  See Public Guidance at 12.

265.    According to the Bloomberg School of Public Health at Johns Hopkins University, although mitigation measures are difficult for all mass gatherings, they are more feasible for restaurants and gyms, which are subject to regular health and safety inspections, than they are for indoor services at most houses of worship.  See Public Guidance at 12-16.

266.    Indoor religious services have accounted for several "superspreader" events around the world, and, while most experts agree that restaurants remain among the riskier activities, they may not be as dangerous as indoor mass gatherings that involve prolonged proximity, like concerts, lectures, and religious services.  Alyin Woodward, "70% of people infected with the coronavirus did not pass it to anyone, preliminary research shows.  Superspreading events account for most transmission," Bus. Insider (June 4, 2020), https://www.businessinsider.com/super-spreader-events-account-for-most-coronavirus-transmission-2020-6 (last visited July 13, 2020)(providing several examples of religious services being responsible for a large percentage of a local population's outbreak, and quoting an epidemiologist as saying that "[a]nything outdoors is fine. I'm less concerned about protests," and that "restaurants and bars could also probably operate at

50% capacity, with empty tables between diners"). See David Doolittle, "What's More Risk: Going to the Bar or Opening the Mall?" Tex. Med Ass'n (July 8, 2020), https://www.texmed.org/TexasMedicineDetail.aspx?Pageid=46106&id=53977 (last visited July 12, 2020)(ranking activities from most to least dangerous, and asserting that "attending a religious service with 500+ worshippers" is among the most dangerous activities, while "eating in a restaurant (inside) is moderately less dangerous").

267.    On July 13, 2020, Secretary Kunkel and the New Mexico Department of Health issued the Public Health Order (July 13, 2020), https://cv.nmhealth.org/public-health-orders-and-executive-orders/ (last visited July 13, 2020)("July 13 Order").

268.    The July 13 Order imposes the following restrictions on houses of worship:

"Houses of worship" may hold services and other functions, indoors or outdoors, provided that they comply with the "COVID-Safe Practices (CSPs) for Houses of Worship" section of the "All Together New Mexico: COVID-Safe Practices for Individuals and Employers". Further, "houses of worship" may not exceed 25% of the maximum occupancy of any enclosed building, as determined by the relevant fire marshal or fire department. Nothing in this order is intended to preclude these faith-based institutions from holding services through audiovisual means.

July 13 Order ¶ 2, at 6.

269.    The July 13 Order does not significantly amend the June 30 Order's restrictions on houses of worship, except it explicitly notes that houses of worship may provide services "indoors or outdoors." July 13 Order ¶ 2, at 6.

270.    The July 13 Order prohibits restaurants from providing indoor dining services. See July 13 Order ¶ 1.u, at 5.

271.    The July 13 Order places the following restrictions on restaurants:

Restaurants may provide either delivery or carryout service. No dine-in service may be provided in indoor seating areas. Restaurants and local breweries may

- 53 -

provide dine-in service in outdoor seating areas only at up to 50% of their outdoor fire code occupancy.  Outdoor dine-in service may only be provided to patrons who are seated.  Tables must be placed with at least six feet of distance between tables. No more than six patrons may be seated at any single table.  No bar or counter seating is permitted.  Restaurants and local breweries must operate in compliance with applicable occupancy restrictions and COVID-Safe Practices (CSPs) for Restaurants" section of the "All Together New Mexico: COVID-Safe Practices for Individuals and Employers".  Local wineries and distillers may operate but only for carry out service.

July 13 Order ¶ 1.u, at 5.

272.    The July 13 Order restricts "close contact facilities," which include gyms:

"Close contact facilities" may operate at up to 25% of the maximum occupancy of any enclosed space on the business's premises, as determined by the relevant fire marshal or fire department, but may not conduct group fitness classes. All individuals inside a "close contact facility" must wear face-coverings.

July 13 Order ¶ 8, at 7.

273.    The July 13 Order defines close-contact facilities as "barbershops, hair salons, tattoo parlors, nail salons, spas, massage parlors, esthetician clinics, tanning salons, guided raft tours, guided balloon tours, gyms, and personal training services for up to two trainees."  July 13 Order ¶ 6, at 6.

274.    Like the June 30 Order, the July 13 Order allows public swimming pools to open, "but such facilities are limited to lane-swimming and lessons with up to two students only. Play and splash areas shall be closed. Public swimming pools may not exceed 50% of their maximum occupancy."  July 13 Order ¶ 9, at 7.

275.    The July 13 Order restricts places of lodging from operating "at more than 50% percent [sic] of maximum occupancy."  July 13 Order ¶ 12, at 7.

276.    As of July 13, 2020, about 3,236,130 people in the United States and 15,028 New Mexico residents had tested positive for COVID-19, and 135,205 Americans and 545 New Mexico

residents had died from COVID-19.  See Coronavirus in New Mexico; Total U.S. Deaths; CDC COVID Tracker.

277.    The New Mexico Department of Health reports the total number of coronavirus cases and coronavirus-caused deaths in New Mexico up to July 13, 2020, in the following graph:



Total reported COVID-19 cases in NM over time, Albuquerque J., https://www.abqjournal.com/coronavirus (last visited July 13, 2020).

278.    The New Mexico Department of Health reports the five-day moving average of the number of positive tests for coronavirus in New Mexico up to July 13, 2020, in the following graph:



NM cases: 5-day moving average, Albuquerque J., https://www.abqjournal.com/coronavirus (last visited July 13, 2020)("July 13 Five-Day Moving Average Graph").

279.   In New Mexico, the five-day moving average of the number of positive tests for coronavirus has steadily increased between late June, 2020, and July 13, 2020.  See July 13 Five-Day Moving Average Chart.

**2.    The Complaint.**

For the MTD's purposes, the Court takes its facts from the Complaint.  The Court provides these facts for the MTD's background.  It does not adopt them as the truth, and it recognizes that these facts are largely Legacy Church's version of events.

The case arises from Secretary Kunkel's issuance of the April 11 Order.  See Complaint ¶ 7, at 2.  Secretary Kunkel's previous public health order, the April 6 Order, exempted houses of worship from its social distancing guidelines.  See Complaint ¶ 6, at 2.  The April 11 Order,

however, removed the exemption for houses of worship, and it restricts houses of worship from having a gathering of five or more people within a single room or connected space.  See Complaint ¶ 8, at 2.

Legacy Church is "a New Mexico-based church that operates Christian churches in Bernalillo and Santa Fe Counties in the State of New Mexico, as well as Texas."  Complaint ¶ 1, at 1.  Legacy Church planned to hold church services on Easter Sunday, which fell on April 12, 2020, this year.  See Complaint ¶ 9, at 2.  Easter is the holiest Christian holiday, and it is a "day for celebrating a central tenet" of the Christian faith.  Complaint ¶ 10, at 2.  Legacy Church planned to live-stream its Easter Sunday services at 9:00 a.m., 10:45 a.m., and 12:30 p.m.  See Complaint ¶ 11, at 2.  Legacy Church intended for its worship team, band, pastor, assistant, and technical staff to produce each church service on Easter Sunday.  See Complaint ¶ 12-13, at 2-3.  The worship team, band, pastor, and assistant total approximately twelve to fourteen people, and the technical staff comprises about sixteen people.  See Complaint ¶ 12, 14, at 2-3.  Legacy Church planned to perform and live-stream its services inside an auditorium that can accommodate 2,500 people.  See Complaint ¶ 15, at 3.

Under the April 11 Order, commercial retailers must limit customers "to 20% of the number allowed per the fire code."  Complaint ¶ 16, at 3.  If the April 11 Order placed the same restrictions on houses of worship as it places on commercial retailers, then Legacy Church could allow several hundred people inside its auditorium on Easter Sunday.  See Complaint ¶ 16, at 3.  Legacy Church had asked its congregants to partake in Easter Sunday services by viewing the online live stream.  See Complaint ¶ 18, at 3.  Legacy Church "only intends to have approximately thirty people inside its building on Easter Sunday, all of whom are assisting in the service."  Complaint ¶ 17, at 3.  On Palm Sunday, which fell on April 5, 2020, over 13,000 people viewed

Legacy Church's church service, which Legacy Church live-streamed online.  See Complaint ¶ 19, at 3.  Legacy Church "plans to continue live-streaming its Sunday services after Easter Sunday, to continue its free exercise of its faith, to worship God, and to provide succor to its congregation during this difficult time."  Complaint ¶ 20, at 3.

## PROCEDURAL BACKGROUND

On Saturday, April 11, 2020, at 11:16 p.m. Mountain Standard Time, Legacy Church filed the Complaint.  See Complaint at 1.  In the Complaint, Legacy Church alleges claims for: (i) violation of the Free Exercise Clause; and (ii) violation of the Freedom of Assembly Clause.  See Complaint ¶¶ 21-36, at 3-6.  Each of Legacy Church's claims refer to the April 11 Order as the action that violates Legacy Church's constitutional rights.  See Complaint ¶¶ 21-36, at 3-6.  Legacy Church requests that the Court temporarily and permanently enjoin Secretary Kunkel and New Mexico from prohibiting Legacy Church "from physically gathering in its house of worship."  Complaint ¶ c., at 6.

### 1.   The PI Motion.

On April 14, 2020, Legacy Church filed the PI Motion, which requests that the Court grant a temporary restraining order so that Legacy Church "can freely exercise its religion, by conducting services in accordance with its sincerely held religious beliefs."  PI Motion at 3.  With respect to its Free Exercise claim, Legacy Church argues that "'a law burdening religious practice [that] is not neutral or not of general application must undergo the most rigorous of scrutiny.'"  PI Motion at 6 (quoting Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 546 (1993)("Lukumi")).  According to Legacy Church, the April 11 Order "restricts houses of worship from a gathering of more than four people within a single room or connected space, regardless of the size of that space or distancing taking place within the house of worship,

significantly burdening Legacy's exercise of religion."  PI Motion at 6.  Legacy Church argues

that the April 11 Order "specifically targets houses of worship," because the April 11 Order does

not prohibit groups of five or more people from gathering at retail stores, funeral homes, media

outlets, and other essential businesses.  PI Motion at 6.  Legacy Church notes, for example, that

the April 11 Order allows retail stores to accommodate more than four shoppers "so long as they

maintain a distance of six feet from one another" while shopping.  PI Motion at 6.  Legacy Church

asserts that the distinction between how the April 11 Order treats gatherings at essential businesses

and how it treats gatherings at houses of worship shows that the New Mexico Department of Health

and New Mexico can further the state's public health interests through less restrictive means.  See

Motion at 6.

        Legacy Church argues that Secretary Kunkel's decision to prohibit religious services on

the evening before Easter is "facially discriminatory and not neutral."  PI Motion at 7.  According

to Legacy Church, government actions that "burden religious practice and are either not neutral or

not generally applicable must satisfy a compelling governmental interest and be narrowly tailored

to achieve that end."  Motion at 7 (citing Lukumi, 508 U.S. at 546).  Legacy Church does not

dispute that preventing the spread of coronavirus is a compelling governmental interest.  See

Motion at 7.  Legacy Church asserts, however, that the State "undermines its interest and exceeds

its constitutionally permissible powers when the state withholds allowances to a religious group

following its belief, while bestowing those allowances to others, but there is no pandemic

exception to fundamental liberties of the Constitution."  PI Motion at 7 (citing Little Sisters of the

Poor Home for the Aged, Denver, Colo. v. Burwell, 794 F.3d 1151 (10th Cir. 2015)).

        Legacy Church argues that the April 11 Order's prohibition of mass gatherings is not

narrowly tailored, because "it fails to afford the same narrowly tailored restrictions to Legacy as it

does essential businesses, both retail and non-retail." PI Motion at 8.  Legacy Church contends

that the State can achieve its public health interests by less restrictive means, because Legacy

Church's thirty-member staff can perform and live-stream church services while "comply[ing]

with social distancing guidelines promulgated for essential businesses"  Motion at 8.  Legacy

Church also notes that it can "comply with the distancing measures to accommodate those few

Legacy members who may show up to be physically present at the service."  PI Motion at 8.

Legacy Church asserts that the April 11 Order prohibits mass gatherings for some organizations

while "exempting a litany of others," and that, therefore, the April 11 Order is not generally

applicable or narrowly tailored to achieve the State's public health interests.  PI Motion at 8.

Legacy Church also argues that the April 11 Order burdens its Freedom of Assembly.  See

Motion at 8.  Legacy Church asserts that Freedom of Assembly is a "'fundamental right[].'"  PI

Motion at 9 (quoting Whitney v. California, 274 U.S. 357, 373 (1927)(Brandeis, J., concurring)).

According to Legacy Church, "[w]hen a government practice restricts fundamental rights, it is

subject to strict scrutiny and can be justified only if it furthers a compelling government purpose

and, even then, only if no less restrictive alternative is available."  PI Motion at 9 (citing San

Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 16-17 (1973); Dunn v. Blumstein, 405 U.S.

330 (1972)).  Legacy Church reiterates that the April 11 Order is not narrowly tailored to achieve

the State's compelling interests, and thus the April 11 Order violates its Freedom of Assembly.

See PI Motion at 9.

### 2.    The Secretary Kunkel Response.

Secretary Kunkel responded to the PI Motion on Wednesday, April 15, 2020.  See

Response to Verified Emergency Motion for a Temporary Restraining Order, Preliminary

Injunction, and Permanent Injunctive Relief, filed April 15, 2020 (Doc. 12)("Secretary Kunkel

Response").  Secretary Kunkel argues that the exercise of fundamental constitutional rights does not "justify significantly jeopardizing statewide public health."  Secretary Kunkel Response at 1 (citing Kennedy v. Mendoza-Martinez, 372 U.S. 144, 160 (1963); Prince v. Massachusetts, 321 U.S. 158, 166-67 (1944)).  Secretary Kunkel says that "the exemption that has been granted to all houses of worship has been specifically tailored to allow them to provide services to their congregants via remote electronic means or through drive-in services without the significant risk of exposing those congregants to an infectious disease through person-to-person contact."  Secretary Kunkel Response at 2.  Secretary Kunkel argues that Legacy Church has not demonstrated that allowing houses of worship to provide religious services through audiovisual means while prohibiting in-person attendance at religious service infringes upon Legacy Church's rights under the Free Exercise and Freedom of Assembly clauses.  See Secretary Kunkel Response at 2.

Secretary Kunkel says that coronavirus is a contagious disease that is spread through person-to-person contact.  See Secretary Kunkel Response at 2.  She notes that the number of individuals in the United States who have tested positive for coronavirus has grown rapidly in the past two months: from twelve confirmed cases on February 11, 2020, to 1,215 confirmed cases on March 11, 2020, to 525,704 confirmed cases on April 11, 2020.  See Secretary Kunkel Response at 2-3.  According to Secretary Kunkel, the "ease and rapidity with which COVID-19 spreads and its severe and sometimes fatal symptoms in a certain percentage of the population create a real potential for mass deaths and a severely overloaded health care system."  Secretary Kunkel Response at 3.  Secretary Kunkel argues that the only effective way to limit coronavirus' spread is "to limit person-to-person contact and to close down public spaces and gatherings to the greatest extent possible."  Secretary Kunkel Response at 3.  Secretary Kunkel maintains that the purpose

of the New Mexico Department of Health's recent Public Health Orders is "to encourage New Mexicans to stay in their homes to the greatest extent possible and to practice all possible precautions when they are required to enter public spaces."  Secretary Kunkel Response at 3-4.

Secretary Kunkel says that the April 11 Order's primary message is that "'all New Mexican should be staying in their homes for all but the most essential activities and services.'"  Secretary Kunkel Response at 5 (quoting April 11 Order at 1)(emphasis omitted).  Secretary Kunkel notes that "the term 'essential business' is not meant as a value judgment that some businesses are more important than others; it is intended to identify categories of businesses and services that are life-sustaining and may be required on an immediate in-person basis."  Secretary Kunkel Response at 5.  Secretary further notes that, before the April 11 Order, the New Mexico Department of Health's Public Health Orders exempted houses of worship from restrictions on mass gatherings and non-essential businesses.  See Secretary Kunkel Response at 6 (citing April 6 Order at 5).  Secretary Kunkel said that the Public Health Orders placed restrictions on other large venues -- such as movie theaters, concert venues, and casinos -- before the April 11 Order extended the restrictions to houses of worship.  See Secretary Kunkel Response at 6.  Secretary Kunkel argues that the April 11 Order "narrowed the special exemption provided to houses of worship by requiring them to adhere to generally applicable restrictions on private and public 'mass gatherings,' but stating that nothing in the order was intended to preclude them from operating to the extent necessary to hold services through audiovisual means."  Secretary Kunkel Response at 6 (quoting April 11 Order at 5).  Secretary Kunkel clarifies that "houses of worship are still exempt from the 'mass gatherings' restriction to the extent necessary to provide remote services to their congregants, but they are no longer exempt with respect to in-person services.  Secretary Kunkel Response at 7 (quoting April 11 Order at 5).

Secretary Kunkel notes that Legacy Church argues that its temporary inability to allow people to attend its church services in person violates Legacy Church's First Amendment rights, even though Legacy Church: (i) is capable of live-streaming its church services online; (ii) has live-streamed its services to over 10,000 online viewers; and (iii) has asked its members to stay home during church services.  See Secretary Kunkel Response at 7.  Secretary Kunkel says that, after Legacy Church filed its Complaint, her counsel told Legacy Counsel that the April 11 Order allows them "to have the minimum number of people physically present to celebrate their service and to broadcast it online and encouraged Legacy to consider whether a full live band was necessary."  Secretary Kunkel Response at 8.  According to Secretary Kunkel, Legacy Church rejected this suggestion and "now seeks a ruling that would allow an unnamed number of congregants to be physically present, so long as they followed social distancing protocols."  Secretary Kunkel Response at 8.

Secretary Kunkel disagrees with Legacy Church's characterization of the April 11 Order as "one that 'specifically targets houses of worship.'"  Secretary Kunkel Response at 9 (quoting Motion at 6).  Secretary Kunkel avers that the April 11 Order applies to all public and private gatherings -- including houses of worship -- of five or more people, it also "provide[s] religious institutions with leeway to allow for persons necessary to conduct services through audiovisual means."  Secretary Kunkel Response at 9.  Secretary Kunkel argues that the April 11 Order's "even-handed restrictions" do not target or single out religious institutions, and thus "the concerns attendant to governmental infringement on the free exercise of religion are not implicated."  Secretary Kunkel Response at 9 (citing Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 649).  Secretary Kunkel says that she need only show that the restrictions placed on houses of worship are "rationally related to a legitimate state interest even if, arguendo, those restrictions

burden Plaintiff's ability to conduct religious services."  Secretary Kunkel Response at 9 (citing Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 649; Swanson v. Guthrie Indep. Sch. Dist. No. I-L, 135 F.3d 694, 697-98 (10th Cir. 1998)).

Secretary Kunkel asserts that the Free Exercise Clause does not require her to carve out special exemptions for religious institutions from a generally applicable restriction on gatherings. See Secretary Kunkel Response at 10 (citing Swanson v. Guthrie Indep. Sch. Dist. No. I-L, 135 F.3d at 702; Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet, 512 U.S. 687, 696 (1994); Comm. for Pub. Educ. & Religious Liberty v. Nyquist, 413 U.S. 756, 792-93 (1973)).  She notes that New Mexico and the Department of Health have a compelling interest in ensuring the public's health.  See Secretary Kunkel Response at 11.  According to Secretary Kunkel, "'[t]he right to practice religion freely does not include liberty to expose the community . . . to communicable disease or the latter to ill health or death.'"  Secretary Kunkel Response at 11 (quoting Prince v. Massachusetts, 321 U.S. at 167)(alteration added)(ellipsis in Secretary Kunkel Response only).  In response to Legacy Church's argument that April 11 Order does not use the least restrictive means available, Secretary Kunkel asserts that the Free Exercise Clause is not designed "'to allow an individual to exact special treatment from the government.'"  Secretary Kunkel Response at 12 (quoting Swanson v. Guthrie Indep. Sch. Dist. No. I-L, 135 F.3d at 702).

Secretary Kunkel next argues that the First Amendment does not guarantee a "categorical right" for people to gather in person at a particular location.  Secretary Kunkel Response at 13 (citing San Jose Christian Coll. v. City of Morgan Hill, 360 F.3d 1024, 1033 (9th Cir. 2004)). Secretary Kunkel avers that Legacy Church has not shown how disallowing physical gatherings while allowing houses of worship to provide religious services through audiovisual means infringes Legacy Church's First Amendment rights.  See Secretary Kunkel Response at 13.

Secretary Kunkel further argues that the April 11 Order also survives strict scrutiny, because New Mexico and the New Mexico Department of Health have a compelling interest in mitigating coronavirus' spread.  See Secretary Kunkel Response at 14.  Secretary Kunkel also asserts that the April 11 Order's restriction on gatherings is narrowly tailored, because it allows houses of worship to perform and live-stream religious services online.  See Secretary Kunkel Response at 14. Secretary Kunkel warns that Legacy Church's "proposed least restrictive means" would "very likely spread the virus to Plaintiff's congregants and in their local communities."  Secretary Kunkel Response at 15.

Secretary Kunkel asserts that the balance of harms does not favor Legacy Church.  See Secretary Kunkel Response at 15.  Secretary Kunkel emphasizes that there is "nothing speculative" about coronavirus' harms or about "the possibility of substantially increasing the number of infections through public gatherings simultaneously bringing together hundreds of people in a public space."  Secretary Kunkel Response at 15-16.  Secretary Kunkel argues that Legacy Church's alleged harms are speculative, because Legacy Church "has never received a citation under a public health order" and is "already conducting its services in a manner that is very close to complying with the Order and could easily be adjusted to do so."  Secretary Kunkel Response at 16.  Secretary Kunkel avers that the April 11 Order does not permit gatherings similar to those that Legacy Church seeks to have in similar places, such as theaters, concert halls, and stadiums. See Secretary Kunkel Response at 16.  Last, Secretary Kunkel argues that the public interest favors denying Legacy Church's request for injunctive relief.  See Secretary Kunkel Response at 16. Secretary Kunkel notes that state and local governments throughout New Mexico and the United States "have adopted temporary rules that encourage or require people to stay in their homes and avoid physical proximity to others to the greatest extent possible."  Secretary Kunkel Response at

16.  She argues that allowing public gatherings at Legacy Church could lead to a coronavirus outbreak that would further exacerbate the public health problems that New Mexico is currently facing.  See Secretary Kunkel Response at 16-17.

> ### 3.    The Thursday, April 16, 2020, Hearing.

The Court held a hearing on Thursday, April 16, 2020.  See Draft Transcript of Hearing at 1 (held April 16, 2020)("April 16 Tr.").[8]  Legacy Church conceded "without question" that New Mexico's interest in protecting public health is a compelling interest.  April 16 Tr. at 6:5-6 (Hunter).  Legacy Church argued that it has met the four factors for granting a temporary restraining order: (i) likelihood of success on the merits; (ii) irreparable harm; (iii) balancing of harms to Legacy against harms to the State; and (iv) the public interest.  See April 16 Tr. at 6:14-16 (Hunter).  Legacy Church said that "there is no pandemic exception the fundamental liberties that the constitution safeguards."  April 16 Tr. at 6:23-25 (Hunter).

The Court said that, on page seven of the Secretary Kunkel Response, Secretary Kunkel says that houses or worship are still exempt from restrictions on gatherings to the extent necessary to provide and live-stream church services, but congregants are no longer exempt and cannot appear in person.  See April 16 Tr. at 7:18-22 (Court).  The Court asked Legacy Church what its concern is if the April 11 Order does restrict Legacy Church's ability to provide and live-stream its church services online.  See April 16 Tr. at 7:22-8:4 (Court).  Legacy Church responded that it does not interpret the April 11 Order as providing "sufficient protection" to conduct audiovisual services in the manner that it seeks.  See April 16 Tr. at 8:14-19 (Hunter).  Legacy Church confirmed that it is not asking members to attend church services in person like it did on Easter.

---

[8]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

<u>See</u> April 16 Tr. at 10:4-9 (Court, Hunter).  Legacy said, however, that there "would be certain circumstances where it's possible that parishioners can't stream or don't have access" to internet, and Legacy Church would like to allow such individuals to attend church services in person.  April 16 Tr. at 10:13-15 (Hunter).  Legacy Church said that it would comply with the CDC's guidelines and ensure that members who attend church services engage in social distancing.  <u>See</u> April 16 Tr. at 11:1-3 (Hunter).   The Court asked whether Legacy Church's church services also air on broadcast television, and Legacy Church answered affirmatively.  <u>See</u> April 16 Tr. at 11:4-7 (Court, Hunter).  The Court expressed that it is difficult to imagine that congregants cannot view church services online or on television.  <u>See</u> April 16 Tr. at 11:14-18 (Court).  Legacy Church asked if the Court would Pastor Smothermon to speak about the "real life situations" that Legacy Church faces, but Secretary Kunkel objected and argued that the parties had agreed that they would argue only their briefs at the hearing.  11:19-12:9 (Hunter, Court, Garcia).

Legacy Church argued that it is in the best position to determine how to conduct its church services in a manner consistent with the CDC's guidelines.  <u>See</u> April 16 Tr. at 12:17-20 (Hunter).  Legacy Church asserted that the Constitution does not allow New Mexico and the New Mexico Department of Health to limit houses of worships to the extent that the April 11 Order restricts religious gatherings.  <u>See</u> April 16 Tr. at 12:21-13:4 (Hunter).  Legacy Church said that it "a determination by this Court that the April 11 order is unenforceable with respect to Legacy Church."  April 16 Tr. at 13:7-8 (Hunter).  Legacy Church argued that, "under a heightened scrutiny standard or a strict [scrutiny] standard," the April 11 Order "is not the least restrictive means available to protect the compelling Government interest at stake."  April 16 Tr. at 13:13-17 (Hunter).  Legacy Church contended that "there is no fundamental difference between what Legacy Church intends to do and what the state in this case is allowing" stores such as Wal-Mart,

Home Depot, and liquor stores to do.  April 16 Tr. at 13:22-24 (Hunter).  Legacy Church argued

that the April 11 Order is not "applied equally across the board."  April 16 Tr. at 14:6-7 (Hunter).

Legacy Church asserted that the Court should apply strict scrutiny review, but if said that under

either strict scrutiny or a "heightened scrutiny standard," the Court should enjoin New Mexico and

the New Mexico Department of Health from enforcing the April 11 Order against it.  April 16 Tr.

at 14:14 (Hunter).

The Court asked Legacy Church why it should apply strict scrutiny review based on the

opinion in Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S.

872 (1990)("Smith"), by the Honorable Antonin Scalia, then-Associate Justice for the Supreme

Court of the United States.  See April 16 Tr. at 14:20-24 (Court).  Legacy Church responded that

the April 11 Order is not neutral or generally applicable.  See April 16 Tr. at 14:1-15:3 (Hunter).

Legacy Church conceded, however, that the April 11 Order does not discriminate between

religions or elevate one religion over another religion.  See April 16 Tr. at 15:4:-20 (Court, Hunter).

Legacy Church reiterated that the April 11 Order deems some businesses as essential and other

businesses non-essential, but there is "no rational difference between the conduct going on" at

essential businesses and the conduct at Legacy Church's church services.  April 16 Tr. at 16:1-2

(Hunter).  The Court stated that, if Legacy Church argues that there is must be a rational basis for

the April 11 Order's restrictions, then the government "probably can come up with a rational

reason."  April 16 Tr. at 16:14 (Court).

Legacy Church noted that the right of free exercise is enshrined in the First Amendment

and is "why thousands and hundreds of thousands of people have come to this country since its

founding."  April 16 Tr. at 17:2-4 (Hunter).  Legacy Church then argued that, "by not declaring

religious [] services as essential, that in itself was treating them unequal."  April 16 Tr. at 17:4-6

- 68 -

(Hunter).  Legacy Church also noted that the April 6 Order's restriction on mass gatherings exempted houses of worship, and then, at 5:00 p.m. on the day before Easter, the New Mexico Department of Health issued the April 11 Order, which does not exempt houses of worship.  See April 16 Tr. at 18:4-7 (Hunter).  According to Legacy Church, "that by itself . . . is unequal treatment."  April 16 Tr. at 18:7-8 (Hunter).  Legacy Church reiterated that "the treatment of Legacy should be no different than the treatment of Wal-Mart or Home Depot or any other entity [on] the long list of essential services."  April 16 Tr. at 19:22-25 (Hunter).

Legacy Church declined to make oral arguments on its Freedom of Assembly claim.  See April 16 Tr. at 20:1-6 (Court, Hunter).  Legacy Church again conceded that the government has articulated a compelling state interest and that it is arguing that the April 11 Order is not narrowly tailored to promote that compelling state interest.  See April 16 Tr. at 20:20-21:2 (Court, Hunter). The Court asked whether strict scrutiny still applies.  See April 16 Tr. at 21:3-4 (Court).  Legacy Church responded that, even if the Court applied heightened scrutiny, it would be entitled to a temporary restraining order under Lukumi.  See April 16 Tr. at 21:5-16 (Hunter).

Secretary Kunkel began by providing background about the coronavirus pandemic.  See April 16 Tr. at 21:25-22:2 (Garcia).  Secretary Kunkel explained that New Mexico experience its first three confirmed cases of coronavirus about one month ago and, as of April 15, 2020, New Mexico had reported about 1,500 confirmed cases, thirty-six deaths caused by coronavirus, and that ninety people are currently seeking treatment in New Mexico hospitals.  See April 16 Tr. at 22:2-8 (Garcia).  Secretary Kunkel stressed that the coronavirus' infection rate is increasing and that "the only means [for] stemming the spread of the virus is through social distancing."  April 16 Tr. at 22:18-20 (Garcia).  Secretary Kunkel argued that "there is no safe space" for gatherings, because "[a]ny time people are together in a group there is a heightened risk of transmission."

April 16 Tr. at 22:22-24 (Garcia).  Secretary Kunkel noted that the New Mexico Department of Health has issued multiple Public Health Orders and that, until the April 11 Order, houses of worship "received a favorable position with respect to other" entities, because previous Public Health Orders exempted houses of worship from complying with restrictions.  April 16 Tr. at 23:11-12 (Garcia).  See April 16 Tr. at 23:20-25 (Court, Garcia).  Secretary Kunkel explained that previous Public Health Orders exempted houses of worship because of the important function that religion plays in New Mexico communities and because houses of worship provide comfort during difficult times.  See April 16 Tr. at 24:4-9 (Garcia).  Secretary Kunkel said that religious institutions have been voluntarily complying with directives to limit activities outside the home, and as the coronavirus has progressed, the New Mexico Department of Health has imposed additional restrictions.  See April 16 Tr. at 24:9-21 (Garcia).  Secretary Kunkel argued that the new restrictions placed on houses of worship are more favorable than the restrictions placed on other entities that often organize mass gatherings, such as sports teams.  See April 16 Tr. at 24:12-17 (Garcia).

The Court asked whether the New Mexico Department of Health classified houses of worship as essential businesses and then re-classified them as non-essential businesses and whether such governmental discretion move houses of worship "back and forth" is permissible under the First Amendment.  April 16 Tr. at 25:8 (Court).  Secretary Kunkel clarified that the New Mexico Department of Health's Public Health Orders have never classified houses of worship as essential businesses, because they do not sell goods or services.  See April 16 Tr. at 25:13-17 (Garcia).  Secretary Kunkel explained that, until the April 11 Order, houses of worship always had been exempted from the mass gathering restrictions that previous Public Health Orders imposed on non-essential businesses.  See April 16 Tr. at 25:10-26:10 (Court, Garcia).  The Court stated:

But I guess my question still stands.  If the state has almost unlimited discretion to determine who gets the exemption and who doesn't get the exemption I guess that gives me some pause under the First Amendment of saying that it's neutral and there is some limitation on the Government's ability to move people from list to list.

April 16 Tr. at 26:11-17 (Court).  Secretary Kunkel responded that the New Mexico Department of Health is not moving people from list to list, because houses of worship are not businesses, so they never qualified as essential businesses.  See April 16 Tr. at 26:18-24 (Garcia).  Secretary Kunkel reiterated that the public health order's mass gathering restriction has remained "largely unchanged" and that houses of worship have been "given [a] favorable position throughout the pendency of this health emergency."  April 16 Tr. at 26:25-27:2 (Garcia).

The Court asked Secretary Kunkel why she waited until 5:00 p.m. on the day before Easter to impose new mass gathering restrictions on houses of worship.  See April 16 Tr. at 27:3-4 (Court).  Secretary Kunkel responded that it was also Passover the same weekend as Easter, and she noted that the police did not show up at Legacy Church or enforce the April 11 Order against it.  See April 16 Tr. at 27:5-8 (Garcia).  The Court said that the fact that the police did not show up at Legacy Church "goes perhaps to some equities here," and it asked Secretary Kunkel whether she believes that Legacy Church violated the April 11 Order.  See April 16 Tr. at 27:12-13 (Court).  Secretary Kunkel argued that Legacy Church violated the April 11 Order on Easter, because it believes that more than five people gathered in the church.  See April 16 Tr. at 27:16-20 (Garcia, Court).

The Court asked whether Legacy Church violated the April 11 Order by having fourteen people -- the music worship team, the pastor, and the assistant -- present in the church.  See April 16 Tr. at 27:21-24 (Court).  Secretary Kunkel's counsel said that he drafted the Public Health Orders, and that this is "a gray area" that he did not contemplate when he drafted the order.

April 16 Tr. at 28:11 (Garcia).  The Court told Secretary Kunkel to take a position on whether

Legacy Church violates the April 11 Order by having fourteen staff members present at the same

time.  <u>See</u> April 16 Tr. at 28:22-24 (Court).  Secretary Kunkel said that having fourteen people

would not be necessary, and the Court expressed concern that the government is determining who

is essential and who is not essential to produce a church service.  <u>See</u> April 16 Tr. at 29:3-30:3

(Garcia, Court).  Secretary Kunkel responded that the government is not deciding what aspects of

worship are essential and argued that, if music, for example, is a core part of the worship service,

then the music worship team or band could perform in a different building and record the

performance separately.  <u>See</u> April 16 Tr. at 30:4-13 (Garcia).  Secretary Kunkel added, however,

that the New Mexico Department of Health is willing to accommodate Legacy Church's need for

its worship team to perform in the space where the rest of the church service occurs.  <u>See</u> April 16

Tr. at 30:24-31:2 (Garcia).  The Court recapitulated Secretary Kunkel's position: "So your position

is that the band did not comply with the order, but you would have been willing to overlook that

and allow them to go ahead and have the 14 people there to conduct the worship."  April 16 Tr.

at 31:3-7 (Court).  Secretary Kunkel confirmed that the Court's summary is correct.  <u>See</u> April 16

Tr. at 31:8 (Garcia).  Secretary Kunkel also confirmed that Legacy Church can have sixteen

technical staff members present for church services as well.  <u>See</u> April 16 Tr. at 31:9-22 (Court,

Garcia).

       The Court again asked Secretary Kunkel why the New Mexico Department of Health

waited until 5:00 p.m. on the day before Easter to issue the April 11 Order.  <u>See</u> April 16 Tr.

at 33:13-16 (Court).  Secretary Kunkel's counsel said that he was busy in the morning and that the

timing of the April 11 Order "was not intended to preclude religious services," which is "why you

didn't see State Police or any law enforcement agency out at any church in the state regulating the

conduct of Easter services." April 16 Tr. at 33:19-23 (Garcia). The Court asked if something occurred the day before Easter that triggered the April 11 Order. See April 16 Tr. at 33:24-34:4 (Court). Secretary Kunkel responded:

> Your Honor some of it again was just part of my schedule. Some of it was that the governor had asked me to do it. Some of it was you know just a function of the way the disease has progressed. But again I point to you no enforcement action was taken on Easter. And so to try and say that we did this in order to stop Easter services there is nothing to support that. If we had really wanted to stop Easter services we would have issued the directive and then sent State Police out to enforce it. That didn't happen.

April 16 Tr. at 34:5-15 (Garcia).

Secretary Kunkel next argued that the mass gathering restriction is a "rule of general applicability," so the Court should apply rational basis review under Lukumi. April 16 Tr. at 34:20-21 (Garcia). The Court pressed Secretary Kunkel to explain what the rational basis was for distinguishing between scattered members in a massive church and shoppers at a large hardware store "who may be there to buy flowers." April 16 Tr. at 35:15-16 (Court). Secretary Kunkel responded that the relationship between the customer and a business is largely transactional, and customers do not come in to sit, congregate, and stay for an extended period of time. See April 16 Tr. 35:20-36:9 (Garcia). She added that "thousands of businesses are closed" and -- unlike churches -- not allowed to operate in any manner. April 16 Tr. at 36:9-15 (Garcia). She concluded on this point that, while the Court should apply rational basis, the April 11 Order survives heightened standard of review, because the interest is compelling and allowing churches to stream or broadcast services is the least restrictive means. See April 16 Tr. at 36:20-37:6 (Garcia).

Secretary Kunkel then discussed the other elements in the preliminary injunction analysis. See April 16 Tr. at 37:21-22 (Garcia). She argued that Legacy Church would not suffer irreparable

harm, because it is still conducting services and is carrying its message to its constituents.  See April 16 Tr. at 38:6-16 (Garcia).  She stated that the balance of equities and the public interest factors also weigh against Legacy Church, because "ensur[ing] the strictest of social distancing measures during the next several weeks" is the only way to slow COVID-19's spread.  April 16 Tr. at 38:22-24 (Garcia).

New Mexico then presented its argument.  See April 16 Tr. at 40:1-10 (Court, Sydow).  It argued first that, under Employment Division v. Smith, the April 11, 2020, Public Health Order is a rule of general applicability and thus is constitutional.  See April 16 Tr. at 41:22-5 (Sydow).  The Court noted its hesitancy to call a rule with so many exemptions "generally applicable," April 16 Tr. at 42:10-11 (Court), and New Mexico directed the Court to Axson-Flynn v. Johnson, 356 F.3d 1277, 1298 (10th Cir. 2004), and Swanson by & Through Swanson v. Guthrie Indep. Sch. Dist. No. I-L, 135 F.3d 694 (10th Cir. 1998), which it said held that laws with categorical exemptions were still generally applicable so long as they did not require case-by-case determinations, see April 16 Tr. at 42:22-44:9 (Sydow).

The Court then asked New Mexico whether it was bothered that "we're setting up a situation where churches are either bargaining with the state or the state's order is so fuzzy that [] churches can't figure out what they can do and can't do."  April 16 Tr. at 45:4-8 (Court).  New Mexico responded that incomplete enforcement is inevitable, see April 16 Tr. at 45:9-14 (Court), and the Court pressed again whether this suggested that perhaps the Order was not narrowly tailored, see April 16 Tr. at 45:15-20 (Court).  New Mexico stated that, assuming strict scrutiny applies, it was trying to accommodate free exercise of religion and left to churches and other places of worship the determination of what is necessary for their religious services.  See April 16 Tr. at 45:21-46:5 (Sydow).  It agreed with the Court's characterization of its argument that it should

not be penalized because it is "bending over backwards" to accommodate religion. Tr. at 46:6-10 (Court, Sydow).

New Mexico then argued that Legacy Church has not satisfied the other requirements for a preliminary injunction. See April 16 Tr. at 46:12 (Sydow). It stated that Legacy Church has not articulated "how essential parts of their religious practice are hamstrung by the public health order, and how they cannot accommodate that religious practice." April 16 Tr. at 46:17-21 (Sydow). It added that, even at the oral argument, Legacy Church had not shown how the April 11 Order had prevented members from attending services. See April 16 Tr. at 47:8-11 (Sydow).

Next, New Mexico argued that it was not a proper defendant in the case. See April 16 Tr. at 47:12-15 (Sydow). It stated that Ex Parte Young did not provide a waiver of sovereign immunity for a situation such as this, and that it did not fall into the definition of a "person" capable of suit under 42 U.S.C. § 1983. April 16 Tr. at 47:20-48:4 (Sydow). The Court asked whether Legacy Church could still win an injunction against the State, see April 16 Tr. at 48:5-12 (Court), and New Mexico clarified that, while "it may be a matter of semantics," Legacy Church could get injunctive relief against individual state actors but not the State itself. April 16 Tr. at 48:16-17 (Sydow).

Legacy Church then made rebuttal arguments. See April 16 Tr. at 49:9 (Hunter). It stated that language from Prince v. Massachusetts is not a vaccination case but instead concerned child welfare and child labor laws. See April 16 Tr. at 49:12-20 (Hunter). It argued that the line "[t]he right to practice religion freely does not include liberty to expose the community . . . to communicable disease," 321 U.S. at 160, was out of context, and the situation the Supreme Court was discussing "has no similarities to the factual circumstances that we have in the case before [the] Court," April 16 Tr. at 50:19-20 (Hunter). Next, Legacy Church agreed with the Court that its showing of irreparable harm depended on whether it could prove a likely success on the merits.

- 75 -

See April 16 Tr. at 50:22-52:4 (Hunter).  It stated that it met this showing, because the State was defining which businesses were essential and making discretionary calls about whom the April 11 Order applies to.  See April 16 Tr. at 52:4-10 (Hunter).  It stated that, although general rules can have exceptions to them and still constitute rules of general applicability, the April 11 Order fails, because of its "complete arbitrariness of what they determined to be essential and the fluidness of how that process has come about."  April 16 Tr. at 53:5-7 (Hunter).

The Court then asked why the Order should be treated differently than a statute passed by the legislature "in the calm of the moment."  April 16 Tr. at 53:8-9 (Court).  The Court noted that legislatures do not have to explain their reasoning.  See April 16 Tr. at  54:6-13 (Court).  Legacy Church replied that the number of exemptions and their arbitrariness was troubling, and that if Secretary Kunkel has the power to deem arbitrarily deem hundreds of activities essential and hundreds of other non-essential, the April 11 Order was not generally applicable.  See April 16 Tr. at 54:17-55:7 (Hunter).  Legacy Church added that, contrary to the State's contention, it did not have the ability to broadcast live services.  See April 16 Tr. at 55:22-56:3 (Hunter).  Legacy Church then summed up its argument and stated that the New Mexico allows certain commercial activities to occur, but makes no distinction for religious services and, in fact, excludes them all together.  See April 16 Tr. at 56:16-57:15 (Hunter).  Legacy Church noted that instead of providing an exemption, New Mexico invites churches to negotiate with them "and then have the state dictate to them what is an essential part of the service and what is a nonessential part of the service."  April 16 Tr. at 57:15-18 (Hunter).  It argued it is not the State's job to determine what is an essential part of a religious service, and this makes the Order not a rule of general applicability.  See April 16 Tr. at 57:18-58:2 (Hunter).  The parties then agreed that they were before the Court on a motion

for a temporary restraining order, and they set a hearing on the preliminary injunction for April 30, 2020, at 8:30 a.m.  See April 16 Tr. at 58:5-59:23 (Court, Garcia, Hunter, Sydow).

    4.  .   **The Secretary Kunkel Supplemental Brief.**

    On Friday, April 17, 2020, several hours before the Court said that it would file the TRO MOO, Secretary Kunkel filed the Notice of Supplemental Authority in Further Support of Defendant Secretary Kunkel's Response to Verified Emergency Motion for a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunctive Relief, filed April 17, 2020 (Doc. 18)("Secretary Kunkel Supplemental Brief").  Secretary Kunkel notifies the Court that, on March 25, 2020, the Supreme Court of New Hampshire denied a request to enjoin a state executive order limiting all gatherings in New Hampshire to fifty people or less to reduce the coronavirus' spread.  See Secretary Kunkel Supplemental Brief at 1 (citing Binford v. Sununu, Docket No. 217-2020-CV000152 (N.H. Sup. Ct. March 25, 2020)).  Secretary Kunkel notes that the plaintiff alleged violations of the Free Exercise Clause and the Freedom of Assembly Clause, and the Supreme Court of New Hampshire held that New Hampshire's gatherings restriction was "'content neutral, narrowly tailored to serve the government's interest in slowing the spread of COVID-19, of a limited duration, and allow[ed] for alternative methods of speech, assembly, and association.'" Secretary Kunkel Supplemental Brief at 1-2 (quoting Binford v. Sununu, Docket No. 217-2020-CV000152, at 16-20).  Secretary Kunkel also notes that the Supreme Court of New Hampshire "determined that the law was neutral and of general applicability with respect to religion -- despite the explicit mention of 'spiritual activities' and 'faith based events' in the ban -- and the order was reasonable because it was a temporary public health measure."  Secretary Kunkel Supplemental Brief at 1-2 (quoting Binford v. Sununu, Docket No. 217-2020-CV000152, at 4, 20-21).

5.      **The TRO MOO**.

On April 17, 2020, the Court issued a 100-page Memorandum Opinion and Order denying the Legacy Church's request for a temporary restraining order ("TRO"). <u>See</u> TRO MOO, 2020 WL 1905586, at *1. The Court concluded that Legacy Church had not satisfied the exacting standards for injunctive relief on either of its claims. <u>See</u> TRO MOO, 2020 WL 1905586, at *1. The Court first dismissed the State of New Mexico as a Defendant, because the Eleventh Amendment to the Constitution prohibits Legacy Church's suit insofar as it seeks to enjoin the State of New Mexico. <u>See</u> TRO MOO, 2020 WL 1905586, at *27. The Court then concluded that Legacy Church's requested TRO falls into a category of disfavored injunctions, because it would entitle Legacy Church to all the relief that it could expect to win at trial. <u>See</u> TRO MOO, 2020 WL 1905586, at *28-*29.

The Court next held that Legacy Church had not demonstrated that it is substantially likely to succeed on the merit of its Free Exercise claim, because the April 11 Order is both generally applicable and neutral with respect to religion. <u>See</u> TRO MOO, 2020 WL 1905586, at *30-*37. The Court also held that, even if the April 11 Order either is not generally applicable or not neutral, the April 11 Order satisfies strict scrutiny, because Secretary Kunkel has demonstrated that the April 11 Order is necessary to further a compelling government interest. <u>See</u> TRO MOO, 2020 WL 1905586, at *36 n.12. Last, the Court concluded that Legacy Church was not substantially likely to succeed on its Assembly Clause claim, because the April 11 Order is reasonably related to the demands of the coronavirus public health crisis. <u>See</u> TRO MOO, 2020 WL 1905586, at *38. The Court further concluded that, if the April 11 Order was subject to a strict scrutiny analysis, the Court would conclude that it meets strict scrutiny and uphold the April 11 Order. <u>See</u> TRO MOO, 2020 WL 1905586, at *38. Accordingly, the Court denied Legacy Church's request for a TRO.

See TRO MOO, 2020 WL 1905586, at *44.[9]

**6.      The Becket Fund Amicus Brief.**

The Becket Fund for Religious Liberty filed an amicus brief shortly before the Court issued its ruling on the temporary restraining order.  See *Amicus Curiae* Brief of Proposed *Amicus* the Becket Fund for Religious Liberty in Support of Plaintiff, filed April 17, 2020 (Doc. 27)("Beckett Fund Amicus Brief").  After summarizing its argument, the Becket Fund argues first that, because New Mexico does not seek to limit the number of people Legacy Church gathers to produce its services, the Court should grant the requested injunctive relief.  See Beckett Fund Amicus Brief at 4-5.

The Becket Fund then turns to the case's constitutional arguments and asserts that New Mexico's restrictions on in-person service attendance require the Court to apply strict scrutiny.  See Becket Fund Amicus Brief at 6.  It argues that the April 11 Order's lack of general applicability necessitates this heightened review standard.  See Becket Fund Amicus Brief at 6.  The Becket Fund argue that the April 11 Order's many exemptions mean that it "'fail[s] to prohibit nonreligious conduct that endangers' the government's regulatory interest 'in a similar or greater degree' than the prohibited religious conduct."  Becket Fund Amicus Brief at 7 (quoting Lukumi, 508 U.S. at 543).  Further, the Becket fund argues that the April 11 Order is based on value judgments, because it exempts twenty-three "essential businesses" from its mass gatherings prohibition.  Becket Fund Amicus Brief at 8.  It disputes New Mexico's characterization of these

---

[9]After the Court issued the TRO MOO, Professor Eugene Volokh discussed the Court's opinion on his blog and stated his opinion that the Court's analysis is "generally quite right."  Eugene Volokh, Judge Rejects Free Exercise Challenge to New Mexico's Ban on In-person Gatherings of >5 People in Places of Worship, The Volokh Conspiracy (April 18, 2020), https://reason.com/2020/04/18/judge-rejects-free-exercise-challenge-to-new-mexico-ban-on-in-person-gatherings-of-5-people-in-places-of-worship/ (last visited July 9, 2020).

businesses as essential and argues that the government should take sides over what is necessary for society.  See Becket Fund Amicus Brief at 8-9 (citing Laurence H. Tribe, Disentangling Symmetries: Speech, Association, Parenthood, 28 Pepp. L. Rev. 641, 651-53 (2001)).  It argues that "defining 'life-sustaining' solely in materialist terms is, at a minimum, a value judgment" and that allowing local breweries, bike repair shops, and real estate services to operate but not religious worship demonstrates the government's view that while certain secular activities are important, religious worship is unfavored.  See Becket Fund Amicus Brief at 9.

The Becket Fund then discusses the strict scrutiny test.  See Becket Fund Amicus Brief at 10.  It concedes the compelling government interest but notes that "'individual rights secured by the Constitution do not disappear during a public health crisis.'"  Becket Fund Amicus Brief at 10 (quoting In re Abbott, No. 20-50264, 2020 WL 1685929, at *6 (5th Cir. Apr. 7, 2020)).  It notes that New Mexico has not identified facts supporting its decision to revoke religious institutions' mass-gathering exception.  See Becket Fund Amicus Brief at 11.  It also argues that, under strict scrutiny, New Mexico must explain why the excluded essential businesses do not harm its interest in stopping COVID-19 while religious services must be banned.  See Becket Fund Amicus Brief at 11.  The Becket Fund further argues that New Mexico must prove there is harm to not preventing religious services, especially where Legacy Church has promised to enforce the same safety measures other essential businesses have adopted.  See Becket Fund Amicus Brief at 11-12 (citing Gonzales v. O Centro Benificente Uniao do Vegetal, 546 U.S. at 431).  Finally, the Becket Fund argues that restricting worship to four or fewer people is not narrowly tailored, because it could still prevent certain religious practices requiring more people, and the government should not be in the business of determining what is essential for a religious service.  See Becket Fund Amicus Brief at 12.

7.      **The MTD.**

Secretary Kunkel moves to dismiss the Complaint.  See MTD at 1.  After discussing the

case's factual background, see MTD at 5-10, Legacy Church's Complaint, see MTD at 10-11, and

the Court's previous ruling, see MTD at 11-12, Secretary Kunkel begins her legal arguments.  She

first argues that Legacy Church has not pled a plausible claim for relief under the Free Exercise

Clause.  See MTD at 12.  The first prong of her argument is that the April 11 Order is a neutral

law of general applicability, and it is therefore subject to rational basis review.  See MTD at 12

(quoting Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 649 (10th Cir. 2006)).

Secretary Kunkel states that the April 11 Order is neutral, "[b]ecause its object is to protect public

health by limiting in-person interactions and preventing large public gatherings to mitigate the

effects of a highly contagious and potentially lethal virus, and it is not specifically targeted at any

one religion or at religious practices more generally."  MTD at 13.  She further notes that the April

11 Order applies to all large gatherings and was not motivated by religious animus.  See MTD at

14.  She contends that the April 11 Order also applies to numerous commercial and recreational

activities, and those services that are allowed to stay open must substantially reduce operations

and meet public hygiene requirements.  See MTD at 14-15.  She asserts that New Mexico has

forbidden all similar mass gatherings, but the State has nevertheless granted churches like Legacy

Church an exception to broadcast its services.  See MTD at 15.  Secretary Kunkel argues that,

regarding the essential businesses that are allowed to operate under the April 11 Order, the

"transient person-to-person contact in these stores is also distinct from the nature of Plaintiff's

church services, which gather large groups of people together for over an hour in an enclosed

auditorium."  MTD at 16.

Next, Secretary Kunkel argues that the April 11 Order is still generally applicable despite its numerous exemptions.  See MTD at 16.  She asserts that the April 11 Order does not require extensive, individualized inquiries that would require New Mexico to make subjective determinations.  MTD at 16 (citing Flynn v. Johnson, 356 F.3d 1277, 1298 (10th Cir. 2004); Memorandum Opinion and Order at 73-74).  She argues that the First Amendment does not entitle religious groups to special exemptions from neutral laws.  See MTD at 17.  Secretary Kunkel also contends that Lukumi is inapplicable.  See MTD at 17-18.  She argues that, unlike in that case, Legacy Church has not argued that the mass gatherings restriction "targets religion generally or any specific religious group," or that religious animus motivated it in any way.  MTD at 18.

After arguing that the Court should apply rational basis review to the April 11 Order, Secretary Kunkel contends that it satisfies both this standard of review and strict scrutiny review. See MTD at 19.  She notes that the Court has already suggested that April 11 Order passes strict scrutiny.  See MTD at 19-20 (citing TRO MOO 2020 WL 1905586, at *36 n.12).  She also reiterates the April 11 Order's narrow tailoring, arguing that large gatherings in close proximity in confined spaces "are almost universally banned."  MTD at 20.  She asserts that, while most gatherings are banned, New Mexico still allows Legacy Church to broadcast its services; this policy she calls a "middle ground" between the two sides that "strikes an appropriate balance." MTD at 20.  Because the April 11 Order passes strict scrutiny, Secretary Kunkel argues that it also passes rational basis review.  See MTD at 21.

Secretary Kunkel next argues that Legacy Church has not pled a plausible claim for relief on its Freedom of Assembly claim.  See MTD at 21.  She first notes that she agrees with the Court's Freedom of Assembly analysis in the TRO MOO, as well as its general decision to treat Legacy Church's claim as asserting a right to expressive association.  See MTD at 21 n.15.  Secretary

Kunkel then argues that the April 11 Order serves compelling state interests -- a necessary requirement to pass constitutional muster.  See MTD at 22.  She asserts that limiting the coronavirus' spread protects public health, and that temporary restrictions on public gatherings is the best way to accomplish this goal.  See MTD at 22 (citing C.M. v. Urbina, 640 F. App'x 825, 831 (10th Cir. 2016)).  She then notes that there is no argument or evidence that New Mexico designed the April 11 Order to suppress Legacy Church's ideas or beliefs, because it is still allowed to broadcast.  See MTD at 22-23.  Secretary Kunkel also notes that the April 11 Order allows drive-in services or "gatherings in houses of worship that include the people necessary to perform religious services and to make those available to remote congregants through audiovisual means." MTD at 23.  She argues that allowing congregants into churches is not permissible even if everyone complies with social distancing guidelines, because "even strident social distancing does not eliminate the risk of transmitting COVID-19."  MTD at 23.  She argues that her judgment to limit mass gatherings such as Legacy Church's services would likely spread the virus, and for these reasons all such mass gatherings are impermissible.  See MTD at 23-24.

Finally, Secretary Kunkel argues that the Court should not grant Legacy Church leave to amend its Complaint, because any amendment would be futile.  See MTD at 24.  She argues that, because the April 11 Order passes strict scrutiny, it would also pass the standard of review in any other constitutional challenge.  See MTD at 24-25.  She states that, given that the Public Health Orders and records are publicly available, it is "not plausible that some additional information pleaded by Plaintiff outside of the public record would satisfy some constitutional claim that is yet to be named."  MTD at 25.

### 8. The Americans United for Separation of Church and State Amicus Brief.

Americans United for Separation of Church and State ("Americans United") filed an

amicus brief supporting the MTD and opposing the PI Motion.  See Brief of Amicus Curiae Americans United for Separation of Church and State in Opposition to Plaintiff's Motion for Preliminary Injunction and in Support of Defendant's Motion to Dismiss at 1, filed May 6, 2020 (Doc. 44-1)("Americans United Amicus Brief").  Americans United is a "national, nonsectarian public-interest organization that is committed to preserving the constitutional principles of religious freedom and the separation of religion and government."  Americans United Amicus Brief at 8.  Americans United contends that the coronavirus outbreak in New Mexico "demands action from leaders at all levels of government," and that data "from other regions suggest that order like New Mexico's have been successful in limiting transmission of COVID-19 and saving lives."  Americans United Amicus Brief at 9 (citing The State of Our State's Coronavirus Fight, Seattle Times (Apr. 12, 2020), https://bit.ly/2KtMqTq; Rong-Gong Lin II, et al., Social distancing may have helped California slow the virus and avoid New York's fate, L.A. Times (Mar. 31, 2020, 5:00 AM), https://lat.ms/2VSbYih).

Americans United analyzes the April 11 Order and contends that it is neutral, because the April 11 Order "applies to religious and secular activities equally" by banning all mass gatherings. Americans United Amicus Brief at 11.  Americans United also asserts that, although the April 11 Order "removed an earlier exemption for houses of worship" does not demonstrate animus or discrimination, "but rather a solicitude toward religion," because "greater restrictions became necessary in the face of a rapidly escalating public health crisis."  Americans United Amicus Brief at 11.  Americans United also argues that the April 11 Order's essential-business definitions "draw no distinctions based on religious views or motivations," because defined businesses may remain open "regardless of whether they have a religious affiliation."  Americans United Amicus Brief at 13. Americans United Amicus Brief at 13. Americans United next asserts that the April 11 Order's

definition of essential businesses does not undermine its general applicability, because the April 11 Order treats "burdened religious conduct" similar to "analogous nonreligious conduct." Americans United Amicus Brief at 12.  Americans United further contends that "the businesses deemed essential further New Mexico's interest in safeguarding public health during the COVID-19 crisis."  Americans United Amicus Brief at 12 (citing Stormans, Inc. v. Selecky, 586 F.3d 1109, 1134-35 (9th Cir. 2009)).  Americans United thus asserts that the Court should review the April 11 Order under the rational basis test.  See Americans United Amicus Brief at 11.

Americans United also contends that that April 11 Order would satisfy "even a compelling-interest test."  Americans United Amicus Brief at 13.  It asserts that "more than a century of constitutional jurisprudence demonstrates that neutral restrictions on religious exercise tailored to containing contagious diseases withstand even the strictest judicial scrutiny."  Americans United Amicus Brief at 13.  Americans United says that, before Smith, the Supreme Court interpreted the Free Exercise Clause to require application of a compelling-interest test whenever religious exercise was substantially burdened by governmental action."  Americans United Amicus Brief at 13 (citing Sherbert v. Verner, 374 U.S. 398, 407 (1963)).  Americans United avers, however, that this test, "while exacting, is not 'fatal in fact.'"  Americans United Amicus Brief at 14 (quoting Grutter v. Bollinger, 539 U.S. 306, 326-27 (2003)).  Americans United notes the parties' agreement that New Mexico has a compelling interest in containing the COVID-19 outbreak.  See Americans United Amicus Brief at 14.  Americans United further avers that the April 11 Order is narrowly tailored, because the order is "no broader than necessary to ensure that the targeted activities -- physical gatherings that create opportunities for transmission of the virus -- are curtailed." Americans United Amicus Brief at 15.

Americans United next asserts that the "vast majority" of courts that have considered

similar Free Exercise challenges have rejected them.  Americans United Amicus Brief at 16 (citing

Cross Culture Christian Ctr. v. Newsom, __ F. Supp. 3d __, No. 2:20-cv-832-JAM-CKD, 2020

WL 2121111 (E.D. Cal. May 5, 2020)(Mendez, J.); Roberts v. Neace, __ F. Supp. 3d __, 2:20-cv-

054, 2020 WL 2115358 (E.D. Ky. May 4, 2020)(Bertelsman, J.)), appeal docketed, No. 20-5465

(6th Cir. May 5, 2020); Cassell v. Snyders, __ F. Supp. 3d __, No. 3:20-cv-50153, 2020 WL

2112374 (N.D. Ill. May 3, 2020)(Lee, J.), appeal filed, ECF No. 46 (May 4, 2020); Lighthouse

Fellowship Church v. Northam, __ F. Supp. 3d __, No. 2:20-cv-2040-AWA-RJK, 2020 WL

2110416 (E.D. Va. May 1, 2020)(Wright Allen, J.), appeal docketed, No. 20-1515 (4th Cir. May

4, 2020); Gish v. Newsom, No. 5:20-cv-755, 2020 WL 1979970 (C.D. Cal. April 23, 2020)(Bernal,

J.), appeal docketed, No. 20-55445 (9th Cir. April 28, 2020); Davis v. Berke, No. 1:20-cv-98, 2020

WL 1970712 (E.D. Tenn. April 17, 2020)(Collier, J.); Tolle v. Northam, No. 1:20-cv-00363-LMB-

MSN, 2020 WL 1955281 (E.D. Va. April 8, 2020)(Brinkema, J.), motion for injunction pending

appeal denied, No. 20-1419, ECF No. 14 (4th Cir. April 28, 2020); Hughes v. Northam, No. CL

20-415 (Va. Cir. Ct. Russell Cty. April 14, 2020); Hotze v. Hidalgo, No. 2020-22609 (Tex. Dist.

Ct. April 13, 2020); Binford v. Sununu, No. 217-2020-CV-00152 (N.H. Super. Ct. March 25,

2020)).   Americans United asserts that only three courts have held coronavirus restrictions

unconstitutional but that, "in two of them, relief was limited to drive-in religious services."

Americans United Amicus Brief at 17 (citing Maryville Baptist Church, Inc. v. Beshear, __ F.3d

__, No. 20-5427, 2020 WL 2111316, at *5 (6th Cir. May 2, 2020)(Hale, J.); On Fire Christian Ctr.,

Inc. v. Fischer, __ F. Supp. 3d __, No. 3:20-cv-264, 2020 WL 1820249, at *1 (W.D. Ky. April 11,

2020)(Walker, J.); First Baptist Church v. Kelly, __ F. Supp. 3d __, No. 6:20-cv-1102, 2020 WL

1910021, at *9 (D. Kan. April 18, 2020)(Broomes, J.)).   Americans United avers that these

decisions are distinguishable, because the April 11 Order does not prohibit drive-in religious

services.  See Americans United Amicus Brief at 18.

Turning to Legacy Church's Assembly Clause claim, Americans United says that "the right to assemble has been subsumed under the free-speech doctrine regarding expressive association." Americans United Amicus Brief at 18 (citing John D. Inazu, The Forgotten Freedom of Assembly, 84 Tulane L. Rev. 565, 609-11 (2010)).  Americans United contends that the First Amendment does not prohibit regulations that incidentally burden expressive activity.  See Americans United Amicus Brief at 18 (citing Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U.S. 47, 62 (2006)).  Americans United argues that, by temporarily limiting in-person gatherings, the April 11 Order "plainly regulates conduct other than speech" and that the April 11 Order subjects all manner of gatherings without regard to expression.  Americans United Amicus Brief at 18.  Americans United thus contends that the April 11 Order regulates conduct, and so it "can, at most, trigger intermediate scrutiny -- and only if it were interpreted to regulate 'inherently expressive conduct.'"  Americans United Amicus Brief at 18 (quoting Holder v. Humanitarian Law Project, 561 U.S. 1, 26-27 (2010)).

Americans United nonetheless argues that, if the Court construes the April 11 Order as regulating inherently expressive conduct, the April 11 Order remains constitutional.  See Americans United Amicus Brief at 19.  Americans United asserts that the April 11 Order is content-neutral, advances important interests unrelated to speech suppression, and does not burden any more speech than necessary to further those interests.  See Americans United Amicus Brief at 19 (citing Turner Broad. Sys. v. F.C.C., 520 U.S. 180, 189 (1997)).  Americans United avers that the April 11 Order's restrictions have nothing to do with content and that the April 11 Order narrowly furthers a compelling public health interest.  See Americans United Amicus Brief at 19.  Accordingly, Americans United asserts that the Court should deny the PI Motion and grant the

MTD.  See Americans United Amicus Brief at 20-22.

### 9.    The MTD Response.

Legacy Church responds to the MTD.  See Plaintiff's Response to Defendant Secretary Kunkel's Motion to Dismiss at 1, filed May 13, 2020 (Doc. 57)("MTD Response").  Legacy Church begins by offering additional background facts beyond those that the Complaint alleges. See MTD Response at 1.  Legacy Church says that, "in fifty laboratories of democracy, Governors and Health Secretaries implemented myriad ways to combat the virus' spread," and that, because there is no imminently available vaccine, coronavirus "will remain with us for months and maybe even years."  MTD Response at 1.  Legacy Church contends that the pandemic's duration means that "New Mexicans must be allowed to safely exercise their religion and safely assemble for religious reasons."  MTD Response at 1-2.  Legacy Church then provides a "response" to the MTD's factual background and notes that, since the MTD, Secretary Kunkel has issued additional Public Health Orders.  MTD Response at 2.  Legacy Church avers that the April 30 Order "expanded the secular activities that may operate with socially distanced, physical proximity." MTD Response at 2.  Legacy Church says that the May 5 Order requires face coverings for all businesses that interact with the public.  See MTD Response at 2.  Legacy Church further says that, while its Complaint and PI Motion focus on the April 11 Order's impact on Legacy Church's Easter services, Legacy Church "has tallied" the subsequent orders' "impact on all the ministries and activities offered to its parishioners."  MTD Response at 2-3.  It states that it provides myriad programs beyond its Sunday services, such as "baptisms, weddings, Bible study groups, support groups for addiction, anger management, [and] abuse survivors, among others, and therapy sessions for children and adults."  MTD Response at 3.  Legacy Church says that these "smaller

group ministries" typically involve fifteen to twenty people, but Legacy Church avers that "the Public Health Order" does not permit it to conduct these activities.  MTD Response at 3.

Legacy Church argues that the April Order, the April 30 Order, and the May 6 Order prohibit religious activities that they otherwise permit when conducted for secular reasons.  See MTD Response at 3.  Legacy Church contends that Secretary Kunkel "continues to pick and choose more activities to open, further diluting the government's contention that these orders are generally applicable and neutral."  MTD Response at 3.  Legacy Church says that the May 5 Order permits non-essential retail business to operate with employees necessary to offer curbside pickup or delivery to customers, and that the May 5 Order affords these businesses discretion to determine how many employees are necessary for such operations.  See MTD Response at 3.  Legacy Church asserts that the May 5 Order does not define retail businesses, and so the May 5 Order "conceivably" enables many "nonlife-sustaining secular, commercial businesses to operate" that "necessarily involve higher risk for virus spread: in-store work shifts of many hours, day in and day out, in smaller spaces, handling physical merchandise, taking money from customers' hands, etc."  MTD Response at 3-4.  Legacy Church thus argues that a "parishioner and her four co-workers can report to work their retail employer's shop on Monday morning, but those same ladies cannot meet on Monday night at their church for a Bible study," and so the May 5 Order is not generally applicable.  MTD Response at 4.  Legacy Church accordingly avers that the April 11 Order and the May 5 Order is subject to strict scrutiny.[10]  See MTD Response at 4.

_____

[10]Legacy Church does not specify which Order it evaluates in this section of the MTD Response.  See MTD Response at 3-4.  Legacy Church begins the paragraph by stating that, "[a]s of May 5, 2020, retail businesses that are not essential businesses may operate with the employees necessary to offer curbside or delivery to their customers."  MTD Response at 3.  It proceeds, for the rest of the paragraph, by referring to "the Order," but it concludes the paragraph with a general statement that "the Secretary's Public Health Orders are not generally applicable[.]"  MTD

Legacy Church contends that the April 11 Order is not narrowly tailored, and "fails to address the multifaceted aspects of religions and instead creates an exception for 'services,' which is just one aspect of Legacy's religious exercise."  MTD Response at 4.  Legacy Church acknowledges that the "April 11, April 30, and May 5 Public Health Orders reflect the evolving guidance on preventive measures to slow the virus' spread," and Legacy Church notes that Dr. Jerome Adams, Surgeon General of the United States of America, has issued contradictory guidance on preventive measures.  MTD Response at 4.  Legacy Church asserts, however, that its members are "as capable" as "employees or customers in the pet grooming salons, breweries, or the gun store" in following consensus preventive measures like wearing face masks and social distancing.  MTD Response at 5.  It also contends that the evolving coronavirus outbreak and corresponding Public Health Orders "show[] the advisability of allowing this case to survive a 12(b)(6) motion to dismiss."  MTD Response at 5.  Legacy Church says that, because Secretary Kunkel has "already identified less restrictive means to [prevent] the virus' spread, such as the measures imposed in the commercial setting," Legacy Church should be permitted discovery to evaluate Secretary Kunkel's decision-making process and to "bolster Legacy's claim that the Secretary has less restrict means [available] to protect public health."  MTD Response at 5-6.  Legacy Church avers that, "[l]ikewise, Federal Rules of Civil Procedure 65(a)(2)'s permissive allowance for merging a preliminary injunction and a merits trial would not be appropriate," because there is "simply too much data to digest . . . for the Court to definitely determine what are the least restrictive means to stop the disease's spread."  MTD Response at 6.  Legacy Church

Response at 4.  In this Memorandum Opinion and Order's Analysis section, the Court will address the significance of Legacy Church's arguments about Orders and facts other than the April 11 Order and the facts that the Complaint alleges.

contends that less restrictive means' availability will "depend upon expert testimony about the virus and the known precautions to stop the spread." MTD Response at 6. Legacy Church thus asks that the Court deny the MTD as to its Free Exercise claim. See MTD Response at 6.

Legacy Church turns to its Assembly Clause claim and argues that this claim's "survival . . . also depends upon the least restrictive means prong." MTD Response at 6. It contends that the "Secretary affords secular, commercial businesses less restrictive means to further the government's interest." MTD Response at 6. Legacy Church acknowledges that Secretary Kunkel "correctly identifies that some venues, such as stadiums, theaters, and concert halls, with physical similarities to Legacy's church building are closed," but Legacy Church argues that its "other ministries, involving small groups that exceed the four-person maximum, are similarly restrained." MTD Response at 6. Legacy Church asserts that, because Secretary Kunkel permits businesses like breweries to operate while prohibiting Legacy Church's small ministry activities, "the Secretary sanctions physical proximity for employment and commercial enterprise, but not physical proximity for those motivated to meet by their religious belief." MTD Response at 7.

Next, Legacy Church contends that the Court should permit it to amend the Complaint "if necessary." MTD Response at 7. Legacy Church avers that its "additional factual allegations included in this response offer another dimension to its claims in its Original Complaint." MTD Response at 7. It asserts that the April 30 Order and the May 5 Order "further dilute the purported general applicability and non-neutral treatment of religious enterprises versus commercial ones," which "bolster[s]" Legacy Church's claims. MTD Response at 7. Legacy Church thus avers that these "factual developments, . . . if necessary, can be incorporated into an Amended Complaint to satisfy Defendant Secretary Kunkel's objections." MTD Response at 7. Legacy Church thus asks that the Court deny the MTD. See MTD Response at 7.

10.     **The Kunkel Notice**.

On May 14, 2020, the Court issued a Minute Order, filed May 14, 2020 (Doc. 58)(text-only entry), which states: "Secretary Kunkel shall notify the Court by Friday, May 15, at 12:00 p.m., whether the current public health order restricts Plaintiff Legacy Church's small ministry activities, which include up to 20 people, from gathering in an enclosed space."  Minute Order. On May 15, 2020, Secretary Kunkel responded.  See Notice Regarding May 14, 2020 Minute Order [Doc. 58], filed May 15, 2020 (Doc. 59)("Kunkel Notice").  Secretary Kunkel says that, although "[t]here is no categorical answer to the Court's question," "it is highly likely that all small ministry activities involving up to 20 people can take place under the order."  Kunkel Notice ¶ 2, at 2. Secretary Kunkel explained:

> The current public health order exempts houses of worship, such as Plaintiff Legacy Church, Inc., from the mass gatherings restriction by permitting them to gather together a number of people that is equal to 25% of the maximum occupancy of the space where they are gathering, so long as the house of worship complies with the "COVID-Safe Practices for Houses of Worship" section of "All Together New Mexico: COVID-Safe Practices for Individuals and Businesses."  This means that if any of the small ministry activities take place or could take place in a space with a maximum occupancy of 80 people or more (assuming 20 in-person attendees), then those activities are permitted under the order, assuming that the relevant COVID-Safe Practices are followed.

Kunkel Notice ¶ 2, at 2.  Secretary Kunkel said that the final version of the new public health order would be available by the afternoon on May 15, 2020.  See Kunkel Notice ¶ 3, at 2.

11.     **The MTD Reply**.

Secretary Kunkel replies.  See Reply in Support of Motion to Dismiss Plaintiff's Original Complaint, Request for Temporary Restraining Order, and Permanent Injunction at 1, filed May 22, 2020 (Doc. 65)("MTD Reply").  Secretary Kunkel argues that Legacy Church, "[a]fter failing to secure a temporary restraining order" on its theory that the April 11 Order violates its First

Amendment rights, "effectively abandons those original claims."  MTD Reply at 1.  Secretary

Kunkel asserts, instead, that the MTD Response "advances a new theory based on new evidence

not included in the original pleadings: Plaintiff now claims that its constitutional rights have been

violated by an inability to gather 15-20 people in-person for 'small groups ministries and

activities.'"  MTD Reply at 1-2 (quoting MTD Response at 3-4).  Secretary Kunkel says that

Legacy Church, instead of arguing for the Complaint's sufficiency, "switches gears and instead

attacks the Orders entered on April 30 and May 5."  MTD Reply at 2.  Secretary Kunkel asserts

that the Court "need not consider the new evidence and arguments."  MTD Reply at 1-2.  Secretary

Kunkel says that she will "not delve deeply into the propriety or justiciability of such an open-

ended and ill-defined suit for prospective relief," and Secretary Kunkel argues that Legacy

Church's suit "does not seem to be based on any specific injury or concrete dispute, but rather an

evolving dispute that can be redefined whenever Plaintiff's legal theories are rejected by a court

or whenever a new Order eliminates Plaintiff's prior concerns."  MTD Reply at 2 n.1.  Secretary

Kunkel asserts, however, that, because Legacy Church

> seems to be treating its original challenge to the April 11 Order as license to engage
> in a freewheeling challenge to anything that Plaintiff dislikes in a subsequent Order,
> it is only fair to observe that the current Order permits Plaintiff to engage in the
> activities that Plaintiff sought to engage in by challenging the prior orders.

MTD Reply at 2-3.  Secretary Kunkel avers that the May 15 Order permits houses of worship to

"'hold services and other functions provided that they comply with the COVID-Safe Practices for

Houses of Worship of All Together New Mexico: COVID-Safe Practices for Individuals and

Employers.'"  MTD Reply at 3 (quoting May 15 Order at 6).  Secretary Kunkel says that, under

the May 15 Order, houses of worship "'may not exceed 25% of the maximum occupancy of any

enclosed building, as determined by the relevant fire marshal or fire department.'"  MTD Reply at

3 (quoting Mary 15 Order at 6).  Secretary Kunkel further assert that the May 15 Order's occupancy

restriction "applies to nearly all business that are not essential businesses and to essential

businesses that operate a 'retail space' such as grocery stores and hardware stores.'"  MTD Reply

at 3 (quoting May 15 Order at 5-6).  Secretary Kunkel contends that the May 15 Order is solicitous

of religious activity, because other activities that involve large gatherings, like theaters, museums,

and conferences, remain closed while houses of worship may operate to a limited extent.  See

MTD Reply at 3.  Secretary Kunkel thus argues that the May 15 Order "effectively give[s] Plaintiff

the relief that it sought in its original Complaint along with the new relief that it requests in its

Response," although Secretary Kunkel concedes that Legacy Church's claims "are likely not yet

moot under the 'voluntary cessation' exception to the mootness doctrine."  MTD Reply at 4 & n.2

(quoting Brown v. Buhman, 822 F.3d 1151, 1169 (10th Cir. 2016)).

Secretary Kunkel asserts that the Court should not permit Legacy Church to "use its

original challenge to the April 11 Order to create a shifting theory of harm that can be altered with

the entry of any subsequent Order" and that the Court "has discretion to choose not to even

consider the new arguments in Plaintiff's Response, which are based on entirely new" evidence.

MTD Reply at 4 (citing Sawyer v. USAA Ins. Co., 912 F. Supp. 2d 1118, 1132 (D.N.M.

2012)(Browning, J.)).  Secretary Kunkel thus argues that that Court should decline to consider the

additional evidence and arguments that the MTD Response asserts.  See MTD Reply at 4.

Secretary Kunkel contends that the Court may dismiss the Complaint "for the reasons described

in the Motion to Dismiss."  MTD Reply at 4.

Secretary Kunkel next avers that, if the Court considers the new materials that the MTD

Response submits, the Court should convert MTD to a motion for summary judgment.  See MTD

Reply at 5.  Secretary Kunkel contends that, although rule 12(d) of the Federal Rules of Civil

Procedure "normally requires notice and an opportunity to present material outside of the pleadings, those measures are unnecessary where, as here, the non-moving party has introduced additional facts beyond those stated in its complaint through the submission of an affidavit or other outside materials."  MTD Reply at 5 (citing <u>Sawyer v. USAA Ins. Co.</u>, 912 F. Supp. 2d at 1132). Secretary Kunkel says that she "presented only matters contained in the Complaint or subject to judicial notice in her Motion to Dismiss."  MTD Reply at 5 (citing <u>Harjo v. City of Albuquerque</u>, 307 F. Supp. 3d 1163, 1185 (D.N.M. 2018)(Browning, J.)).  Secretary Kunkel contends that "basic facts" about COVID-19 relevant to ruling on the MTD "are generally known and not subject to reasonable dispute," and so the Court may take judicial notice of those facts.  MTD Reply at 5-6 (citing <u>Harjo v. City of Albuquerque</u>, 307 F. Supp. at 1185; <u>Harris v. H. & W. Contracting Co.</u>, 102 F.3d 516, 522 (11th Cir. 1996)).  Secretary Kunkel avers, however, that, even if the Court concludes that those facts are not judicially noticeable, the Court may take judicial notice of the Public Health Orders which, Secretary Kunkel asserts, "provide ample justification for Defendant Secretary Kunkel's official actions."  MTD Reply at 6 (citing <u>Harjo v. City of Albuquerque</u>, 307 F. Supp. 3d at 1185).  Secretary Kunkel argues that, "[b]y contrast," the MTD Response "is based on a set of facts that is entirely separate from those set forth . . . in [the] Complaint[.]"  MTD Reply at 6.  Secretary Kunkel thus asserts that converting the MTD to a motion for summary judgment will not prejudice Legacy Church, because the Legacy Church "has apparently abandoned the legal theories advanced in its Complaint and relies entirely on the new factual predicates described in the Smothermon Declaration."  <u>See</u> MTD Reply at 7 (citing <u>Burnham v. Humphrey Hosp. Reit. Tr., Inc.</u>, 403 F.3d 709, 713-14 (10th Cir. 2005)).  Secretary Kunkel contends that, if the Court is unable to rely on "these new factual predicates, then Plaintiff has effectively provided no response to Defendant Secretary Kunkel's challenges to the sufficiency of Plaintiff's Complaint through her

Motion to Dismiss."  MTD Reply at 7.

Turning to Legacy Church's Free Exercise claim, Secretary Kunkel contends that, "even treating [Legacy Church's asserted] facts . . . as undisputed, its new Free Exercise claim regarding small group ministries fails as a matter of law."  MTD Reply at 7.  Secretary Kunkel disagrees with Legacy Church's assertion that the May 5 Order, with its loosened restrictions on non-essential businesses, is not neutral or generally applicable, because Legacy Church "does not establish that the May 5 Order permits equivalent secular activities or gatherings to its small ministry activities, such as group therapy or counseling, secular wedding ceremonies, book clubs, and other group celebration."  MTD Reply at 8 (citing Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 649-50).  Secretary Kunkel contends that Legacy Church "seeks to draw a parallel between its small group ministries and non-essential retail businesses," but Secretary Kunkel argues that non-essential retail businesses' operations, as the May 5 Order restricts, are not equivalent to Legacy Church's small group ministry activities.  MTD Reply at 8-9.  Secretary Kunkel argues that other activities that are likely to bring fifteen to twenty people together in an enclosed space, "such as casinos, conferences, call centers, dine-in restaurants, bars, and schools, remain closed under the May 5 Order."  MTD Reply at 9.  Secretary Kunkel accordingly argues that the May 5 Order is neutral with respect to religion.  See MTD Reply at 10.

Secretary Kunkel also asserts that the May 5 Order is generally applicable and argues that the May 5 Order's providing additional categorical exemptions "does not take the Order outside the realm of general applicability."  MTD Reply at 10.  She acknowledges that government may not "refuse to extend a system of individual case-by-case exemptions to request for exemptions based on religious hardship," but Secretary Kunkel avers that this principle "'does not apply to statutes that, although otherwise generally applicable, contain express exemption for objectively

defined categories.'"  MTD Reply at 10 (quoting <u>Axson-Flynn v. Johnson</u>, 356 F.3d 1277, 1298 (10th Cir. 2004)).  Secretary Kunkel says that none of the Public Health Orders violates this principle, because none involves officials' "subjective determinations or judgments regarding the genuineness or value of specific religious beliefs."  MTD Reply at 10 (citing <u>Smith</u>, 494 U.S. at 884).  Secretary Kunkel thus avers that the Public Health Orders are neutral and generally applicable, and so are subject to rational basis review.  <u>See</u> MTD Reply at 10.  Secretary Kunkel avers that, under that standard, the Public Health Orders are valid, because they reasonably further New Mexico's interest in minimizing the coronavirus outbreak in New Mexico.  <u>See</u> MTD Reply at 11.

Turning to Legacy Church's Assembly Clause claim, Secretary Kunkel similarly "tak[es] the new facts introduced by Plaintiff as undisputed" and asserts that Legacy Church's "new freedom of assembly claim also fails as a matter of law."  MTD Reply at 11.  Secretary Kunkel avers that government action can infringe upon assembly and associational rights "'by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.'"  MTD Reply at 11 (quoting <u>Roberts v. United States Jaycees</u>, 468 U.S. 609, 623 (1984)).  Secretary Kunkel says that Legacy Church focuses primarily on this test's third prong to argue that the Public Health Orders are impermissibly over-restrictive.  <u>See</u> MTD Reply at 11 (citing MTD Response at 6-7).  Secretary Kunkel disagrees with Legacy Church and argues that the May 5 Order is narrowly tailored: "Simply put, a handful of retail employees providing delivery and curbside service does not pose comparable public health risks to groups of 15-20 people congregating in a room together for significant periods of time."  MTD Reply at 12.  Secretary Kunkel asserts that Legacy Church "has not established that the May 5 Order allows any other activities that are analogous to

- 97 -

Plaintiff's small group ministries," and that Legacy Church "may engage in small ministry activities through various alternative channels of expression, such as the use of audiovisual or telephonic technology, permitting limited in-person attendance of members who do not have access to technology, or breaking the activities into groups of less than five people in a single physical space."  MTD Reply at 12.  Secretary Kunkel thus argues that the Court should dismiss Legacy Church's "new freedom of assembly claim" and grant the MTD.  MTD Reply at 12.

### 12.     The Court's Minute Orders and the Parties' Positions on Conversion

On May 12, 2020, the Court directed the parties to notify it whether they favor converting the MTD into a motion for summary judgment.  See Minute Order, filed May 12, 2020 (Doc. 55)("May 12 Minute Order").  Legacy Church opposed the conversion and Secretary Kunkel favored the conversion.  On May 15, 2020, Legacy stipulated to a two-week stay in light of a public health order that permitted houses of worship to conduct services with up to twenty-five percent maximum occupancy.  See Unopposed MOTION to Vacate May 18, 2020 Hearing And Stay Proceedings Until June 3, 2020 at 1, filed May 15, 2020 (Doc. 63).  On June 29, 2020, the Court again directed the parties to notify it whether they favor converting the MTD into a motion for summary judgment, citing the parties' reliance on factual matters outside the pleadings.  See Minute Order, filed June 29, 2020 (Doc. 72)(text-only entry)("June 29 Minute Order").  The Court further asked the parties to specify which public health order the Court should evaluate in ruling on the MTD.  See June 29 Minute Order.  Legacy Church responded that the Court should rely on the June 15 Order and should convert the MTD into a Motion for Summary Judgment.  See Plaintiff's Response to June 29 Minute Order, filed June 29, 2020 (Doc. 68)("Legacy Church Minute Order Response").  Secretary Kunkel responded and suggested that the Court should rely on the April 11 Order and not convert the MTD into a Motion for Summary Judgment, but

Secretary Kunkel also said that she did not oppose conversion.  See Notice Responding to Minute Order at 1-3, filed June 29, 2020 (Doc. 69)(providing that the Court "does not need to evaluate any Public Health Orders other than" the April 11 Order, but also stating that "[t]o be clear, Secretary Kunkel has no objection to the conversion of her motion to dismiss to a motion for summary judgment under those circumstances").

13.    **The July 2 Minute Order.**

Noting the shift in the parties' positions regarding conversion, the Court again asked Secretary Kunkel to provide her present position on conversion.  See Minute Order, filed July 2, 2020 (Doc. 71)(text-only entry)("July 2 Minute Order").  The Court stated that it understood Secretary Kunkel's current position to disfavor conversion, and asked Secretary Kunkel to clarify whether the Court's understanding is correct.  See July 2 Minute Order.  The Court then invited the parties to submit additional briefing regarding the June 30 Order's different treatment of restaurants and gyms on the one hand, and churches on the other hand.  See July 2 Minute Order.

14.    **The Legacy Church Response to the July 2 Minute Order.**

On July 7, 2020, Legacy Church responded to the July 2 Minute Order.  See Plaintiff's Supplementary Brief on Public Health Order's Unequal Disparity Between Restaurants and Houses of Worship at 1, filed July 7, 2020 (Doc. 73)("Legacy Church Disparity Brief").  Legacy Church asserts that the June 30 Order is "substantially underinclusive and thus not generally applicable."  Legacy Church Disparity Brief at 1.  Legacy Church asserts that there are 3,468 "eating and drinking establishments in the state of New Mexico," and so the "Court can take judicial notice that the Secretary permits hundreds, if not thousands, of New Mexico restaurants to seat customers at 50% capacity, all day every day."  Legacy Church Disparity Brief at 1.  Legacy Church also asserts that there are 219 "health clubs serving hundreds of thousands of customers in

the state of New Mexico." Legacy Church Disparity Brief at 2. It argues that the June 30 Order "permits a strange dichotomy that the same group of New Mexicans [can] visit their local big box fitness center and favorite large chain restaurant, but would encounter a more draconian limitation because they entered a building to pray, worship, or discuss religion." Legacy Church Disparity Brief at 2.

Legacy Church further avers that the June 30 Order's "textual exemption for hundreds of gyms and restaurants is not the only development since" the Court issued the TRO MOO. Legacy Church Disparity Brief at 2. Legacy Church contends that Governor Lujan Grisham "has since explicitly created a new category of permissible physical proximity: demonstrations protesting longstanding injustice and racism," because Governor Lujan Grisham has commended recent protests against racism in New Mexico. Legacy Church Disparity Brief at 2. Legacy Church notes that the City of Albuquerque deployed riot police against one protest, but Legacy Church avers that Governor Lujan Grisham's comments create a "de facto exemption for mass gatherings of protesters," which "undermines the Public Health Order's professed general applicability." Legacy Church Disparity Brief at 2. Legacy Church argues that Governor Lujan Grisham and Secretary Kunkel "have made a clear value judgment, favoring exemptions for groups perceived as political allies and disfavoring those gathered with no political agenda, such as houses of worship." Legacy Church Disparity Brief at 3. Legacy Church says that Governor Lujan Grisham made this value judgment "irrespective of public health." Legacy Church Disparity Brief at 3. Legacy Church thus asserts that the June 30 Order is subject to strict scrutiny. See Legacy Church Disparity Brief at 3-4.

**15.    Secretary Kunkel's Response to the July 2 Minute Order.**

Secretary Kunkel responds to the July 2 Minute Order.  See Supplemental Brief Regarding Defendant's Response to Verified Emergency Order, Preliminary Injunction, and Permanent Injunctive Relief at 1, filed July 7, 2020 (Doc. 74)("Secretary Kunkel Disparity Brief").  Secretary Kunkel says that the essential facts about COVID-19 "remain relatively unchanged" since the Court issued the TRO MOO.  Secretary Kunkel Disparity Brief at 2.  Secretary Kunkel notes that the coronavirus has continued to spread rapidly throughout the world, the United States, and New Mexico.  See Secretary Kunkel Disparity Brief at 2.  Secretary Kunkel thus avers that "social distancing and other preventative measures such as avoiding large crowds in indoor spaces remain crucial to the State's effort to slow the spread of COVID-19."  Secretary Kunkel Disparity Brief at 3.  She asserts that the June 30 Orders "core directive" is "the same as other recent Public Health Orders: all New Mexicans should be staying in their homes for all but the most essential activities and services."  Secretary Kunkel Disparity Brief at 3 (quoting June 30 Order at 1)(emphasis in June 30 Order).  Secretary Kunkel states that the June 30 Order maintains the previous Public Health Orders' general restrictions against mass gatherings, but that "numerous other businesses and other facilities, including houses of worship, are exempt from mass gathering restrictions but remain subject to a variety of other restrictions in the June 30 Order."  Secretary Kunkel Disparity Brief at 3.  Secretary Kunkel acknowledges that the June 30 Order allows restaurants to operate at fifty percent capacity, but she contends that "restaurants may only reach this 50% threshold if they comply with various other requirements designed to ensure social distancing and prevent even moderately sized gatherings in close proximity."  Secretary Kunkel Disparity Brief at 3.  For example, Secretary Kunkel says that customers may not sit at any bar or counter and may not be served while standing, and that no more than six customers may sit at any one table.  See Secretary Kunkel Disparity Brief at 3 (citing June 30 Order at 5-6).  She also says that the June 30 Order

permits gyms and public pools to operate at fifty percent capacity, but may not conduct group activities and pools "are limited to lane-swimming and lessons with up to two students." Secretary Kunkel Disparity Brief at 5. Secretary Kunkel further asserts that "the restrictions on houses of worship are more relaxed than those which apply to movie theaters, concert venues, bars, and other large indoor gathering places where individuals gather together in relatively close proximity for prolonged periods of time." Secretary Kunkel Disparity Brief at 6.

Secretary Kunkel avers that the different treatment regarding restaurants, gyms, and houses of worship is based on the latest public health guidance from Johns Hopkins University. See Secretary Kunkel Disparity Brief at 6. Secretary Kunkel says that Johns Hopkins University's Public Health Guidance "assesses the risk levels for different businesses, activities, and gatherings along three dimensions: (1) contact intensity; (2) number of contacts; and (3) modification potential." Secretary Kunkel Disparity Brief at 6 (citing Caitlin Rivers, Ph.D. MPH, et. al., Public Health Principles for a Phased Reopening During COVID-19: Guidance for Governors at 10, Johns Hopkins U. Bloomberg Sch. of Pub. Health (April 17, 2020), filed July 7, 2020 (Doc. 74-7)("Public Health Guidance"). She asserts that contact intensity is a function of contact type and duration, while the number-of-contacts metric measures the number of people in a location at the same time. See Secretary Kunkel Disparity Brief at 6 (citing Public Health Guidance at 10). Last, Secretary Kunkel says that modification potential measures the degree to which an activity can be modified to reduce the risk of transmissibility. See Secretary Kunkel Disparity Brief at 6 (citing Public Health Guidance at 10). Secretary Kunkel avers that the Public Health Guidance classified gyms, houses, or worship, and restaurants to have medium modification potential. See Secretary Kunkel Disparity Brief at 6 (citing Public Health Guidance at 12). Secretary Kunkel states that restaurants and gyms involve medium levels of contact intensity and number of contacts. See

Secretary Kunkel Disparity Brief at 6 (citing Public Health Guidance at 12).  "By contrast," Secretary Kunkel says that houses of worship "are classified as generally involving high contact intensity level with a high number of contacts."  Secretary Kunkel Disparity Brief at 6 (citing Public Health Guidance at 16).  She says that activities with similar transmissibility risks are theaters, museums, concert venues, and bars.  See Secretary Kunkel Disparity Brief at 6 (citing Public Health Guidance at 12, 14).  Secretary Kunkel notes that all such activities "remain entirely closed in New Mexico."  Secretary Kunkel Disparity Brief at 7.

Secretary Kunkel describes "other concerns that support a more cautious approach to reopening houses of worship than dine-in restaurants and gyms," such as the discrepancy in size between some larger houses of worship relative to restaurants, including large restaurants. Secretary Kunkel Disparity Brief at 7.  She notes that, at twenty-five percent capacity, Legacy Church's campuses may hold 625 attendees, and she argues that it is "unlikely that anywhere close that number of people will gather together in a socially-distanced gym restaurant or gym, even with facilities at 50% of occupancy."  Secretary Kunkel Disparity Brief at 7.  Secretary Kunkel also describes "superspreader" events involving churches around the world, including a church in South Korea responsible for 5,080 confirmed COVID-19 cases, and a mosque in India that "accounted for about a fifth of the total cases in India in early April."  Secretary Kunkel Disparity Brief at 7 (citing Thes Youjin Shin, Bonnie Berkowitz, and Min Joo Kim, "How a South Korean church helped fuel the spread of the coronavirus," The Washington Post (March 25, 2020) https://www.washingtonpost.com/graphics/2020/world/coronavirus-southkorea-church/;  Joanna Slater, Niha Masih, and Shams Irfan, "India confronts its first coronavirus 'superspreader' -- a Muslim missionary group with more than 400 members infected," The Washington Post (April 2, 2020)      https://www.washingtonpost.com/world/asia_pacific/indiacoronavirus-tablighi-jamaat-

delhi/2020/04/02/abdc5af0-7386-11ea-ad9b254ec99993bc_story.html).      Secretary    Kunkel

contends that, although restaurants and gyms are "by no means risk-free environments, a wide

array of superspreader events have not been linked with those venues."  Secretary Kunkel Disparity

Brief at 9.

Turning to Legacy Church's Free Exercise claim, Secretary Kunkel asserts that the June

30 Order is neutral, because its object is to protect public health by limiting in-person interactions

and mass gatherings.  See Secretary Kunkel Disparity Brief at 11 (citing Grace United Methodist

Church v. City of Cheyenne, 451 F.3d at 649-50).  Secretary Kunkel contends that the June 30

Order does not target religious mass gatherings with special restrictions, but rather affords special

treatment for religious mass gatherings compared with analogous secular conduct.  See Secretary

Kunkel Disparity Brief at 11.  Secretary Kunkel also argues that the June 30 Order is generally

applicable, because it "'does not prohibit religious conduct only; it prohibits a host of secular

activities, both commercial and recreational.'"  Secretary Kunkel Disparity Brief at 12 (quoting

TRO MOO, 2020 WL 1905586, at *26).  She asserts that the June 30 Order is not underinclusive

"with respect to similar secular venues to Plaintiff's church; if anything, if provides more favorable

treatment to religious activities."  Secretary Kunkel Disparity Brief at 12.  Secretary Kunkel

contends that the June 30 Order's different occupancy limits for gyms, restaurants, and churches

does not render the June 30 Order underinclusive, because restaurants and gyms "are not close

comparators to Plaintiff's church and Plaintiff is not constitutionally entitled to fall under the same

occupancy of those facilities just because they are higher than 25%."  Secretary Kunkel Disparity

Brief at 12 (citing Swanson by & Through Swanson v. Guthrie Indep. Sch. Dist. No. I-L, 135 F.3d

694, 702 (10th Cir. 1998)).  Secretary Kunkel furthers asserts that the June 30 Order subjects

restaurants and gyms to "other unique restrictions that are also designed to reduce occupancy and

do not apply to Plaintiff: restaurants must comply with certain strict seating patterns and groups limits; and gyms may not conduct group fitness classes." Secretary Kunkel Disparity Brief at 12.

Secretary Kunkel next argues that the June 30 Order's various exemptions "does not create a system of case-by-case exemptions that would undermine its general applicability." Secretary Kunkel Disparity Brief at 13 (citing Smith, 494 U.S. at 884). Instead, Secretary Kunkel asserts that the June 30 Order contains differing restrictions for "'objectively defined categories' that do not require government officials to make subjective determinations regarding the value or genuineness of a person's religious beliefs." Secretary Kunkel Disparity Brief at 13 (quoting Axson-Flynn v. Johnson, 356 F.3d at 1298). Secretary Kunkel thus contends that the June 30 Order is subject to rational basis review, but Secretary Kunkel nonetheless avers that the June 30 Order survives strict scrutiny See Secretary Kunkel Disparity Brief at 13 (citing C.M. v. Urbina, 640 F. App'x 825, 831 (10th Cir. 2016)). Last, Secretary Kunkel avers that the Honorable Richard F. Boulware II, United States District Judge for the United States District Court for the District of Nevada, recently rejected the arguments that Legacy Church makes with regards to Governor Lujan Grisham's statements about protests. See Secretary Kunkel Disparity Brief at 15 (citing Calvary Chapel Dayton Valley v. Sisolak, No. 3:20-CV-0303-RFB\VCF, 2020 WL 3404700, at *1 (D. Nev. June 19, 2020)(Boulware, J.)). Secretary Kunkel says that Judge Boulware, as a matter of deference, noted that the executive branches of government have discretion as to the enforcement of laws and whom to prosecute, and that a governor's statements regarding protests are not enough to establish a selective enforcement claim. See Secretary Kunkel Disparity Brief at 16 (citing Calvary Chapel Dayton Valley v. Sisolak, 2020 WL 3404700, at *8). Secretary Kunkel says that Legacy Church "has not put forward sufficient evidence to establish a likelihood of success on the merits of a selective enforcement claim based on some positive comments made

by public officials supportive of the message behind racial justice protests."  Secretary Kunkel Disparity Brief at 16.

Turning to Legacy Church's Freedom of Assembly claim, Secretary Kunkel contends that Legacy Church concedes that the June 30 Order serves a compelling interest and is unrelated to the suppression of ideas.  Secretary Kunkel Disparity Brief at 18.  Secretary Kunkel argues that the June 30 Order is narrowly tailored to prevent large gatherings that are most deleterious to public health, while "leaving open multiple avenues for Plaintiff's free expression and association that do not implicate heightened public health concerns."  Secretary Kunkel Disparity Brief at 18.  She asserts that, "if anything," the June 30 Order "provides houses of worship with more lenient restrictions than gatherings and venues posing equivalent risks."  Secretary Kunkel Disparity Brief at 18 (emphasis in original).  Secretary Kunkel contends that the June 30 Order's imposition of different occupancy restrictions on businesses like restaurants and gyms is "likewise congruent with the comparatively lower risks posed by those businesses."  Secretary Kunkel Disparity Brief at 19.  Secretary Kunkel thus requests that the Court deny the PI Motion.  See Secretary Kunkel Disparity Brief at 19.

### 16.   The Witness Motion.

On July 8, Secretary Kunkel sought leave to testify at the July 10 evidentiary hearing through audiovisual means.  See Witness Motion at 1.  Secretary Kunkel cites her advanced age -- she is sixty-nine years old -- and the public health risks that she asserts are attendant to testifying in the courtroom.  See Witness Motion at 1.  Secretary Kunkel says that "8 of 10 COVID-19 deaths reported in the United States have been adults 65 years old and older."  Witness Motion at 2 (citing Ctrs. for Disease Control and Prevention, "Coronavirus Disease 2019 (COVID-19): Your Health: Older   Adults,"   available   at   https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

precautions/older-adults.html.).  Secretary Kunkel says that she "feels uncomfortable testifying in person: an experience that will likely involve sitting in an indoor courtroom with an uncertain number of other people for a prolonged time."  Witness Motion at 2.  Although Secretary Kunkel "respects the COVID-19-related safety measures" that the District of New Mexico has taken, she asserts that "it is impossible to completely eliminate COVID-related risk even through strict social distancing, sanitizing, and other precautions."  Witness Motion at 2.  She says that she is "happy to testify telephonically."  Witness Motion at 2.  Secretary Kunkel states that Legacy Church opposes this request, but Secretary Kunkel asks that the Court grant the Witness Motion.  See Witness Motion at 2.

### 17.     **The Witness Motion Hearing**.

The Court held a hearing on the Witness Motion on July 9, 2020.  See Clerk's Minutes at 1, filed July 9, 2020 (Doc. 77).   The Court held the hearing on the Witness Motion telephonically.  See Draft Transcript of Hearing (held July 9, 2020) at 1:1-5 (Court)("July 9 Tr.").[11] Secretary Kunkel noted that she has agreed voluntarily to testify at the July 10, 2020, evidentiary hearing.  See July 9 Tr. at 3:16-17 (Guss).  She stated that  her "concern is she's 69 years old," and that, while she "understands that there are precautions that the court has taken, . . . no level of precautions is a guarantee against the spread of virus."  July 9 Tr. at 3:20-23 (Guss).  Secretary Kunkel thus asked that the Court grant her leave to testify telephonically or through audiovisual means.  See July 9 Tr. at 4:7-10 (Guss).  New Mexico and Amicus Americans United both asserted that they do not object to Secretary Kunkel testifying remotely.  See July 9 Tr. at 4:18-25 (Sydow, Goetze).

---

[11]The Court's citations to the July 9 Tr. refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Legacy Church asserted that, when the Court initially set the evidentiary hearing in April, 2020, the "hysteria" regarding COVID-19 "was in full swing." July 9 Tr. at 5:16-19 (Stern). Legacy Church averred that this concern has decreased lately and that, while Secretary Kunkel may be "busy," her testimony is "of vital importance." July 9 Tr. at 5:19-23 (Stern). Legacy Church contended that it is safe to appear and testify in the District of New Mexico, she would be unlikely to "be within six feet of anybody," and "there's enough precautions to have her there." July 9 Tr. at 6:8-11 (Stern). Legacy Church argued that Secretary Kunkel is the "main witness," so that he "credibility, her demeanor, her testimony, all of that is important for the court to make its decision." July 9 Tr. at 6:13-16 (Stern). Legacy Church noted that the current Public Health Order have not ordered "that nobody should be going out," but rather "have decided that there are levels of contact" that are acceptable. July 9 Tr. at 6:25-7:3 (Stern). Legacy Church argued that, if Secretary Kunkel has been leaving her home, "still conducting business, still going into the office, still going out to dinner, still doing anything, those things are the same as [or] maybe less safe than the procedures and everything that's been put on by the federal court." July 9 Tr. at 7:10-14 (Stern). Legacy Church offered to "take some extra wipes to wipe down everything if need be" to assuage Secretary Kunkel's concerns. July 9 Tr. at 7:25-8:1. Legacy Church further argued that it has a "Constitutional right" to have Secretary Kunkel testify in person, and this this right is akin to the "right to a fair trial" under the Sixth Amendment to the Constitution of the United States. July 9 Tr. at 8:20-24 (Esquibel). Legacy Church thus asked that the Court deny the Witness Motion. See July 9 Tr. at 7:20-22 (Stern).

The Court stated that Secretary Kunkel's credibility is unlikely to be at issue, so that even if Legacy Church has "the most vigorous cross-examination that we can imagine . . . Secretary Kunkel's going to be the same here in the courtroom or on the phone." July 9 Tr. at 9:3-8 (Court).

Legacy Church responded that "seeing how an individual is testifying" is necessary to evaluate the testimony's validity.  July 9 Tr. at 10:4-6 (Esquibel).  Legacy Church also stated its concern that technical problems could interfere with its ability to cross-examine Secretary Kunkel effectively.  See July 9 Tr. at 10:18-24 (Esquibel).  Amicus Becket Fund supported Legacy Church's position and expressed concern about technical problems inherent to remote testimony.  See July 9 Tr. at 11:23-25 (Dunn).  Amicus Americans United added that Secretary Kunkel "should not be forced to choose between protecting her own health . . . and her public functions."  July 9 Tr. at 12:16-20 (Luchenitser).  New Mexico also asserted that the "science out there" shows that indoor activities "in a contained space" that involve speaking "are the most dangerous."  July 9 Tr. at 13:5-8 (Sydow).

Secretary Kunkel disputed Legacy Church's "characterization of us being in a lull in terms of COVID," because New Mexico has recently seen "some of the highest single day case counts."  July 9 Tr. at 13:17-20 (Guss).  Secretary Kunkel also noted that the Court conducted the July 9 Hearing telephonically without issue, so "there doesn't seem to be a strong counterbalancing interest that would outweigh her health concerns."  July 9 Tr. at 14:20-23 (Guss).  Secretary Kunkel thus asked that the Court grant the Witness Motion.  See July 9 Tr. at 15:1-4 (Guss).

The Court then granted the Witness Motion.  See July 9 Tr. at 15:5-7 (Court).  The Court noted that, if this were a criminal matter and the witness's credibility was at issue, the Court would require in-person testimony.  See July 9 Tr. at 15:8-9 (Court).  The Court noted, however, that the July 10 Hearing is on a preliminary injunction, and that on similar motions "we often do things by affidavit[ or] proffer."  July 9 Tr. at 15:14-17 (Court).  The Court expressed its confidence that Legacy Church would procure the facts it needs from Secretary Kunkel's testimony, so the Court's opinion on the PI Motion will be well-informed.  See July 9 Tr. at 15:18-21 (Court).  The Court

and the parties then agreed that Secretary Kunkel would testify by audiovisual means.  See July 9 Tr. at 16:9-17-10 (Court, Equibel, Guss).

   18.   **The July 10, 2020, Evidentiary Hearing**.

   On July 10, 2020, the Court held an evidentiary hearing on Legacy Church's request for a preliminary injunction.  See July 10 Tr. at 1.  Legacy Church began by calling Secretary Kunkel as its first witness, and Secretary Kunkel testified telephonically.  See July 10 Tr. at 3:3 (Esquibel).  Legacy Church asked Secretary Kunkel about the decision-making process for writing and issuing each Public Health Order.  See July 10 Tr. at 4:7-15 (Esquibel, Kunkel).  Secretary Kunkel said that the Public Health Orders are the result of collective deliberation between her, Governor Lujan Grisham, and relevant experts.  See July 10 Tr. at 4:11-21 (Kunkel, Esquibel).  Legacy Church also asked Secretary Kunkel about how she and the New Mexico Department of Health determine which businesses are "essential," which Legacy Church argued is "relevant to show whether or not they are actually being neutral or actually targeting or specifically creating carve outs for different areas."  July 10 Tr. at 16:1-9 (Esquibel).  Legacy Church noted that the June 1 Order -- and subsequent Public Health Orders -- permits houses of worship to provide services indoors that comply with the CSP Handbook and that do not exceed twenty-five percent of an enclosed building's maximum occupancy.  See July 10 Tr. at 60:24-61:7 (Esquibel).  Secretary Kunkel objected to Legacy Church asking about outdoor services on the basis that the topic is irrelevant, see July 10 Tr. at 60:8-14, but the Court overruled the objection, see July 10 Tr. at 62:11-12 (Court), because  Legacy Church argued that the June 1 Order is unclear whether outdoor religious services are subject to the mass gathering rule's restriction on gatherings of five or more people or whether houses of worship can provide services outdoors at any size, which has important implications for how the Public Health Orders' general applicability, see July 10 Tr. at 61:8-62:2

(Esquibel).  Legacy Church also asked Secretary Kunkel about recent protests, and Secretary Kunkel said that the Public Health Orders apply to protests.  See July 10 Tr. at 65:9-20 (Esquibel, Kunkel).  Secretary Kunkel said that she is unsure whether the State of New Mexico or local authorities have done anything to curb protests in light of the Public Health Orders' restrictions on mass gatherings.  See July 10 Tr. at 66:1-4 (Esquibel, Kunkel).

Legacy began redirect examination of Secretary Kunkel, asking her whether the order permits drive-in church services.  See July 10 Tr. at 80:25-81:1 (Esquibel). After denying knowledge of a deal being made regarding drive-in services, Secretary Kunkel clarified that the June 30 Order does not specifically mention drive-in services, although it mentions audiovisual services.  See July 10 Tr. at 81:2-82:3 (Kunkel, Esquibel).  Legacy Church moved onto the April 11 Order, confirming with Kunkel that the April 11 Order, unlike several other Orders, went into effect immediately upon signing.  See July 10 Tr. at 82:8-23 (Esquibel, Kunkel).  Secretary Kunkel acknowledged that, although there was no enforcement of the April 11 Order regarding church services on April 12, New Mexico citizens who followed the order would not have attended church services in person that day.  See July 10 Tr. at 83:17-84:8 (Esquibel, Kunkel).

Smotherman, a pastor at Legacy Church, testified about his own background, gave information about the church and the services it provides, and discussed the impact that the April 11 Order had on Legacy Church. See July 10 Tr. at 94:21-109:9 (Guss, Smotherman). Smotherman then discussed the different campuses and rooms in which services were held and their capacities. See July 10 Tr. at 110:15-117:6 (Guss, Smotherman).  Smotherman then discussed services of Legacy Church, such as the Feed New Mexico Kids program, that were not affected by the April 11 order, although he acknowledged that continuing some of these services requires a significant amount of resources.  See July 10 Tr. at 117:24-120:10 (Guss, Smotherman).  Smotherman

expressed that Legacy Church is seeking the Orders to treat Legacy Church "the same as you would treat a business or a gym or a restaurant." July 10 Tr. at 127:17-18 (Smotherman).  See July 10 Tr. at 127:16-18 (Smotherman).  Smotherman discussed the Court's Opinion on the TRO, distinguishing Legacy Church from a movie theatre, because of the protections it has and the fact that they ask their congregants to "be smart," but not distinguishing them based on COVID-19 risks beyond stating that he does not believe they clean their facilities the way Legacy Church cleans its facilities. July 10 Tr. at 135:7 (Smotherman).  See July 10 Tr. at 133:1-135:7 (Guss, Smotherman).  Smotherman discussed the April 11 order further, reiterating that he was "shocked" to learn that the order would not be enforced on April 12.  July 10 Tr. at 137:10 (Smotherman). 136:3-138 (Esquibel, Smotherman).   Smotherman continued to discuss how the Orders have impacted Legacy Church, noting that he feels as if he is unable to fully serve his congregants and that he believes more congregants would attend services if there were fewer restrictions.  See July 10 Tr. at 141:1-144:18 (Esquibel, Smotherman).

Secretary Kunkel presented evidence. See July 10 Tr. at 142:14 (Court).  Secretary Kunkel explained the rationale for having a twenty-five percent occupancy restriction, which namely is that more individuals in churches, as opposed to restaurants or gyms, "are in a place for a prolonged period of time, and there is singing or praying or speaking in an enclosed space, which increases the risk of transmission significantly." July 10 Tr. at 153:11-15 (Kunkel).  See July 10 Tr. at 153:6-22 (Kunkel, Guss).

After the evidentiary portion of the July 10 Hearing concluded, Legacy Church first argued in support of the preliminary injunction.  See July 10 Tr. at 167:13-23 (Hunter).  The parties clarified that the new PHO was effective Monday, July 13, at 12:01 a.m.  See July 10 Tr. at 167:24-168:11 (Court, Garcia).  The Court noted that the fifty percent restaurant capacity would go to zero

percent capacity at this time; Legacy Church agreed but said that hotels and gyms would remain at fifty percent capacity, and it still had arguments based on these entities different treatment.  <u>See</u> July 10 Tr. at 169:1-170:6 (Court, Hunter).

The Court asked Legacy Church about Chief Justice Roberts' concurrence in <u>South Bay United Pentecostal Church v. Newsom</u>, 140 S. Ct. 1613 (2020)("<u>South Bay</u>").  <u>See</u> July 10 Tr. at 171:2-3 (Court).  Legacy Church stated that New Mexico's public health orders deserved strict scrutiny after Chief Justice Roberts' concurrence, because they are not generally applicable and neutral.  <u>See</u> July 10 Tr. at 171:15-19 (Court, Hunter).  Legacy Church noted that several gyms require extensive contact with objects and other people, and that youth programs were exempt -- both of which suggest an arbitrary decision from New Mexico -- and Legacy Church argued that is should be entitled to the same restrictions as the least restrictive secular activity.  <u>See</u> July 10 Tr. at 171:19-172:11 (Hunter).  It asked for a fifty percent capacity limitation and no restriction on outdoor activities.  <u>See</u> July 10 Tr. at 172:21-25 (Hunter).

Legacy Church then discussed the June 30 Order's exemption from "mass gatherings" of public officials or public employees in the course and scope of their employment.  <u>See</u> July 10 Tr. at 173:22-174:3 (Hunter).  It noted it was just one of many exemptions in the June 30 Order.  <u>See</u> Jul 10 Tr. at 174:3-12 (Hunter).  It argued that, under <u>Smith</u>, these exemption require that the Court apply strict scrutiny.  <u>See</u> July 10 Tr. at 174:25-176:11 (Hunter).  The Governor's protest comments, it argued, also require the Court to apply strict scrutiny.  <u>See</u> July 10 Tr. at 176:12-20 (Hunter).  Legacy Church next discussed <u>Soos v. Cuomo</u>, and it argued that it had a stronger case than the plaintiffs in that case, because Governor Lujan Grisham had explicitly encouraged the protests rather than passively sanctioning them, and because the disparity between occupancy rates was more extreme.  <u>See</u> July 10 Tr. at 178:10-179:4 (Hunter).

Regarding disfavored injunctions, Legacy Church argued that the Court should not consider its requested relief as eliminating the need for a trial, because the relief it is seeking would change continuously with each new order.  See July 10 Tr. at 181:1-14 (Hunter).  It added that it also sought attorneys fees and other costs that an injunction would not provide.  See July 10 Tr. at 181:14-25 (Hunter).  It concluded that this case looks different than it did last time the Court addressed the issue, and that its deprivation of liberty was more clear than before.  See July 10 Tr. at 182:1-10 (Hunter).

In response to the Court's questioning, Legacy Church stated that it did not have any empirical data to support its arguments.  See July 10 Tr. at 182:11-183:3 (Hunter).  It added, however, that was only asking for the Court to follow Chief Justice Roberts' concurrence and require strict scrutiny in the face of numerous exemptions.  See July 10 Tr. at 183:8-24 (Hunter).  Although Legacy Church argued that New Mexico's guidelines were arbitrary, the Court expressed concern that second-guessing dangerousness of certain locations was not something it could do.  See July 10 Tr. at 184:14-18 (Court).  Legacy Church stated that the burden should be on Secretary Kunkel to explain her rationale for fifty percent capacity at gyms given those locations' activities.  See July 10 Tr. at 184:1-18 (Hunter).  The Court stated that the cleaning requirements for gyms may be slightly different than for churches.  See July 10 Tr. at 186:2-187:4 (Court, Hunter).  In response, Legacy Church discussed South Bay United Pentecostal Church v. Newsom, and it argued again that New Mexico has enuerated more exemptions than  California and New York.  See July 10 Tr. at 187:5-188:24 (Hunter).

After a short break, Legacy Church discussed remedies.  See July 10 Tr. at 189:17-25 (Hunter).  It argued first that, because churches had, at one time, been deemed essential, South Bay United Pentecostal Church v. Newsom does not apply.  See July 10 Tr. at 190:4-190:7 (Hunter).

Alternatively, it argued that the Court should rule that churches are entitled to the least restrictive treatment that any secular activity gets.  <u>See</u> July 10 Tr. at 190:10-16 (Hunter).  For outdoor activities, Legacy Church argued that no restrictions should apply at all based on that day's testimony; alternatively, it argued that it should be subject to the least restrictive treatment.  <u>See</u> July 10 Tr. at 190:17-191:4 (Hunter).  It added that given the number of restrictions, the Court should apply strict scrutiny.  <u>See</u> July 10 Tr. at 191:5-192:6 (Hunter).

Secretary Kunkel then addressed the Court.  <u>See</u> July 10 Tr. at 193:14-16 (Guss).  She argued that the Governor made her protest comments after the Complaint's filing, and so the Court cannot consider the for the MTD.  <u>See</u> July 10 Tr. at 193:21-24 (Guss).  Secretary Kunkel then tried to distinguish <u>Soos v. Cuomo</u>.  <u>See</u> July 10 Tr. at 194:2-14 (Guss).  She argued that, in that case, Mayor Bill DeBlasio sent police to break up a funeral service and otherwise said that funerals and similar mass gatherings were unacceptable, and then endorsed and even joined large protest marches.  <u>See</u> July 10 Tr. at 194:25-195:15 (Guss).  The Court then discussed why the selective prosecution arguments the parties made did not apply to this case.  <u>See</u> July 10 Tr. at 195:16-196:8 (Court).  Secretary Kunkel said that, nevertheless, there was no evidence that any protesters were treated differently than anyone else.  <u>See</u> July 10 Tr. at 196:24-197:11 (Guss).

The Court then wondered, given the Governor's comments supporting some protests but not others, whether June 30 Order was as generally applicable as Secretary Kunkel claimed.  <u>See</u> July 10 Tr. at 197:23-198:19 (Court).  It noted that her statements were "an exemption form the mass gathering requirement.  She's saying, you get to demonstrate, but churches don't get to do their thing."  July 10 Tr. at 200:8-10 (Court).  Secretary Kunkel argued that tensions were high at protests, and police were more concerned with keeping peace than they were about public health.  <u>See</u> July 10 Tr. at 201:1-21 (Guss).  The Court responded that, if this is true, abiding the law would

seem to make certain groups more likely to be targeted for enforcement, which did not appear to help the argument.  See July 10 Tr. at 201:22-202:7 (Court).  The Court reiterated that its concern went beyond enforcement, and that the doctrine was not applicable.  See July 10 Tr. at 203:6-20 (Court).

Secretary Kunkel clarified that the comparable activity to an outdoor protest is an outdoor service.  See July 10 Tr. at 204:19-22 (Guss).  She stated that it was unclear whether Legacy Church can perform such services under the June 30 Order.  See July 10 Tr. at 205:25 (Guss).  The Court expressed its concern that in First Amendment cases, someone in Secretary Kunkel's position should be able to give an answer one way or the other.  See July 10 Tr. at 205:2-14 (Court).  It noted that "as far as the order's written, protests and churches in a parking lot are just gatherings, and they're mass, and one's being encouraged by the governor, and the other one's not."  July 10 Tr. at 208:24-209:2 (Court).  The Court also noted that previous orders allowed mass gatherings in outdoor spaces so long as individuals were socially distant, but this restriction is not in current orders.  See July 10 Tr. at 209:14-201:6 (Court, Guss).

Secretary Kunkel next discussed gyms.  She argued that South Bay United Pentecostal Church v. Newsom actually involved more exemptions than the June 30 Order, because it contained numerous exemptions and it limited churches to twenty-five percent capacity and a maximum of 100 attendees.  See July 10 Tr. at 210:8-23 (Guss).  She argued that the Court had correctly lumped churches in with concerts, movie theaters, and spectator sports, but she said that "whether a gym is sufficiently comparable to a church . . . [is a] difficult question right now," and that this decision "should be entrusted to state policy makers."  July 10 Tr. at 211:12-24 (Guss).  Regarding deference to policy makers, the Court discussed the lack of science and empirical data in this case and said that, having read the Johns Hopkins study cover to cover, "there's no science

in there." July 10 Tr. at 214:3-4 (Court). Secretary Kunkel argued that gyms are subject to stricter cleaning requirements than churches, but the Court stated that this seemed to imply that New Mexico trusted gyms to clean but not churches. See July 10 Tr. at 214:15-22 (Court, Guss). Secretary Kunkel then argued that fifty percent capacity in a gym is a lot fewer people than twenty-five percent capacity in Legacy Church, but it noted that the real issue is the interpersonal contact. See July 10 Tr. at 214:23-215:3 (Guss); id. at 215:17-25 (Guss).

Secretary Kunkel then argued that the June 30 Order is narrowly tailored. See July 10 Tr. at 216:1 (Guss). She argued that the state was learning more about coronavirus all the time and was constantly adjusting its guidance. See July 10 Tr. at 216:1-9 (Guss). It also argued that there is evidence that "churches have been at the . . . center of various outbreaks around the world," July 10 Tr. at 216:12-13 (Guss), which she argued "provides a sufficient basis to . . . distinguish between, you know, a church and a gym or another [house] of worship and a gym." July 10 Tr. at 216:16-19 (Guss).

The Court then stated that Secretary Kunkel had helped her case with the July 13 Order by reducing restaurant capacity to zero, because keeping restaurants at fifty percent capacity but leaving churches at twenty-five percent capacity was perplexing. See July 10 Tr. at 218:1-9 (Court). Still, the Court asked what it was supposed to do with the changing nature of the public health orders, and whether it could dismiss the Complaint based only on this moment in time when it is likely that restaurant dining will again come back at fifty percent capacity. See July 10 Tr. at 219:4-22 (Court). The Court noted that it would probably grant leave to amend, and although Secretary Kunkel argued that there was no reason to give Legacy Church this leeway, the Court stated that it thought it owed the parties this an answer on what claims it takes to stay in federal court. See July 10 Tr. at 221:7-222:21 (Court, Guss).

New Mexico then argued its position.  See July 10 Tr. at 224:2 (Sydow).  It argued that the June 30 Order does not prohibit a house of worship from holding an outdoor service, because it only restricts capacity with respect to building capacity.  See July 10 Tr. at 224:10-17 (Sydow).  It also argued that "scientific consensus out there shows" that houses of worship are "one of the most dangerous activities in terms of spreading the virus."  July 10 Tr. at 225:12-14 (Sydow).  It noted that gyms do not have interpersonal interactions such as singing and talking.  See July 10 Tr. at 225:20-226:1 (Sydow). It also argued that strict scrutiny still allowed for some deference to the expert opinions of the government.  See July 10 Tr. at 227:7-21 (Sydow).

Americans United for Separation of Church and State then presented its argument.  See July 10 Tr. at 230:13 (Luchenitser).  Americans United first addressed Tenth Circuit law.  See July 10 Tr. at 230:25-231:1 (Luchenitser).  It noted that the Tenth Circuit has rejected the position that categorical exceptions for secular conduct automatically require strict scrutiny and instead requires strict scrutiny when there are case by case individualized exceptions involving religion.  See July 10 Tr. at 231:1-16 (Luchenitser).  It argued, similarly, that Legacy Church cannot show that the June 30 Order targets religion, because there is no evidence the June 30 Order was based on animus towards religion rather than scientific evidence.  See July 10 Tr. at 232:4-11 (Luchenitser).  It also argued that the most reasonable way to read the June 30 Order is that outdoor religious gatherings are not restricted.  See July 10 Tr. at 233:1-6 (Luchenitster).

The Court pressed Americans United about whether the twenty-five percent capacity applies to outdoor services.  See July 30 Tr. at  235:7-236:7 (Court).  Americans United argued that it did not think the twenty-five percent limit would apply outdoors, because it is based on building size.  See July 30 Tr. at 236:8-15 (Luchenitser).  It next discussed New Mexico's youth camp restrictions, which it characterized as "a whole lot," July 10 Tr. at 238:4 (Luchenitser).

Americans United also stated that fire occupancy is based on varying standards from state to state, but that it depends on the size of the door and the buildings' layout.  See July 10 Tr. at 239:1-22 (Luchenitser).  Finally, Americans United argued that South Bay United Pentecostal Church v. Newsom still upheld California's restrictions, even though California restricted religious gatherings to 100 attendees but made no such restriction on commercial businesses.  See July 10 Tr. at 240:10-25 (Luchenitser).

### LAW REGARDING MOTIONS TO DISMISS UNDER RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  A court may also consider documents to which the complaint refers, if their adequacy is central to the plaintiffs' claims and their authenticity is unquestioned.  See Armstrong v. N.M. Disability Det. Servs., 278 F. Supp. 3d 1193, 1201 n.3 (D.N.M. 2017)(Browning, J.)(concluding that the court properly considered notices attached to the motion and not to the complaint, because the complaint referenced them, their adequacy was central to the plaintiffs' claims, and their authenticity was unquestioned).  See also GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997)("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered[.]").

A complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences

in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).  At the motion-to-dismiss stage, the court does not weigh the evidence, and "is interested only in whether it has jurisdiction and whether the [p]laintiffs plead a claim to relief that is plausible on its face."  Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1199 (D.N.M. 2010)(Browning, J.).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)("Iqbal")(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (citation omitted).  See Duncan v. Citibank (S.D.), N.A., No. CIV 06-0246 JB/KBM, 2006 WL 4063021, at *3 (D.N.M. June 30, 2006)(Browning, J.)(dismissing a civil Racketeer Influenced and Corrupt Organizations Act ("RICO") cause of action from a complaint where the complaint alleged a single physical act, and not a pattern of racketeering activity, and a pattern of activity is one of the elements required to state a RICO claim).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). A court will not construe a plaintiff's pleadings "so liberally that it becomes his advocate." Bragg v. Chavez, No. CIV 07-0343 JB/WDS, 2007 WL 5232464, at *25 (D.N.M. Aug. 2, 2007)(Browning, J.). The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(internal citations omitted). See Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 278 F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

Generally, the sufficiency of a complaint must rest on its contents alone. See Casanova v. Ulibarri, 595 F.3d at 1125; Gossett v. Barnhart, 139 F. App'x 24, 25 (10th Cir. 2005)("In ruling on a motion to dismiss, the district court is limited to the facts pled in the complaint."). Emphasizing this point, the Tenth Circuit, in Carter v. Daniels, 91 F. App'x 83 (10th Cir. 2004), states: "When ruling on a Rule 12(b)(6) motion, the district court must examine only the plaintiff's

complaint.  The district court must determine if the complaint alone is sufficient to state a claim; the district court cannot review matters outside of the complaint." 91 F. App'x at 85.  There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103 (holding that the district court did not err by reviewing a seminar recording and a television episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity").  "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the motion."  627 F.3d at 1186.  The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment."  627 F.3d at 1186-87.  In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint . . . it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)."  Nard v. City of Okla. City,

- 122 -

153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished).  The Court has previously ruled that, when a plaintiff references and summarizes the defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the defendants attach in their briefing. See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.).  The Court reasoned that the statements were neither incorporated by reference nor central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack the defendant's reliability and truthfulness.  See 2013 WL 312881, at *50-51.  The Court has also previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which show that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired.  See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree"). The Court in Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents.  See 2012 WL 3656500, at *22-23; Mocek v. City of Albuquerque, 2013 WL 312881, at *50 (refusing to consider statements that were not "central to [the plaintiff's] claims").

On the other hand, in a securities class action and as an exception to the general rule, the Court has concluded that the Court may consider a defendant's operating certification, to which plaintiffs refer in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment.  See Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs.

Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.; SEC v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, emails referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

## LAW REGARDING AMENDMENTS TO PLEADINGS

Rule 15(a) provides that a party may amend his or her pleading as a matter of right within twenty-one days of serving it and within twenty-one days of the service of a response pleading. See Fed. R. Civ. P. 15(a).  Otherwise, the party must obtain the opposing parties' consent or the court's leave -- which should be "freely give[n] . . . when justice so requires" -- to amend his or her pleading.  Rule 15(a) provides:

(a)     Amendments Before Trial.

(1)     Amending as a Matter of Course.  A party may amend its pleading once as a matter of course within:

(A)     21 days serving it, or

(B)     if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

(2)     Other Amendments.  In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

> (3)     Time to Respond. Unless the court orders otherwise,
> any required response to an amended pleading must be made within
> the time remaining to respond to the original pleading or within 14
> days after service of the amended pleading, whichever is later.

Fed. R. Civ. P. 15(a).  Under rule 15(a), the court should freely grant leave to amend a pleading

where justice so requires.  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. 571, 579-80

(D.N.M. 2010)(Browning, J.).  The Supreme Court has stated that, in the absence of an apparent

reason such as "undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies

by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance

of the amendment, futility of amendment, etc.," leave to amend should be freely given.  Foman v.

Davis, 371 U.S. 178, 182 (1962).  Furthermore, the Tenth Circuit has held that district courts

should grant a plaintiff leave to amend when doing so would yield a meritorious claim.  See Curley

v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001); In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D.

at 579-80.

A court should deny leave to amend under rule 15(a), however, where the proposed

"amendment would be futile."  Jefferson Cty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d

848, 859 (10th Cir. 1999).  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.  An

amendment is "futile" if the pleading, "as amended, would be subject to dismissal."  In re

Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80 (citing TV Commc'ns Network, Inc. v.

Turner Network Television, Inc., 964 F.2d 1022, 1028 (10th Cir. 1992)).  A court may also deny

leave to amend "upon a showing of undue delay, undue prejudice to the opposing party, bad faith

or dilatory motive, [or] failure to cure deficiencies by amendments previously allowed."  In re

Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579 (quoting Frank v. U.S. W., Inc., 3 F.3d 1357,

1365-66 (10th Cir. 1993)).  "The . . . Tenth Circuit has emphasized that '[t]he purpose of [rule

15(a) ] is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'" B.T. ex rel. G.T. v. Santa Fe Pub. Sch., No. 05-1165, 2007 WL 1306814, at *2 (D.N.M. March 12, 2007)(Browning, J.)(quoting Minter v. Prime Equip. Co., 451 F.3d 1196, 1204 (10th Cir. 2006)).

## LAW REGARDING RULE 52 FINDINGS BY THE COURT

Rule 52(a) of the Federal Rules of Civil Procedure provides:

(a)     Findings and Conclusions.

(1)     In General.  In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58.

(2)     For an Interlocutory Injunction.  In granting or refusing an interlocutory injunction, the court must similarly state the findings and conclusions that support its action.

(3)     For a Motion.  The court is not required to state findings or conclusions when ruling on a motion under Rule 12 or 56 or, unless these rules provide otherwise, on any other motion.

(4)     Effect of a Master's Findings.  A master's findings, to the extent adopted by the court, must be considered the court's findings.

(5)     Questioning the Evidentiary Support.  A party may later question the sufficiency of the evidence supporting the findings, whether or not the party requested findings, objected to them, moved to amend them, or moved for partial findings.

(6)     Setting Aside the Findings. Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.

Fed. R. Civ. P. 52(a).  "Appellate courts must accept findings of fact that substantial evidence supports and that are not clearly erroneous."  United States v. Metric Const., Inc., No. CIV 02-1398 JB/LAM, 2007 WL 1302606, at *11 (D.N.M. March 1, 2007)(Browning, J.)(citing Stoody Co. v. Royer, 374 F.2d 672, 678 (10th Cir. 1967);  Fed. Sec. Ins. Co. v. Smith, 259 F.2d 294, 295 (10th Cir. 1958)).  As the Supreme Court recently has explained,

> a district court's findings of fact, "whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. Rule Civ. Proc. 52(a)(6).  In "'applying [this] standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo.'" Anderson v. Bessemer City, 470 U.S. 564, 573 . . . (1985)(quoting Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123 . . . (1969)).  Where "the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson, 470 U.S. at 573-574 . . . .  "A finding that is 'plausible' in light of the full record -- even if another is equally or more so -- must govern." Cooper v. Harris, . . . 137 S. Ct. 1455, 1465 . . . (2017).

June Medical Servs. L.L.C. v. Russo, --- S. Ct. ---, 2020 WL 3492640, at *11 (June 29, 2020)(plurality).  "Substantial evidence means more than a mere scintilla, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Stoody Co. v. Royer, 374 F.2d at 678.  "'The Federal Rules of Evidence do not apply to preliminary injunction hearings.'"  Firebird Structures, LCC v. United Brotherhood of Carpenters and Joiners of Am., Local Union No. 1505, 252 F. Supp. 3d at 1140 (quoting Heideman v. S. Salt Lake City, 348 F.3d at 1188).

> When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.

Anderson v. Bessemer City, 470 U.S. 564, 575 (1985). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse." Anderson v. Bessemer City, 470 U.S. at 573-74. "That proposition holds true, not only when the district court's factual findings are predicated upon assessments of witness credibility, but also when they arise from consideration of documentary evidence." Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation, 599 F.3d 1165, 1175 (10th Cir. 2010)(citing La Resolana Architects, PA v. Reno, Inc., 555 F.3d 1171, 1177 (10th Cir. 2009)).

## LAW REGARDING PRELIMINARY INJUNCTIONS

"It is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is clear and unequivocal." Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001)(internal quotation marks omitted). To show that the extreme remedy of a preliminary injunction should issue, "[a] party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law." N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306 (1984). Before a district court may issue a preliminary injunction pursuant to rule 65 of the Federal Rules of Civil Procedure, the movant must make four showings: (i) that the movant is likely to "suffer irreparable injury unless the injunction issues"; (ii) that "the threatened injury" to the movant if the court does not issue the preliminary injunction "outweighs whatever damage the proposed injunction may cause the opposing party"; (iii) that "the injunction, if issued, would not be adverse to the public interest"; and (iv) that "there is a substantial likelihood [of success] on the merits." Resolution Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992). See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 19 (2005)("Winter")("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  (citing <u>Munaf v. Geren</u>, 553 U.S. 674, 688-89 (2008))).  The movant bears the burden of demonstrating all four prongs' satisfaction.  <u>See</u> <u>Automated Mktg. Sys., Inc. v. Martin</u>, 467 F.2d 1181, 1183 (10th Cir. 1972).  "[A]ny modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible."  <u>Diné Citizens Against Ruining Our Env't v. Jewell</u>, 839 F.3d 1276, 1282 (10th Cir. 2016)("<u>Diné</u>").  "A plaintiff suffers irreparable harm 'when the court would be unable to grant an effective remedy after a full trial because such damages would be inadequate and difficult to ascertain.'"  <u>Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.</u>, 778 F. Supp. 2d 1180, 1190 (D.N.M. 2011)(Browning, J.)(quoting <u>Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.</u>, 269 F.3d 1149, 1156 (10th Cir. 2001)(citing <u>Kikumura v. Hurley</u>, 242 F.3d at 963) ).  "Tenth Circuit decisions have linked the 'irreparable injury' inquiry to the 'likelihood of success' inquiry, holding that a plaintiff who cannot demonstrate a substantial likelihood of success is not entitled to a presumption of irreparable harm."  <u>Logan v. Pub. Emps. Ret. Ass'n</u>, 163 F. Supp. 3d 1007, 1030 (D.N.M. 2016)(Browning, J.)(citing <u>Schrier v. Univ. of Colo.</u>, 427 F.3d 1253, 1266 (10th Cir. 2005).

"[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held[.]'"  <u>Schrier v. Univ. of Colo.</u>, 427 F.3d at 1258 (quoting <u>Univ. of Tex. v. Camenisch</u>, 451 U.S. at 395).  In that vein, the Tenth Circuit has identified the following three specifically disfavored preliminary injunctions: (i) "preliminary injunctions that alter the status quo"; (ii) "mandatory preliminary injunctions," meaning injunctions that compel, rather than prohibit, activity on the enjoined party's part; and (iii) "preliminary injunctions that afford the movant all the relief that it could recover at the

conclusion of a full trial on the merits."  Schrier v. Univ. of Colo., 427 F.3d at 1258 (internal

quotation marks omitted)(quoting O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,

389 F.3d 973, 975 (10th Cir. 2004), aff'd and remanded sub nom. Gonzales v. O Centro Espirita

Beneficente Uniao do Vegetal, 546 U.S. 418 (2006)("O Centro")).  Accord Westar Energy, Inc. v.

Lake, 552 F.3d 1215, 1224 (10th Cir. 2009).   Regarding mandatory preliminary injunctions, the

Court has explained:

> The Tenth Circuit "characterize[s] an injunction as mandatory if the
> requested relief 'affirmatively require[s] the nonmovant to act in a particular way,
> and as a result . . . place[s] the issuing court in a position where it may have to
> provide ongoing supervision to assure the nonmovant is abiding by the injunction.'"
> Schrier v. Univ. of Colorado, 427 F.3d at 1261 (all alterations but first in Schrier v.
> Univ. of Colo.)(quoting O Centro . . . , 389 F.3d at 979).  The Tenth Circuit has
> thus disclaimed -- or at least augmented -- the simpler and more intuitive way of
> defining these terms, i.e., that a prohibitory injunction is one in which the court
> orders the enjoined party not to do something, and a mandatory injunction is one in
> which the court orders the enjoined party to do something.

Salazar v. San Juan Cty. Det. Ctr., No. CIV 15-0417 JB/LF, 2016 WL 335447, at *40 (D.N.M.

Jan. 15, 2016)(Browning, J.).  When evaluating whether the issuance of a requested injunction

would alter the status quo between the parties, the court should look at "the reality of the existing

status and relationships between the parties, regardless of whether the existing status and

relationships may ultimately be found to be in accord or not in accord with the parties' legal rights."

SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1100 (10th Cir. 1991),   overruled on other

grounds by O Centro, 389 F.3d at 975).  "The meaning of this category is self-evident."  Salazar

v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *41.  With respect to preliminary injunctions that

will change the status quo, "the movant has an even heavier burden of showing that the four factors

listed above weigh heavily and compellingly in movant's favor before such an injunction can be

issued."  Salt Lake Tribune Publ'g Co. v. AT & T Corp., 320 F.3d 1081, 1099 (10th Cir.

2003)(internal quotation marks omitted)(quoting <u>SCFC ILC, Inc. v. Visa USA, Inc.</u>, 936 F.2d at 1098-99).

"[I]n an action for money damages, the district court does not have the power to issue a preliminary injunction[.]" <u>United States ex rel. Rahman v. Oncology Assocs.</u>, 198 F.3d 489, 495-96 (4th Cir. 1999)(citing <u>Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.</u>, 527 U.S. 308, 324-25 (1999)). <u>See</u> <u>Gelco Corp. v. Coniston Partners</u>, 811 F.2d 414, 418-20 (8th Cir. 1987)(concluding that a preliminary injunction should not issue where a remedy of money damages was available). Federal courts have the inherent equitable power to issue a preliminary injunction only when it is necessary to protect a movant's entitlement to a final equitable remedy. <u>See</u>, <u>e.g.</u>, <u>De Beers Consol. Mines v. United States</u>, 325 U.S. 212, 219-23 (1945); <u>Reebok Int'l, Ltd. v. Marnatech Enters., Inc.</u>, 970 F.2d 552, 559-60 (9th Cir. 1992).

## RELEVANT LAW REGARDING THE FREE EXERCISE CLAUSE

The First Amendment's Religion Clauses states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. Const. amend. I. The earliest test for determining if the state had violated the free exercise clause was a conduct-belief distinction. In <u>Reynolds v. United States</u>, 98 U.S. 145 (1879), George Reynolds, an adherent of the Church of Latter Day Saints, challenged his conviction under a federal statute prohibiting bigamy in United States Territories. <u>See</u> 98 U.S. at 146-47. Reynolds argued that his religious beliefs mandated polygamy, and that his prosecution violated the Free Exercise Clause. <u>See</u> 98 U.S. at 147. The Supreme Court framed the issue as inquiring into "the guilt of one who knowingly violates a law which has been properly enacted, if he entertains a religious belief that the law is wrong." 98 U.S. at 162. The Honorable Morris Waite, then-Chief Justice of the Supreme Court,

weighed Reynolds' religious freedom against government's interest in regulating marriage and

concluded that the Free Exercise Clause does not provide such a shield, holding:

> [I]t is impossible to believe that the constitutional guaranty of religious freedom was intended to prohibit legislation in respect to this most important feature of social life.  Marriage, while from its very nature a sacred obligation, is nevertheless, in most civilized nations, a civil contract, and usually regulated by law.

98 U.S. at 165.  Chief Justice Waite went on to write that, while freedom of religious belief is

absolute, freedom of religious practice is subject to restraint.  See 98 U.S. at 166.  He noted that:

> Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices.  Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government . . . could not interfere to prevent a sacrifice? . . . Can a man excuse his practices . . . because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself.  Government could only exist in name under such circumstances.

98 U.S. at 167.[12]

So stood the law of religious freedom until the mid-20th century, when the Supreme Court

expanded its interpretation of the Free Exercise Clause.  In Cantwell v. Connecticut, 310 U.S. 296

(1940), the Supreme Court held that an ordinance which operated to prevent two Jehovah's

Witnesses from proselytizing on a street corner, including denouncing the Catholic faith, violated

the Free Exercise Clause.  310 U.S. at 303.  "No one would contest the proposition that a state may

not, by statute, wholly deny the right to preach or to disseminate religious views.  Plainly such a

---

[12]The Supreme Court has consistently upheld the laws preventing polygamy.  See Mormon Church v. United States, 140 U.S. 665 (1891); Davis v. Beason, 133 U.S. 333 (1890).  After Obergefell v. Hodges, religious polygamy may be back in play.  See Obergefell v. Hodges, 135 S. Ct. 2584, 2622 (2015)(Roberts, C.J., dissenting)("Although the majority randomly inserts the adjective 'two' in various places, it offers no reason at all why the two-person element of the core definition of marriage may be preserved while the man-woman element may not.").

previous and absolute restraint would violate the terms of the guarantee."  310 U.S. at 304.  The

Supreme Court nonetheless maintained Reynolds v. United States' belief/practice duality, and held

that the First Amendment "embraces two concepts[] -- freedom to believe and freedom to act.  The

first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to

regulation for the protection of society."  310 U.S. at 303-04.  The Supreme Court further noted

that "[e]ven the exercise of religion may be at some slight convenience in order that the state may

protect its citizens from injury." 310 U.S. at 306.

          Religious freedom continued to expand under the Warren and Burger Courts.  The Supreme

Court's decision in Committee for Public Education and Religious Liberty v. Nyquist, 413 U.S.

756 (1973)("Nyquist"), states one formulation of the standards governing establishment clause

challenges.[13]  The Supreme Court in Nyquist stated that, "to pass muster under the Establishment

Clause the law in question, first, must reflect a clearly secular legislative purpose . . . , second,

must have a primary effect that neither advances nor inhibits religion . . . , and, third, must avoid

excessive government entanglement with religion . . . ." 413 U.S. at 773 (citations omitted).  See

Thomas v. Review Bd., 450 U.S. at 720-27 (Rehnquist, J., dissenting); Stone v. Graham, 449 U.S.

39 (1980); Lemon v. Kurtzman, 403 U.S. 602, 612 (1971)("A given law might not establish a state

---

          [13]The establishment clause of the first amendment prohibits Congress from enacting any
law "respecting an establishment of religion."  U.S. Const. amend. I.  In the main, the Supreme
Court has tended to view the religion clauses as embodying two independent mandates.
Consequently, it has developed separate tests for determining whether government action violates
either clause.  See Choper, The Religion Clauses of the First Amendment: Reconciling the
Conflict, 41 U. Pitt. L. rev. 673, 673 (1980).  See also, Committee for Pub. Educ. & Religious
Liberty v. Regan, 444 U.S. 646, 653 (1980); Roemer Bd. Of Pub. Works, 426 U.S. 726, 748 (1976);
Walz v. Tax Comm'n, 397 U.S. 664, 674 (1970); Board of Educ. v. Allen, 392 U.S. 236, 243
(1968).  The Supreme Court has held that the first amendment's religion clauses apply fully to the
states as well as the national government.  See generally School Dist. v. Schempp, 374 U.S. 203,
212-17 (1963); Everson v. Board of Educ., 330 U.S. 1, 15 (1947).

religion but nevertheless be one 'respecting' that end in the sense of being a step that could lead to such establishment . . .")(emphasis in original); Everson v. Board of Educ., 330 U.S. 1, 15 (1947) ("The establishment of religion clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church.  Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another.")

Although it difficult to distinguish between advancement of religion and avoidance of free exercise infringement,[14] religious exemptions from statutory schemes were upheld, see Walz v. Tax Comm'n, 397 U.S. 664, 672-73 (1970); United States v. Branigan, 299 F. Supp. 225 (S.D.N.Y. 1969)(exemption from draft for ministers); Commonwealth v. Arlan's Dep't Store, 357 S.W.2d 703 (Ky.), dismissed for want of substantial federal question, Arlan's Dep't Store v. Kentucky, 371 U.S. 218 (1962)(exemption from Sunday closing law for Saturday Sabbath observers), and even judicially created, see Thomas v. Review Bd., 450 U.S. at 707; Wisconsin v. Yoder, 406 U.S. 205 (1971); Sherbert v. Verner, 374 U.S. 205 (1963).  Therefore, arguably, an exemption does not advance religion in violation of the primary purpose test.  On the other hand, a literal application

---

[14]Arguably, there is no principled way of determining this issue, suggesting that the two purposes may not be that dissimilar: to refuse to regulate an area because of litigation is inevitably bound to benefit the unregulated parties.

of the Nyquist standard would still seem to hold an exemption constitutionally invalid.[15, 16]   See

Thomas v. Review Bd., 450 U.S. at 720-27 (Rehnquist, J., dissenting).   Moreover, the Supreme

Court has even upheld or created exemptions conferring definite economic benefits.   See Thomas

---

[15]Then-Chief Justice Burger has warned against a mechanical application of the Nyquist test:

> In attempting to articulate the scope of the two Religion Clauses, the Court's opinions reflect the limitations inherent in formulating general principles on a case-by-case basis.  The considerable internal inconsistency in the opinions of the Court derives from what, in retrospect, may have been too sweeping utterances on aspects of these clauses that seemed clear in relation to particular cases but have limited meaning as general principles.

Walz v. Tax Comm'n, 397 U.S. at 668.   See Note, A Workable Definition of the Establishment Clause, 62 Geo. L.J. 1461, 1481 (1974)(arguing that the Nyquist test is too rigid and that its future is "problematic").

[16]Arguably, the Nyquist test and its  should not be applied at all to cases dealing with exemptions from statutory schemes, and such cases must be analyzed with another mode of scrutiny.  The test developed in cases dealing with direct state aid to religious organizations. See Meek v. Pittenger, 421 U.S. 349 (1975); Sloan v. Lemon, 413 U.S. 825 (1973); Committee for Pub. Educ. & Religious Liberty v. Nyquist, 413 U.S. 756 (1973); Hunt v. McNair, 413 U.S. 743 (1973); Levitt v. Committee for Pub. Educ. & Religious Liberty, 413 U.S. 472 (1973); Norwood v. Harrison, 413 U.S. 455 (1973); Tilton v. Richardson, 403 U.S. 672 (1971); Lemon v. Kurtzman, 403 U.S. 602 (1971); Everson v. Board of Educ., 330 U.S. 1 (1947). The Supreme Court, however, has used similar tests in various cases not involving financial aid. See, e.g., Epperson v. Arkansas, 393 U.S. 97, 107 (1968); School Dist. v. Schempp, 374 U.S. 203, 222 (1963); McGowan v. Maryland, 366 U.S. 402, 445, 453 (1961). On the other hand, the Supreme Court in Hunt v. NcNair, 413 U.S. 734 (1973), stated the primary effect test in such a way as hardly to be applicable to the exemption situation:

> Aid normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so persuasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting.

Id. at 743. By contrast, King's Garden claimed that the case for holding the religion discrimination exemption unconstitutional grows stronger rather than weaker as the exemption includes religious organizations that do essentially secular work that is separable from the organizations' religious activities. See 498 F.2d at 56.

v. Review Bd., 450 U.S. at 720-27 (Rehnquist, J., dissenting); Walz v. Tax Comm'n, 397 U.S. 664 (1970) (ignoring the Nyquist test).

The Supreme Court recognized, among other rights, freedom of religious ministers to serve as elected officials, see McDaniel v. Paty, 435 U.S. 618 (1978), freedom to abstain from a school's pledge of allegiance ritual, see West Va. State Bd. of Ed. v. Barnette, 319 U.S. 624 (1943), freedom from compelled affirmation of religious belief, see Torcaso v. Watkins, 367 U.S. 488 (1961), and freedom from compulsory school attendance laws, see Wisconsin v. Yoder, 406 U.S. 205 (1972). The Supreme Court typically subjected burdens on the free exercise of religion to strict scrutiny. See, e.g., Sherber v. Verner, 374 U.S. 398, 404 (1963). At the high-water mark, the Supreme Court held that the Free Exercise Clause acts as a sword to mandate that government accommodate religious belief in employment contexts. Thus, a compelling governmental purpose must justify a law which imposes special disability on religious groups or individuals because of their religion. See, e.g., Sherbert v. Verner, 374 U.S. at 404. In Sherbert v. Verner, the Supreme Court held that states may not withhold unemployment benefits to an individual who was terminated from her job because her religious beliefs dictated that she could not work on Saturdays. See 374 U.S. at 406. During this high-water period, the Supreme Court also held that government may not condition receipt of public benefits on conduct that one's religion proscribes. See Thomas v. Review Bd. of Ind. Emp't, 450 U.S. 707, 717-18 (1981).

The Supreme Court did concede that its approach in this area "sacrifices clarity and predictability for flexibility." Committee for Pub. Educ. v. Regan, 444 U.S. 646, 662 (1980). It did appear that the Supreme Court has no principled analysis for these cases, and the Court could find some support in its prior opinions for any decision it reached. Compare Meek v. Pittenger, 421 U.S. 349 (1975)(holding unconstitutional state provision of health services to pupils in the

parochial school), with Wolman v. Walter, 433 U.S. 229 (1977)(holding constitutional same services at a neutral site adjacent to parochial school); Levitt v. Committee for Pub. Educ., 413 U.S. 472 (1973)(holding unconstitutional reimbursement to parochial schools for administering state-required tests prepared by the teachers), with Committee for Pub. Educ. v. Regan, 444 U.S. 646 (1980)(holding constitutional reimbursement to parochial schools for administering state-prepared tests); Board of Educ. v. Allen, 392 U.S. 236 (1968)(holding that state may lend textbooks to parochial schools), with Meek v. Pittenger, 421 U.S. 349 (1975)(finding that state may not lend tape recorders and maps parochial schools); Everson v. Board of Educ., 330 U.S. 1 (1947)(holding that state may fund busing to parochial schools), with Wolman v. Walter, 433 U.S. 229, 252 (1977) (finding that state may not fund field trips by parochial school children).  Further, the ability of any court to apply neutrally the constitutional avoidance canon in this field seems questionable. By reading the statute literally or loosely, depending on how eager it is to reach the constitutional issue, the Supreme Court may in many cases remake congressional enactments. Such flexibility to avoid constitutional issue and to reach its desired end by requiring Congress to be more express than the legislative process will normally allow strains the Supreme Court's assertion to being a court and puts little institutional limit on its antidemocratic powers.[17]

---

[17]How a judge or court chooses among these two canons might well depend on whether one views judicial review of legislation as constitutionally required or pragmatically necessary. For the view that the text of the Constitution requires judicial review and thus courts cannot pragmatically avoid the constitutional issue, see Wechsler, Toward Neutral Principles of Constitutional Law, 73 Harv. L. Rev. 1, 9-10 (1959). Judge Hand, on the other hand, has argued that, since judicial review of legislation

> Is not a logical deduction from the structure of the Constitution but only a practical condition upon which its successful operation, it need not be exercised whenever a court sees, or thinks that it sees, an invasion of the Constitution. It is always a preliminary question how importunately the occasion demands an answer.

Despite the view that religious freedom has eroded since the Warren and Burger Courts, some principles from Reynolds v. United States remain consistent to this day.  The Burger Court recognized that the Free Exercise Clause does not protect against every burden on religious practice incident to living in a well-ordered society.  In United States v. Lee, 455 U.S. 252 (1982), the Supreme Court held that the Free Exercise Clause does not entitle an Old Order Amish employer to forgo filing federal tax returns because of his religious beliefs.  See 455 U.S. at 260.  The Supreme Court noted that it had "been sensitive to the needs flowing from the Free Exercise Clause, but every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs."  455 U.S. at 261.  Similarly, in Bowen v. Roy, 476 U.S. 693 (1986), the Supreme Court held that the Free Exercise Clause does not compel the United States to accommodate a religious objection to statutory requirements that the government use Social Security numbers for applicants seeking welfare benefits.  See 476 U.S. at 699-700.  The Supreme Court concluded that the First Amendment does not "require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family."  455 U.S. at 699 (emphasis in original).  Similarly, in Lyng v. Northwest Indian Cemetery Protective Association, 485 U.S. 439 (1988), the Supreme Court held that the Free Exercise Clause did not require the United States to accommodate Native Americans' religious objections to a planned road through a section of a national forest which they held sacred.  See 485 U.S. at 449.  The Supreme Court held that not all governmental actions which "make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, require government to bring forward a compelling justification

---

L. Hand, The Bill of Rights 15 (1958).

for its otherwise lawful actions."  485 U.S. at 450-51.  The First Amendment's key word, the

Supreme Court concluded, is "'prohibit," because the "'Free Exercise Clause is written in terms

of what the government cannot do to the individual, not in terms of what the individual can exact

from government.'"  485 U.S. at 451 (first quoting U.S. Const. amend. I and then quoting Sherbert

v. Verner, 374 U.S. at 412 (Douglas, J., concurring)).

Practically, a free exercise clause challenge, or "religious exemption" claim, is grounded

on the theory that the imposing of certain civil duties upon persons whose religious beliefs

purportedly compel noncompliance infringes in their free exercise rights.  Once it has looked at

the religiousness and centrality of the conduct,[18] and the sincerity of the motivating belief, the

court must identify the nature and magnitude of the governmental interest in burdening the

religious organization.[19]  The court will then balance the religious and state interests, and where

---

[18]Before balancing an organization's religious interest against the state interest, the Supreme Court has, in the past, determined the centrality of the belief to the religious party.  The Supreme Court may feel free to ignore the religious views of the minority or to wink at the infringement where the impact of the regulation, in the Supreme Court's eyes, would have little impact on the religious body as a whole.  See, e.g., Wisconsin v. Yoder, 406 U.S. 205 (1972)(finding that education of older children exclusively within the Amish community was crucial to the Amish religion).  See also People v. Woody, 61 Cal. 2d 716, 394 P.2d 813, 40 Cal. Rptr. 69 (1964)(exempting peyote smoking of the Native American Church from criminal sanction because of its centrality).  Moreover, the same discriminatory act may be more central to one religion than another, putting the Court in the unsavory position of discriminating in favor of only conservative, often unorthodox, religions.

[19]The analysis used has not been consistent.  In the 1960's and early 1970's, the Court claimed it was using strict scrutiny and required the state interest to be compelling to outweigh the religious interest. See Wisconsin v. Yoder, 406 U.S. 205; Sherbert v. Verner, 374 U.S. 398, 403, 406 (1963) (citing NAACP v. Button, 371 U.S. 415, 438 (1963); Thomas v. Collins, 323 U.S. 516, 530 (1945)). The Court has also ascertained whether less restrictive means can achieve the governmental objectives. v. Verner, 374 U.S. at 406-09; See also L. Tribe, American Constitutional Law 846-859 (1978). On the other hand, the Court has not invoked strict scrutiny where religious interests have been involved. See Braunfield v. Brown, 366 U.S. 599 (1961). Apparently, the Court invokes strict scrutiny when the religious interest outweighs that of the state and ignores that mode of analysis when the state's interest are weighty. Thus, the compelling

- 139 -

the religious claims prevail, the court will deem them deserving of constitutional protection.[20] In

the end, the court decides, as a legislature would, how significant the governmental interest is and

the extent to which it could be realized if the court carved out an exemption for the religious

party.[21]

---

nature of the state interest is dependent upon the nature of the religious interest, and almost any legitimate governmental interest with a neutral secular purpose will prevail where the Court perceives the religious interest as slight.

[20]Another factor in the balancing process has been the directness of the burden upon the religion. When a religious activity is prohibited or a contrary practice compelled, the burden is direct, and where there is otherwise some burden, the interference is considered indirect. The Court found an indirect burden in Braunfield v. Brown, 366 U.S. 599 (1961) (orthodox Jew claimed that the Sunday closing law was economically burdensome to him), and upheld the statute. For a case, however, in which the Court found an indirect economic hardship overriding the state interest, see Sherbert v. Verner, 374 U.S. 398, 399-402 (1963).

[21] "The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion."  Yoder v. Wisconsin, 406 U.S. 205, 215 (1972). See, e.g., Brown v. Dade Christian Schools, Inc., 556 F.2d 310, 321 (5th Cir. 1977)(en banc)(Goldberg, J., concurring); Stevens v. Berger, 428 F. Supp. 896, 906 (E.D.N.Y. 1977).  The state has met its burden on many occasions. See Braunfield v. Brown, 366 U.S. 599 (1961); Prince v. Massachusetts, 321 U.S. 158 (1944)(holding that public safety may require prohibiting children from selling religious literature in the streets); Board of Educ. v. Mass, 152 A.2d 394 (N.J. Super. Ct. 1959), cert. denied, 363 U.S. 843 (1960) (finding that public health necessitated vaccinating children against parents' religious objections). See also Reynolds v. United States, 98 U.S. 145 (1878). For cases looking at the free exercise clause and the conscientious objector exemption, see Johnson v. Robison, 415 U.S. 361 (1974)(finding burden on religion incidental where educational benefits are granted to veterans but not to alternative service conscientious objectors); Gillette v. United States, 401 U.S. 459, 461 (1971)(finding that "government interest of a kind and weight sufficient to justify under the Free Exercise Clause the impact of the conscription laws on those who object to particular wars"). See also Welsh v. United States, 398 U.S. 333 (1970); United States v. Seeger, 380 U.S. 163 (1965); note 23 supra. The Court, however, has also determined that the state has failed to meet its burden in some cases. See, e.g., Wisconsin v. Yoder, 406 U.S. 205; Sherbert v. Verner, 374 U.S. 398. It is interesting, but not surprising, that a compelling state interest in one context will not be a compelling state interest in another. Compare Wisconsin v. Yoder, 406 U.S. at 224-25, 236 n.23 (1972)(finding no compelling interest in compulsory education), with Brown v. Board of Educ., 347 U.S. 483, 493 (1954)(recognizing "education is perhaps the most important function of state and local governments"). Cf. San Antonio School Dist. v. Rodriquez, 411 U.S. 1, 29-30 (1972) (holding that education is not a "fundamental right").

Smith shapes contemporary Free Exercise law.  In Smith, the Supreme Court addressed whether Oregon could deny unemployment benefits to two adherents of the Native American Church who were terminated from private employment for ingesting peyote, which Oregon defines as a controlled substance.  See 494 U.S. at 874.  The Honorable Antonin Scalia, then-Associate Justice of the Supreme Court, answered that question in the affirmative.  See 494 U.S. at 882.  Citing Reynolds v. United States, the Supreme Court noted that freedom to believe and profess is absolute, but concluded that to permit individuals to use their religious beliefs to circumvent neutral and generally applicable laws would "'permit every citizen to become a law unto himself.'"  494 U.S. at 879 (quoting Reynolds v. United States, 98 U.S. at 167).  Justice Scalia first distinguished the Supreme Court's precedent.  He asserted that cases like Cantwell v. Connecticut, Yoder v. Wisconsin, and Barnette v. West Virginia Board of Education used strict scrutiny, because those cases involved plaintiffs who asserted more than one constitutional right.  See 494 U.S. at 881.  Justice Scalia then contended that Sherbert v. Verner and Thomas v. Review Board of Indiana Employment Security Division's use of strict scrutiny is unique to employment discrimination cases involving statutes with preexisting exemptions that could not be limited without discriminating against religion.  See 494 U.S. at 882-84.  Instead, the Supreme Court held that generally applicable, neutrally applied laws that incidentally restrict religious exercise need be only rational and legitimate exercises of governmental power.  See 494 U.S. at 885.  To apply strict scrutiny to such laws, the Supreme Court held, would endanger myriad important legislation in the nation's cosmopolitan, religiously diverse society.  See 494 U.S. at 888-89.  Accordingly, the religious adherent holds the burden to demonstrate that across-the-board, neutrally applied laws are irrational or beyond the government's authority.

An otherwise valid law may be discriminatory when its purpose is to burden religion.  In Lukumi, the Supreme Court addressed city ordinances that prohibited the sacrificing of animals for religious purposes.  See Lukumi, 508 U.S. at 527-28.  A new Santería[22] church in the city motivated the laws' enactment, and the city expressed its belief that Santería's practice of sacrificing animals is "inconsistent with public morals."  508 U.S. at 528.  Although the ordinances were facially neutral -- they prohibited animal sacrifice without singling out the Santeria church or using exclusively religious language -- the Supreme Court concluded that the ordinances were neither neutral nor generally applicable, in part because the Santería church members' religious conduct was "almost the only conduct subject to" the ordinances.  508 U.S. at 535.  Unlike Smith's treatment of the Oregon drug law, the city's ordinances evinced sufficient animus to justify the Supreme Court's extended examination of the ordinance's motivations.  See 508 U.S. at 540-45.  That examination revealed that the laws were not neutral, because the ordinances' legislative history revealed that "they were enacted because of, not merely in spite of, their suppression of Santeria religious practice."  508 U.S. at 540.  The Supreme Court also concluded that the ordinances were not generally applicable, because they were under-inclusive in serving the defendant city's stated goals of protecting public health and preventing animal cruelty.  See 508 U.S. at 543.  The ordinances did not prohibit irreligious conduct that endangered these interests to

---

[22]Santería, or la Religión Lucumí, is a pantheistic Afro-Cuban religion developed from the beliefs and customs of the Yoruban peoples of West Africa, who were brought to Cuba as slaves, and which incorporates some elements of Catholicism.  See Encyclopaedia Britannica, "Santería," https://www.britannica.com/topic/Santeria (last accessed April 16, 2020).  The name "Santería" derives from the belief in communications between Yoruban Yoruba deities -- called orishas -- and Roman Catholic saints.  See Encyclopaedia Britannica, "Santería."  Santería religious practice involves developing personal relationships with these divinities and saints through divination, sacrifice, and initiation, well as mediumship between Santería adherents and the orisha deities, who protect the adherents and give guidance, wisdom, and success.  See Encyclopaedia Britannica, "Santería."

a greater extent than did Santeria religious practice.  See 508 U.S. at 543.  The Supreme Court accordingly concluded that the ordinances served only the defendant city's animus against Santería, and asserted that the general applicability requirement is designed to prevent precisely such animus.  See 508 U.S. at 546.  The Supreme Court accordingly subjected the ordinances to a form of strict scrutiny and found them lacking.  See 508 U.S. at 547.

The Supreme Court also continues to hold -- albeit in a strengthened form -- that laws cannot impose special disability based on one's status as religious.  In Trinity Lutheran Church of Columbia, Inc. v. Comer, 137 S. Ct. 2012 (2017)("Trinity Lutheran"), the Supreme Court addressed a Missouri state constitutional provision that prohibited the State from giving public benefits to religious institutions.  See 137 S. Ct. at 2017.  The plaintiff-church applied to participate in a state program that gave grants to non-profit organizations that repaved surfaces with material made from recycled tires.  See 137 S. Ct. at 2017.  The state pointed out the declining to issue the grant to the plaintiff-church did not in any way infringe upon the plaintiff-church's religious exercise and noted that it had no duty to give the grant in the first place.  See 137 S. Ct. at 2021-22.  Chief Justice Roberts, writing for the majority, disagreed:

> [T]he . . . policy puts Trinity Lutheran to a choice: It may participate in an otherwise available benefit program or remain a religious institution.  Of course, Trinity Lutheran is free to continue operating as a church . . . .  But that freedom comes at the cost of automatic and absolute exclusion from the benefits of a public program for which the Center is otherwise fully qualified.  And when the State conditions a benefit in this way . . . the State has punished the free exercise of religion: "To condition the availability of benefits . . . upon [a recipient's] willingness to . . . surrender[] his religiously impelled [status] effectively penalizes the free exercise of his constitutional liberties."

137 S. Ct. at 2021-22 (quoting McDaniel v. Paty, 435 U.S. at 626).  On a narrow reading, Trinity Lutheran merely continues well-established precedent that government may not impose special disability or withhold government benefits on the basis of one's religion.  See McDaniel v. Paty,

435 U.S. at 626; Sherbert v. Verner, 374 U.S. at 406.   The Supreme Court noted that it has repeatedly held that only compelling governmental interests justify withholding generally available services on the basis of religion.   See 137 S. Ct. at 2019.   On a broader reading, however, Trinity Lutheran provides that the Free Exercise Clause now protects individuals' and institutions' status as religious.   Trinity Lutheran, under this broader reading, thus erases the distinction between what a religious institution is and what a religious institution does for the governmental services' purposes, because there was no actual conflict between Missouri's policy and the plaintiff-church's religious beliefs.   See 137 S. Ct. at 2020.   In other words, Trinity Lutheran provides that the fact of having beliefs cannot be a setback where government services and benefits are concerned.   In Espinoza v. Montana Department of Revenue, the Supreme Court confirmed that, government may not condition aid or benefits on a recipient's religious status, and that the Establishment Clause affords no justification for such discrimination.   See Espinoza v. Montana Dep't of Revenue, No. 18-1195, __ S. Ct. __, 2020 WL 3518364, at *5-*6 (U.S. June 30, 2020).

A law also may violate the Free Exercise Clause if it is not applied neutrally.   In Masterpiece Cakeshop, LLC v. Colorado Civil Rights Commission, 138 S. Ct. 1719 (2018)("Masterpiece Cakeshop"), a baker, citing his religious beliefs, refused to make a cake for a same-sex couple's wedding, defying a Colorado anti-discrimination statute.   See 138 S. Ct. at 1723-25.   He was cited for violating the Colorado statute, and in arguing his case before the Colorado Civil Rights Commission, one commissioner stated:

> Freedom of religion and religion has been used to justify all kinds of discrimination throughout history, whether it be slavery, whether it be the [H]olocaust . . . --we can list hundreds of situations where freedom of religion has been used to justify discrimination.   And to me it is one of the most despicable pieces of rhetoric that people can use to -- to use their religion to hurt others.

138 S. Ct. at 1729.  The Supreme Court did not ultimately decide whether anti-discrimination laws that conflict with religious beliefs violate the First Amendment.  Instead, the Supreme Court concluded that the Colorado Civil Rights Commission's treatment of the baker's appeal violated the First Amendment's command that government may not "base laws or regulations on hostility to a religion or religious viewpoint."  138 S. Ct. at 1731.  Justice Kagan summarized in a concurring opinion:

> "[I]t is a general rule that [religious and philosophical] objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral  and generally applicable public accommodations law."  But in upholding that principle, state actors cannot show hostility to religious views; rather, they must give those views neutral and respectful consideration.

138 S. Ct. at 1732 (Kagan, J., concurring)(quoting Masterpiece Cakeshop, 138 S. Ct. at 1727)(alterations in concurring opinion).

In this way, Masterpiece Cakeshop reflects the Supreme Court's longstanding aversion to laws and regulations that allow officials' subjective, case-by-case determinations.  See, e.g., Sherbert v. Verner, 374 U.S. at 401 (invalidating denial of unemployment benefits where statute allowed officials to evaluate, on a case-by-case basis, whether an individual's termination from employment was for "good cause"); Cantwell v. Connecticut, 310 U.S. at 305 (invalidating a statute that prohibited solicitation for religious or charitable causes without a designated official's approval, and authorizing the official to determine whether the cause is genuinely religious or charitable).  Similarly, a law may not be generally applicable where it has built-in exemptions that it does not extend to accommodate religious exercise.  See, e.g., Smith, 494 U.S. at 884-85 (citing cases).  "[W]here the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason."  Smith, 494 U.S.

at 884 (quoting Bowen v. Roy, 476 U.S. at 708).  Such instances require government to weigh religious freedom against governmental interest, a process that Smith expressly decries.  See Smith, 494 U.S. at 887.  Accordingly, where government regulates within its prerogative, it may enact general laws and apply them neutrally without inquiry into the extent to which the law incidentally burdens religious exercise.  Only where the government acts with religious animus or requires case-by-case determination of the merits or sincerity of religious beliefs as a condition of governmental benefits or exemption from legal requirements will the government violate the First Amendment.

## LAW REGARDING THE ASSEMBLY CLAUSE

The First Amendment to the Constitution of the United States guarantees that "Congress shall make no law . . . abridging . . . the  right of the people peaceably to assemble."  U.S. Const. amend. I.  The right to assemble was not a controversial addition to the Bill of Rights -- the only controversy concerning its passage concerned whether it even needed enumeration.  See Tabatha Abu El-Haj, The Neglected Right of Assembly, 56 U.C.L.A. L. Rev. 543, 564-65 (2009)(noting that this right was a traditional right in England).[23]  The proposed assembly right that James Madison first proposed in the House of Representatives looks slightly different, and more expansive, than the version adopted in the Bill of Rights.  Madison proposed: "The people shall not be restrained from peaceably assembling and consulting for their common good; nor from applying to the legislature by petitions, or remonstrances for redress of their grievances."  John D.

---

[23]The Bill of Rights 1689, which William III of Orange agreed to accept upon ascension to the throne in the Glorious Revolution, states that "it is the right of the subjects to petition the king, and all commitments and prosecutions for such petitioning are illegal."  Bill of Rights, 1689, 1 W. & M., 2d Sess., c.2.

Inazu, <u>The Forgotten Freedom of Assembly</u>, 84 Tul. L. Rev. 565, 572 (2010)("<u>Forgotten</u>

<u>Freedom</u>")(citing <u>The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins</u> 129

(Neil H. Cogan ed., 1997)).  The House of Representative eventually debated condensed language

which incorporated speech rights: "The freedom of speech and of the press, and the right of the

people peaceably to assemble and consult for their common good, and to apply to the government

for redress of grievances shall not be infringed."  The Congressional Register, August 15, 1789.

Theodore Sedgwick, representative from Massachusetts, spoke to oppose including the freedom

of assembly, because he thought it diminished the other enumerated rights, and he argued that:

> [s]hall we secure the freedom of speech, and think it necessary at the same time to allow the right of assembling?  If people freely converse together, they must assemble for that purpose; it is self-evident unalienable right which the people possess; it is certainly a thing that never would be called in question; it is derogatory to the dignity of the house to descend to such minutiae.

The Congressional Register, August 15, 1789.  Sedgwick's proposal "lost by a considerable

majority."  The Congressional Register, August 15, 1789.  Those opposed to Sedgwick's

amendment noted that North Carolina and Virginia had recommended this amendment, that state

constitutions had similar provisions, and that this freedom had been suppressed in the past and was

therefore in need of express enumeration.[24]

---

[24]The debate concerning Sedgwick's amendment contains a notable parallel to the problem before the Court.  Congressman Sedgwick, in defense of his amendment, sarcastically said that the committee might just as well "have declared that a man should have a right to wear his hat if he pleased," or "could go to bed when he thought proper," as these rights were just as in need of enumeration as the right to assemble.  Congressman John Page, from Virginia, responded that not only had people "been prevented from assembling together on their lawful occasions," but that "a man has been obliged to pull off his hat when he appeared before the face of authority."

Page was referring William Penn and his trial for violating the 1664 Conventicle Act, "a *cause celebre* in America."  <u>Origins and Historical Understanding</u>, 103 Harv. L. Rev. at 1472.  On August 14, 1670, William Penn and other Quakers attempted to gather at their meeting-house in London.  <u>See</u> <u>Forgotten Freedom</u> at 575.  Soldiers prevented his entrance, and so Penn conducted his sermon outside on the street. <u>See</u> <u>Forgotten Freedom</u> at 575.  As he began to speak, Penn was

As noted during the House floor debate, State constitutions at the time had robust assembly and petition protections. These protections linked the freedom of assembly to democractic process; the right to assemble was closely linked to the right to petition the government. Massachusetts' 1780 Constitution, for example, stated that "[t]he people have a right, in an orderly and peaceable manner, to assemble to consult upon the common good; give instructions to their representatives, and to request of the legislative body, by the way of addresses, petitions, or remonstrances, redress of the wrongs done them, and of the grievances they suffer." New Hampshire's 1780 Constitution contains very similar language. North Carolina, Pennsylvania, and Vermont meanwhile, protected the people's "right to assemble together, to consult for their

---

arrested for violating the 1664 Conventicle Act. This Act forbade religious gatherings of groups of five or more people, other than immediate family, not associated with the Church of England. See Forgotten Freedom at 575. Parliament justified the 1664 Conventicle Act and its prohibition against gatherings of five or more people based on its concerns over the threats these meetings posed to the government itself rather than the public welfare. It cited the "growing and dangerous Practices of Seditious Sectaryes and other disloyall persons who under pretence of Tender Consciencies doe at their Meetings contrive Insurrections as late experience hath shewed," as a reason for the act, 1664 Conventicle Act, § I, and it granted local officials the power to stop all such meetings to prevent "the mischeifes which may grow by such Seditious and Tumultuous Meetings under pretence of Religious Worship," 1664 Conventicle Act, § VIII.

Although he essentially confessed, Penn was ultimately acquitted for violating the Act the jury repeatedly refused to follow jury instructions and find him guilty. See Kenneth Hoyt, What Jurors Know: a Trial Judge's Perspective, 40 S. Tex. L. Rev. 907, 911-12 (1999); David Dorfman & Chris Iijima, Fictions, Fault, and Forgiveness: Jury Nullification in a New Context, 28 Mich. J. L. Reform 861, 868 (1995). This was one of the earliest and still one of the most famous examples of that other traditional democratic right: jury nullification. See United States v. Courtney, 960 F. Supp. 2d 1152, 1189-90 (D.N.M. 2013)(Browning, J.). The United States has since forbidden jury nullification, and Legacy Church is therefore forbidden from appealing directly to jurors in the same way William Penn could. See United States v. Courtney, 960 F. Supp. 2d at 1173. Despite escaping the charge of violating the Conventicle Act, the government still punished Penn for his religious principles. Penn arrived in court without wearing a hat, "but knowing his religious scruple, the judge ordered a court official to place a hat on his head." Origins and Historical Understanding, 103 Harv. L. Rev. at 1472. When Penn refused to remove the hat in respect to the court, as Quaker faith dictates, the court held him in contempt and imprisoned him. See Origins and Historical Understanding, 103 Harv. L. Rev. at 1472.

common good, to instruct their representatives, and to apply to the legislature for redress of grievances."[25]  Delaware's 1776 Declaration of Rights and Maryland's 1776 Declaration of Rights stated that "every man hath a right to petition the Legislature for the redress of grievances in a peaceable and orderly manner."   That the right to assemble is closely linked to democratic government is also evident from the legislative history surrounding the right to assemble.  The proposal to qualify the freedom of assembly with the requirement that it be "to instruct their representatives," although defeated, garnered significant debate.  See Baylen J. Linnekin, "Tavern Tak" and the Origins of the Assembly Clause: Tracing the First Amendment's Assembly Clause Back to its Roots in Colonial Taverns, 39 Hastings Const. L.Q. 593, 614-15 (2012).  And until it was dropped without explanation from the final draft, both the House and the Senate had approved versions of the right which qualified the right to assemble as the right "to peaceably assemble and to consult for their common good."  Forgotten Freedom at 572-73.  The assembly right thus derives in spirit, at least, from the democratic government the founders envisioned, and the ability of all citizens under that government to seek change.  See The Neglected Right of Assembly, 56 U.C.L.A. L. Rev. at 565 ("The right was understood primarily to protect a democratic practice.").  In this vein, Georgia Congressman James Jackson noted that the freedom "to assemble and consult for the common good, . . . had been used in this country as one of the best checks on the British legislature in their unjustifiable attempts to tax the colonies without their consent."  1 Annals of Congress 139-40 (1791).

---

[25]Pennsylvania and Vermont's Declaration of Rights added that citizens could apply for redress of grievances "by address, petition, or remonstrance."  Pennsylvania Declaration of Rights 1776, § XVI; Vermont Declaration of Rights 1777, § XVIII.

The Supreme Court concluded in De Jonge v. Oregon, 299 U.S. 353 (1937), that the right to assemble is applicable to state action, because the Due Process Clause of the Fourteenth Amendment incorporates the right to assemble.  See John D. Inazu, The Forgotten Freedom of Assembly, 84 Tul. L. Rev. 565, 599 (2010)("Forgotten Freedom").   The Supreme Court emphasized the importance of the right to assemble, declaring that it "cannot be denied without violating those fundamental principles which lie at the base of all civil and political institutions." De Jonge v. Oregon, 299 U.S. at 364 (citing Herbert v. Louisiana, 272 U.S. 312, 216 (1926); Powell v. Alabama, 287 U.S. 45, 67 (1932)).

Despite the importance of the right to assemble, it, like other constitutional rights, is still subject to restrictions. The Supreme Court in Jacobson v. Massachusetts, 197 U.S. 11 (1905), stated that constitutional rights "may at times, under the pressure of great dangers" be restricted "as the safety of the general public may demand."  197 U.S. at 29.  The Court of Appeals for the Fifth Circuit has noted that this "settled rule allows the state to restrict, for example, one's right to assemble."  In re Abbott, 2020 WL 1685929, at *1.

The Supreme Court has all but forgotten the right to assemble in the modern era.  See Forgotten Freedom at 610-11 (noting that, as of 2010, the Supreme Court had not heard a right-to-assemble claim in over twenty years); Emmanuel Hiram Arnaud, Note, The Dismantling of Dissent: Militarization and the Right to Peaceably Assemble, 101 Cornell L. Rev. 777, 812 (2016)("Dismantling of Dissent")(noting that, as of 2016, the Supreme Court had not heard a right-to-assemble claim in over thirty years).  Instead, the freedom of association has largely subsumed the freedom of assembly.  See Timothy Zick, Recovering the Assembly Clause, 91 Tex. L. Rev. 375, 377 (2012)("[T]he freedom of assembly was transformed into a right of association.")(citing John D. Inazu, Liberty's Refuge: The Forgotten Freedom of Assembly, (2010)).  In the 1980s, the

- 150 -

Supreme Court "swept the remnants of association within the ambit of free speech law," culminating in its opinion about a freedom-of-assembly claim that did not include any reference to the freedom of assembly, but included several references to freedom of association. Recovering the Assembly Clause at 396 (quoting John D. Inazu, Liberty's Refuge: The Forgotten Freedom). See Forgotten Freedom at 611 (citing Boos v. Barry, 485 U.S. 312 (1985)). Since then, the Supreme Court has applied the freedom-of-association standard to freedom of assemblies cases, rendering them one and the same. See Dismantling of Dissent (noting that "the standard for assessing freedom of assembly cases is now the one applies for freedom of association" and that "freedom of assembly is standardless because the [Supreme] Court conflates the two freedoms")

The Tenth Circuit similarly has conflated the freedom of association with the freedom of assembly by generally treating them as a single claim and analyzing them together. See, e.g., McCook v. Spriner Sch. Dist., 44 F. App'x 896, 910 (10th Cir. 2002)(unpublished)(repeating throughout the opinion that the plaintiffs brought a "freedom of assembly and association claim"); Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 658 (stating that "[t]he First Amendment protects associational and assembly rights in two distinct ways," and then quoting a Supreme Court case that mentions only freedom of association)(citing Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 544 (1987)). In the past thirty-two years, the Tenth Circuit's lengthiest discussion of freedom of assembly is a dissent analogizing churches in the free exercise context to public forums in the free speech context. See Messiah Baptist Church v. Cty. of Jefferson, State of Colo., 859 F.2d 820, 830 (10th Cir. 1988)(McKay, J., dissenting). The dissent, discussing a zoning ordinance's restriction of buildings for religious worship, notes that "the right to assemble or speak in a public forum cannot be absolutely prohibited, and may only be infringed by narrowly-drawn time, place, and manner restrictions." Messiah Baptist Church v.

Cty. of Jefferson, State of Colo., 859 F.2d at 830.  Beyond that case, the Tenth Circuit generally

has folded freedom of assembly into freedom of association[26] -- specifically expressive

association.  See Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 658.

Expressive association is the "'right to associate for the purpose of engaging in those

activities protected by the First Amendment -- speech, assembly, petition for the redress of

grievances, and the exercise of religion.'"  Schalk v. Gallemore, 906 F.2d at 498 (quoting Roberts

v. United States Jaycees, 468 U.S. at 617-18.).  The First Amendment protects political expression

manifested through conduct as well as through speech.  See Texas v. Johnson, 491 U.S. 397, 406

(1989)(holding that the burning of an American flag is conduct "sufficiently imbued with elements

of communication to implicate the First Amendment")(citation omitted)(internal quotation marks

omitted).  Expressive association is not, however, an absolute right, because "'there may be

countervailing principles that prevail over the right of association.'"  Grace v. United States v. City

of Cheyenne, 451 F.3d at 658 (quoting Walker v. City of Kansas City, 911 F.2d 80, 89 n.11 (8th

Cir. 1990)).  The Supreme Court has cautioned that "[i]nfringements on that right may be justified

by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas,

---

[26]The   Tenth Circuit uses different terminology for expressive association in different
cases.  In Grace v. United Methodist Church v. City of Cheyenne, 451 F.3d 643, 658 (2006), and
Schalk v. Gallemore, 906 F.2d 491, 499 (1990), the Tenth Circuit appears to label "freedom of
association" as "freedom of expressive association," which it breaks down into "intimate
association" and "political association."   What it calls "political association" is actually
"expressive association."  It corrects the labels in Vigil v. South Valley Academy, 247 F. App'x
982, 988 (10th Cir. 2007)(unpublished)("treating the "freedom of expressive association" and "the
right to familial association" as two separate freedoms, as opposed to treating the right of familial
association as a subtype of freedom of expressive association).  The Court relies on this case for
the appropriate labels, because it accords with generally accepted terms.  John D. Inazu, The
Unsettling "Well-Settled" Law of Freedom of Association, 43 Ct. L. Rev. 149, 149 (2010)(noting
that the Supreme Court stated two categories -- expressive association and intimate association --
in Roberts v. United States Jaycees, 468 U.S. 609 (1984)).

that cannot be achieved through means significantly less restrictive of associational freedoms." Roberts v. United States Jaycees, 468 U.S. at 623.  See Nat'l Commodity & Barter Ass'n v. Archer, 31 F.3d 1521, 1531 (10th Cir. 1994)(quoting Roberts v. United States Jaycees, 468 U.S. at 623). Although an opportunity "might be described as 'associational' in the common parlance," it does not necessarily follow that it involves "the sort of expressive association that the First Amendment has been held to protect." City of Dallas v. Stanglin, 490 U.S. 19, 24 (1989). Because "there is no generalized right of free association," courts only "recognize[] a right to associate for the purpose of engaging in those activities protected by the First Amendment -- speech, assembly, petition for the redress of grievances, and the exercise of religion." Roberts v. United States Jaycees, 468 U.S. at 618.

In Roberts v. United States Jaycees, the Supreme Court extended First Amendment protection to the United States Jaycees, a civic organization, because it engaged in "the advocacy of political and public causes." Roberts v. United States Jaycees, 468 U.S. at 622.  The Boy Scouts of America similarly qualified for First Amendment protection, because the organization "engaged in instilling its system of values in young people." Boy Scouts of Am. v. Dale, 530 U.S. at 643. In addition to civic or political causes, courts also often recognize the freedom of expressive association for organizations that "'associate for the purpose of engaging in . . . religious activities.'" Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 658 (quoting Bd. of Dirs. v. Rotary Club of Duarte, 481 U.S. at 544).[27]

----

[27]Professor Eugene Volokh has noted that:

> [i]n addition to the general First Amendment expressive association right that [Boy Scouts of Am. v. ]Dale recognized, religious groups might have a special "freedom of religious association" right under the Free Exercise Clause. This could either be a narrow church autonomy right recognized even after Employment Division v. Smith, 494 U.S. 872 (1990), see Eugene Volokh, A Common-Law

Although "[i]t is possible to find some kernel of expression in almost every activity a person undertakes . . . such a kernel is not sufficient to bring the activity within the protection of the First Amendment." City of Dallas v. Stanglin, 490 U.S. at 25.  Courts generally refuse to extend First Amendment protection to individuals or organizations that assert the freedom of association in a context that does not include the assertion of a separate First Amendment right.  See City of Dallas v. Stanglin, 490 U.S. at 24.  In City of Dallas v. Stanglin, the Supreme Court declined to recognize a First Amendment right of association for dance-hall patrons seeking to overturn a municipal regulation creating age-restricted dance halls.  See 490 U.S. at 24.  The Supreme Court listed four reasons that "chance encounters in dance halls" do not involve "the sort of expressive association that the First Amendment has been held to protect": (i) the dance hall patrons were not "members of any organized association"; (ii) "most [were] strangers to one another"; (iii) the dance hall admitted all who paid the admission fee; and (iv) "[t]here [was] no suggestion that these patrons take positions on public questions."  City of Dallas v. Stanglin, 490 U.S. at 24-25.

"To determine whether a group is protected by the First Amendment's expressive associational right, we must determine whether the group engages in 'expressive association.'  The First Amendment's protection of expressive

---

Model for Religious Exemptions, 46 UCLA L. Rev. 1465, 1506-07 (1999)(so suggesting), or a "hybrid" of the expressive association right and the Free Exercise Clause right, compare Smith, 494 U.S. at 881-82 (so suggesting), with Kissinger v. Bd. of Trs. of the Ohio State Univ., 5 F.3d 177, 180 (6th Cir. 1993) (criticizing the hybrid rights doctrine, in my view persuasively), Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993)(Souter, J., concurring) (likewise), and Bertrand Fry, Note, Breeding Constitutional Doctrine: The Provenance and Progeny of the "Hybrid Situation" in Current Free Exercise Jurisprudence, 71 Tex. L. Rev. 833 (1993)(likewise).

Eugene Volokh, Freedom of Expressive Association and Government Subsidies, 58 Stan. L. Rev. 1919, 1968 (2006)

association is not reserved for advocacy groups. But to come within its ambit, a group must engage in some form of expression, whether it be public or private."

A.M. ex rel. Youngers v. NM Dep't of Health, 117 F. Supp. 3d 1220, 1258 (D.N.M. 2015)(quoting Boy Scouts of Am. v. Dale, 530 U.S. at 648).  If the First Amendment's expressive associational right protectsthe group, courts next determine whether "'[i]nfringements on that right [are] justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.'"  Roberts v. United States Jaycees, 468 U.S. at 623.

## ANALYSIS

The Court analyzes both the MTD, which it does not convert to a motion for summary judgment, and the PI Motion.  The Court concludes, first, that Secretary Kunkel may testify at the evidentiary hearing by audiovisual means, because she cites credible health concerns and audiovisual testimony will not prejudice Legacy Church.  The Court then concludes that Legacy Church is not substantially likely to succeed on the merits of its Free Exercise claim, because the June 30 Order is neutral and generally applicable, and its most problematic aspects have been superseded by the July 13 Order.  Similarly, Legacy Church is not substantially likely to succeed on the merits of its Freedom of Assembly claim, because the June 30 Order and the July 13 Order are unrelated to the suppression of speech or religion, serve a compelling state interest, and significantly less restrictive alternatives are not available.  The Court then concludes  that Legacy Church does not state a plausible claim that the Public Health Orders violates Legacy Church's Free Exercise rights, because the Complaint -- liberally construed -- does not allege protected interests that the Public Health Orders impair.  Similarly, the Court concludes that Legacy Church does not state a plausible associational or Freedom of Assembly claim, because the Complaint --

liberally construed -- does not allege protected interests that the Public Health Orders impair.  In ruling on the MTD, however, the Court evaluates each of the Public Health Orders and concludes that Legacy Church cannot, consistent with rule 11 of the Federal Rules of Civil Procedure, state a plausible First Amendment claim.  The Court thus does not grant Legacy Church leave to amend the Complaint.  Accordingly, the Court grants the MTD and denies the PI Motion.

**I.     SECRETARY KUNKEL MAY TESTIFY AT THE EVIDENTIARY HEARING BY AUDIOVISUAL OR TELEPHONIC MEANS.**

Secretary Kunkel asks that the Court permit her to testify at the evidentiary hearing telephonically or by audiovisual means.  See Witness Motion at 1.  Secretary Kunkel cites her age -- she is sixty-nine years old -- as being associated with higher risks of suffering severe illness in the event she contracts COVID-19.  See Witness Motion at 1-2.  Secretary Kunkel notes that, as discussed in the Public Health Orders, indoor meetings generally present risks of transmitting the coronavirus.  See Witness Motion at 2.  Legacy Church opposes the Witness Motion and argues that live in-person testimony is necessary for the Court to evaluate Secretary Kunkel's credibility.  See July 9 Tr. at 8:9-8:20 (Stern).

Rule 43 of the Federal Rules of Civil Procedure provides that witness testimony "must be taken in open court unless a federal statute, the Federal Rules of Evidence, the [Federal Rules of Civil Procedure], or other rules adopted by the Supreme Court provide otherwise."  Fed. R. Civ. P. 43(a).  If a party shows  "good cause in compelling circumstances, the court "may permit testimony in open court by contemporaneous transmission from a different location."  Fed. R. Civ. P. 43(a).  "Transmission cannot be justified merely by showing that it is inconvenient for the witness to attend the trial."  Fed. R. Civ. P. 43 advisory committee notes to 1996 amendment.

District courts have typically concluded that COVID-19-related health concerns justify requests to testify telephonically or through audiovisual means, despite one party's objections. <u>See</u> <u>Vitamins Online, Inc. v. HeartWise, Inc.</u>, No. 2:13-CV-00982-DAK, 2020 WL 3452872, at *9 (D. Utah June 24, 2020)(Kimball, J.); <u>Argonaut Ins. Co. v. Manetta Enterprises, Inc.</u>, No. 19CV00482PKCRLM, 2020 WL 3104033, at *2 (E.D.N.Y. June 11, 2020)(Chen, J.); <u>Centripetal Networks, Inc., v. Cisco Sys., Inc.</u>, No. 2:18CV94, 2020 WL 3411385, at *1 (E.D. Va. April 23, 2020)(Morgan, J.); <u>In re RFC & ResCap Liquidating Tr. Action</u>, No. 013CV3451SRNHB, 2020 WL 1280931, at *2-5 (D. Minn. March 13, 2020); <u>Centripetal Networks, Inc., v. Cisco Systems, Inc.</u>, No. 2:18CV94, 2020 WL 3411385, at *1 (E.D. Va. Apr. 23, 2020)(Nelson, J.).  Where, "as here, the primary issue before the court is a legal question . . . we think little purpose would be served by a blanket rule requiring oral testimony." <u>United Commercial Ins. Serv., Inc. v. Paymaster Corp.</u>, 962 F.2d 853, 858 (9th Cir. 1992).  Here, the primary issue before the Court concerns the factual content of Secretary Kunkel's testimony.  Legacy Church does not contend that Secretary Kunkel's credibility is at issue.  Moreover, Secretary Kunkel cites reasonable health concerns that other district courts have concluded amount to a good cause for testifying remotely under rule 43.  Accordingly, the Court grants the Witness Motion.

## II.     LEGACY CHURCH'S REQUESTED RELIEF FALLS UNDER A CATEGORY OF <u>DISFAVORED INJUNCTIONS.</u>

The Court reiterates and maintains its conclusion in the TRO MOO that Legacy Church seeks a disfavored injunction.  In the TRO MOO, the Court concludes that Legacy Church does not seek a mandatory injunction or an injunction that alters the status quo.  <u>See</u> TRO MOO, 2020 WL 1905586, at *29.  The Court concludes, however, that the "injunction Legacy Church seeks would supply it with all the relief [it] could hope to win from a full trial."  2020 WL 1905586,

at *30.  The injunction Legacy Church seeks would supply it with all the relief could hope to win

from a full trial.  In the Complaint, Legacy Church asks that the Court declare that the Defendants

have unlawfully burdened its constitutional rights, and "[t]emporarily and permanently enjoin[]

Defendants from prohibiting Plaintiff from physically gathering in its house of worship."

Complaint at 6.  Legacy Church argues that a preliminary injunction would not afford it all of its

requested relief, because it requests attorney's fees in the Complaint, and a preliminary injunction

would not award costs or fees.  See July 10 Tr. at 181:15-17 (Hunter).  It is true that the Complaint

seeks  "costs and reasonable attorneys' fees and expenses," Complaint at 6, but these are incidental

to the injunction as they would not exist on their own without the injunction request.  Accordingly,

the Court will "more closely scrutinize[]" Legacy Church's case "to assure that the exigencies of

the case support the granting of a remedy that is extraordinary even in the normal course."  O

Centro, 389 F.3d at 975.

III.   **HISTORY PROVIDES A PRINCIPLED MEANS OF INTERPRETING THE FIRST AMENDMENT CLAUSES, AND IT SUGGESTS THAT GOVERNMENT MAY LIMIT FREE EXERCISE AND ASSEMBLY RIGHTS IN CERTAIN CIRCUMSTANCES.**

If originalists and textualists are to be honest brokers of constitutional interpretation, their

methods must be rigorous and principled.  It is important that their decisions are not seen as result-

oriented or post-rationalized to reach a conservative position.  If they do not adhere to these

principles -- in good times and in bad times, in health and in pandemic, in peace and in war -- their

interpretations will not be seen as any more legal than the views they so vigorously criticize.  The

Court strives to consider only legitimate sources for its constitutional analysis such as the words

of the Constitution, and the reasonable inferences that may be drawn from the document's text and

history, and from the structure of democratic government that it proscribes.  Accordingly, it

reviews the early history of Free Exercise Clause and the Freedom of Assembly Clause to ground its analysis.

A.     HISTORY OF THE FREE EXERCISE CLAUSE SUGGESTS THAT THE GOVERNMENT MAY LIMIT FREE EXERCISE TO SOME EXTENT.

The First Amendment's Religion Clauses states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]"  U.S. Const. amend. I.  A principle for Religion-Clause analysis will not come from a simple reading of the text.  The text itself provides no principled means of deciding whether some particular belief or conduct is "religion," or whether Congress has "establish[ed]" or failed to allow the "free exercise" of that religion.  U.S. Const. amend. I.  History tells us little more about the precise meaning that those who drafted the Religion Clauses contemplated.  The Religion Clause's historical record inhibits simplistic characterization.  See Vincent Philip Muñoz, The Original Meaning of the Establishment Clause and the Impossibility of Its Incorporation, 8 U. Pa. J. Const. L. 585, 587 n.15 (2006)(collecting sources suggesting that the Establishment Clause's original meaning is impossible to discern).

History does demonstrate that states generally limited free exercise to the extent it significantly interfered with the public good.  The years after the American Revolution and before ratification saw the newly liberated states modifying constitutions, and by 1789, every state other than Connecticut had a constitutional provision protecting religious freedom.  See Michael McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv. L. Rev. 1409, 1455 (1990)("Origins and Historical Understanding").  These provisions provide excellent evidence of the original intent behind the Free Exercise clause, and unlike the United States Constitution, most of the state constitutional provisions imposed explicit limits on their

citizen's religious practices when these religious practices interfered with the public good. Massachusetts, for example, commanded its citizens "to worship the Supreme Being," "provided he doth not disturb the public peace or obstruct others in their religious worship." Mass. Const. of 1780, art. II. In Delaware, citizens could not "disturb the Peace, the Happiness or Safety of Society," with their religious practice. Del. Declaration of Rights and Fundamental Rules of 1776, § 3. Maryland extended freedom of religion except to the extent that "any man shall disturb the good order, peace or safety of the State, or shall infringe the laws of morality, or injure others, in their natural, civil, or religious rights . . . ." Md. Declaration of Rights of 1776, art. XXXIII. And Georgia decreed that "[a]ll persons whatever shall have the free exercise of their religion; provided it be not repugnant to the peace and safety of the State." Ga. Const. of 1777, art. LVI. Many other states adopted similar limitations on their citizens' freedom of religion.[28] The Constitutions of Virginia, New Jersey, Pennsylvania, and North Carolina did not include explicit limitations on the free exercise right, although at least in Virginia's case, this decision was prompted by the legislature's inability to agree on a proper formulation. See Origins and Historical Understanding, 103 Harv. L. Rev. at 1463 (arguing that, based on the historical debate records surrounding its drafting, Virginia's constitution limits free exercise of religious when it threatens less than "'manifest danger' to the 'preservation of equal liberty, and existence of the state,'" but does not limit free exercise when it merely conflicts with "'the peace, the happiness, or safety of society.'").

---

[28]N.Y. Const. of 1777, art. XXXVIII (stating that "liberty of conscience, hereby granted, shall not eb so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace of safety of this State."); N.H. Const. of 1784, pt. 1, art. V (stating that all individuals have a natural and unalienable right to worship "provided he doth not disturb the public peace, or disturb others, in their religious worship."); S.C. Const. of 1790, art. VIII, § 1 (stating that "liberty of conscience" did not "excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this State.").

The Free Exercise principles that emerged in these state constitutions were not ingrained inviolably in each colonies' identity.  Professor McConnell argues that the free exercise of religion first emerged as a legal principle from colonies such as Maryland, Rhode Island, Delaware, Pennsylvania, and the Carolinas, which were originally established as havens for religious dissenters from less tolerant colonists.  See Origins and Historical Understanding, 103 Harv. L. Rev. at 1424-25.  See also B. Bailyn, The Ideological Origins of the American Revolution, 195 (1968)(discussing New York's 1691 "Rights and Privileges of the Majesty's Subjects," which protected Protestant free exercise).  The New England puritans, for example, actively persecuted those who held different religious beliefs.  See Marci A. Hamilton & Rachel Steamer, The Religious Origins of Disestablishment Principles, 81 Notre Dame L. Rev. 1755, 1766 (2006)(describing Massachusetts' execution of four Quakers between 1659 and 1661); Michael McConnell, Origins and Historical Understanding, 103 Harv. L. Rev. at 1423 (noting that non-Puritans in New England were occasionally horsewhipped or jailed for their beliefs until the 1680's, "and the hostility to religious diversity continued in New England well into the nineteenth century").  As Professor Kurland notes "Our nation's history begins with religious persecution.  The emigres . . . fled . . . in order to be free to worship as they pleased or as they believed they must.  This was not, however, a principled adherence to a doctrine of freedom -- or even tolerance -- for religious beliefs not held by the majority."  The Irrelevance of the Constitution, 24 Vill. L. Rev. 3, 4 (1979).  Similar intolerance pervaded the Virginia Colony's Anglican-centered society until the Revolution, and infected, to a lesser extent, its southern neighbors.  See Origins and Historical Understanding, 103 Harv. L. Rev. at 1423-24; Philip Hamburger, Separation of Church and State 90 (2004)(stating that Virginia imprisoned Baptists for meeting and preaching into the

1770s); Leonard Levy, The Establishment Clause, 2-3 (1986)(discussing Virginia's Baptist persecutions in the 1770s).

Thus, instead of representing the organic, singular expression of the American colonies' conscience -- perhaps in reaction to "historical instances of religious persecution and intolerance," Bowen v. Roy, 476 U.S. 693, 703 (1986) -- constitutional protection of free religious exercise was born as much from contemporary reaction against established religion. The unestablished, more evangelical religious groups on American society's periphery largely championed constitutionally enshrining this right. See Origins and Historical Understanding, 103 Harv. L. Rev. at 1437 ("To determine the meaning of the religion clauses, it is necessary to see them through the eyes of their proponents, most of whom were members of the most fervent and evangelical denominations in the nation."). These religious groups, primarily Baptists, Quakers, Presbyterians, Lutherans, and Jews, could expect greater freedom to practice their religions as a result of ending state sponsorship of the Anglican Church in the southern colonies and the Congregational churches in New England. See Origins and Historical Understanding, 103 Harv. L. Rev. at 1439; Carl H. Esbeck, Dissent and Disestablishment: The Church-State Settlement in the Early American Republic, 2004 B.Y.U. L. Rev. 1385, 1590 (describing a desire for more limited government as motivating some groups pushing for disestablishment). Some of these groups were able to flex their political power to see such protections passed. See Origins and Historical Understanding, 103 Harv. L. Rev. at 1476-77 (noting that James Madison narrowly won election to the First Congress after following the advice of his political advisor and promising local Baptist leaders to fight for constitutional protection of religious liberty). Prominent Antifederalists joined the religious minorities, and, although they ordinarily promoted established religion as advancing public virtue, fargued in this case that the Constitution's lack of a bill of rights required states to reject it. See Origins and Historical

Understanding, 103 Harv. L. Rev. at 1440-41; City of Boerne v. Flores, 521 U.S. 507, 549-50 (1997)(O'Connor, J., dissenting).

Although the Enlightenment ideals embodied in John Locke's writings and Thomas Jefferson's political philosophy also found expression in the Free Exercise Clause, "it is a mistake to read the religion clauses under the now prevalent assumption that 'the governing intellectual climate of the late eighteenth century was that of deism (or natural law).'" Origins and Historical Understanding, 103 Harv. L. Rev. at 1437 (quoting William P. Marshall, The Case Against the Constitutionally Compelled Free Exercise Exemption, 40 Case W. Res. L. Rev. 357, 377 (1989)); id. at 1455 ("The evidence indicates, however, that Madison, with his more generous vision of religious liberty, more faithfully reflected the popular understanding of the free exercise provision that was to emerge both in state constitutions and the Bill of Rights."). Jefferson famously adhered to "rational" rather than "traditional religion," and, accordingly, he believed that, while governments could not regulate thought, they were empowered to regulate religious conduct for society's benefit.[29] Origins and Historical Understanding, 103 Harv. L. Rev. at 1449-50. But see City of Boerne v. Flores, 521 U.S. at 562 (O'Connor, J., dissenting)(suggesting that Jefferson's writings imply that he did not believe the government lawfully could interfere with religious practice). Although his views on the Religion Clause are far less representative than other founding fathers, see, e.g., Wallace v. Jaffree, 472 U.S. 38, 92 (1985)(Rehnquist, J, dissenting)(Jefferson "would seem to any detached observer as a less than ideal source of

---

[29]See, e.g., Jefferson's statement in Notes on the State of Virginia (1784), that "[t]he legitimate powers of government extend to such acts only as are injurious to others.  But it does me no injury for my neighbor to say there are twenty gods, or no god. It neither picks my pocket nor breaks my leg."

contemporary history as to the meaning of the Religion Clauses of the First Amendment"),  the

Supreme Court has nevertheless looked to Jefferson to help explain the Religion Clauses.  See

Everson v. Bd. of Educ. of Ewing Twp., 330 U.S. 1, 13 (1947); Reynolds v. United States, 98 U.S.

145, 164 (1878)(asserting that Jefferson's views on the Religion Clause is authoritative).  See also

Wallace v. Jaffree, 472 U.S. 38, 92-3 (1985)(Rehnquist, J, dissenting)(criticizing the Supreme

Court's reliance on Jefferson's writings).

The various inspirations for the Free Exercise Clause provide no clear historical answer

how to handle conflicts between the government's rights protect the public welfare and Americans'

rights to practice their faith.[30]  See City of Boerne v. Flores, 521 U.S. at 562 (O'Connor, J,

[30]Congressional debates surrounding the First Amendment's passage also do not suggest where to draw the line between free exercise and public welfare.  Madison's proposed language, which was as broad a proposition as was debated, stated: "The civil rights of none shall be abridged on account of religious belief or worship, nor shall any national religion be established, nor shall the full and equal rights of conscience be in any manner, or on any pretext, infringed. No state shall violate the equal rights of conscience…" 1 Annals of Congress 434 (Gales & Seaton eds. 1789). See Kurland, supra note 115, at 7. Congress never seriously considered such a broad amendment; instead, the House debate centered on a clause that reads: "[N]o religion shall be established by law, nor shall the equal rights of conscience be infringed." 1 Annals of Congress 729 (Gales & Seaton eds. 1789). See Kurland, supra note 115, at 8. Madison interpreted this proposal to mean "that Congress should not establish a religion, and enforce the legal observation of it by law, nor compel men to worship God in any manner contrary to their conscience." 1 Annals of Congress 730 (Gales & Seaton eds. 1789). To protect "worship" could mean what religious freedom in theory means today: government cannot interfere with a person's religious worship. An equally reasonable interpretation would be that the government must not ban certain beliefs or establish a few tenets of faith to which all faiths must adhere. The criticism of Madison's proposal indicates that it was much more likely that the latter was the intended meaning. Some feared that the amendment as written would be viewed as antireligious. One congressman, agreeing with the Madisonian interpretation of the proposed clause, thought it might allow the federal government to infringe on the state's power to support religion by allowing the federal courts to abstain from enforcing any commitments "for a support of minister or building of place of worship." 1 Annals of Congress at 730 (remarks of Congressman Huntington). The final House version read: "Congress shall make no law establishing religion, or to prevent the free exercise thereof, or to infringe the rights of conscience." The additional clause in the House version may well have been intended simply to prohibit the courts from treating the state-church relationship

dissenting)("[I]t is not possible to distill [the Framers'] thoughts into one tidy formula.").  This is true even though the conflict is by no means a modern issue.  In fact, the Supreme Court's earliest precedent on the Free Exercise Clause also concerned a local government's restriction on religious practice to help stem the spread of a deadly disease.  Permoli v. Municipality No. 1 of the City of New Orleans, 44 U.S. 589 (1845), concerned a public health ordinance that banned open-casket funerals in the local Catholic church and required that they be held in a separate, approved chapel.  See 44 U.S. at 591.  Although generally applicable, in practice the ordinance did not affect protestants, who conducted funerals in the open air at grave-sites.  See 44 U.S. at 601.  New Orleans' lawyer defended the ordinance partly on the ground that "New Orleans is visited annually with the yellow fever, in either the sporadic or epidemic form, and strong sanitary measures are deemed indispensable there to check the range and prevalence of the pestilence when it comes," and that Catholics "perform the mortuary services with the corpse exposed in open church, and before the congregation."  44 U.S. at 600-01.  The Supreme Court ultimately did not decide whether New Orleans' order violated the Free Exercise Clause, because it concluded that it did not have jurisdiction to hear the case.  See 44 U.S. at 609.  Despite avoiding the issue in Permoli v. Municipality No. 1 of the City of New Orleans, the Supreme Court recognized that religious

---

as something unique and the Congress from interfering at all in that relationship. In other words, "thereof" may simply mean the establishment churches of the state.

The Senate version of the Religion Clause read: "Congress shall make no law establishing articles of faith or a mode of worship, or prohibiting the free exercise of religion[.]"  1 Documentary History of the First Federal Congress of the United States of America, March 4, 1789- March 3, 1791, at 166 (L. Grant De Pau ed. 1972).  A joint conference committee produced the present language.  See Documentary History of the First Federal Congress of the United States of America, March 4, 1789- March 3, 1791, at 188, 189, 192.  If the Senate version defines establishment, and if religion was seen as encompassing faith and worship, one could argue that the two clauses simply mean that Congress may not establish the tenets of faith or the rituals used in worship, nor prohibit the states from freely doing so.

freedom does not act as an absolute shield against generally applicable laws in its first true case

concerning the Free Exercise Clause in 1878, <u>Reynolds v. United States</u>.

**B.    THE FREEDOM OF ASSEMBLY IS TRADITIONALLY A POLITICAL RIGHT.**

The First Amendment to the Constitution of the United States guarantees that "Congress

shall make no law . . . abridging . . . the  right of the people peaceably to assemble."  U.S. Const.

amend. I.  The right to assemble was not a controversial addition to the Bill of Rights -- the only

controversy concerning its passage concerned whether it even needed enumeration.  <u>See</u> Tabatha

Abu El-Haj, <u>The Neglected Right of Assembly</u>, 56 U.C.L.A. L. Rev. 543, 564-65 (2009)(noting

that this right was a traditional right in England).[31]  The proposed assembly right that James

Madison first proposed in the House of Representatives looks slightly different, and more

expansive, than the version adopted in the Bill of Rights.  Madison proposed: "The people shall

not be restrained from peaceably assembling and consulting for their common good; nor from

applying to the legislature by petitions, or remonstrances for redress of their grievances."  John D.

Inazu, <u>The Forgotten Freedom of Assembly</u>, 84 Tul. L. Rev. 565, 572 (2010)("<u>Forgotten</u>

<u>Freedom</u>")(citing <u>The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins</u> 129

(Neil H. Cogan ed., 1997)).  The House of Representative eventually debated condensed language

which incorporated speech rights: "The freedom of speech and of the press, and the right of the

people peaceably to assemble and consult for their common good, and to apply to the government

for redress of grievances shall not be infringed."  The Congressional Register, August 15, 1789.

---

[31]The Bill of Rights 1689, which William III of Orange agreed to accept upon ascension to the throne in the Glorious Revolution, states that "it is the right of the subjects to petition the king, and all commitments and prosecutions for such petitioning are illegal."  Bill of Rights, 1689, 1 W. & M., 2d Sess., c.2.

Theodore Sedgwick, representative from Massachusetts, spoke to oppose including the freedom of assembly, because he thought it diminished the other enumerated rights, and he argued that:

> [s]hall we secure the freedom of speech, and think it necessary at the same time to allow the right of assembling?  If people freely converse together, they must assemble for that purpose; it is self-evident unalienable right which the people possess; it is certainly a thing that never would be called in question; it is derogatory to the dignity of the house to descend to such minutiae.

The Congressional Register, August 15, 1789.  Sedgwick's proposal "lost by a considerable majority."  The Congressional Register, August 15, 1789.  Those opposed to Sedgwick's amendment noted that North Carolina and Virginia had recommended this amendment, that state constitutions had similar provisions, and that this freedom had been suppressed in the past and was therefore in need of express enumeration.[32]

---

[32]The debate concerning Sedgwick's amendment contains a notable parallel to the problem before the Court.  Congressman Sedgwick, in defense of his amendment, sarcastically said that the committee might just as well "have declared that a man should have a right to wear his hat if he pleased," or "could go to bed when he thought proper," as these rights were just as in need of enumeration as the right to assemble.  Congressman John Page, from Virginia, responded that not only had people "been prevented from assembling together on their lawful occasions," but that "a man has been obliged to pull off his hat when he appeared before the face of authority."

Page was referring William Penn and his trial for violating the 1664 Conventicle Act, "a *cause celebre* in America."  Origins and Historical Understanding, 103 Harv. L. Rev. at 1472.  On August 14, 1670, William Penn and other Quakers attempted to gather at their meeting-house in London.  See Forgotten Freedom at 575.  Soldiers prevented his entrance, and so Penn conducted his sermon outside on the street.  See Forgotten Freedom at 575.  As he began to speak, Penn was arrested for violating the 1664 Conventicle Act.  This Act forbade religious gatherings of groups of five or more people, other than immediate family, not associated with the Church of England.  See Forgotten Freedom at 575.  Parliament justified the 1664 Conventicle Act and its prohibition against gatherings of five or more people based on its concerns over the threats these meetings posed to the government.  It cited the "growing and dangerous Practices of Seditious Sectaryes and other disloyall persons who under pretence of Tender Consciencies doe at their Meetings contrive Insurrections as late experience hath shewed," as a reason for the act,  1664 Conventicle Act, § I, and it granted local officials the power to stop all such meetings to prevent "the mischeifes which may grow by such Seditious and Tumultuous Meetings under pretence of Religious Worship," 1664 Conventicle Act, § VIII.  Notably, Parliament cited harms threatening the safety of the current government rather than the public's safety.

As noted during the House floor debate, State constitutions at the time had robust assembly and petition protections.  These protections linked the freedom of assembly to democractic process; the right to assemble was closely linked to the right to petition the government. Massachusetts' 1780 Constitution, for example, stated that "[t]he people have a right, in an orderly and peaceable manner, to assemble to consult upon the common good; give instructions to their representatives, and to request of the legislative body, by the way of addresses, petitions, or remonstrances, redress of the wrongs done them, and of the grievances they suffer."  New Hampshire's 1780 Constitution contains very similar language.  North Carolina, Pennsylvania, and Vermont meanwhile, protected the people's "right to assemble together, to consult for their common good, to instruct their representatives, and to apply to the legislature for redress of grievances."[33]  Delaware's 1776 Declaration of Rights and Maryland's 1776 Declaration of Rights stated that "every man hath a right to petition the Legislature for the redress of grievances in a

---

Although he essentially confessed, Penn was ultimately acquitted for violating the Act the jury repeatedly refused to follow jury instructions and find him guilty.  See Kenneth Hoyt, What Jurors Know: a Trial Judge's Perspective, 40 S. Tex. L. Rev. 907, 911-12 (1999); David Dorfman & Chris Iijima, Fictions, Fault, and Forgiveness: Jury Nullification in a New Context, 28 Mich. J. L. Reform 861, 868 (1995).  This was one of the earliest and still one of the most famous examples of that other traditional democratic right: jury nullification.  See United States v. Courtney, 960 F. Supp. 2d 1152, 1189-90 (D.N.M. 2013)(Browning, J.).  The United States has since forbidden jury nullification, and Legacy Church is therefore forbidden from appealing directly to jurors in the same way William Penn could.  See United States v. Courtney, 960 F. Supp. 2d at 1173.

Even though the jury refused to convict Penn for violating the ban on mass religious gatherings in the 1664 Conventicle Act, the government still punished Penn for his religious principles.  Penn arrived in court without wearing a hat, "but knowing his religious scruple, the judge ordered a court official to place a hat on his head."  Origins and Historical Understanding, 103 Harv. L. Rev. at 1472.  When Penn refused to remove the hat in respect to the court, as Quaker faith dictates, the court held him in contempt and imprisoned him.  See Origins and Historical Understanding, 103 Harv. L. Rev. at 1472.

[33]Pennsylvania and Vermont's Declaration of Rights added that citizens could apply for redress of grievances "by address, petition, or remonstrance."  Pennsylvania Declaration of Rights 1776, § XVI; Vermont Declaration of Rights 1777, § XVIII.

peaceable and orderly manner."  That the right to assemble is closely linked to democratic government is also evident from the legislative history surrounding the right to assemble.  The proposal to qualify the freedom of assembly with the requirement that it be "to instruct their representatives," although defeated, garnered significant debate.  See Baylen J. Linnekin, "Tavern Tak" and the Origins of the Assembly Clause: Tracing the First Amendment's Assembly Clause Back to its Roots in Colonial Taverns, 39 Hastings Const. L.Q. 593, 614-15 (2012).  And until it was dropped without explanation from the final draft, both the House and the Senate had approved versions of the right which qualified the right to assemble as the right "to peaceably assemble and to consult for their common good."  Forgotten Freedom at 572-73.  The assembly right thus derives in spirit, at least, from the democratic government the founders envisioned, and the ability of all citizens under that government to seek change.  See The Neglected Right of Assembly, 56 U.C.L.A. L. Rev. at 565 ("The right was understood primarily to protect a democratic practice.").  In this vein, Georgia Congressman James Jackson noted that the freedom "to assemble and consult for the common good, . . . had been used in this country as one of the best checks on the British legislature in their unjustifiable attempts to tax the colonies without their consent."  1 Annals of Congress 139-40 (1791).

## IV.   LEGACY CHURCH IS NOT SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS OF ITS FREE EXERCISE CLAIM AGAINST THE JUNE 30 ORDER OR THE JULY 13 ORDER.

The June 30 Order's provisions that are most relevant to Legacy Church's Free Exercise claim are no longer in effect.  The July 13 Order superseded the June 30 Order on the day that the Court issues this Memorandum Opinion and Order.  Nonetheless, the Court, as it did with the MTD, recognizes that it is not implausible that Secretary Kunkel will, in the future, issue a Public Health Order that is similar to the June 30 Order.  Accordingly, the Court evaluates whether Legacy

Church is substantially likely to succeed on a claim that the June 30 Order violates its Free Exercise rights.

Legacy Church asserts a broader interest in the PI Motion than it does in the Complaint. In the PI Motion, Legacy Church requests that the Court enjoin Secretary Kunkel so that Legacy Church "can freely exercise its religion, by conducting services in accordance with its sincerely held religious beliefs." PI Motion at 3. Legacy Church requests that the Court "prohibit[] the Secretary from now enforcing mass gatherings restrictions on places of worship, including Legacy's four New Mexico campuses." PI Motion at 11. Legacy Church says that it is willing to employ "the same socially distanced measures used by essential businesses." PI Motion at 12. "In the alternative," Legacy Church "requests that restrictions on gathering be no-less than those imposed on retail spaces in the state." PI Motion at 12. Legacy Church thus asks that the Court "enjoin the Secretary from enforcing the [Public Health Orders'] mass gathering restriction of five people or more in a connected space, as it specifically targets people freely exercising their religious beliefs." PI Motion at 12.

Although the Court denied the PI Motion under the TRO standard in the TRO MOO, Legacy Church has not submitted any new motions that reflect the current restrictions, but instead asked that the Court apply the arguments it makes in favor of the TRO to its request for a preliminary injunction. The Court thus applies the PI Motion's arguments to the most recent the June 30 Order, which is the Public Health Order in effect during the July 10 evidentiary hearing, to determine whether Legacy Church is entitled to injunctive relief on its Free Exercise or Freedom of Assembly claims. The Court construes the PI Motion to allege that the June 30 Order is not generally applicable, nonneutral, and overly restrictive, as those are the arguments that Legacy Church makes against the April 11 Order in the PI Motion. Although the Public Health Orders no

- 170 -

longer infringe Legacy Church's right to broadcast its services, "it is readily and reasonably inferable from [its] allegations that the 25% indoor capacity limitation would continue to burden [its] free exercise of religion." Soos v. Cuomo, No. 20-cv-0651 GLS\DJS, 2020 WL 3488742, at *10 (N.D.N.Y. June 26, 2020)(Sharpe, J.). Last, the Court evaluates whether Legacy Church is entitled to an injunction against the July 13 Order, which becomes effective on the day that the Court issues this Memorandum Order and Opinion.

Since April 17, 2020, when the Court issued the TRO MOO, the COVID-19 threat that New Mexico faces had declined, for a time, but has increased lately, with the number of infections, the positivity rate in coronavirus tests, and the transmissibility rate all on the rise. See FOF ¶¶ 277-79, at 54-56. Until the July 13 Order, however, Secretary Kunkel's Public Health Rrders have generally decreased in restrictiveness. Compare, e.g., April 11 Order at 4 (prohibiting all religious gatherings of more than four individuals within an enclosed space), with, e.g., May 15 Order at 4-5 (permitting religious gatherings whose participants amount to less than twenty-five percent of an enclosed space's maximum occupancy). ). See FOF ¶¶ 80-121, at 21-29. Accordingly, the question before the Court is whether the June 30 Order is either not neutral or not generally applicable and, if it is not, whether the May 15 Order is narrowly tailored to further the Secretary's response to the coronavirus threat that New Mexico faces on May 15. See Lukumi, 508 U.S. at 547.

The Court begins its analysis with the observation that, when the State faces a major public health threat, as New Mexico now does, its Tenth Amendment police and public health powers are heightened. "The right to practice religion freely does not include liberty to expose the community . . . to communicable disease or the latter to ill health or death." Prince v. Massachusetts, 321 U.S. at 166-67. Nonetheless, no matter how grave the emergency, individual constitutional freedoms -

- such as the free exercise of religion, one of the United States' most treasured and closely guarded liberties -- constrain State action.  See, e.g., Jacobson v. Massachusetts, 197 U.S. at 29; In re Abbott, 954 F.3d at 784.  Further, as the coronavirus threat ebbs and flows, New Mexico must ensure that its Public Health Orders remain commensurate in scope with current public health needs.  Cf. Shelby Cty., Ala. v. Holder, 570 U.S. 529, 536 (2013)("'[T]he Act imposes current burdens and must be justified by current needs.'" (quoting Nw. Austin Municipal Util. Dist. No. One v. Holder, 557 U.S. 193, 203 (2009))).

If the June 30 Order is neutral and generally applicable, however, Secretary Kunkel faces a lower burden in demonstrating this means-end fit, because it need not demonstrate that less restrictive means are unavailable.  Compare City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 442 (1985)("[R]ational means to serve a legitimate end[.]"), with Bernal v. Fainter, 467 U.S. 216, 219 (1984)("In order to withstand strict scrutiny, the law must advance a compelling state interest by the least restrictive means available.").  This is because the Supreme Court has concluded that the Free Exercise Clause prohibits the government from imposing special disability on the basis of religion; government may not "ban [religiously motivated] acts or abstentions only when they are engaged in for religious reasons, or only because of the religious belief that they display," Smith, 494 U.S. at 877, or impose special disability on religious status, see Espinoza v. Montana Dep't of Revenue, 2020 WL 3518364, at *5 (citing Trinity Lutheran Church of Columbia, Inc. v. Comer, 137 S. Ct. at 2021).  Instead, the First Amendment is not "offended" when infringement on religious conduct is not government's "object . . . , but merely the incidental effect of a generally applicable and otherwise valid provision."  Smith 494 U.S. at 878.  Although neither Smith nor Lukumi defines clearly the general-applicability requirement, see Lukumi, 508 U.S. at 543 ("In this case we need not define with precision the standard used to evaluate whether

- 172 -

a prohibition is of general application, for these ordinances fall well below the minimum standard necessary to protect First Amendment rights."), if restricting religious activity is not New Mexico's object, but rather an incidental effect of an across-the-board restriction on similar activity -- both secular and religious -- then New Mexico need not demonstrate that it has chosen the most permissible lockdown regime with respect to religion, see Lukumi, 508 U.S. at 543 (holding that "government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief"); id. at 533 (holding that a law is not neutral "if the object of a law is to infringe upon or restrict practices because of their religious motivation").

### A.      THE JUNE 30 ORDER IS NEUTRAL, BECAUSE IT DOES NOT IMPOSE SPECIAL DISABILITY ON THE BASIS OF RELIGION.

The Court first examines the facial neutrality requirement.  A law is facially nonneutral when, by its terms, it imposes special disability on the basis of religion.  See Lukumi, 508 U.S. at 557-58 (Scalia, J., concurring in part and concurring in the judgment, joined by Rehnquist, C.J.). A law imposes special disability on the basis of religion when it singles out religion for reasons unrelated to the interests that the law purportedly advances.  See Lukumi, 508 U.S. at 533 ("A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context.").  Legacy Church avers that the Public Health Orders are not facially neutral, because they "specifically target[] houses of worship.  The Secretary does not restrict the number of people who may gather at funeral homes, media outlets, and other essential businesses. Walmart, Home Depot, and other big box retailers continue to welcome patrons."  PI Motion at 6. As a preliminary matter, Legacy Church's characterization of the Public Health Orders' effect on essential businesses is incorrect.   Contrary to Legacy Church's characterization, essential businesses may continue operating, but only if they comply with myriad restrictions.  In fact,

Legacy Church receives the same treatment as all essential retail businesses, because Legacy Church and essential retail businesses must cap occupancy at twenty-five percent, enforce social distancing measures, and require masks.  See June 30 Order at 5-6.

Moreover, that a law mentions religion does not necessarily mean that the law is facially nonneutral.  See Maryville Baptist Church, Inc. v. Beshear, 2020 WL 2111316, at *3 (6th Cir. May 2, 2020)(per curiam)(noting that a law's mentioning religious gatherings "by name" does not establish "that the Governor singled out faith groups").  This is so especially when the law mentions religious conduct alongside a host of secular conduct.  Cf. Lukumi, 508 U.S. at 535-36 (concluding that a law was non-neutral despite the law not expressly mentioning religious conduct, because the law's secular exemptions demonstrated the law's object as restricting religious conduct).  Instead, the test is whether the law mentions religious conduct without reference to the law's purported secular interests.  See Lukumi, 508 U.S. at 533.  Moreover, unlike the April 11 Order, the June 30 Order mentions religion not to remove a freedom that a previous Public Health Order referenced, but rather to make clear that the June 30 Order's restrictions on mass gatherings do not apply to houses of worship.  See June 30 Order at 6-7.  Accordingly, Secretary Kunkel has asserted plausible, non-discriminatory reasons for the June 30 Order's reference to religion, and so the June 30 Order is facially neutral.

There is some ambiguity regarding whether the neutrality prong involves inquiring into lawmaker's subjective intent, or whether courts should examine only a law's text to determine whether the law facially discriminates against religion.  Concurring in Lukumi, Justice Scalia elaborated on Smith's neutrality and general applicability principles:

> The terms "neutrality" and "general applicability" are not to be found within the First Amendment itself, of course, but are used in [Smith] and earlier cases to describe those characteristics which cause a law that prohibits an activity a

particular individual wishes to engage in for religious reasons nonetheless not to constitute a "law . . . prohibiting the free exercise" of religion within the meaning of the First Amendment.  In my view, the defect of lack of neutrality applies primarily to those laws that by their terms impose disabilities on the basis of religion (e.g., a law excluding members of a certain sect from public benefits, *cf. McDaniel v. Paty*, . . . , *see Bowen v. Roy*, . . . ; whereas the defect of lack of general applicability applies primarily to those laws which, though neutral in their terms, through their design, construction, or enforcement target the practices of a particular religion for discriminatory treatment, *see Fowler v. Rhode Island*, 345 U.S. 67 (1953).  But certainly a law that is not of general applicability (in the sense I have described) can be considered "nonneutral"; and certainly no law that is nonneutral (in the relevant sense) can be thought to be of general applicability.

Lukumi, 508 U.S. at 557-58 (Scalia, J., concurring in part and concurring in the judgment, joined by Rehnquist, C.J.).  Justice Scalia there criticizes Justice Kennedy's inquiry into lawmakers' subjective intent to determine whether a law is neutral and generally applicable.  See 508 U.S. at 557-58.  Justice Scalia added that Smith and the precedent on which it is based focus, as the primary examination, not on lawmakers' subjective intentions, but rather on the "object of the *laws* at issue." Lukumi, 508 U.S. at 558 (Scalia, J., concurring, joined by Rehnquist, C.J.)(emphasis in original).  Justice Kennedy's inquiry into the city-defendant's subjective intent in passing the ordinances at issue in Lukumi thus did not convince a majority of the Supreme Court's Justices. See Lukumi, 508 U.S. at 523 n.* ("THE CHIEF JUSTICE, Justice SCALIA, and Justice THOMAS join all but Part II-A-2 of this opinion. Justice WHITE joins all but Part II-A of this opinion. Justice SOUTER joins only Parts I, III, and IV of this opinion.").

The Court nonetheless examines the June 30 Order's language and circumstances to determine whether the June 30 Order manifests religious animus.  Although such an inquiry did not carry the majority in Lukumi, the Supreme Court's analysis in Masterpiece Cakeshop suggests that lawmakers' religious bigotry or animus may violate the First Amendment, even where an underlying law may be facially neutral and generally applicable.  See Masterpiece Cakeshop, 138

S. Ct. at 1731-32.[34]  As the Court concluded in the TRO MOO, there is no evidence that religious

bigotry or animus motivated the April 11 Order.  See TRO MOO, 2020 WL 1905586, at *32;

Genevieve Lakier, "Religious Liberties and the COVID-19 Pandemic," YouTube (May 8, 2020),

33:40-35:30, https://www.youtube.com/watch?v=bgqIwdFB2Hg (commenting that the Court

"went out of its way" to ensure that animus against religion did not motivate Secretary Kunkel's

restrictions on houses of worship).  Although the April 11 Order's timing -- issued the day before

Easter -- troubles the Court, the Court concluded, in the TRO MOO, that new coronavirus cases

had increased steadily in the days leading up to Easter, and Governor Lujan Grisham received

word that several churches were planning to offer full Easter services.  See TRO MOO, 2020 WL

1905586, at *32.  These churches' plans, in Secretary Kunkel's view, endangered public health,

not because of their religious nature, but because they involved masses of people in closed spaces

and in close proximity.  As Secretary Kunkel has asserted a plausible, religion-neutral justification

for the April 11 Order's timing, the Court saw no animus or overt discrimination in the April 11

Order's timing.  See TRO MOO, 2020 WL 1905586, at *32.  There is similarly no evidence that

religious bigotry or animus motivates the June 30 Order, which affords far more latitude to

churches than did the April 11 Order.  As Secretary Kunkel apparently perceived the COVID-19

threat as diminishing in May and June, she relaxed restrictions on religious gatherings.  Moreover,

---

[34]The Court notes that, while Lukumi provides that courts should subject nonneutral laws to strict scrutiny, see Lukumi, 508 U.S. at 546, nowhere is such an analysis found in Justice Kennedy's opinion for the Supreme Court in Masterpiece Cakeshop.  After concluding that the defendant Colorado Civil Rights Commissioner's comments expressed hostility to religion, Justice Kennedy concluded that the defendant's actions violated the plaintiff's Free Exercise rights without any strict scrutiny analysis.  See 138 S. Ct. at 1731-32.  While, as the Justice Scalia notes in his concurring opinion in Lukumi, see 508 U.S. at 557-58, discerning subjective intent is a very poor constitutional analysis and test, if the policymaker or enforcer is unwise enough to make anti-Christian comments while formulating or implementing policy, the law may have a harder time meeting the neutrality standard.  See Masterpiece Cakeshop, 138 S. Ct. at 1731-32.

these restrictions remained relaxed through the first half of July, 2020, despite New Mexico seeing record-high new-case averages.  See FOF ¶¶ 118-122, 130, 276-79, at 28-29, 31, 54-56.  As discussed below, the June 30 Order is solicitous of religious gatherings, because it affords greater freedom to churches than it does to analogous secular conduct, like concerts, conferences, or theaters.  See June 30 Order at 5-6.  The June 30 Order thus has as its object is something other than the infringement or restriction of religious practices."  Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 649-50.

### B.   THE JUNE 30 ORDER IS GENERALLY APPLICABLE.

Legacy Church also contends that the Public Health Orders are not generally applicable, because it is underinclusive with regards to secular conduct that might cause the same harm that the prohibition against religious gatherings is supposed to prevent.  See PI Motion at 7.  Legacy Church's primary argument that the June 30 Public Health Order is not generally applicable is that it sets different restrictions on churches, gyms, and restaurants.  See Legacy Church Response to June 29, 2020, Minute Order at 1.  The general-applicability requirement is related closely to the neutrality requirement.  See Lukumi, 508 U.S. at 531.  Although all laws "are selective to some extent," a regulation is not generally applicable when the government affords favorable treatment to secular conduct "that endangers the [government]'s interests in a similar or greater degree" as does restricted religious activity.  Lukumi, 508 U.S. at 542-43.  Here, at a quick glance, the June 30 Order appears not to be generally applicable, because it sets different occupancy restrictions for restaurants and gyms, on the one hand, and churches, on the other hand.  As the Court will discuss, however, the June 30 Order does not afford favorable treatment to secular conduct that, in Secretary Kunkel's plausible estimation, endangers the public health in a similar or greater degree.

The Honorable John G. Roberts, Jr., Chief Justice of the Supreme Court of the United States, famously said at his confirmation hearing:

> Judges and Justices are servants of the law, not the other way around . . . . Judges are like umpires.  Umpires don't make the rules, they apply them.  The role of an umpire and a judge is critical.  They make sure everybody plays by the rules, but it is a limited role.  Nobody ever went to a ball game to see an umpire.

Confirmation Hearing on the Nomination of John G. Roberts, Jr. to be Chief Justice of the United States Before the S. Comm. on the Judiciary, 109th Cong. 55 (2005)(statement of Judge John G. Roberts, Jr.).  While this metaphor may not empirically be apt, see Neil S. Siegel, Umpires at Bat: On Integration and Legitimation, 24 Const. Comment. 701, 702- 11 (2007); or necessarily helpful, see Kim McLane Wardlaw, Umpires, Empathy, and Activism: Lessons from Judge Cardozo, 65 Notre Dame L. Rev. 1629, 1636 (2010)("The judge-as-umpire construct establishes a false choice between the judge who calls balls and strikes, and nothing more, and the activist judge who behaves extrajudiciously."), it is clear that some Justices have wider strike zones than other Justices, and that a Justice's strike zone is apt to vary with the subject matter of the case that Justice is deciding.  In South Bay, Chief Justice Roberts concurred in a denial of application for injunctive relief that a church filed to enjoin an Executive Order by the Governor of California.  See South Bay, 140 S. Ct. at 1613.  Chief Justice Roberts demonstrated that he is inclined to call a broad strike zone regarding the States' responses to the coronavirus pandemic.  See South Bay, 140 S. Ct. 1613, 1614 (2020)(Roberts, C.J., concurring).  According to Chief Justice Roberts, where public officials act in the face of both grave threat and scientific uncertainty, those officials are subject to broad limits and, unless they clearly exceed those broad limits, unelected judges should not second-guess those officials' expertise.  See South Bay, 140 S. Ct. at 1614 (citing Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 545 (1985)).  Were the Court a policymaker, it

would draft a different Public Health Order. But the Court is not a policymaker. As a Court, Secretary Kunkel's relatively broad strike zone informs the analysis. Where the State points to plausible conclusions that the secular activities that are treated more favorably than religious activities do not endanger to the public health to a similar or greater degree than the restricted religious activities, and where the Court, through its own research, does not find any reliable information that undermines the State's conclusions, the Court is inclined to conclude, under Chief Justice Roberts' guidance, that the State has imposed a generally applicable law.

The Court also comments on the standard for general applicability. Legacy Church argues that the April 11 Order is not generally applicable, in part because it is not the least restrictive means of protecting the public health. See April 16 Tr. at 13:14-17 (Hunter). But the generally-applicable and neutral standards cannot equal a least-restrictive-means standard, else Smith's rational basis prescription -- and its "'parade of horribles'" that would result from subjecting generally applicable, neutral laws to strict scrutiny, see Smith, 494 U.S. at 889 n.5 (quoting Smith, 494 U.S. at 902 (O'Connor, J., concurring) -- would amount to semantics. Asserting that government action that burdens religions is subject to rational basis unless it the action is not the least restrictive means towards achieving the government's stated end is a tautology, one that erases the distinction between the standards of review. The Court's review of governmental action's constitutionality requires that it apply the correct standard of review, and that application requires criteria beyond the test that the standard of review prescribes. For example, strict scrutiny applies when the government, among other presumptively impermissible actions, discriminates on the basis of race, and the Court asks whether that discrimination is narrowly tailored after identifying racial discrimination. See, e.g., Adarand Constructors v. Peña, 515 U.S. 200 (1995).

Here, the April 11 Order is subject to rational basis review unless it is nonneutral or not generally applicable.

The Court first compares the June 30 Order's religious-gathering exemptions to the restrictions it places on analogous secular conduct. The June 30 Order restricts indoor religious gatherings to twenty-five percent occupancy. See June 30 Order ¶ 2, at 6. Also restricted to twenty-five-percent occupancy are all essential retail businesses, all non-essential retail businesses that are not defined as recreational businesses, and shopping malls. See June 30 Order at 7. The June 30 Order defines recreational businesses and activities by way of example: recreational facilities "include indoor movie theaters, museums, bowling alleys, miniature golf, arcades, amusement parks, concert venues, event venues, performance venues, go-kart courses, adult entertainment venues, and other places of indoor recreation or indoor entertainment." June 30 Order ¶ 7, at 6. Of all the restricted activities, certain recreational facilities like movie theaters and concert venues are most like religious mass gatherings in terms of the public health risks presented. See FOF ¶¶ 262-63, at 51. According to Secretary Kunkel, movie theaters, museums, and concert venues involve high contact intensity and high number of contacts, and so present relatively severe public health risks. See Disparity Brief at 2-4 (citing Public Guidance at 12). Secretary Kunkel says that indoor religious services present equivalent risks. See Public Health Guidance at 12; FOF ¶¶ 262-63, at 51. . Although, in Secretary Kunkel's estimation, indoor religious mass gatherings, concerts, and movie theaters present equivalent public health risks, the June 30 Order treats indoor religious services favorably, allowing them to operate at twenty-five percent capacity, while closing concerts and movie theaters entirely. See June 30 Order at 5-7. The June 30 Order thus does not afford favorable treatment to conduct that, in Secretary Kunkel's estimation, "endangers the [government]'s interests in a similar or greater degree" as does religious activity.

Lukumi, 508 U.S. at 543.  Accordingly, with respect to other mass gathering activities, Secretary

Kunkel has demonstrated that the June 30 Order is generally applicable.

The Court next compares the June 30 Order's treatment of gyms and restaurants, on the

one hand, and religious mass gatherings, on the other hand.  The June 30 Order permits gyms and

restaurants to operate at fifty percent capacity while restricting churches to twenty-five percent

capacity.  See June 30 Order ¶¶ 2-4, at 6-7.  According to Secretary Kunkel, restaurants and gyms

present a medium level of both contact intensity and number of contacts.  See Disparity Brief at 7

(citing Public Guidance at 12; FOF ¶¶ 264-65, at 51-52.  Secretary Kunkel avers that houses of

worship, alternatively, present a high level of both contact intensity and number of contacts.  See

Disparity Brief at 8 (citing Public Guidance at 16); FOF ¶¶ 262-66, at 51-52..[35]  Secretary Kunkel

---

[35]The Court is skeptical of the source on which Secretary Kunkel relies.  She relies on a study from Johns Hopkins University, which thirteen epidemiologists wrote, that support the Public Health Order's different treatment of restaurants, gyms, and houses of worship.  See Disparity Brief at 6-8.  In the Court's view, the Public Guidance document is heavy on anecdote and conjecture and light on concrete science.  Most sources similarly rely, however, on doctors and epidemiologists' assertions regarding which activities present the highest risk, without providing any statistical modeling that supports those assertions.  See, e.g., Allison Hurley, "From Camping To Dining Out: Here's How Experts Rate The Risks Of 14 Summer Activities," Nat'l Pub. Radio (May 23, 2020), https://www.npr.org/sections/health-shots/2020/05/23/861325631/from-camping-to-dining-out-heres-how-experts-rate-the-risks-of-14-summer-activit (last visited July 12, 2020).  It may be, however, that anecdotal evidence is all the public has at the moment.  As the Public Guidance document notes, "[t]here are still many gaps in scientific understanding about the transmission dynamics of SARS-CoV-2."  Public Guidance at 8.  Further, the Court is unable to locate any credible science that contradicts the Public Guidance document's general assertions.  Moreover, most experts agree that restaurants remain among the riskier activities, they may not be as dangerous as indoor mass gatherings that involve prolonged proximity, like concerts, lectures, and religious services.  E.g., Alyin Woodward, "70% of people infected with the coronavirus did not pass it to anyone, preliminary research shows.  Superspreading events account for most transmission," Bus. Insider (June 4, 2020), https://www.businessinsider.com/super-spreader-events-account-for-most-coronavirus-transmission-2020-6 (last visited July 12, 2020)(providing several examples of religious services being responsible for a large percentage of a local population's outbreak, and quoting an epidemiologist as saying that "[a]nything outdoors is fine.  I'm less concerned about protests," and that "restaurants and bars could also probably operate at 50% capacity, with empty tables between

further asserts that, although mitigation measures are difficult for all mass gatherings, they are more feasible for restaurants and gyms, which are subject to regular health and safety inspections, and the June 30 Order imposes such measures.  See Public Guidance at 12-16.  The June 30 Order permits limited restaurant operation that is conditioned on compliance with safety measures: restaurants must ensure that at least six feet separate all tables, which are limited to six chairs, and may not serve customers at any bar or counter, or standing area.  See June 30 Order at 5.  Further, restaurants are already subject to a system of health and quality regulations and regular inspections to ensure compliance.  See N.M. Stat Ann. § 25-1-8 (providing that the New Mexico Department of Environment "shall inspect food service establishments to determine compliance or lack of compliance" with regulations).  Such regulations and inspection would not be feasible, and likely unconstitutional, if applied to religious organizations.  See, e.g., Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 339 (1987).  Secretary Kunkel contends that the State may thus more readily ensure compliance the June 30 Order's restrictions in restaurants than it may in religious organizations.  See Disparity Brief at 6-8.

Legacy Church' campuses at twenty-five percent capacity may see as many seven hundred members, a number that few, if any, New Mexico restaurants can hold at fifty percent capacity.

_____

diners"); David Doolittle, "What's More Risky: Going to the Bar or Opening the Mall?" Tex. Med Ass'n (July 8, 2020), https://www.texmed.org/TexasMedicineDetail.aspx?Pageid=46106&id=53977 (last visited July 12, 2020)(ranking activities from most to least dangerous, and asserting that "attending a religious service with 500+ worshippers" is among the most dangerous activities, while "eating in a restaurant (inside) is moderately less dangerous).  See also FOF ¶ 266, at 52.  While the Court would prefer more precise science, public health officials' latitude is "'especially broad'" when those officials "'undertake[ ] to act in areas fraught with medical and scientific uncertainties.'" South Bay, 140 S. Ct. at 1614 (quoting Marshall v. United States, 414 U.S. at 427).  Accordingly, with both the science's limitations and Chief Justice Roberts' broad strike zone in mind, the Court is reluctant to substitute its own opinions for the expertise of Secretary Kunkel and the epidemiologists on which she relies.

While Legacy Church has offered to enforce social distancing among its members, that those members may sit more than six feet from each other does not mean that they all enter and exit the church through different ingress or egress for services that have a fixed start and end time. Secretary Kunkel states that restaurants and gyms, alternatively, are more transitory and so will involve less person-to-person contact.  See Disparity Brief at 7-8.  Although the Court would draw a different line between churches on the one hand, and restaurants and gyms on the other hand, the Court is inclined to think that Secretary Kunkel has cited plausible, religion-neutral justifications for the June 30 Order's differential treatment of restaurants, gyms and bars.

This treatment differs from the impermissible regulations in Lukumi.  There, the defendant-city asserted that the reason for prohibiting ritual sacrifice was that the sacrificed animals' carcasses threatened public health.  See 508 U.S. at 544-45.  A county health official testified, however, that food waste from restaurants posed a greater hazard to public health than sacrificed animals posed.  See 508 U.S. at 544-45.  Restaurant waste was thus analogous to the prohibited religious behavior, because its harms undermined the defendant-city's asserted interest, and it harmed that interest "in a similar or greater degree than Santería sacrifice."  508 U.S. at 543.  Here, Secretary Kunkel states that mass gatherings harm the public health in a greater degree than restaurants and gyms, and so Secretary Kunkel has offered a secular, non-discriminatory purpose in treating gyms and restaurants different than mass gatherings, including religious mass gatherings.  Additionally, the June 30 Order permits churches greater latitude than secular conduct presenting similar public health risks, like concerts, movie showing, and lectures, while affording more freedom only to secular conduct that, according to Secretary Kunkel and the experts on which she relies, presents fewer risks.  Accordingly, the June 30 Order is generally applicable.

The Court next considers Governor Lujan Grisham's comments regarding the recent protests.  In its Response to the July 2, 2020, Minute Order, Legacy Church notes that Governor Lujan Grisham has commended recent protests against racism, police violence, and the killing of George Floyd in Minneapolis, Minnesota.[36]  See Legacy Church Response to July 2, 2020, Minute

---

[36]Regarding the protests, Governor Lujan Grisham stated:

> I want to wholeheartedly commend the thousands of New Mexicans who peacefully protested in Albuquerque last night.  Freedom of speech is an undeniable right of every American and every New Mexican, and in moments of crisis, in expressing anger at long-standing injustice and racism, that right is all the more important.  These protesters were part of an exemplary demonstration.

> Later in the night, a small group took a wrong turn, and this is greatly concerning.  We have received reports of shots fired at or in the direction of public safety officers -- and this is flatly unacceptable.  That sort of behavior is an attempt to distort the important work of the peaceful protesters -- who have every right to demonstrate in peace -- and puts both the protesters and public safety officers at risk.  Those individuals, I have complete confidence, will be held accountable.  There is no place in this moment for hijacking the protesters' message of justice and non-violence.

> The president's comments this morning were a dangerous step in this wrong direction.  His effort to militarize the response to these protests will only serve to inflame the feelings of anger and injustice -- and will give rise to additional opportunity for violence and chaos.  I unequivocally reject his notion that physical or military force is the only worthwhile or effective response to these protests.

> The state of New Mexico will stand ready to assist local governments in facilitating peaceful protests.  These protesters are giving voice to powerful and deep feelings about the unacceptable inequity and injustice woven into this country; their stand against racism is a worthy one; and I encourage them to continue demonstrating in a peaceful and safe fashion, remembering the urgent health risks of this moment.  Lastly it is essential that I underscore the importance of not allowing that message to be distorted by the harmful actions of a few bad actors.

Governor issues statement on peaceful protests, president stoking escalation, Office of the Governor, Michelle Lujan Grisham (June 1, 2020), https://www.governor.state.nm.us/2020/06/01/governor-issues-statement-on-peaceful-protests-president-stoking-escalation/ (last visited July 10, 2020)("June 1 Statement").  See FOF ¶ 218, at 45.  Governor Lujan Grisham also posted the following message on her Twitter account: "I

---

Order at 2-3.  Legacy Church contends that these comments create a "de facto exemption for mass gatherings of protestors" and "evince that the policy is not faith or content neutral."  Legacy Church Response to July 2, 2020, Minute Order at 3.  The Court evaluates Governor Lujan Grisham's comments for their effect on the Public Health Orders' general applicability.

Defending Governor Lujan Grisham's comments, Secretary Kunkel first asserts that Governor Lujan Grisham did not encourage protests, but rather stated that, if individuals attend a protest, they should practice social distancing and wear masks.  See July 10 Tr. at 194:18-22 (Guss).  This argument is not convincing.  Governor Lujan Grisham "wholeheartedly commend[ed] the thousands of New Mexicans who peacefully protested in Albuquerque[.]" June 1 Statement at 1.  She further "encourage[s] them to continue demonstrating in a peaceful and safe fashion, remembering the urgent health risks of this moment."  June 1 Statement at 1. Nowhere in the June 1 Statement does Governor Lujan Grisham discourage protests, but rather endorses the protests' message and offers the State's power to "facilitate" further "peaceful protests."  June 1 Statement at 1.  Additionally, the parties have not pointed to -- and the Court has not found -- any statements from Governor Lujan Grisham urging or supporting religious mass gatherings, whether indoor or outdoor.  Second, Secretary Kunkel avers that Governor Lujan Grisham's statements, by themselves, do not demonstrate that the State is selectively enforcing the Public Health Orders against religious gatherings and in favor of secular gatherings.  The Court agrees that there is no evidence of selective enforcement -- the only enforcement action that the

---

encourage all protestors to be safe and to remember the urgent health risks.  Our nation is hurting -- a pain generations deep.  Only justice can heal it.  Only by truly hearing one another, by reckoning with the suffering of long-oppressed communities can we move forward."  Michelle Lujan    Grisham    (@GovMLG),    Twitter    (May    29,    2020,    1:10    PM), https://twitter.com/GovMLG/status/ 1266446768247410688?s=21.  See FOF ¶ 215, at 44.

parties have identified is a letter that the New Mexico Department of Health sent to a church in Truth or Consequences, New Mexico, after the local Sheriff deputized church members, labeled them an essential business, and facilitated in holding a religious service.  See July 10 Tr. at 160:20-24 (Kunkel).  Additionally, the New Mexico Department of Health has enforced the Public Health Orders against non-religious conduct that violated the Public Health Orders, such as an issuance of a cease and desist letter to the Mayor of Grants, New Mexico, who wanted to hold a Fourth of July parade.  See July 10 Tr. at 70:24-71:13 (Kunkel, Esquibel).  See FOF ¶ 222, at 46  The Court is thus not convinced that the Public Health Orders' enforcement renders them nonneutral. Nonetheless, the parties have not pointed to any Supreme Court or Tenth Circuit caselaw which demonstrates that the selective-enforcement analysis applies in determining whether a law is neutral or generally applicable.[37]

---

[37]Secretary Kunkel points to Calvary Chapel Dayton Valley v. Sisolak, No. 3:20-cv-00303-RFB-VCF, 2020 U.S. Dist. LEXIS 103234 (D. Nev. June 11, 2020)(Boulware, J.), to support its selective-enforcement argument.  See Secretary Kunkel Disparity Brief at 15.  In that case, the Honorable Richard F. Boulware II, United States District Judge for the United States District Court for the District of Nevada, considered the doctrine of selective enforcement in an "as-applied Free Exercise" claim.  2020 U.S. Dist. LEXIS 103234, at *12-13.  Judge Boulware first stated that he was "not persuaded that outdoor protest activity is similar to places of worship in terms of the nature of the activity and its ability to be regulated." 2020 U.S. Dist. LEXIS 103234, at *12.  Judge Boulware concluded that enforcing the Public Health Orders against large protests "could result in greater harm than that sought to be avoided by the Directive," and that the "choice between which regulations or laws shall be enforced in social settings is a choice allocated generally to the executive, not the judiciary, absent clear patterns of unconstitutional selective enforcement." 2020 U.S. Dist. LEXIS 103234, at *12.  Judge Boulware also concluded that the plaintiff had not proven a selective-enforcement claim, which, in the Ninth Circuit, requires evidence that the State is enforcing the Public Health Orders against religious gatherings "only." 2020 U.S. Dist. LEXIS 103234, at *12.

The Court agrees that prosecutorial and enforcement decisions are largely the executive branch's prerogative.  The Court does not agree, however, that, in the First Amendment context, a law remains neutral and generally applicable so long as the State does not enforce the law against religious conduct only.  The neutrality requirement as stated in Smith and Lukumi incorporate Equal Protection doctrine, and so a lack of neutrality may be evident in a law's disparate enforcement, if the executive's intent is to discriminate.  See, e.g., Washington v. Davis, 426 U.S.

Instead, the Court concludes that the proper analysis, under <u>Lukumi</u>, is whether Governor Lujan Grisham's comments create a de facto exemption for secular conduct that the Public Health Orders do not extend to analogous religious conduct. Such a selective exemption would likely fall within the "substantial[] overlap" between neutrality and general applicability. <u>See</u> <u>Lukumi</u>, 508 U.S. at 557 (Scalia, J., concurring). The Public Health Orders' text prohibits outdoor protests. <u>See</u> June 30 Order ¶ 4, at 5-6 ("'Mass gathering' means any public gathering, private gathering, organized event, ceremony, parade, or other grouping that bring together five (5) or more individuals in a single room or connected space, confined outdoor space or an open outdoor space."). Although earlier Public Health Orders may have permitted outdoor protest, provided that social-distancing was maintained, <u>see</u> April 30 Order at 5-6 (defining "mass gathering" to exclude outdoor gatherings in which individuals remain more than six feet apart), the Public Health Orders did not permit outdoor protests when the protests occurred, and when Governor Lujan Grisham commended and encouraged the protests, <u>see</u> May 15 Order ¶ 4, at 5. Governor Lujan Grisham's comments thus encourage activity that violates the Public Health Orders, and her statement that New Mexico would facilitate protests creates a de facto exemption. The question, then, is whether the Public Health Orders afford analogous religious conduct the same treatment.

---

229, 246 (1976); <u>Wayte v. United States</u>, 470 U.S. 598, 608 (1985). Moreover, the Court does not see a satisfactory limiting principle in Judge Boulware's analysis. Although Chief Justice Roberts has indicated that States are to receive broad leeway in crafting their responses to the coronavirus, the Court does not suspect that he would require a house of worship to demonstrate that a State is enforcing its public health order only against churches to demonstrate that religious discrimination is afoot. The Court concludes that <u>Masterpiece Cakeshop</u>, in which the Chief Justice joined the majority opinion, does not set so high a bar for houses of worship that allege Free Exercise violations. <u>See</u> <u>Masterpiece Cakeshop</u>, 138 S. Ct. at 1731 (holding that States "cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices").

Conduct is analogous when it endangers a law's interests "in a similar or greater degree than" the restricted religious conduct.  Lukumi, 508 U.S. at 543.  Experts appear to agree that outdoor gatherings are less dangerous than indoor gatherings.  See FOF ¶ 206, at 43.  Secretary Kunkel has asserted this belief, and stated that she bases her belief on experts' advice.  See July 10 Tr. at 55:6-10 (Kunkel). Secretary Kunkel has offered no evidence -- and the Court has not found any evidence -- that outdoor protests are not equivalent in danger to outdoor religious services.  Outdoor protests are thus analogous to outdoor religious gatherings.  Accordingly, if the Public Health Orders provide a de facto exemption for outdoor protests but not for outdoor religious gatherings, the Public Health Orders will not be generally applicable.

The "'elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'"  Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council, 485 U.S. 568, 575 (1988)(quoting Hooper v. Cal., 155 U.S. 648, 657 (1895)).  Here, Secretary Kunkel's attorneys construed the June 30 Order as prohibiting outdoor religious gatherings.  See July 10 Tr. at 208:18-20 (Guss).  Secretary Kunkel, however, asserted that "[t]here's no specific language precluding outdoor [religious] services."  July 10 Tr. at 59:3-4 (Kunkel).  Further, the Attorney General of New Mexico has interpreted the Public Health Orders to permit outdoor religious services, provided that attendants maintain social distancing and wear masks.  See July 10 Tr. at 224:10-19 (Sydow).  The Court examines the June 30 Order's text to determine whose interpretation it supports.  The June 30 Order provides that mass gatherings are prohibited regardless where they take place.  See June 30 Order ¶ 4, at 5-6.  The June 30 Order also, however, provides an express exemption for houses of worship from this general restriction.  See June 30 Order ¶ 2, at 6.  The exemption provides that houses of worship "may hold services and other functions provided that they comply with the 'COVID-Safe Practices (CSPs) for Houses

of Worship' section of the "All Together New Mexico: COVID-Safe Practices for Individuals and Employers.'"  The June 30 Order limits the houses of worship exemption in that they "may not exceed 25% of the maximum capacity of any enclosed building."  June 30 Order ¶ 2, at 6.  The COVID-Safe Practices section for houses of worship does not prohibit outdoor religious services.  See COVID-Safe Practices at 29-30.

The Court concludes that the Public Health Orders do not prohibit outdoor religious gatherings.  The June 30 Order expressly exempts religious services from the mass gatherings rule.  See June 30 Order ¶ 2, at 6.  That exemption includes only two limitations.  First, houses of worship must comply with the COVID-Safe Practices section pertaining to houses of worship.  See June 30 Order ¶ 2, at 6.  Nowhere in that section are outdoor religious gatherings prohibited.  Second, the June 30 Order limits religious gatherings to twenty-five percent capacity, but this limitation expressly applies only to indoor gatherings.  See June 30 Order ¶ 2, at 6 (providing that houses of worship may hold gatherings that do "not exceed 25% of the maximum capacity of any enclosed building" (emphasis added)).  It is foundational principle in criminal law that what is not prohibited is permitted: Nulla poena sine lege.  See Rogers v. Tennessee, 532 U.S. 451, 467 (2001)(Scalia, J., dissenting, joined by Stevens and Thomas, J.J.).  This principle, along with the canon of avoidance, leads the Court to conclude that June 30 Order permits outdoor religious gatherings that comply with the COVID-Safe Practices section pertaining to houses of worship.[38]  That the Attorney

---

[38]Because the June 30 Order permits outdoor religious services, this case differs significantly from Soos v. Cuomo, No. 20-CV-651 GLS\DJS, 2020 WL 3488742 (N.D.N.Y. June 26, 2020)(Sharpe, J.), a case that the Court finds convincing.  In that case, the Honorable Gary Sharpe, Senior United States District Judge for the United States District Court for the Northern District of New York, enjoined a stay-at-home order that applied, "on its face," twenty-five-percent capacity restriction on indoor religious events only, and limited outdoor events to between ten and twenty-five people, depending on the severity of the locality's outbreak.  See Soos v. Cuomo, 2020 WL 3488742, at *10.  The "tangle" of Public Health Orders at issue applied differing degrees

of restrictions depending on the severity of city or county's outbreak.  2020 WL 3488742, at *2-4, *10.  The Public Health Orders, however, limited only religious activities to twenty-five percent capacity: "no other secular entity, save for those that remain closed in their entirety until [the coronavirus outbreak's severity had significantly abated], are limited to only 25% capacity."  2020 WL 3488742, at *10.  Finally, although the Public Health Orders generally limited all outdoor gatherings to less than twenty-five people, the Public Health Orders created an express exemption for outdoor graduation ceremonies of less than 150 people.  See 2020 WL 3488742, at *12.

Judge Sharpe noted that both the Governor of the State of New York and the Mayor of New York City had commended mass protests, while religious services reported police "harassment" and "surveillance."  See 2020 WL 3488742, at *7.  Judge Sharpe concluded that the Governor of New York's "comments, which applauded and encouraged protesting and discouraged others from violating the outdoor limitations, likely demonstrate the creation of a de facto exemption." 2020 WL 3488742, at *11.  Judge Sharpe further noted that, although the public safety rationale that negated the selective enforcement claim in Sisolak could have insulated the New York Public Health Orders, the Mayor of New York City's "simultaneous pro-protest/anti-religious gathering messages, which clearly undermine the legitimacy of the proffered reason for what seems to be a clear exemption, no matter the reason." 2020 WL 3488742, at *12.  "Governor Cuomo and Mayor de Blasio could have just as easily discouraged protests, short of condemning their message, in the name of public health and exercised discretion to suspend enforcement for public safety reasons instead of encouraging what they knew was a flagrant disregard of the outdoor limits and social distancing rules.  They could have also been silent.  But by acting as they did, Governor Cuomo and Mayor de Blasio sent a clear message that mass protests are deserving of preferential treatment." 2020 WL 3488742, at *12.  Judge Sharpe held that the Public Health Orders were neither neutral nor generally applicable, and so subject to strict scrutiny, and standard that the Public Health Orders did not satisfy.  See 2020 WL 3488742, at *12.

Here, Governor Lujan Grisham's comments create a de facto exemption for outdoor protests, but the June 30 Order permits outdoor religious gatherings.  Anti-religion comments have not accompanied Governor Lujan Grisham's comments commending the protests.  Unlike the Governor of New York and the Mayor of New York City, Governor Lujan Grisham has not denigrated religion.  The Mayor of New York City threatened members of a Jewish synagogue with arrests while at the same time attending several protests, and the Governor of New York denigrated New Yorkers' desire to attend religious gatherings.  New York law enforcement harassed and surveilled attendees at religious services.  Secretary Kunkel has also stated, however, that, with one exception, New Mexico has not enforced the Public Health Orders against religious gatherings.  That incident, however, involved sending a cease and desist letter to a local pastor whom a local sheriff had deputized and declared an essential worker, and who held services despite the State's demand.  See July 10 Tr. at 72:5-9 (Kunkel).  The State also did not enforce the Public Health Orders on Easter Sunday, which saw relatively high church attendance across the State. See July 10 Tr. at 76:10-16 (Guss, Kunkel).  Finally, Secretary Kunkel stated that she has attended and supports outdoor religious gatherings.  See July 10 Tr. at 76:5-9 (Kunkel).  Accordingly, the situation in New Mexico is quite different from the situation in New York.

- 190 -

General of New Mexico, who is charged with defending the State in any tribunal in which it has an interest, see N.M. Stat. Ann. § 8-5-2(b), and the Secretary of the New Mexico Department of Health, who is tasked with drafting and enforcing the Public Health Orders, see N.M. Stat. Ann. §§ 24-1-1, 12-10A-1; 9-7-1, interpret the Public Health Orders to permit outdoor religious gatherings bolsters the Court's conclusion.[39]  Moreover, that the July 13 Order more expressly allows outdoor religious services convinces the Court that its interpretation of the June 30 Order does not contravene the State's intent.  See July 13 Order ¶ 2, at 6.

Accordingly, Governor Lujan Grisham's creation of a de facto exemption for secular protests does not negate the Public Health Orders' general applicability.  When government affords a secular exemption to secular conduct, it must extend that exemption to analogous religious conduct or else demonstrate that its refusal to extent the exemption is narrowly tailored to serve a compelling State interest.  See Lukumi, 508 U.S. at 543.  Here, the Public Health Order affords outdoor religious gatherings the same treatment that Governor Lujan Grisham has extended to outdoor secular protests.  Accordingly, the June 30 Order is generally applicable with respect to outdoor First Amendment activity.[40]

_____

[39]Only one Public Health Order -- the April 11 Order -- expressly states that the mass gathering rule applies to houses of worship, but other Public Health Orders exempt houses of worship from the mass gathering rule and instead impose different restrictions on houses of worship.  See April 11 Order ¶ 1, at 5; FOF ¶¶ 53-57, at 16-17.

[40]Although the First Amendment requires that the State treat analogous conduct alike, the Court pauses to note that this rule does not require Secretary Kunkel treat all outdoor activity alike. The State may permissibly restrict non-expressive outdoor activity in the name of public health, like sporting events and barbecues: Although "[i]t is possible to find some kernel of expression in almost every activity a person undertakes . . . such a kernel is not sufficient to bring the activity within the protection of the First Amendment."  City of Dallas v. Stanglin, 490 U.S. at 25.  Instead, the First Amendment requires the State to treat religious activity the same as it treats analogous secular activity.  See Lukumi, 508 U.S. at 542-44.  Accordingly, if Secretary Kunkel, in a later

Since its earliest decisions addressing religious freedom, the Supreme Court has recognized that, if religious conduct is defined broadly enough, and its protections afforded too much bite against government regulation, "most activities of the modern regulatory state are thrown into chaos." Steven G. Gey, Why is Religion Special: Reconsidering the Accomodation of Religion under the Religion Clauses of the First Amendment, 52 U. Pitt. L. Rev. 75, 78 (1990). See Reynolds v. United States, 98 U.S. at 166-67 (noting that, while laws cannot interfere with religious belief, "[t]o permit [a religious veto against generally applicable prohibitions] would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself"). "The government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, 'cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development.'" Smith, 494 U.S. at 885 (quoting Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. at 451). First Amendment caselaw thus recognizes and allows that "[a]ll laws are selective to some extent." Lukumi, 508 U.S. at 542. Instead, the Free Exercise Clause "'protect[s] religious observers against unequal treatment.'" Lukumi, 508 U.S. at 542 (quoting Hobbie v. Unemployment Appeals Comm'n of Fla., 480 U.S. 136, 148 (1987)(Stevens, J., concurring in judgment)). Impermissible "inequality results when a Legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." Lukumi, 508 U.S. at 543.

Here, Secretary Kunkel may distinguish between certain classes of activity, grouping religious gatherings in with a host of secular conduct, to achieve what she determines is a balance

---

Public Health Order, provides that outdoor protests are restricted, she could likely also restrict outdoor religious activities, provided that the restrictions are equivalent.

between maintaining community needs and protecting public health.  Secretary Kunkel does not pursue this aim "only against conduct with a religious motivation." Lukumi, 508 U.S. at 543. Although public health risks may arise in allowing say, Wal-Mart, to continue its operations, the June 30 Order does not leave such business untouched.  See June 30 Order at 4-5.  In furtherance of its goal of minimizing social proximity, the June 30 Order directs all essential businesses to reduce occupancy, enforce social distancing, and reduce staffing.  See April 11 Order at 3-7.  The June 30 Order reflects Secretary Kunkel's judgment that certain activities -- namely, large gatherings -- present the greatest risk to public health.  See June 30 Order at 2.  Accordingly, contrary to Legacy Church's contention, the June 30 Order does not permit analogous secular conduct that it prohibits for religious activities.[41]  The April 11 Order is thus generally applicable.

The Supreme Court's cases contemplate, as Free Exercise violations, individualized determinations of what religious activity is preferable or amounts to a good cause, and what religious activity falls short of meriting governmental protection.  See Cantwell v. Connecticut,

---

[41]At the July 10 Hearing, Legacy Church, for the first time, claimed that the June 30 Order is also not generally applicable, because it permits secular food banks and similar activities that it does not permit for houses of worship.  See July 10 Tr. at 104:20-25 (Smotherman).  Legacy Church later acknowledged, however, that the June 30 Order does not restrict who may operate food banks, and that it has continued its food bank services.  See July 10 Tr. at 118:12-23 (Guss, Smotherman).  The Court agrees -- the Public Health Orders permit Legacy Church to exercise this aspect of its faith.  See June 30 Order ¶1.a., at 3.  Legacy Church also contended that the June 30 Order allows children's summer camps to operate without restrictions.  See July 10 Tr. at 174:1-10 (Esquibel).  The June 30 Order does not, however, allow daycare and children's summer camps to operate without restriction.  Summer youth camps may "operate on a limited basis" and must comply with the COVID-Safe Practices.  See June 30 Order ¶ 19, at 8.  Summer youth camps must maintain social distancing, must limit their operations to a "5:1 child to adult ratios" and keep these groups separated, and must take temperature checks of all children, among dozens of other requirements.  COVID-Safe Practices at 17-19.  Most importantly, the June 30 Order does not restrict summer youth camps to those that are secular in nature, and Legacy Church stated that it has maintained its youth activities and will continue doing so.  See July 10 Tr. at 135:20-25 (Smotherman).  Accordingly, the June 30 Order does not prohibit Legacy Church from exercising these aspects of its faith.

310 U.S. at 305.  Further, the Tenth Circuit has rejected the notion that a secular exemption automatically necessitates a religious exemption.  See Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 651.  .  Here, the June 30 Order's classification system reflects assessment as to what Secretary Kunkel perceives as risk resulting from different activities.  Thus, the recategorization resulted from increased danger that some religious activity -- mass gatherings -- caused.  Because the June 30 Order is both neutral and generally applicable according to the broad strike zone Chief Justice Roberts accords it, it need only satisfy rational basis review.  See Lukumi, 508 U.S. at 531.

### C.  CASELAW SINCE THE COURT ISSUED THE TRO MOO DOES NOT COMMAND A DIFFERENT RESULT.

Since the Court issued the TRO MOO, courts around the country have grappled with similar issues.  Although courts have reached differing results, the common trend is to deny preliminary injunctive relief to churches asserting First Amendment challenges to restrictive Public Health Orders.  The Supreme Court, by a five-to-four decision, recently denied a church's petition for a preliminary injunction against a California public health order that generally paralleled the May 15 Order and that, among other rules, restricted church attendance to twenty-five percent occupancy.  See South Bay United Pentecostal Church v. Newsom, 140 S. Ct. 1613, 1613 (2020)("South Bay").  In a concurring opinion, Chief Justice Roberts relied primarily upon the principle that courts are ill-equipped to second-guess executive officials' public health decisions in the face of a deadly, evolving pandemic.  See 140 S. Ct. at 1614 (Roberts, C.J., concurring).  Chief Justice Roberts noted that the Constitution "principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'"  140 S. Ct. at 1614 (Roberts, C.J., concurring) (quoting Jacobson v. Massachusetts, 197

U.S. at 38)(alterations in South Bay).  Chief Justice Roberts also concluded that California's public health order imposed "[s]imilar or more severe restrictions" to "comparable secular gatherings, including lectures, concerts, movie showings, spectator sports, and theatrical performances, where large groups of people gather in close proximity for extended periods of time."  140 S. Ct. at 1613.  Additionally, the California public health order "exempts or treats more leniently only dissimilar activities, such as operating grocery stores, banks, and laundromats, in which people neither congregate in large groups nor remain in close proximity for extended periods."  140 S. Ct. at 1613.  Against the high standard for obtaining injunctive relief, the Chief Justice wrote, the petitioners were not entitled to relief.  See 140 S. Ct. at 1613.

Justice Kavanaugh dissented.  See 140 S. Ct. at 1614 (Kavanaugh, J., dissenting, joined by Thomas and Gorsuch, J.J.).  Justice Kavanaugh asserted that the public health order "indisputably discriminates against religion."  140 S. Ct. at 1614.  Justice Kavanaugh did not, however, specifically state how the public health order so discriminates, but the Court assumes that Justice Kavanaugh's conclusion rests on the public health order's express reference to religious activity.  See 140 S. Ct. at 1614 (asserting that "'government may not use religion as a basis of classification for the imposition of duties, penalties, privileges or benefits.'" (quoting McDaniel v. Paty, 435 U.S. at 639).  Having concluded that California's public health order facially discriminates against religion, Justice Kavanaugh argued that the public health order is unconstitutional, because it "'inexplicably'" imposed a different restriction on religious activity than it did on "the litany of other secular businesses that are not subject to an occupancy cap."  140 S. Ct. at 1615 (quoting Roberts v. Neace, 958 F.3d 409, 414 (6th Cir. 2020)(per curiam)).  Justice Kavanaugh concluded that "California has ample options that would allow it to combat the spread of COVID-19 without discriminating against religion," because California could require that congregants adhere to

"social-distancing and other health requirements," or "could impose reasonable occupancy caps across the board." 140 S. Ct. at 1615.

Both Justice Kavanaugh and Legacy Church rely on Roberts v. Neace, in which the United States Court of Appeals for the Sixth Circuit invalidated Kentucky's stay-at-home orders. See Roberts v. Neace, 958 F.3d at 416.  The Public Health Orders at issue prohibited all mass gatherings, including religious gatherings, and required "organizations that are not 'life sustaining' to close." 958 F.3d at 411.  One "order lists 19 broad categories of life-sustaining organizations and over a hundred sub-categories spanning four pages." 958 F.3d at 411.  The Public Health Orders permitted, for example, "laundromats, accounting services, law firms, hardware stores, airlines, mining operations, funeral homes, landscaping businesses, and grocery stores." 958 F.3d at 411-12.  The Sixth Circuit concluded that prohibit[ing] faith-based mass gatherings by name" is not sufficient to demonstrate that religious animus motivated the Public Health Orders or that the Public Health Orders "single out faith-based practices for special treatment." 958 F.3d at 413. Instead, the Sixth Circuit concluded that the  Public Health Orders' "four pages of exceptions . . . remove them from the safe harbor for generally applicable laws[.]" 958 F.3d at 413.  The Sixth Circuit asserted, as a "rule of thumb," that "the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law." 958 F.3d at 414 (citing Ward v. Polite, 667 F.3d 727, 738 (6th Cir. 2012)).  Because the Public Health Orders permitted "law firms, laundromats, liquor stores, gun  shops, airlines, mining operations, funeral homes, and landscaping operations" as essential "life-sustaining" businesses, the Sixth Circuit concluded that the Public Health Orders discriminated against "soul-sustaining group services of faith organizations." 958 F.3d at 414.  The Sixth Circuit further asserted that the Governor of Kentucky had "offered no good reason for refusing to trust the congregants who promise to care in worship in the same way

it trusts accountants, lawyers, and laundromat workers to do the same."  958 F.3d at 414.
Kentucky's Public Health Orders, the Sixth Circuit concluded, "inexplicably" treated essential
businesses differently than religious mass-gatherings.  958 F.3d at 414.

Although Roberts v Neace more accurately reflects the Court's views than Chief Justice
Roberts' concurring opinion in South Bay, the Supreme Court's intervening caselaw requires a
different result.  The Supreme Court's decision on a public health order that closely resembles the
June 30 Order strongly counsels against enjoining the June 30 Order's enforcement.  Activities'
relative danger regarding COVID-19 presents an empirical question on which unelected judges,
according to the Supreme Court, are not well-suited to opine without more extensive factual
findings than are present here.  "Our Constitution principally entrusts '[t]he safety and the health
of the people' to the politically accountable officials of the States 'to guard and protect.'"  South
Bay, 140 S. Ct. at 1613 (Roberts, C.J., concurring)(quoting Jacobson v. Massachusetts, 197 U.S.
at 38).  "Where those broad limits are not exceeded, they should not be subject to second-guessing
by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to
assess public health and is not accountable to the people."  South Bay, 140 S. Ct. at 1614.  The
Court also notes that the Sixth Circuit's rule that a public health order's specificity is inversely
correlated with its constitutionality may cut against what the public needs right now: specific
guidance as to what is permissible and what is impermissible.

That the Supreme Court's Justices and the lower courts cannot agree what states may do to
guard against a once-in-a-generation public health threat demonstrates the confusion of the
Supreme Court's Free Exercise doctrine.  States need to know what they can do to fight the
pandemic, and religious individuals and institutions need to know what their rights are, but the
Supreme Court has not created a workable, determinative framework.  The Supreme Court's

occasional focus on subjective intent, balancing of competing interests, and lack of clarity on the level of scrutiny has created a lack of principled analysis and irreconcilable precedent in its own opinions. Its "modern" broad interpretation of the Free Exercise Clause has manufactured an unnecessary "conflict" with the other First Amendment religious clause, the Establishment Clause. The Supreme Court has thus created its own exemptions and invalidated Congress' exemptions. See, e.g., NLRB v. Catholic Bishops, 440 U.S. 490, 506-07 (1979)(Burger, C.J.)(holding that Church-operated schools teaching both religious and non-religious students are not within the National Labor Review Board's jurisdiction, as Congress granted it in the National Labor Relations Act, 29 U.S.C. §§ 151-169 (1976)); id. at 508-18 (Brennan, J., dissenting)(criticizing the majority for its evasive statutory construction, and arguing that the Supreme Court should have reached the constitutional issues). All that could have and can be avoided. Reynolds v. United States was the high point of free exercise analysis, and the Supreme Court's jurisprudence has resulted in confusion and muddled thinking. Justice Scalia's majority opinion in Smith was a valiant effort to right the ship. But the Supreme Court since then has not resisted its urge to focus on subjective intent and balancing interests. The Supreme Court should make clear that the Free Exercise protects belief and thought only, and let the First Amendment's speech clauses protect speech, and let the political branches in the federalist system regulate actions and conduct. Religious organizations -- particularly the Catholic Church in New Mexico -- enjoy majority support and do not lack political clout, and they do not have much to fear from New Mexico. No sound constitutional theory of majority / minority rights can support well a different interpretation of Free Exercise rights. Moreover, while the nation struggles to figure out what the First Amendment permits and prohibits regarding public-health restrictions, the Supreme Court is dealing this term  and the next term with inside-the-beltway issues like President Trump's tax

returns or Special Counsel Robert Mueller's report.  The nation deserves better constitutional law than what the Supreme Court has been giving it.

### D.   IF THE JUNE 30 ORDER IS NOT NEUTRAL OR GENERALLY APPLICABLE, IT DOES NOT SATISFY STRICT SCRUTINY.

To satisfy strict scrutiny, Secretary Kunkel must demonstrate that the June 30 Order is narrowly tailored to further a compelling government interest.  See Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 649.  Typically, "'a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.'"  Lukumi, 508 U.S. at 520 (quoting Florida Star v. B.J.F., 491 U.S. 524, 541-542 (1989)(Scalia, J., concurring in part and concurring in judgment)).  Here, Legacy Church concedes "without question" that the June 30 Order furthers a compelling governmental interest.  See April 16 Tr. at 6:5-8 (Hunter).  The Court agrees.  When "faced with a society-threatening epidemic," In re Abbott, 954 F.3d at 784, state governments, pursuant to their Tenth Amendment police and public health powers, have an interest of the highest order in taking measures to protect the populace.  See, e.g., C. M. v. Urbina, 640 F. App'x 825, 831 (10th Cir. 2016)(unpublished).

Although the June 30 Order furthers a compelling State interest, it is not narrowly tailored.  A law burdening religious practice is not narrowly tailored if it is overbroad or underinclusive.  See Lukumi, 508 U.S. at 546.  The June 30 Order is underinclusive, because Secretary Kunkel permits restaurants and gyms, which unquestionably pose public health risks, to operate at fifty-percent capacity.  Further, that the previous Public Health Orders were more restrictive regarding secular conduct demonstrates that the June 30 Order could be more narrowly drawn.  The June 30 Order may also be overbroad, because it could treat indoor religious gatherings the same it treats restaurants and gyms, or achieve a balance at, say, thirty-three percent occupancy across the board.

If Secretary Kunkel trusts restaurants and gyms to operate at fifty percent, she could likely trust houses of worship to do the same.  Whatever means are less restrictive, it is certain that a Public Health Order that permits restaurants and gyms to operate a fifty-percent capacity, while limiting houses of worship to twenty-five percent capacity, has not chosen the least restrictive means possible to safeguard the public health while preserving religious freedoms.  Nonetheless, the Court has concluded that, under Chief Justice Roberts' broad strike zone, the June 30 Order is neutral and generally applicable, even if it is a far different framework than the Court would fashion.

### E.   LEGACY CHURCH IS NOT SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS OF ITS FREE EXERCISE CLAIM AGAINST THE JULY 13 ORDER.

In any event, the June 30 Order no longer governs activities in New Mexico.  The day the Court issued this Memorandum Opinion and Order, Secretary Kunkel issued a new Public Health Order that treats religious and secular conduct more equally than did the June 30 Order.  Legacy Church is thus less likely to succeed on the merits of its Free Exercise claim against the July 13 Order -- the current Public Health Order -- because the July 13 Order treats indoor religious gatherings more equally than does the June 30 Order.  Whereas the June 30 Order's differential treatment of restaurants, gyms, and houses of worship troubles the Court, the July 13 Order removes the favorable treatment that the June 30 Order affords restaurants and gyms.  See July 13 Order at 6-7.  Among arguably analogous secular activities, only hotels and swimming pools receive more favorable treatment than houses of worship.  The question, then, is whether the July 13 Order's treatment of hotels and swimming pools renders it nonneutral or not generally applicable.  As with the previous Public Health Orders, there is no evidence that religious animus motivates the July 13 Order.  The July 13 Order also sets different restrictions on various activities,

but does so with "secular meaning discernable from [its] language or context," because the Public Health Orders reflect Secretary Kunkel's conclusion that certain activities are more dangerous than others, and so deserve different restrictions.  Lukumi, 508 U.S. at 533.

The July 13 Order is also generally applicable.  First, the Court is not convinced that hotels are close comparators to houses of worship.  Hotels do not involve bringing large groups of people in close proximity in the same room.  Hotels are thus not analogous to indoor religious gatherings, and so the July 13 Order's differential treatment of hotels does not negate its general applicability. Second, as the Court has discussed, Secretary Kunkel has determined that swimming pools at fifty percent capacity pose less of a public health risk than houses of worship at twenty-five percent, and so differential treatment -- including between indoor religious mass gatherings and indoor secular mass gatherings -- is required to reach a maximally unrestrictive framework.  The July 13 Order limits public and commercial swimming pools to lane swimming and restricts swimming lessons to a maximum of two students.  Accordingly, the July 13 Order minimizes proximity.  As the Court has also discussed, it is not impressed with the data on which Secretary Kunkel relies in arriving at this determination.  Through its own research, however, the Court has found no indication that the coronavirus -- a principally airborne disease -- is transmissible through pool water.  See, e.g., Katie Kerwin McCrimmon, "Is it safe to swim during the COVID-19 pandemic? Are pools, lakes and beaches safe this summer?" U. Colo. Health (May 21, 2020), https://www.uchealth.org/today/is-it-safe-to-swim-during-the-covid-19-pandemic-are-pools-lakes-and-beaches-safe-this-summer/ (last visited July 13, 2020).  Accordingly, the Court is inclined to conclude that the July 13 Order falls within the broad strike zone that the Supreme Court has articulated for States' response to the COVID-19 pandemic.  Because Secretary Kunkel asserts that public swimming pools, under the restrictions that the July 13 Order imposes, do not

undermine the public health to a similar or greater degree than houses of worship operating at twenty-five percent capacity, the July 13 Order is generally applicable, and so subject to rational basis review.  Again, while the Court is not impressed with the data on which Secretary Kunkel relies in the disparity brief, and so the Court, if it were a policymaker, would draw the line differently, the Court has not found, through its own research, science that undermines Secretary Kunkel's determination.  Moreover, the Court is not a policymaker, but Secretary Kunkel is.  The Court cannot say that the July 13 Order's treatment of indoor religious gatherings and swimming pools lacks a rational basis.  Accordingly, Legacy Church is unlikely to succeed on a Free Exercise claim against the July 13 Order, and so is not entitled to a preliminary injunction against the July 13 Order's enforcement against it.

## V.   LEGACY CHURCH IS NOT SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS OF ITS FREEDOM-OF-ASSEMBLY CLAIM WITH RESPECT TO THE JUNE 30 ORDER AND THE JULY 13 ORDER.

Legacy Church argues that the April 11 Order impermissibly burdens its freedom of assembly.  See PI Motion at 8.  Since April 17, 2020, Secretary Kunkel's Public Health Orders have become gradually less restrictive.  Compare April 11 Order at ¶ 1, at 5 (prohibiting all religious gatherings of more than four individuals within an enclosed space), with June 30 Order at ¶ 2, at 6 (permitting religious gatherings whose participants amount to less than twenty-five percent of an enclosed space's maximum occupancy).  In the past several weeks, however, New Mexico's coronavirus infection rate has steadily increased.  See FOF ¶¶ 277-79, at 54-56.  As with the Court's analysis of Legacy Church's Free Exercise claims, the Court construes the PI Motion to allege that the June 30 Order -- which was in effect until the day the Court issued this Memorandum Opinion and Order -- violates its freedom of assembly.  In the TRO MOO, the Court denied Legacy Church's request that the Court temporarily enjoin the April 11 Order, and, since

issuing that opinion, Legacy Church has not submitted any new motions to challenge the more recent Public Health Orders' restrictions.  The Court thus applies the PI Motion's arguments to the June 30 Order to determine whether Legacy Church is entitled to injunctive relief on its freedom-of-assembly claim.

> ### A.  LEGACY CHURCH IS NOT SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS OF ITS ASSEMBLY CLAIM AGAINST THE JUNE 30 ORDER.

Legacy Church asserts that the freedom of assembly is a fundamental right.  See  PI Motion at 9 (citing Whitney v. California, 274 U.S. at 373 (Brandeis, J., concurring)).  According to Legacy Church, "[w]hen a government practice restricts fundamental rights, it is subject to strict scrutiny and can be justified only if it furthers a compelling government purpose and, even then, only if no less restrictive alternative is available."  PI Motion at 9 (citing San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. at 16-17; Dunn v. Blumstein, 405 U.S. 330).  Legacy Church argues that the June 30 Order is not narrowly tailored to achieve the state's compelling interests, and thus the June 30 Order violates its freedom of assembly.  See PI Motion at 9.

As the Court explained in the TRO MOO, the Supreme Court and the Tenth Circuit's analysis of freedom-of-association claims has largely subsumed its analysis of freedom-of-assembly claims.  See, e.g., Roberts v. U.S. Jaycees, 468 U.S. at 618; Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 658; McCook v. Springer Sch. Dist., 44 F. App'x at 910 (citing Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. at 544).  Relying on the Supreme Court's freedom-of-association opinion in Board of Directors of Rotary International v. Rotary Club of Duarte, the Tenth Circuit noted in Grace United Methodist Church v. City of Cheyenne that the "First Amendment protects associational and assembly rights in two distinct ways."  Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 658.

> "First, the Court has held that the Constitution protects against unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships.  Second, the Court has upheld the freedom of individuals to associate for the purpose of engaging in protected speech or religious activities."

Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 658 (quoting Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. at 544).  Moreover, the Supreme Court and the Tenth Circuit have conflated and rephrased associational and assembly rights as the "freedom to expressive association."  Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 658 (citing Roberts v. United States Jaycees, 468 U.S. at 622 ("[W]e have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.")).

As is evident in several states' early Constitutions and the legislative history surrounding the freedom of assembly, the freedom of assembly is closely linked to other rights protected by the First Amendment -- such as freedom of speech and the right to petition the legislature for the redress of grievances -- which are central to the democratic process.  See Linnekin, 39 Hastings Const. L.Q. at 614-15.  The Supreme Court has explained that, "[f]rom the [nation's] outset, the right of assembly was regarded not only as an independent right but also as a catalyst to augment the free exercise of the other First Amendment rights with which it was deliberately linked by the draftsmen."  Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 577 (1980).  See De Jonge v. Oregon, 299 U.S. at 364 ("The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental.").  Thus, as with many freedom-of-speech cases, the Supreme Court has applied a time, place, and manner test to governmental restrictions in freedom-of-assembly cases.  See, e.g., Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 578

(1980)(analyzing a freedom-of-assembly challenge to a Virginia trial judge's decision to prohibit reporters from entering the courtroom during a trial, and reasoning that, "[s]ubject to the traditional time, place, and manner restrictions . . . streets, sidewalks, and parks are places traditionally open, where First Amendment rights may be exercised . . . ; a trial courtroom also is a public place where the people generally -- and representatives of the media -- have a right to be present, and where their presence historically has been thought to enhance the integrity and quality of what takes place" (citations omitted)); Cox v. New Hampshire, 312 U.S. 569, 576 (1941).  Similarly, the Honorable Monroe G. McKay, former United States Court of Appeals for the Tenth Circuit, dissented in Messiah Baptist Church v. County of Jefferson, State of Colorado, where he wrote that "[t]he right to assemble or speak in a public forum cannot be absolutely prohibited, and may only be infringed by narrowly-drawn time, place, and manner restrictions."  859 F.2d at 828-29 (McKay, J., dissenting).  Judge McKay observed that "churches serve much the same function as public forums do in the free speech context."  859 F.2d at 828 (McKay, J., dissenting).[42]  Judge McKay further explained that "the place of worship is central to the first amendment concept of free exercise as essentially the only place of religious 'assembly' and the central place for the expression of religious 'speech.'"  859 F.2d at 829.

_____

[42]In a footnote, Judge McKay downplayed the public forum/private space distinction for the purposes of First Amendment protection.  Judge McKay wrote:

> Although traditional time, place and manner analysis has taken place in the context of cases involving public property, it is not the public/private distinction that is crucial for present purposes, but the nature of the protected activity. It is activity involving speech, assembly, and free exercise which falls under the rubric of first amendment protection.

Messiah Baptist Church v. Cty of Jefferson, State of Colo., 859 F.2d at 831 n.8 (McKay, J., dissenting).

Judge McKay objected to the majority opinion's application of rational basis review to zoning regulations that prohibited land in one district of a county from being "used for schools, community buildings, and churches."   Messiah Baptist Church v. Cty of Jefferson, State of Colo., 859 F.2d at 821.  See 859 F.2d at 831 (McKay, J., dissenting).  The majority opinion reasoned that "[t]he record contains no evidence that the zoning regulations infringe upon *any* protected liberty. The [] zoning regulations affect only property interests and, therefore, need only bear a substantial relationship to the general welfare."  859 F.2d at 823 (citing Vill. of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 391 (1926))(emphasis in original).  Judge McKay disagreed, noting that "zoning cases involving places of worship . . . implicate[] at a minimum three different and cumulative interests recognized by the first amendment itself: speech, assembly, and religious exercise."  859 F.2d at 829 (McKay, J., dissenting).  According to the dissent, "[t]he rational basis standard. . . trivializes the burdening role which zoning can and does play in the exercise of religious expression."  859 F.2d at 831 (McKay, J., dissenting).  Judge McKay thus distilled a four-step analysis for applying the time, place, and manner test to laws that implicate First Amendment interests.

> The first step is to determine whether the challenged regulation does indeed infringe upon a first amendment interest. . . .  The second step is to determine whether the ordinance is content-neutral. . . .  The third step is to determine the governmental interest at stake. . . .  Finally, under this analysis the state must carry the burden in the first instance to prove that the means it has chosen are narrowly tailored to achieve the state's legitimate ends.

Messiah Baptist Church v. Cty of Jefferson, State of Colo., 859 F.2d at 833 (McKay, J., dissenting).

The four-part framework that Judge McKay articulated in his Messiah Baptist Church v. County of Jefferson, State of Colorado dissent closely echoes the Supreme Court's formula for

evaluating laws that regulate the freedom of expressive association.  See Roberts v. United States Jaycees, 468 U.S. at 623.  In Roberts v. United States Jaycees, the Supreme Court held that infringements on the freedom of expressive association "may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms."  468 U.S. at 623 (citing Brown v. Socialist Workers '74 Campaign Comm., 459 U.S. 87, 91-92 (1982); Democratic Party of United States v. Wisconsin, 450 U.S. 107, 124 (1981); Buckley v. Valeo, 424 U.S. 1, 25 (1976)(per curiam); Cousins v. Wigoda, 419 U.S. 477, 489 (1975); Am. Party of Tex. v. White, 415 U.S. 767, 780-81 (1974); NAACP v. Button, 371 U.S. 415, 438 (1963); Shelton v. Tucker, 364 U.S. 479, 486 (1960)).  Indeed, in her concurrence, the Honorable Sandra Day O'Connor, former Associate Justice to the Supreme Court of the United States of America, underscored the overlap between the time, place, and manner test and the Supreme Court's expressive-association test: "Reasonable, content-neutral state regulation of the time, place, and manner of an organization's relations with its members or with the State can pass constitutional muster, but only if the regulation is 'narrowly drawn' to serve a 'sufficiently strong, subordinating interest' 'without unnecessarily interfering with First Amendment freedoms.'"  See Roberts v. United States Jaycees, 468 U.S. at 634 (O'Connor, J., concurring)(quoting Vill. of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 636-37 (1980), and citing Sec'y of State of Md. V. Joseph H. Munson Co., 467 U.S. 947, 960-61 (1984)).

The primary difference between the time, place, manner test and the expressive-association test in Roberts v. United States Jaycees is that the latter framework requires that the government articulate a "compelling" interest for restricting the freedom of expressive association.  Roberts v. United States Jaycees, 468 U.S. at 623.  In contrast, time, place, and manner restrictions must

"'serve a significant governmental interest'" to comport with the First Amendment.  Evans v. Sandy City, 944 F.3d 847 (10th Cir. 2019)(quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)).  In her concurrence, Justice O'Connor targets the majority opinion's "mechanical application of a 'compelling interest' test" as a "fundamental flaw in its analysis."  468 U.S. at 634 (O'Connor, J., concurring).  According to Justice O'Connor, the majority "entirely neglects to establish at the threshold that the Jaycees is an association whose activities or purposes should engage the strong protections that the First Amendment extends to expressive associations."  468 U.S. at 634 (O'Connor, J., concurring).  Justice O'Connor notes that some associations are more expressive than others, and, accordingly, the Supreme Court's "case law recognizes radically different constitutional protections for expressive and nonexpressive associations."  468 U.S. at 634 (O'Connor, J., concurring).  Relatedly, Judge McKay's dissent in Messiah Baptist Church v. County of Jefferson, State of Colorado acknowledged that "applying the most rigid compelling state interest test [to a zoning regulation] would be improvident," but he suggested that the standard should be more searching than rational basis review.  859 F.2d at 831 (McKay, J., dissenting).

The Court requires that Roberts v. United States Jaycees requires that Secretary Kunkel and the State of New Mexico establish that their Public Health Orders serve a compelling governmental interest, rather than a significant governmental interest, which time, place, and manner restrictions must satisfy.  Here, the June 30 Order's impact on the ability of Legacy Church's members to assemble is far greater than the zoning ordinances' impact on the ability of the church's members to assemble in Messiah Baptist Church v. County of Jefferson, State of Colorado.  Whereas New Mexico's Public Health Orders directly regulate expressive association by restricting the size of religious gatherings at every house of worship in New Mexico, county zoning ordinances, like that in Messiah Baptist Church v. County of Jefferson, State of Colorado,

indirectly regulate expressive conduct by impacting the locations of houses of worship within a county. Instead, New Mexico's Public Health Orders more closely resemble the anti-discrimination law at issue in <u>Roberts v. United States Jaycees</u>, which affected an organization's "internal structure or affairs." 468 U.S. at 623. Moreover, the Supreme Court's framework in <u>Roberts v. United States Jaycees</u> binds the Court, and, thus, the Court applies the more heightened scrutiny that the Supreme Court prescribed in that case by requiring Secretary Kunkel and the State of New Mexico to establish that the June 30 Order serves a compelling interest. The "'assembly of a community of believers is an integral part of religion,'" <u>Messiah Baptist Church v. County of Jefferson, State of Colorado</u>, 859 F.2d at 828 n.2 (quoting Comment, <u>Zoning Ordinances Affecting Churches: A Proposal for Expanded Free Exercise Protection</u>, 132 U. Pa. L. Rev. 1131, 1150-51 (1984)), and the Court concludes that Legacy Church is "an association whose activities or purposes should engage the strong protections that the First Amendment extends to expressive associations," <u>Roberts v. United States Jaycees</u>, 468 U.S. at 634 (O'Connor, J., concurring).

As a baseline matter, the Court concludes that the June 30 Order infringes upon a First Amendment right -- the freedom of assembly, which the Supreme Court and Tenth Circuit have folded into the broader freedom of expressive association. Parties bringing an expressive-association claim under the First Amendment must demonstrate that they are asserting their right to associate "for the purpose of engaging in those activities protected by the First Amendment -- speech, assembly, petition for the redress of grievances, and the exercise of religion." <u>Roberts v. United States Jaycees</u>, 468 U.S. at 618. The Tenth Circuit recognizes religious gatherings in which individuals come together "'for the purpose of engaging in . . . religious activities,'" <u>Grace United Methodist Church v. City of Cheyenne</u>, 451 F.3d at 658 (<u>quoting</u> <u>Bd. of Dirs. v. Rotary Club of Duarte</u>, 481 U.S. at 544), as an activity that the First Amendment protects. Legacy Church objects

to the June 30 Order's prohibition on gatherings inside houses of worship that exceed twenty-five percent maximum occupancy of any enclosed building.  Legacy Church thus asserts its right to assembly for the purpose of engaging in religious exercise and expressive association, which the First Amendment protects.  See Boy Scouts of Am. v. Dale, 530 U.S. at 655 ("An association must merely engage in expressive activity that could be impaired in order to be entitled to protection."). The Court thus concludes that Legacy Church is an expressive association and that the size limitation on its church services affects its expression.

Expressive association is not, however, an absolute right, because "'there may be countervailing principles that prevail over the right of association.'"  Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 658 (quoting Walker v. City of Kan. City, 911 F.2d at 89 n.11).  See Roberts v. United States Jaycees, 468 U.S. at 623.  Under Roberts v. United States Jaycees, government can regulate expressive association if its regulation: (i) "serve[s] compelling state interests"; (ii) is "unrelated to the suppression of ideas"; and (iii) "cannot be achieved through means significantly less restrictive of associational freedoms."  Roberts v. United States Jaycees, 468 U.S. at 623.  The Court first concludes that New Mexico's infringement on Legacy Church's right to expressive association is unrelated to the suppression of Legacy Church's expression of its ideas.  The June 30 Order does not prohibit conduct on the basis of viewpoint, and it "does not license enforcement authorities to administer the statute on the basis of such constitutionally impermissible criteria."  Roberts v. United States Jaycees, 468 U.S. at 623.  Moreover, there is no evidence indicating that Secretary Kunkel issued the June 30 Order "for the purpose of curtailing or controlling the content of expression."  Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 657.  In other words, the June 30 Order is both viewpoint-neutral and content-neutral. See Ward v. Rock Against Racism, 491 U.S. at 791 (noting that a regulation which "serves

purposes unrelated to the content of expression" is neutral "even if it has an incidental effect on some speakers or messages but not others").

The June 30 Order also supports a compelling government interest -- combatting local outbreaks of the coronavirus amidst a global pandemic -- and Legacy Church does not challenge this conclusion.  See PI Motion at 7 ("Plaintiff does not dispute that the state has a compelling governmental interest in its response to COVID-19.").  The June 30 Order's stated purpose is to "to amend restrictions on mass gatherings and business operations, which were implemented in response to the spread of the Novel Coronavirus 2019" and "to protect public health given the potentially devastating effects that could result from a rapid increase in COVID-19 cases in New Mexico."  June 30 Order at 1.  As the Court has discussed, "[t]he right to practice religion freely does not include liberty to expose the community . . . to communicable disease or the latter to ill health or death." Prince v. Massachusetts, 321 U.S. at 166-67.  As New Mexico and the nation battle one of the past century's most deadly public health crises, the Court can think of few government interests more compelling than safeguarding public health and preventing avoidable illnesses and deaths.  See Buchwald v. Univ. of N.M. Sch. of Med., 159 F.3d 487, 498 (10th Cir. 1998)(concluding that "public health is a compelling government interest" (citing Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 310 (1978))).  Accordingly, the Court concludes that the June 30 Order's limitations on gatherings inside houses of worship serves a compelling government interest.

Finally, the Court concludes that the June 30 Order's purpose of promoting public health "cannot be achieved through means significantly less restrictive of associational freedoms." Roberts v. United States Jaycees, 468 U.S. at 623.  As discussed above, Judge McKay advocated for applying the time, place, and manner test to restrictions on religious assembly in his Messiah

Baptist Church v. County of Jefferson, State of Colorado dissent, and he wrote that the government must "prove that the means it has chosen are narrowly tailored to achieve" a significant government interest. Messiah Baptist Church v. Cty of Jefferson, State of Colo., 859 F.2d at 833 (McKay, J., dissenting). In Evans v. Sandy City, the Tenth Circuit held that, "[t]o be narrowly tailored," a time, place, or manner restriction "must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" 944 F.3d at 856 (quoting Ward v. Rock Against Racism, 491 U.S. at 799). In Evans v. Sandy City, the Tenth Circuit elaborated that time, place, or manner restrictions

> "need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" Ward, 491 U.S. at 798-99 . . . (quoting United States v. Albertini, 472 U.S. 675, 689 . . . (1985)). "So long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." Id. at 800 . . . . "'The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests' or the degree to which those interest should be promoted." Id. at 800 . . . (quoting Albertini, 472 U.S. at 689 . . . ).

Evans v. Sandy City, 944 F.3d at 856-57 (alteration added in Evans v. Sandy City). Although laws regulating expressive association must serve a compelling government interest, the Court concludes that the expressive-association framework in Roberts v. United States Jaycees and the time, place, and manner test entail the same degree of tailoring between a restriction and its purported purpose. Despite Legacy Church's insistence that the government can curb its freedom of assembly by restricting the size of religious gatherings "only if no less restrictive alternative is available," PI Motion at 9 (citing San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. at 16-17; Dunn v. Blumstein, 405 U.S. 330), both the expressive-association framework in Roberts v. United

<u>States Jaycees</u> and the time, place, and manner test eschew such strictness. All that the Supreme Court and Tenth Circuit caselaw require is that there not be significantly less restrictive means for achieving the June 30 Order's purpose of promoting public health than the requirement that houses of worship not hold services that exceed twenty-five percent of an enclosed building.

The Court concludes that, under the standard for content-neutral time, place, and manner restrictions, Secretary Kunkel and the State of New Mexico have established that significantly less restrictive means would endanger public health. Contrary to Legacy Church's assertion that the June 30 Order prohibits outdoor services and gatherings that exceed four people, the June 30 Order does not prohibit outdoor religious services. Legacy Church suggests that allowing large outdoor gatherings -- similar in size to protests, for which, as discussed above, Governor Lujan Grisham effectively created a de facto exemption -- would be a significantly less restrictive means of promoting public health. <u>See</u> July 10 Tr. at 61:8-62:2 (Esquibel). Although the April 11 Order explicitly states that houses of worship "shall adhere" to the mass gathering rule, which prohibits gatherings of five or more people, subsequent Public Health Orders do not subject houses of worship to the mass gathering rule. April 11 Order ¶ 1, at 5. Instead, the June 30 Order imposes only two limitations on houses or worship: (i) houses of worship must comply with the COVID-Safe Practices pertaining to houses of worship, which does not prohibit outdoor religious gatherings in any way, <u>see</u> June 30 Order ¶ 2, at 6; (ii) houses of worship may provide in-person services so long as the services do not exceed twenty-five percent capacity, but this limitation expressly applies only to indoor gatherings, <u>see</u> June 30 Order ¶ 2, at 6 (providing that houses of worship may hold gatherings that do "not exceed 25% of the maximum capacity <u>of any enclosed building</u>" (emphasis added)). In light of Governor Lujan Grisham's de facto exemption for outdoor protests, outdoor religious services -- without a size restriction -- are a significantly less

- 213 -

restrictive alternative to indoor services, which are subject to the twenty-five percent occupancy restriction.  The June 30 Order does not prohibit such outdoor services, and, thus, Legacy Church's argument that large outdoor religious services would be a less restrictive means to promote public health is inapposite.

Legacy Church also contends that significantly less restrictive means are available to promote public health, because Secretary Kunkel and the State of New Mexico could permit houses of worship to provide services that accommodate up to fifty percent of an enclosed building's occupancy capacity, which is the limitation that the June 30 Order places on restaurants and pools.  See June 30 Order ¶¶ 2-4, at 6-7.  Although raising the occupancy limitation on houses of worship from twenty-five percent to fifty percent would be less restrictive, the Court concludes that this alternative would not serve the compelling interest of promoting public health and stemming the coronavirus' spread.  According to Secretary Kunkel, restaurants and gyms present a medium level of both contact intensity and number of contacts.  See Disparity Brief at 7 (citing Public Guidance at 12); FOF ¶ 264, at 51.  Secretary Kunkel avers that houses of worship, alternatively, present a high level of both contact intensity and number of contacts.  See Disparity Brief at 8 (citing Public Guidance at 16). Moreover, although mitigation measures are difficult for all mass gatherings, they are more feasible for restaurants and gyms, which are subject to regular health and safety inspections, and the June 30 Order imposes such measures.  See Public Guidance at 12-16.  As discussed above, the June 30 Order permits limited restaurant operation that is conditioned on compliance with safety measures: restaurants must ensure that at least six feet separate all tables, which are limited to six chairs, and may not serve customers at any bar or counter seating.  See June 30 Order at 5.  Further, restaurants are already subject to a system of health and quality regulations and regular inspections to ensure compliance.  See N.M. Stat Ann.

§ 25-1-8 (providing that the New Mexico Department of Environment "shall inspect food service establishments to determine compliance or lack of compliance" with regulations).  Courts afford public health officials "'especially broad'" latitude when those officials "'undertake[ ] to act in areas fraught with medical and scientific uncertainties.'"  South Bay, 140 S. Ct. at 1614 (quoting Marshall v. United States, 414 U.S. at 427).  Accordingly, the Court is reluctant to substitute its own opinions for those of Secretary Kunkel and the experts on which she relies.  The Court thus concludes that, under the time, place, and manner test, which does not require Secretary Kunkel to use the least restrictive means, rules that are significantly less restrictive of indoor religious gatherings would endanger the public health.

Secretary Kunkel and the State of New Mexico have established that the June 30 Order's restrictions on houses of worship are unrelated to the suppression of ideas, serve a compelling government interest, and do not leave available significantly less restrictive alternatives.  Just as "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired," Heffron v. International Soc'y for Krishna Consciousness, 452 U.S. 640, 647 (1981), the First Amendment does not guarantee houses of worship the right to gather wherever and however they desire, cf. Snyder v. Murray Corp., 124 F.3d at 1353 ("The Free Exercise Clause does not guarantee any person the right to pray whenever and wherever he chooses.").  Accordingly, Legacy Church is not likely to succeed on the merits of its freedom-of-assembly claim with respect to the June 30 Order's restrictions on houses of worship.

The Court further concludes that Legacy Church is not substantially likely to succeed on the merits of its freedom-of-assembly claim with respect to the July 13 Order.  Although the July 13 Order does not change the June 30 Order's restrictions on houses of worship, it explicitly notes

that houses of worship "may hold services and other functions, indoors or outdoors," as long as services comply with the CSP Handbook and indoor services do not exceed twenty-five percent of an enclosed building's occupancy limit.  July 13 Order ¶ 2, at 6.  The question, then, is whether the July 13 Order's restrictions on houses of worship are unrelated to the suppression of ideas, serve a compelling government interest, and do not leave available significantly less restrictive alternatives.  Like the June 30 Order, the July 13 Order is both viewpoint-neutral and content-neutral, and, thus, it is unrelated to the suppression of ideas.  Moreover, the government's aim to reduce the coronavirus' spread and promote public health is no less compelling than it was at the time that Secretary Kunkel issued the June 30 Order.  Rather, in the past two weeks, New Mexico and its surrounding states have experienced a significant increase in daily coronavirus cases.  See FOF ¶¶ 277-79, at 54-56.  While the July 13 Order leaves earlier restrictions on houses of worship untouched, the July 13 Order prohibits restaurants from providing any indoor dining services.  See July 13 Order ¶ 1.u, at 5 ("Restaurants may provide either delivery or carryout service.  No dine-in service may be provided in indoor seating areas.").

Finally, the July 13 Order does not leave available alternative means of restricting services at houses of worship that are significantly less restrictive.  The July 13 Order, like the June 30 Order, allows outdoor services of any size, so long as the services comply with the CSP Handbook. See July 13 Order ¶ 2, at 6.  Because the coronavirus infection rate has steadily increased in New Mexico, increasing the twenty-five percent occupancy limit on indoor religious services is even less likely to promote public health than it was at the time that Secretary Kunkel issued the June 30 Order.  The July 13 Order is more restrictive than the past several Public Health Orders. Restaurants, which previously could provide indoor dining services at up to fifty percent of their occupancy, can no longer provide any indoor dining services.  See July 13 Order ¶ 1.u, at 5.  In

addition, gyms -- which the July 13 Order categorizes as a "close-contact business," July 13 Order ¶ 6, at 6 -- previously could operate at fifty percent capacity, but now can operate at only twenty-five percent capacity, see July 13 Order ¶ 8, at 7.  The coronavirus' inclining infection rate and Secretary Kunkel's decision to reverse course on easing restrictions for many businesses belie the notion that significantly less restrictive means are available to promote public health and curb the coronavirus' spread.  The Court thus concludes that Legacy Church is not likely to succeed on the merits of its freedom-of-assembly claim with respect to the July 13 Order's restrictions on houses of worship.

**B.     LEGACY CHURCH IS NOT SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS OF ITS ASSEMBLY CLAIM AGAINST THE JULY 13 ORDER.**

The Court further concludes that Legacy Church is not substantially likely to succeed on the merits of its Freedom of Assembly claim with respect to the July 13 Order.  Although the July 13 Order does not change the June 30 Order's restrictions on houses of worship, it explicitly notes that houses of worship "may hold services and other functions, indoors or outdoors," as long as services comply with the CSP Handbook and indoor services do not exceed twenty-five percent of an enclosed building's occupancy limit.  July 13 Order ¶ 2, at 6.  The question, then, is whether the July 13 Order's restrictions on houses of worship are unrelated to the suppression of ideas, serve a compelling government interest, and do not leave available significantly less restrictive alternatives.  Like the June 30 Order, the July 13 Order is both viewpoint-neutral and content-neutral, and, thus, it is unrelated to the suppression of ideas.  Moreover, the government's aim to reduce the coronavirus' spread and promote public health is no less compelling than it was at the time that Secretary Kunkel issued the June 30 Order.  Rather, in the past two weeks, New Mexico and its surrounding states have experienced a significant increase in daily coronavirus cases.  See

FOF ¶¶ 277-79, at 54-56.  While the July 13 Order leaves earlier restrictions on houses of worship untouched, the July 13 Order prohibits restaurants from providing any indoor dining services.  See July 13 Order ¶ 1.u, at 5 ("Restaurants may provide either delivery or carryout service.  No dine-in service may be provided in indoor seating areas.").

Finally, the July 13 Order does not leave available alternative means of restricting services at houses of worship that are significantly less restrictive.  The July 13 Order, like the June 30 Order, allows outdoor services of any size, so long as the services comply with the CSP Handbook. See July 13 Order ¶ 2, at 6.  Because the coronavirus infection rate has steadily increased in New Mexico, increasing the twenty-five percent occupancy limit on indoor religious services is even less likely to promote public health than it was at the time that Secretary Kunkel issued the June 30 Order.  The July 13 Order is more restrictive than the past several Public Health Orders. Restaurants, which previously could provide indoor dining services at up to fifty percent of their occupancy, can no longer provide any indoor dining services.  See July 13 Order ¶ 1.u, at 5.  In addition, gyms -- which the July 13 Order categorizes as a "close-contact business," July 13 Order ¶ 6, at 6 -- previously could operate at fifty percent capacity, but now can operate at only twenty-five percent capacity, see July 13 Order ¶ 8, at 7.  The coronavirus' inclining infection rate and Secretary Kunkel's decision to reverse course on easing restrictions for many businesses belie the notion that significantly less restrictive means are available to promote public health and curb the coronavirus' spread.  The Court thus concludes that Legacy Church is not likely to succeed on the merits of its freedom-of-assembly claim with respect to the July 13 Order's restrictions on houses of worship.

## VI.   LEGACY CHURCH DOES NOT SATISFY THE OTHER NECESSARY ELEMENTS FOR A PRELIMINARY INJUNCTION.

Although Legacy Church is unlikely to succeed on the merits of its claims, and so is unable to satisfy the first requirement for a preliminary injunction, the Court nonetheless examines the remaining factors.  The Court concludes that the balance of harms weighs in Secretary Kunkel's favor, and that a preliminary injunction does not serve the public interest.  Accordingly, the Court denies the PI Motion.

### A.   THE ORDER DOES NOT IRREPARABLY HARM LEGACY CHURCH.

In addition to showing that it is likely to succeed on the merits, a plaintiff seeking a preliminary injunction must also show that "is likely to suffer irreparable harm in the absence of preliminary relief."  Winter, 555 U.S. at 20.  Legacy Church argues that it faces irreparable harm, because "'[t]he loss of First Amendment freedoms, *for even minimal periods of time*, unquestionably constitutes irreparable injury.'"  PI Motion at 9 (quoting Heideman v. S. Salt Lake City, 348 F.3d 1182, 1190 (10th Cir. 2003)(emphasis in Motion but not in Heideman v. S. Salt Lake City)).  Legacy Church also argues that the state's threatened actions "will deny Legacy and its members the right to practice their faith as they feel compelled to practice," and "prohibit Legacy from carrying out its religious mission in accordance with the manner dictated by their strictly held religious belief."  PI Motion at 10.

As in the temporary restraining order stage, see Legacy Church v. Kunkel, 2020 WL 1905586, at *30-41, Legacy Church is unlikely to succeed in showing that Secretary Kunkel violated its First Amendment rights.  While this much is evident, the Tenth Circuit has not spoken clearly to the effect of concluding that a movant is not likely to succeed on the merits.  It has stated,

for example, that "when an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary," which suggests that merely alleging a constitutional violation satisfies the irreparable harm factor per se.  Planned Parenthood Ass'n of Utah v. Herbert, 828 F.3d 1245, 1263 (10th Cir. 2016)(citing Kikumura v. Hurley, 242 F.3d 950, 963 (10th Cir. 2001).  See 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995)).  See also O Centro, 342 F.3d at 1187 ("Because 'a plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA,' we conclude the irreparable harm requirement for a preliminary injunction is satisfied." (quoting Kikumura v. Hurley, 242 F.3d at 963)).

On the other hand, in a 2013 case, Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114 (10th Cir. 2013), aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682 (2014), the Tenth Circuit characterized its precedent as holding "that establishing a *likely* RFRA violation satisfies the irreparable harm factor." 723 F.3d at 1146 (emphasis added)).  Several other courts also appear to require a plaintiff to allege a likelihood of success on the merits before concluding that the plaintiff has shown irreparable harm.  See, e.g., Powell v. Noble, 798 F.3d 690, 702 (8th Cir. 2015)("But as we have concluded Powell is unlikely to succeed in showing his First Amendment rights have been violated, we agree with the district court that Powell has not shown a threat of irreparable harm that warrants preliminary injunctive relief."); Planned Parenthood Minn., N. Dak. S. Dak. v. Rounds, 530 F.3d 724, 737 n.11 (8th Cir. 2008)(noting that, although minimal First Amendment restrictions constitute irreparable injury, "without a showing that it will likely prevail on its claim that physicians will be compelled to deliver an ideological message, Planned Parenthood's asserted threat of irreparable harm is correspondingly weakened . . ."); Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 301 (D.C. Cir. 2006)("Several

other courts have adopted this approach, which emphasizes that where it is not clear that a particular statute, policy, or practice will have any actual adverse effect on protected First Amendment liberties, the moving party must demonstrate some likelihood of a chilling effect on their rights."); Hohe v. Casey, 868 F.2d 69, 72-73 (3d Cir. 1989)("[T]he assertion of First Amendment rights does not automatically require a finding of irreparable injury . . . .  Rather the plaintiffs must show 'a chilling effect on free expression.'" (quoting Dombrowski v. Pfister, 380 U.S. 479, 487 (1965)); Myers v. Gant, 49 F. Supp. 3d 658, 668 (D.S.D. 2014)(Piersol, J.)("Once a constitutional injury has been demonstrated, the Court assumes that Myers has satisfied the irreparable harm prong.").

The Tenth Circuit has acknowledged that the injunctive relief factors can affect each other, and that likelihood of success on the merits impacts the analysis of the remaining factors.  After determining that a district court erred in its likelihood analysis in Derma Pen, LLC v. 4EverYoung Ltd., 773 F.3d 1117 (10th Cir. 2014), the Tenth Circuit reversed and remanded for a redetermination of every factor, because "[w]ithout that error, we do not know how the district court would have ruled on the equitable elements."  773 F.3d at 1122.  It also remanded in Amoco Oil Co. v. Rainbow Snow, 748 F.2d 556 (10th Cir. 1984), after determining that the district court's erroneous likelihood conclusion "may have affected its resolution of the other three prerequisites." 748 F.2d at 559.

Winter provides a helpful backdrop against which to review Tenth Circuit doctrine.  In this case, the Supreme Court evaluated the Ninth Circuit's preliminary injunction test, which allowed plaintiffs to satisfy the irreparable harm prong based only on the "possibility" of irreparable harm where they had demonstrated a likelihood of success on the merits.  Winter, 555 U.S. at 21.  See Nat. Res. Def. Council v. Winter, 518 F.3d 658, 696 (9th Cir. 2008)(explaining the Ninth Circuit's

test).  The Navy argued that plaintiffs "must demonstrate a likelihood of irreparable injury -- not just a possibility."  555 U.S. at 21.  The Supreme Court agreed and stated that the preliminary injunction standard "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction" and that "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter, 555 U.S. at 22 (citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997))(emphasis in original).  Winter suggests, therefore, that courts must interpret the "irreparable harm" factor in conjunction with whether the movant is likely to succeed on the merits. See Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d at 1145 ("In addition, 'in First Amendment cases, the likelihood of success on the merits will often be the determinative factor.'" (quoting ACLU of Illinois v. Alvarez, 679 F.3d 583, 589 (7th Cir. 2012)).  This analysis method differs substantially from earlier Tenth Circuit doctrine that allowed movants to make a lesser showing of their likely success when the other preliminary injunction factors strongly weighed in their favor. See Dine Citizens Against Ruining Our Environment v. Jewell, 839 F.3d 1276, 1282 (10th Cir. 1276)(overruling Davis v. Mineta, 302 F.3d 1104, 1111 (10th Cir. 2002)); Diné Citizens Against Ruining Our Environment v. Jewell, No. CIV 15-0209 JB/SCY, 2015 WL 4997207, at *35-38 (D.N.M. Aug. 14, 2015)(Browning, J.).

Requiring plaintiffs to demonstrate that they are likely to suffer irreparable injury also tends to collapse the irreparable harm factor in the likelihood of success on the merits factor -- at least where a plaintiff alleges constitutional harms.  Here, Legacy Church's demonstration of its success on the merits corresponds exactly with its likelihood of irreparable injury.  See Heideman v. S. Salt Lake City, 348 F.3d at 1190 ("[T]he loss of First Amendment freedoms, for even minimal

periods of time, unquestionably constitutes irreparable injury.").   As before, without a

constitutional violation to point to, Legacy Church has not demonstrated that irreparable injury

was likely.  See TRO MOO, 2020 WL 1905586, at *43 (citing Schrier v. Univ. of Colo., 427 F.3d

1253, 1267 (10th Cir. 2005)).  Although Legacy Church alleges violations that are not redressable

with money damages, the Court again concludes that, because Legacy Church has demonstrated

low chances of success on the merits, the church has not demonstrated that "irreparable injury is

*likely* in the absence of an injunction."  Winter, 555 U.S. at 22 (emphasis in original).

## B.     THE BALANCE OF EQUITIES WEIGHS IN NEW MEXICO'S FAVOR.

The third factor to consider is whether the "balance of equities tips in [the movant's] favor."

Winter, 555 U.S. at 20.  In analyzing whether a movant satisfies this fact, he or she must show that

the "threatened injury outweighs any injury to [non-movants] caused by granting the injunction."

Awad v. Ziriax, 670 F.3d 1111, 1131 (10th Cir. 2012).  Legacy Church relies on its claims'

constitutional nature; it argues that the balance of equities weighs in its favor, because "[w]here

the government's perception of harm is speculative and when the state permits the same

speculative harm in other places, as it does here, such speculative harm cannot outweigh an injury

to the First Amendment rights of plaintiffs who have established a substantial likelihood of success

on the merits."  PI Motion at 10.  It argues that the Defendants "will not suffer more than

speculative harm if an injunction is granted, and the Plaintiffs will suffer certain harm in the

absence of injunctive relief."  PI Motion at 11.  Finally, it asserts that the Court should presume

that the balance of harms weighs in its favor, because it has raised First Amendment issues.  See

Motion at 11 (citing Sammartano v. First Judicial Dist. Court, 303 F.3d 959, 973 (9th Cir. 2002).

New Mexico's Secretary of State argues that there is nothing speculative "about the harms

caused by COVID-19" and "the possibility of substantially increasing the number of infections

through public gatherings simultaneously bringing together hundreds of people in a public space." PI Motion at 14-15.  The Secretary of State instead argues that Legacy Church's asserted injuries are speculative, because it "has never received a citation under a public health order or otherwise been prevented from delivering religious services to its congregants."  PI Motion at 15.

Secretary Kunkel bolsters her argument with citation multiple "superspreader events" tied to church gatherings in the media, Disparity Brief at 8-10.  These are largely inapposite, because the churches involved in these "superspreader events" did not observe social distancing or take other protective measures which Legacy Church has promised to take, see James McAuley, "How a prayer meeting at a French megachurch may have led to scores of coronavirus deaths," The Washington Post (April 1, 2020), https://www.washingtonpost.com/world/europe/how-a-prayer-meeting-at-a-french-megachurch-may-have-led-to-scores-of-coronavirus-deaths/2020/04/01/fe478ca0-7396-11ea-ad9b-254ec99993bc_story.html (last visited July 12, 2020)(noting that the church meeting took place before the French government recommended health protocols); Sabrina Thompson & Ronald Bond, "COVID-19 Explosion," The Observer (June 15, 2020), https://www.lagrandeobserver.com/coronavirus/covid-19-explosion/article_feb41198-af5c-11ea-b466-9bb49be5644c.html; Choe Hang-Sun, "Shadowy Church Is at Center of Coronavirus Outbreak in South Korea," The New York Times (Feb. 21, 2020), https://www.nytimes.com/2020/02/21/world/asia/south-korea-coronavirus-shincheonji.html (noting that members of the church did not wear masks); Lauren Frayer, "Blamed For Coronavirus Outbreak, Muslims in India Come Under Attack," Nat'l Pub. Radio (April 23, 2020), https://www.npr.org/2020/04/23/839980029/blamed-for-coronavirus-outbreak-muslims-in-india-come-under-attack (noting that the Tablighi Jamaat conference in India was in violation of social distancing rules).  In areas with COVID-19, mass gatherings where participants do not

take precautions are likely to lead to an increased number of infections regardless where these gatherings occur or the reasons that brought everyone together.

As in the irreparable harm analysis, district courts in the Tenth Circuit must consider the likelihood of success when analyzing the balance of harms.  In Planned Parenthood Association of Utah v. Herbert, the Tenth Circuit stated that the "threshold, and ultimately critical, flaw in the district court's [balance of equities] analysis is that it failed to take into account PPAU's likelihood of success on the merits of its unconstitutional conditions claim and the resulting likelihood of irreparable harm to PPAU."  828 F.3d at 1265.  In First Amendment cases in the Tenth Circuit, likelihood of success on the merits "will often be . . . determinative" in the overall analysis.  See Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d at 1145 (citing Awad v. Ziriax, 670 F.3d at 1114). The Court has already concluded that Legacy Church is not likely to succeed on the merits of its First Amendment claims, and Legacy Church framed the harms it suffered for this fact exclusively in terms of a First Amendment violation.  Without a likely First Amendment violation, Legacy Church has alleged no harm to balance against New Mexico's.  New Mexico's stated harm -- a potential escalation in COVID-19 cases, is not insignificant.  Accordingly, when weighed against each other, the balance of equities favors New Mexico.

### C.   THE PUBLIC'S INTEREST IN DENYING THE PRELIMINARY INJUNCTION IS STRONG

The last issue to consider is whether the preliminary injunction is in the public's interest. Winter, 555 U.S. at 20.  This factor "is another way of inquiring whether there are policy considerations that bear on whether the order should issue."  11A Fed. Prac. & Proc. Civ., § 2948.4 Grounds for Granting or Denying a Preliminary Injunction -- Public Interest, (3d ed.).  Legacy Church argues that an injunction is in the public's interest, because the Tenth Circuit "recognizes

that '[v]indicating First Amendment freedoms is clearly in the public interest.'"  PI Motion at 11

(quoting Pac. Frontier v. Pleasant Grove City, 414 F.3d 1221, 1237 (10th Cir. 2005) and citing

Utah Licensed Bev., 256 F.3d 1061, 1076 (10th Cir. 2001); Elam Constr., Inc. v. Regional Transp.

Dist., 129 F.3d 1343, 1347 (10th Cir. 1997)).  Legacy Church also argues that its "religious

exercise and the right to assemble -- and the rights of others like them in the State of New Mexico

-- are burdened beyond the narrowly tailored means the Constitution requires."  PI Motion at 11.

New Mexico argues in response that the state is "in the midst of a public health crisis of a scale

and severity unprecedented in modern times," and that "the most potent weapon that the State and

local communities can wield against this significant health threat is through individuals choosing

to stay in their homes as much as possible and avoiding physical proximity to other people and to

public spaces."  PI Motion at 16.

      In evaluating the public's interest, the Court must consider whether the movant has

demonstrated a likelihood of success on the merits.  Planned Parenthood Ass'n of Utah v. Herbert,

828 F.3d at 1265-66.  Where a movant has demonstrated that the non-movant has violated the law,

Coal. of Concerned Citizens To Make Art Smart v. Fed. Transit Admin. of U.S. Dep't of

Transportation, 843 F.3d 886, 915 (10th Cir. 2016), or constitutional rights, Verlo v. Martinez, 820

F.3d 1113, 1127-28 (10th Cir. 2016), the public interest weighs in favor of granting an injunction.

See Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d at 1147.  Awad v. Ziriax, 670 F.3d 1111, 1132

(10th Cir. 2012)(stating that "'it is always in the public interest to prevent the violation of a party's

constitutional rights.'" (quoting G&V Lounge, Inc. v Mich. Liquor Control Comm'n 23 F.3d 1071,

1079 (6th Cir. 1994)).  Again, Legacy Church relies on vindicating its constitutional rights as the

interest at stake.  See Motion at 11.  Had it demonstrated likely success on the merits of its

constitutional claims, Legacy Church could point to weighty public interests that could overcome

the public's interests in enforcing social distancing.  It has not demonstrated likely success,

however.  Without a constitutional right to rely on, Legacy Church must therefore rely on the

public interest inherent in bringing together members and staff within its doors, and in this light,

the law views Legacy Church's Easter service as just another gathering with as much right to

protection as any other.   The public's interest in limiting the COVID-19 outbreak in the State, a

compelling interest outweighs the right to gather.  As this factor and the three discussed before all

weigh in favor of the Defendants and against Legacy Church, the Court will not grant the requested

relief.

## VII.   THE COURT DOES NOT CONVERT THE MTD, BECAUSE SECRETARY KUNKEL DISFAVORS CONVERSION, BUT THE COURT TAKES JUDICIAL NOTICE OF THE PUBLIC HEALTH ORDERS.

"When a party presents matters outside of the pleadings for consideration, as a general rule

'the court must either exclude the material or treat the motion as one for summary judgment.'"

Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103 (quoting Alexander v.

Okla., 382 F.3d 1206, 1214 (10th Cir. 2004)).   "When presented with a Rule 12(b)(6) motion, the

district court has broad discretion in determining whether to accept materials beyond the

pleadings."  Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103.  There are

three limited exceptions to this general principle: (i) documents that the complaint incorporates by

reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents

referred to in the complaint if the documents are central to the plaintiff's claim and the parties do

not dispute the documents' authenticity," Jacobsen v. Desert Book Co., 287 F.3d at 941; and

(iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights,

Ltd., 551 U.S. at 322.  See Brokers' Choice of America, Inc. v. NBC Universal, Inc., 861 F.3d

at 1103 (holding that the district court did not err by reviewing a seminar recording and a TV

episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity"). "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record." Van Woudenberg v. Gibson, 211 F.3d at 568. "When presented with a Rule 12(b)(6) motion, the district court has broad discretion in determining whether to accept materials beyond the pleadings." Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103.

Here, the Complaint refers to the April 6 Order, which did not restrict religious gatherings, and the April 11 Order, which, at the time Legacy Church filed the Complaint, was the only Public Health Order that directly restricted religious gatherings. See Complaint ¶ 24, at 4. The Complaint attaches the April 6 Order and the April 11 Order as exhibits. See Complaint at 7-22. All Legacy Church's factual allegations and legal claims are directed at the April 11 Order, although the Complaint refers to the April 6 Order as context to support Legacy Church's contention that the April 11 Order is not neutral, because it rescinded the April 6 Order's religious-gatherings exemptions on the day before Easter Sunday. See Complaint ¶¶ 8-36, at 2-5. The Complaint provides no allegations regarding the coronavirus or its attending public health risks. As for Legacy Church's alleged rights, the Complaint asserts, as its protected interest under the Free Exercise Clause, not a right to hold unencumbered, in-person religious services, but rather a right to employ more than four individuals to conduct and broadcast its services. See Complaint ¶ 31, at 4 ("Requiring Plaintiff to abstain from gathering at it[s] worship service, which requires several dozen people in a building designed for thousands, violates Plaintiff's constitutional right to free exercise of its religion."). Last, construed liberally, the Complaint alleges, as its Freedom of Assembly Clause interest, a right to hold in-person services that comply with the April 11 Order's

social distancing guidelines.  See Complaint ¶ 36, at 5-6 (alleging that the April 11 Order violates Legacy Church's assembly rights by "prohibiting church members' in-person attendance" despite Legacy Church's ability to "comply with" the April 11 Order's "social distancing guidelines for retail space." (internal quotation marks omitted)).

In the MTD, Secretary Kunkel directs her assertions almost exclusively towards the April 11 Order, although the MTD attaches as exhibits the March 12 Order, the March 16 Order, the March 19 Order, the March 23 Order, the March 26 Order, the April 6 Order, and the April 11 Order.  See MTD at 23-60.  Although Secretary Kunkel does not specifically request that the Court take judicial notice of these prior Public Health Orders, she avers that the "Court can consider these prior Public Health Orders just as it could consider legislative history or prior versions of a statute as helpful context to assess the current language of the rule."  MTD at 7 n.9.  She further asserts that, although the Complaint alleges that the April 11 Order violates Legacy Church's Free Exercise rights "insofar as it prevents Plaintiff from livestreaming its services," Secretary Kunkel contends that the April 11 Order "does not prohibit this conduct."  MTD at 10 n.10.  Secretary Kunkel asserts, however, that, "in light of Plaintiff's arguments in support of its request for a temporary restraining order and for the sake of efficiency, this Motion assumes that Plaintiff is alleging that its free exercise right is infringed by Plaintiff's churches being subjected to different restrictions than an essential business under the April 11 Order."  MTD at 11 n.10 (internal quotation marks omitted).

In the MTD Response, Legacy Church refers to the April 11 Order, the April 30 Order, and the May 5 Order.  See MTD Response at 2.  Moreover, Legacy Church asserts a novel Free Exercise violation in that the May 5 Order permits limited, non-essential retail operations while prohibiting Legacy Church from conducting its small ministry group activities like Bible studies.

See MTD Response at 3-4.  Legacy Church attaches a new affidavit from Pastor Smothermon in support of this claim.  See Second Smothermon Decl. ¶¶ 5-10, at 1-2.  In the MTD Response, Legacy Church does not maintain the Complaint's allegation that the April 11 Order impermissibly infringes upon its right to conduct and broadcast its religious services.  The MTD Response thus presents no responsive arguments to the MTD's contentions regarding the April 11 Order's constitutionality, but rather asserts a new claim regarding its small group ministries.  Legacy Church does not request that the Court take judicial notice of the Smothermon Decl., the Second Smothermon Decl., the April 30 Order, or the May 5 Order.

The Court concludes that it may consider each of Secretary Kunkel's Public Health Orders for three reasons.  First, the Complaint attaches and incorporates by reference the April 6 Order and the April 11 Order.  See Complaint at 7-22.  The Court may thus consider the April 6 Order and the April 11 Order.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  Second, the Court may consider the previous Public Health Orders, because they are central to Legacy Church's claims that the last-minute revocation of the religious-gatherings exemption evinces religious animus, and the parties do not dispute the Public Health Orders' authenticity.  See Jacobsen v. Deseret Book Co., 287 F.3d at 941.  Third, the Court may take judicial notice of each of Secretary Kunkel's Public Health Orders, including those Public Health Orders that Secretary Kunkel issued after the April 11 Order.  District courts may take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  The Public Health Orders are noticeable, because they are generally known with the District of New Mexico, readily determined from the New Mexico Department of Health, and there is no dispute that the Public Health Orders

accurately reflect New Mexico's COVID-19-related restrictions and guidelines.  The Court may

also take judicial notice, for the MTD's purposes, that the coronavirus is highly contagious and

potentially fatal, because this information is generally known within the District of New Mexico

and can be "accurately and readily determined from sources whose accuracy cannot reasonably be

questioned." Fed. R. Evid. 201(b).  Courts presiding over similar cases have taken judicial notice

of Public Health Orders and scientific consensus regarding the coronavirus.  See, e.g., Givens v.

Newsom, No. 20-CV-00852 JAM\CKD, 2020 WL 2307224, at *2 (E.D. Cal. May 8,

2020)(Mendez, J.)(taking judicial notice of Public Health Orders from other states and

municipalities); McGhee v. City of Flagstaff, No. CV-20-08081-PCT-GMS, 2020 WL 2309881,

at *3 (D. Ariz. May 8, 2020)(Murray Snow, C.J.)(taking judicial notice of COVID-19's public

health risks); Basank v. Decker, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *3 (S.D.N.Y.

March 26, 2020)(Torres, J.)(same).

          The Court may not consider the Second Smothermon Declaration, however, without

converting.  The Complaint does not refer to or incorporate the Second Smothermon Declaration,

which Pastor Smothermon executed after filing the Complaint.  See Jacobsen v. Deseret Book Co.,

287 F.3d at 941.  The Second Smothermon Declaration is not judicially noticeable, because it does

not include facts which are "generally known within" the District of New Mexico, or which are

"capable of accurate and ready determination by resort to sources whose accuracy cannot

reasonably be questioned," Fed. R. Evid. 201(b), (f), but instead includes assertions about

information particular to Legacy Church, see Second Smothermon Decl. at 1-2.  Because the

Second Smothermon Declaration does not fit within one of the three limited exceptions to the

principle that, on a motion to dismiss, the Court may not consider matters outside the pleadings,

the Court may not consider the Second Smothermon Declaration without converting the MTD to a motion for summary judgment.

The Court declines to convert the MTD.  See Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."); GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d at 1384.  Swoboda v. Dubach, 992 F.2d 286, 290 (10th Cir. 1993)("In determining whether a plaintiff has stated a claim, the district court may not look to the Martinez [v. Aaron, 570 F.2d 317 (10th Cir. 1978)("Martinez")] report,[43] or any other pleading outside the complaint itself, to refute facts specifically pled by a plaintiff, or to resolve factual disputes."); Janke v. Price, 43 F.3d 1390, 1392 (10th Cir. 1994)(holding that district court erred in using Martinez hearing to resolve disputed factual issues); Northington v. Jackson, 973 F.2d 1518, 1521 (10th Cir. 1992)("[The Martinez] process is designed to aid the court in fleshing out possible legal bases of relief from unartfully drawn pro se prisoner complaints, not to resolve material factual issues.").  "[C]ourts have broad discretion in determining whether or not to accept materials beyond the pleadings."  Lowe v. Town of Fairland, Okla., 143 F.3d 1378, 1381 (10th Cir. 1998)(citing 5A Charles Alan Wright & Arthur R. Miller, Fed. Practice and Procedure § 1366

---

[43]According to the Tenth Circuit, Martinez Reports

> are intended to provide information for the district court which will enable it to decide preliminary matters, including jurisdiction and definition of the issues, especially in § 1983 actions.  Martinez v. Aaron, 570 F.2d 317, 319 (10th Cir. 1978); El'Amin v. Pearce, 750 F.2d 829, 832 (10th Cir. 1984).  Martinez reports have been used in this circuit almost exclusively to provide the court preliminary information, furnished by prison administration personnel, in pro se cases brought by prisoners against prison officials.

Ketchum v. Cruz, 961 F.2d 916, 920 n.3 (10th Cir. 1992).

(1990)).  The Court thus declines to convert the MTD.  Not converting the MTD avoids prejudice

to the parties.  First, conversion shifts Secretary Kunkel's burden: rather than "merely showing"

that the Complaint fails to state a claim for relief, conversion requires Secretary Kunkel "to

demonstrate, in accordance with the requirements of Rule 56, that there exists no genuine issue as

to any material fact and that the [she] is entitled to the entry of a judgment as a matter of law."  5A

Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1366 (1990).  This

burden shift also prejudices Legacy Church, because it would require evaluating Legacy Church's

factual allegations regarding the Public Health Orders despite the lack of discovery -- until the July

10 evidentiary hearing -- on Secretary Kunkel's decision-making process in issuing the Public

Health Orders.  Further, the Court defers to Secretary Kunkel in construing her motion.  Secretary

Kunkel requests that the Court not convert the MTD, and Legacy Church initially asserted that it

disfavored conversion.  The Court, accordingly, declines to convert the MTD.  In ruling on the

MTD, however, the Court considers the Public Health Orders which Court may judicially notice.

The Court thus will construe the Complaint liberally, but may not add allegations that are not in

the Complaint.[44]

---

[44]In taking judicial notice of the Public Health Orders which Secretary Kunkel has issued since the Complaint's filing, the Court notes that these subsequent orders have negated several of Legacy Church's asserted harms.  In the Complaint, Legacy Church asserts as its protected interest the right to employ more than four individuals to conduct and to broadcast its religious services. See Complaint ¶ 31, at 5.  Secretary Kunkel has since clarified, however, that the Public Health Orders do not prohibit such activities.  See Secretary Kunkel Response at 8.  In the MTD Response, Legacy Church asserts as its protected interest the right to gather fifteen to twenty people to conduct its small group ministries.  See MTD Response at 1-3.  The May 15 Order, however, permits such activities, provided that they take place in a location in which the participants do not exceed twenty-five percent of the room's maximum occupancy.  See May 15 Order ¶ 5, at 6.  More recently, Legacy Church alleges that the June 15 Order, which imposes different occupancy restrictions on churches, restaurants, and gyms.  See Legacy Church Minute Order Response at 1. No Public Health Order has negated Legacy Church's most recent argument.  See June 30 Order at 5-6.  The Complaint, however, cannot plausibly be read to assert these latter two interests.  The

## VIII. THE COURT GRANTS THE MTD, BECAUSE LEGACY CHURCH ASSERTS INTERESTS THAT THE PUBLIC HEALTH ORDERS DO NOT IMPAIR, AND BECAUSE THERE ARE NO FACTS THAT LEGACY CHURCH CAN ALLEGE THAT RENDER THE PUBLIC HEALTH ORDERS UNCONSTITUTIONAL.

When evaluating a rule 12(b)(6) motion to dismiss, the Court must identify whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570). The Court construes the Complaint in the light most favorable Legacy Church and accepts as true all well-pled allegations. See Iqbal, 556 U.S. at 679. Although rule 12(b)(6) presents a liberal standard, the "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. See Bell Atl. Corp. v. Twombly, 550 U.S. at 555, 557 ("[L]abels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do," nor will "naked assertion[s]" devoid of "further factual enhancements."). As the Court discusses in Section VII, the Court takes judicial notice of the Public Health Orders. The more recent Public Health Orders, however, no longer infringe the right that Legacy Church asserts in the Complaint. The Court cannot read the Complaint to contain allegations that it does not contain. The Court thus analyzes each of the substantive Public Health

---

Only instance in which the Complaint might assert a right to in-person attendance is in the Assembly Clause Count, in which Legacy Church states: "Requiring Plaintiff to abstain from gathering in a group of more than five people, despite substantial modification to satisfy the public health interests at stake, e.g. prohibiting church members' in-person attendance, violates Plaintiff's constitutional right to peaceably assemble." Complaint ¶ 36, at 5-6. Here, however, Legacy Church expressly asserts that it does not request in-person attendance, but rather that its willingness to bar in-person attendance demonstrates that the April 11 Order is not narrowly tailored. See Complaint ¶ 36, at 5-6. Accordingly, although the Court considers the subsequent Public Health Orders, the Court may not consider Legacy's subsequent asserted interests in deciding the Complaint's sufficiency. The Court considers these later assertions, however, when deciding whether an amendment is futile.

Order to determine whether amending the Complaint would be futile.  The Court first concludes that the Complaint does not state a claim against the April 11 Order.  The Court then evaluates each of the stages of the Public Health Orders to determine whether, consistent with rule 11 of the Federal Rules of Civil Procedure, Legacy Church could state a First Amendment claim against the Public Health Order such that amendment would not be futile.  Although there have been several Public Health Orders, the Public Health Orders' regulation of religious conduct has come in four stages.  First, the April 11 Order prohibits all indoor religious mass gatherings.  Second, the May 15 Order permits houses of worship, like most other businesses with the exception of indoor secular gatherings like movie theaters and concert venues, to operate at twenty-five percent capacity.  Third, the June 30 Order maintains the twenty-five percent occupancy restriction on indoor religious gatherings, but permits restaurants and gyms to operate at fifty percent.  Fourth, the July 13 Order rescinds permission for restaurants to offer indoor dining, but allows hotels public and commercial swimming pools to operate at fifty percent capacity while restricting indoor religious gatherings to twenty-five percent.  The Court concludes that there are no facts that Legacy Church could allege, consistent with rule 11, that would entitle it to relief.  Accordingly, the Court grants the MTD and does not give Legacy Church leave to amend the Complaint.

### A. LEGACY CHURCH CANNOT STATE A PLAUSIBLE CLAIM THAT THE APRIL 11 ORDER VIOLATES ITS FREE EXERCISE  OR ASSEMBLY RIGHTS, BECAUSE THE APRIL 11 ORDER IS NEUTRAL,  GENERALLY APPLICABLE, AND NARROWLY TAILORED.

In the Complaint, Legacy Church alleges only the right to conduct and broadcast its services; it does not assert a right to hold in-person services.  See Complaint ¶¶ 17, at 3 ("[A]s planned, Legacy only intends to have approximately thirty people inside its building on Easter Sunday, all of whom are assisting in the service.").  Although Legacy Church has since alleged

additional interests in its briefing, the Complaint may not be interpreted plausibly to assert these interests.  After Legacy Church filed its Complaint, Secretary Kunkel clarified that the April 11 Order does not prohibit Legacy Church from employing staff necessary to broadcast its services. See Secretary Kunkel PI Response at 8; April 16 Tr. at 55:22-56:3 (Hunter).  The April 11 Order does not expressly permit Legacy Church, however, to gather more than four people to conduct and broadcast its services, because the April 11 Order does not name houses of worship as essential businesses or activities.  See April 11 Order at 4-6.  Significantly, that the current Public Health Orders do not prohibit Legacy Church from exercising its asserted right does not remove Legacy Church's standing to pursue this action.  See Brown v. Buhman, 822 F.3d 1151, 1169-72 (10th Cir. 2016)(providing that government's voluntary cessation of allegedly unconstitutional action does not negate a plaintiff's standing).  Finally, with daily infection rates on the rise in New Mexico, it is not implausible that Secretary Kunkel may roll back the more recent Public Health Orders to impose restrictions similar to what the April 11 Order imposed.  Accordingly, the Court first analyzes the Complaint to determine whether Legacy Church states a plausible claim that the April 11 Order's prohibition against Legacy Church broadcasting its services violates Legacy Church's Free Exercise rights.  The Court then analyzes the Complaint to determine whether the more recent Public Health Orders violate Legacy Church's asserted First Amendment interests.

### 1.      The April 11 Order Does Not Violate the Free Exercise Clause.

The April 11 Order is neutral and generally applicable, and is rationally related to a compelling government interest.  The Court first examines the April 11 Order's neutrality.  As the Court notes in the TRO MOO, although Justice Kennedy's inquiry into the defendant-city's subjective intent in Lukumi did not carry a majority of the Justice, the Supreme Court has since focused on subjective intent in Masterpiece Cakeshop.  See Masterpiece Cakeshop, 138 S. Ct.

at 1731-32; TRO MOO, 2020 WL 1905586, at *30-31.  The Court thus examines the April 11

Order for facial neutrality, as well as for evidence that religious animus motivates the April 11

Order.  To determine whether religious animus motivates the April 11 Order, the Court examines

first the timeline of events leading up to the April 11 Order.  The April 6 Order restricted myriad

commercial and secular activity but permitted religious activity.  See April 6 Order ¶ 6, at 5.  On

April 11, as the COVID-19 crisis continued to escalate, and on Easter's eve, New Mexico

rescinded the April 6 Order insofar as it permitted religious services, thus effectively prohibiting

in-person Easter services across New Mexico.  See April 11 Order ¶ 6, at 5.

TRO MOO, 2020 WL 1905586, at *30-31.

        The April 11 Order does not, however, discriminate between religions.  Passover began on

April 8, 2020, and ended on April 16, 2020.[45]  The only Muslim holiday that appears to have

occurred during New Mexico's COVID-19 restrictions, and whose celebration Secretary Kunkel

permitted, is Lailat Al Miraj, which landed on March 22, 2020.  The April 11 Order restricted,

however, services and gatherings in observation of one of Islam's most important months --

Ramadan -- which began on April 23, 2020.  Accordingly, the April 11 Order's mass gathering

restrictions burden several different religions and do not shift the burden for its justification to

Secretary Kunkel.

        The April 11 Order's timing nonetheless troubles the Court.  COVID-19 had been an

ongoing health emergency in New Mexico for well over a month.  Governor Lujan Grisham

declared a state of emergency on March 11, 2020, the day New Mexico on which announced its

first confirmed COVID-19 case.  See FOF ¶ 20, at 5-6.  Secretary Kunkel announced further

---

[45]The Court notes that the April 6 Order permitted celebration and gatherings in observance of two Seders, which occurred on April 8 and 9, 2020.

restrictions on mass gatherings on April 6, 2020, two days before Passover began, but permitted religious gatherings.  See April 6 Order at 5-6.  On the evening of April 11, the night before Easter, Secretary Kunkel removed the exemption for religious services, prohibiting Easter services.  The Court notes, however, that the COVID-19 situation had escalated dramatically between April 6 and 11.  On April 6, the state had 685 confirmed cases and twelve deaths.  On April 11, New Mexico had 1,174 confirmed cases, and deaths had more than doubled to twenty-six.  See FOF ¶ 52, at 13.  On April 10, the state announced 106 new cases of COVID-19 and two additional deaths.  See Albuquerque J., "Coronavirus Updates: April 10", April 10, 2020, https://www.abqjournal.com/1442108/coronavirus-updates-april-10.html (last accessed April 15, 2020).  On April 11, the state recorded eighty-six new cases and an additional death.  See Albuquerque J., "Coronavirus Updates: April 11", April 11, 2020, https://www.abqjournal.com/1442624/coronavirus-updates-april-11.html (last accessed April 15, 2020).  Amid this escalation, Governor Lujan Grisham sought to justify the restrictions on religious services:

> We're incredibly grateful that so many houses of worship already took action of their own . . . .   However, there have been a few outliers, putting New Mexicans at risk.  We were hearing additional ones planning on holding services (Sunday) . . . and we wanted to be crystal clear.

Albuquerque J., "Coronavirus Updates: April 11."  See FOF ¶ 62, at 15.  Secretary Kunkel thus contends that anti-Christian animus does not motivate the April 11 Order's timing, but rather churches' last-minute decisions to hold in-person services despite the escalating public health emergency.  This justification is more plausible than Governor Lujan Grisham's desire to thwart Christianity's most sacred holiday.  As officials received word of churches' plans to push forward, which would lead to dozens of gatherings of dozens, perhaps hundreds of people across the state,

the state took action to "be crystal clear" that it viewed mass gatherings as a public health threat. Albuquerque J., "Coronavirus Updates: April 11." See FOF ¶ 62, at 15. These churches' plans, in Secretary Kunkel's view, endangered public health, not because of their religious nature, but because they involved masses of people in closed spaces and in close proximity. As Secretary Kunkel has asserted a plausible, religion-neutral justification for the April 11 Order's timing, the Court sees no animus or overt discrimination in the April 11 Order's timing.

That Secretary Kunkel appears to have discretion to categorize and recategorize activities as essential or nonessential gives the Court pause. See, e.g., Sherbert v. Verner, 374 U.S. at 401 (invalidating denial of unemployment benefits where statute allowed officials to evaluate, on a case-by-case basis, whether an individual's termination from employment was for "good cause"); Cantwell v. Connecticut, 310 U.S. at 305 (invalidating a statute that prohibited solicitation for religious or charitable causes without a designated official's approval, and authorizing the official to determine whether the cause is genuinely religious or charitable). Secretary Kunkel notes, however, that her categorization has remained largely constant through each public health order. See April 16 Tr. at 26:18-23. Similarly, it should not surprise that each public health order might grow more restrictive as time passes and the pandemic worsens. In other words, mass gatherings and activities involving close physical proximity grow more threatening as COVID-19 spreads through the community. The Supreme Court's cases contemplate, as Free Exercise violations, individualized determinations of what religious activity is preferable or amounts to a good cause, and what religious activity falls short of meriting governmental protection. See Cantwell v. Connecticut, 310 U.S. at 305. Here, religious activity's recategorization has not resulted from individualized assessment as to whether certain religious activity is more important than other religious activity. Instead, that recategorization resulted from increased danger that some religious

activity -- mass gatherings -- caused.  This a priori categorization is not the kind of individualized assessment that the First Amendment prohibits.  Similarly, Secretary Kunkel points out that religious activity's relatively late recategorization stemmed not from hostility toward religion, but rather solicitousness towards religion.   Secretary Kunkel sought to preserve religious organizations' leeway to conduct services as long as possible until COVID-19 became too severe to continue affording such latitude.

Having determined that religious animus does not motivate the April 11 Order, the Court next examines its facial neutrality.  The April 11 Order's distinction between religious and secular conduct does not render it nonneutral.  Legacy Church contends that the April 11 Order is not neutral, because it

> specifically targets houses of worship.  The Secretary does not restrict the number of people who may gather at funeral homes, media outlets, and other essential businesses.  Walmart, Home Depot, and other big box retailers continue to welcome patrons. Shoppers may roam the aisles of retail establishments with no barriers between them so long as they maintain a distance of six feet from one another while they purchase house plants, fishing rods and DVDs. The Secretary's treatment of those essential businesses, as well as retailers, shows least restrictive means are available to further the state's public health interest.  Defendants, however, chose to specifically target church services and other places of worship, taking them from exempt to banned on a weekend night before Legacy's most important religious holiday.

PI Motion at 6.  Legacy Church also contends that the April 11 Order is not generally applicable, because it is underinclusive with regards to secular conduct that might cause the same harm that the prohibition against indoor religious gatherings is supposed to prevent.  See PI Motion at 7. Legacy Church contends that courts apply strict scrutiny where the government exempts non-religious entities from the burdens associated with government action but withholds such exemptions from religious entities.  See PI Motion at 7.  Legacy Church accordingly argues that

the April 11 Order is facially discriminatory, and so the Court must subject it to "'the most rigorous scrutiny.'"  PI Motion at 6 (quoting Lukumi, 508 U.S. at 546).

Other Courts of Appeals have held that, when the State offers secular exemptions, it must offer exemptions to analogous religious conduct.  See, e.g., Fraternal Order of Police Newark Lodge No. 12 v. City of Newark, 170 F.3d 359, 366 (3d Cir. 1999)(Alito, J.).  The Tenth Circuit, however, has rejected this interpretation of Smith and Lukumi, holding instead that the Free Exercise Clause "is designed to prevent the government from impermissibly burdening an individual's free exercise of religion, not to allow an individual to exact special treatment from the government."  Swanson by & Through Swanson v. Guthrie Indep. Sch. Dist. No. I-L, 135 F.3d 694, 702 (10th Cir. 1998)("Swanson").  Moreover, Lukumi and Smith require the Court to compare analogous exemptions.  See Lukumi, 508 U.S. at 538-40.  The April 11 Order does not prohibit religious conduct only; it prohibits a host of secular activities, both commercial and recreational.  See April 11 Order at 4-5.  Accordingly, to determine the April 11 Order's facial neutrality,  the Court must compare not only the April 11 Order's essential-business exemptions against religious-activity prohibitions, but also its religious-activity prohibitions against its secular-activity prohibitions.  See Lukumi, 508 U.S. at 543-45 (comparing permitted and restricted activity that involves animal slaughter).

Framed as such, the April 11 Order is facially neutral.  The April 11 Order severely restricts myriad secular activities.  See April 11 Order at 3-6.  By omission from its list of essential businesses, the April 11 Order restricts secular gatherings like sporting events, conferences, and conventions.  See April 11 Order at 3-5 (defining essential businesses).  For example, the April 11 Order maintains the April 6 Order's closure of non-Indian casinos and horse racing facilities, directs all non-essential businesses to reduce their in-person staffing by 100 percent, and restricts

hotels and other lodging operations to twenty-five-percent capacity.  <u>See</u> April 11 Order ¶¶ 2-6, at 5-6.  Nor does the April 11 Order reserve unbridled freedom for secular activities that it deems essential.  <u>See</u> April 11 Order at 6.  For example, it allows essential businesses to remain open, "provided they minimize their operations and staff to the greatest extent possible."  April 11 Order at 5-6.  It also restricts such businesses to twenty percent of their maximum occupancies.  <u>See</u> April 11 Order ¶ 4, at 6.  The April 11 Order thus does not impose special disability on the basis of religion.  <u>Cf.</u> <u>Sherbert v. Verner</u>, 374 U.S. at 404 (invalidating statutory scheme that allowed denial of unemployment benefits to an applicant who was terminated from employment for refusing to act contrary to her religion).  The April 11 Order, accordingly, is neutral on its face and in its aims, because its "object is something other than the infringement or restriction of religious practices."  <u>Grace United Methodist Church v. City of Cheyenne</u>, 451 F.3d at 649-50

The April 11 Order is also generally applicable.  The April 6 Order and the April 11 Order provide a set of activities that Secretary Kunkel deems essential.  <u>See</u> April 6 Order at 3-5; April 11 Order at 3-5.  Those enterprises include, among others, hospitals, farms, media services, funeral homes, automobile and bicycle mechanics, and business that generate the majority of their revenue by selling "canned food, dry goods, fresh fruits and vegetables, pet food, feed, and other animal supply stores, fresh meats, fish, and poultry, and any other household consumer products."  April 11 Order at 3-5.  Thea activities, however, are not analogous to indoor religious gatherings, because they do not bring large groups of people together in an enclosed space for an extended period of time.  Mass gatherings, regardless of their purposes, present a higher contagion risk than grocery stores present.  "The purpose of shopping is not to gather with others or engage them in conversation and fellowship, but to purchase necessary items and then leave as soon as possible."  <u>Cassell v. Snyders</u>, 2020 WL 2112374, at *9.  The April 11 Order also imposes an across-the-

board prohibition on all indoor mass gatherings.  It treats like conduct alike, regardless of that conduct's motivation.  Accordingly, the April 11 Order is both neutral and generally applicable, and so subject to rational basis review.  The Court cannot say that Secretary Kunkel acted unreasonably in restricting all indoor mass gatherings, and this restriction is closely related to her compelling interest in guarding the public health.  Accordingly, Legacy Church cannot state a plausible claim for relief against the April 11 Order.

### 2.    Legacy Church Does Not State a Plausible Claim That its Inability to Conduct and Broadcast its Services Violates its Assembly and Associational Rights.

The Supreme Court has subsumed the Assembly Clause rights within the concept of associational freedoms, "rendering them one and the same."  TRO MOO, 2020 WL 1905586, at *25.  Expressive association is the "'right to associate for the purpose of engaging in those activities protected by the First Amendment -- speech, assembly, petition for the redress of grievances, and the exercise of religion.'"  Schalk v. Gallemore, 906 F.2d at 498 (quoting Roberts v. United States Jaycees, 468 U.S. at 617-18).  As the Court concluded in the TRO MOO, Legacy Church asserts a valid right of expressive association, because the Tenth Circuit has recognized a right of association for religious gatherings in which individuals come together "'for the purpose of engaging in . . . religious activities.'"  Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 658 (quoting Bd. of Dirs. v. Rotary Club of Duarte, 481 U.S. at 544).  See TRO MOO, 2020 WL 1905586, at *39.

The State constitutionally may burden the rights of assembly and association "by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms."  Roberts v. United States Jaycees, 468 U.S. at 623.  Accordingly, a valid Freedom of Assembly

claim must assert that the April 11 Order does not serve compelling state interests, is related to the suppression of ideas, or excessively restricts Legacy Church's Associational or Assembly rights. See Givens v. Newsom, 2020 WL 2307224, at *7. As discussed above, Legacy Church acknowledges that the April 11 Order serves compelling state interests in protecting public health against COVID-19. See MTD Response at 4 ("Legacy Church does not dispute that the Secretary's interest in safeguarding the public and the health system from the spread of coronavirus rises to the highest order."). Nor does Legacy Church allege that the April 11 Order is related to the suppression of ideas. See Complaint ¶¶ 32-36, at 5-6. Legacy Church argues, however, that the April 11 Order "cannot meet the no-less restrictive means test," because Legacy Church can comply with the April 11 Order's "social distancing guidelines for 'retail space,'" and that these guidelines "are appropriate to limit the spread of COVID-19." Complaint ¶ 35, at 5 (quoting April 11 Order). Accordingly, the sole issue regarding the viability of Legacy Church's Freedom of Assembly claim, as the Complaint states, is whether Legacy Church validly alleges that the April 11 Order's interests can "be achieved through means significantly less restrictive of associational freedoms."[46] Roberts v. United States Jaycees, 468 U.S. at 623.

---

[46]The Court notes that Roberts v. United States Jaycees, which predates Smith, affords greater protection for associational freedoms than Smith does for religious freedoms. Whereas under Smith, a law unrelated to the suppression of religious conduct that furthers a legitimate, rather than compelling interest, will generally be valid, regardless whether the law is narrowly tailored. See Smith, 494 U.S. at 885. Under Roberts v. United States Jaycees, however, that same law, if it incidentally burdens associational freedoms, must be narrowly tailored. See Roberts v. United States Jaycees, 468 U.S. at 623. The Court concludes that this result makes sense, because it shows how narrow the protections of the First Amendment should be so that it does not negate a lot social and economic legislation in a modern democracy, and the rest of the First Amendment rights -- assembly and speech -- can carry a lot of water in a modern society. In any case, the analysis demonstrates the flaws of the Supreme Court's cabined and yet overlapping approach to First Amendment freedoms. Moreover, this disparate treatment of religious and associational freedoms undermines Smith's concern that requiring legitimately motivated laws that incidentally burden constitutional rights endangers myriad important legislation in the nation's cosmopolitan,

First Amendment rights may be subject to reasonable time, place, and manner restrictions. See Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 578 (1980).  Time, place, and manner restrictions that are content neutral are subject to intermediate scrutiny.  See Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).  As discussed above, although the April 11 Order mentions religious conduct, it is content-neutral, because its restrictions are unrelated to the suppression of ideas and do not single out religious conduct for differential treatment.  Because the April 11 Order unquestionably burdens associational interests, however, it must be "narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information."  Ward v. Rock Against Racism, 491 U.S. at 791 (citations omitted).  "[T]he requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'"  Ward v. Rock Against Racism, 491 U.S. at 799 (citations omitted).  Moreover, "'[u]nder the pressure of great dangers,' constitutional rights may be reasonably restricted 'as the safety of the general public may demand.'  That settled rule allows the state to restrict, for example, one's right to peaceably assemble, to publicly worship, to travel, and even to leave one's home."  In re Abbott, 954 F.3d at 778 (quoting Jacobson v. Massachusetts, 197 U.S. at 29).

---

diverse society, and "'permit[s] every citizen to become a law unto himself.'"  Smith, 494 U.S. at 879 (quoting Reynolds v. United States, 98 U.S. at 167).  See Smith, 494 U.S. at 888-89.  Finally, that protections for associational freedoms, which may involve the assertion of aggregated, or collective, interests, deserve greater protection than Free Exercise rights, which may be individual, has some force.  Collective rights may be important to protect religious participation in the political process, which could better safeguard religious liberty than the Supreme Court's treatment of the Free Exercise Clause.  In any case, the Supreme Court has increasingly recognized institutional Free Exercise claims.  See, e.g., Trinity Lutheran Church of Columbia, Inc. v. Comer 137 S. Ct. at 2024-25.  Moreover, just as with Free Exercise claims, individuals may assert associational rights.  See Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31, 138 S. Ct. 2448 (2018).

Legacy Church suggests that the restriction is not narrowly tailored for two reasons: (i) a less restrictive alternative is available in which Legacy Church requires the members of its congregation that attend services to stay at a physical distance from each other; and (ii) New Mexico permits "commercial shoppers and others" to gather despite ordering churches to stop hosting gatherings. Motion at 9. Neither of these arguments is compelling.

First, the proffered "less restrictive" alternative in which congregation members attend services but stay physically distant from each other does not further the compelling state interest in escalating social distancing measures to mitigate COVID-19. Motion at 9. In its March 23, 2020 order, the State of New Mexico ordered all essential businesses exempt from the stay-at-home order to "adhere to social distancing protocol and maintain at least a six-foot social distancing from other individuals [and] avoid person-to-person contact." March 23 Order at 4. Although the physical distancing likely helped mitigate the initial spread of disease, under these measures the number of deaths still doubled. If applied to houses of worship, this physical-distancing restriction, under which the death rate doubled in four days, may not advance mitigation efforts further, but instead merely sustain them. With the number of deaths in New Mexico almost doubling between the April 6 Order and the April 11 Order, it makes sense that New Mexico and Secretary Kunkel would escalate social distancing measures.[47] The Court concludes, therefore, that applying social distancing measures that were unable to contain the drastic increase in New Mexico COVID-19 cases is not a less restrictive alternative to the cap on gatherings, because it would sustain, rather than increase, New Mexico's social distancing measures. See Burson v.

---

[47]The Court declines to substitute its judgment for that of subject-area experts because "'[i]t is no part of the function of a court'" to decide which measures are "likely to be the most effective for the protection of the public against disease.'" In re Abbott, No. 20-50264, 2020 WL 1685929, at *1 (quoting Jacobson v. Massachusetts, 197 U.S. at 30).

Freeman, 504 U.S. 191, 206 (1992)(concluding, in a case about restricted zones around voting areas, that the law does not require the government to select a less restrictive alternative that "fall[s] short of serving a State's compelling interests").  Similarly, the April 11 Order is narrowly tailored, because it permits outdoor religious services, thus preserving Legacy Church's ability to associate to practice and express its faith.

Legacy Church next argues that the restriction is underinclusive, because it does not ban mass gatherings at essential businesses, and because it incorrectly equates its religious services[48] with the essential businesses that are permitted to stay open.  Legacy Church specifically draws attention to the following businesses that are permitted to stay open: media outlets, Home Depot, Wal-Mart, grocery stores, automobile repair shops, and funeral homes.  See Motion at  2, 6, 9.  Each and every business mentioned by Legacy Church either sells items necessary for everyday life or to facilitate the mitigation of COVID-19.  While, as Legacy Church noted, some people may take advantage of the exemption and purchase frivolous items, these are open for good New Mexico citizens to use them judiciously.  As Secretary Kunkel noted, Home Depot sells items for emergency home repairs, as does Wal-Mart.  See Secretary Response at 6 n.9.  Wal-Mart also sells thermometers, acetaminophen, and food.  Grocery stores, obviously, sell food.  All these stores facilitate the purchase of necessary items that help treat ill individuals who are staying at home, or that make a house habitable, or that feed people so they can stay alive.  And, of course, people will continue to die, because of COVID-19.  Although the Court wishes that it could pretend these

---

[48]The Court does not want its Memorandum Opinion to be read to minimize the importance of faith in people's lives.  Certainly religion is the centerpiece of many people's lives, and many individuals may feel as if religion saved their life. But essential services focus on the public as a whole -- essential businesses are essential for the lives of everyone, because they are necessary to ensure public health and welfare.

deaths would not occur, it recognizes that as long as people die, "funeral homes, crematoriums, and cemeteries" will need to stay open to take care of and give dignity to the deceased.  Further, in contrast to Legacy Church's contention, nothing in the April 11 Order suggests that funeral homes can host mass gatherings.  See April 11 Order at 6.  Automobile repair shops are necessary so that essential workers -- emergency room physicians, grocery store workers, police officers – will be able to work on the frontlines unhampered by a broken engine.  Finally, media services permit the dissemination of crucial COVID-19-related information to citizens.  Secretary Kunkel has deemed these entities essential, and the Court is not in a position to second-guess expert decisions on which restrictions will be most effective at saving lives during an epidemic when those restrictions are based not on suppression of religion but suppression of a epidemic.  See In re Abbott, No. 20-50264, 2020 WL 1685929, at *1 (quoting Jacobson v. Massachusetts, 197 U.S. at 30).  The Court recognizes that, to many individuals, religious worship is equally essential and important to life.  See Las Cruces Resumes Public Mass Article (quoting Las Cruces Bishop Peter Baldacchino as saying that "while we run a daily count of the physical deaths, we are overlooking those who are dead interiorly.").  Importantly, however, none of the April 11 Order's listed essential businesses can operate remotely, while religious services can be broadcast to congregation members.  The broadcast, of course, may be dissatisfying for some members, but they will still be able to access the services remotely, regardless of their satisfaction.  The entities that Legacy Church named are not comparable to houses of worship; all of these services are necessary to everyday life and to fighting the epidemic, and none of these services can be done remotely, in contrast to religious worship, which, while important, does not facilitate survival of the public and has the ability to be conducted remotely.

Moreover, religious organizations have received preferential treatment relative to their closest comparators -- in terms of physical set-up and risk, not necessarily meaning. Movie theatres and concert halls are spaces where people gather and sit together for a period of time similar to Legacy Church's auditorium. On March 23, New Mexico shuttered movie theatres and concert halls See Secretary Response at 8 (citing March 23 Order at 3-4). Meanwhile, places of worship were kept open, perhaps because New Mexico acknowledge religious worship's importance to many individuals. Cf. Swanson By & Through Swanson v. Guthrie Indep. Sch. Dist. No. I-L, 135 F.3d 694, 702 (10th Cir. 1998)(stating that the Free Exercise Clause provides protection, not special treatment)(citing Snyder v. Murray City Corp., 124 F.3d 1348, 1353 (10th Cir. 1997). Thus, the April 11 Order is not underinclusive even though it has different restrictions for places of religious worship than it does for essential services necessary for everyday life and survival that cannot be done remotely. Yellowbear v. Lampert, 741 F.3d 48, 60 (10th Cir. 2014)(stating that a law is underinclusive when it "fail[s] to cover significant tracts of conduct implicating the law's animating and putatively compelling interest").

Nor is the April 11 overbroad. It allows Legacy Church and other religious organizations to broadcast services. See April 11 Order at 6. It does not ban drive-through or other outdoor services. See April 11 Order at 6; Kunkel PI Response at 2 (stating that the Order "has been specifically tailored to allow [places of worship] to provide services to their congregants via electronic means or through drive-in services"). Lukumi, 508 U.S. at 522. Presumably, based on Secretary Kunkel's Response, Legacy Church can still assemble for worship services, albeit in their cars or in a parking lot. Thus, the Court concludes that Legacy Church likely will not succeed on the merits for its Freedom of Assembly claim.

The Court thus concludes that Legacy Church cannot state a plausible claim that the April 11 Order violates its Freedom of Assembly rights. The Supreme Court has a "settled rule," In re Abbott, 2020 WL 1685929, at *1, that "under the pressure of great dangers," constitutional rights may be restricted "as the safety of the general public may demand," Jacobsen v. Massachusetts, 197 U.S. at 29. Thus, because the Court has determined that the April 11 Order meets strict scrutiny, the Court concludes that it also meets this lesser standard of being related to the safety of the general public. It permits Legacy Church to conduct its services for broadcast. It permits Legacy Church to hold outdoor services. To the extent that the April 11 Order limited Legacy Church's ability to conduct its group ministries, it does so in the context of an across-the-board restriction on analogous conduct, while preserving Legacy Church's right to conduct those ministries by audiovisual means. To the extent that it infringes Legacy Church's other religious exercises, like conducting its food bank operations, that restriction no longer applies. It is thus futile to amend the Complaint to allege additional allegations against the April 11 Order.

## B.   LEGACY CHURCH CANNOT STATE A PLAUSIBLE CLAIM THAT THE MAY 15 ORDER VIOLATES ITS FIRST AMENDMENT RIGHTS.

The May 15 Order loosens restrictions on houses of worship. Whereas the April 11 Order prohibits all mass gatherings, the May 15 Order permits mass gatherings only for houses of worship while maintaining the April 11 Order's prohibition against secular mass gatherings. See May 15 Order. The May 15 Order slightly changes the mass gathering definition in prior Public Health Orders by removing limiting language indicating that mass gatherings are prohibited in open outdoor spaces only where individuals are within six feet of each other. Compare April 11 Order ¶ 6, at 5, and May 5 Order ¶ 6, at 5, with May 15 Order ¶ 4, at 5. The May 15 Order defines mass gathering as:

"Mass gathering" means any public gathering, private gathering, organized event, ceremony, or other grouping that brings together five (5) or more individuals in a single room or connected space, confined outdoor space or an open outdoor space. "Mass gathering" does not include the presence of five (5) or more individuals where those individuals regularly reside. "Mass gathering" does not include individuals who are public officials or public employees in the course and scope of their employment.

May 15 Order ¶ 4, at 5. The May 15 Order also allows non-essential businesses to open "provided that the total number of persons situated within the business does not exceed 25% of the maximum occupancy of any enclosed space on the business's premises, as determined by the relevant fire marshal or fire department." May 15 Order ¶ 4, at 6. The May 15 Order also allowed houses of worship to hold in-person services, as long as services do "not exceed 25% of the maximum occupancy of any enclosed building, as determined by the relevant fire marshal or fire department." May 15 Order ¶ 5, at 6. Like the May 5 Order, the May 15 Order includes restaurants as "essential business," "but only for delivery or carry out and local breweries, wineries, or distillers but only for carry out." May 15 Order ¶ 1.u, at 5. Finally, unlike previous Public Health Orders, the May 15 Order states: "Unless a healthcare provider instructs otherwise, all individuals shall wear a mask or multilayer cloth face covering in public settings except when eating, drinking, or exercising." May 15 Order ¶ 7, at 6.

### 1. Legacy Church Cannot Plausibly Claim that the May 15 Order Violates the Free Exercise Clause.

As with the April 11 Order, there is no evidence that religious animus motivates the May 15 Order. The May 15 Order thus has "as its object something other than the infringement or restriction of religious practices.'" Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 649-50. Nor is the May 15 Order facially nonneutral, because its reference to religious practice hold a secular meaning discernable from its language or context. See Lukumi, 508 U.S. at 533.

The May 15 Order refers to religious conduct by way of exemption -- it notes that, although it bans all mass gatherings, this prohibition does not apply to religious mass gatherings.  See May 15 Order ¶ 5, at 6.  The May 15 Order thus mentions religious conduct not to burden it, but to favor it.  Moreover, as with the April 11 Order, the May 15 Order does not involve officials' subjective, case-by-case review of the merits of religious conduct, but rather exempts all mass gatherings that are religious in nature.  See Sherbert v. Verner, 374 U.S. at 401.  Accordingly, the May 15 Order is neutral.

The May 15 Order is also generally applicable.  A law is not generally applicable if it affords favorable treatment to secular conduct that "endangers these [state] interests in a similar or greater degree" as the burdened religious conduct.  Lukumi, 508 U.S. at 543.  The May 15 Order treats few secular activities more favorably than it treats religious conduct.  Only businesses that it deems essential receive favorable treatment, and, as discussed, those interests do not endanger the public health to a similar or greater degree than the religious mass gatherings that the May 15 Order restricts, and this categorization does not involve subjective, individualized evaluation of the merits of a particular religious exercise.  Moreover, those activities are also not analogous, because they do not involve extended gatherings of large groups of people in close proximity.  Additionally, unlike mass gatherings, they may not be conducted remotely or through audiovisual means.  Further, the May 15 Order does not leave untouched the businesses that it deems essential, but rather requires reducing occupancy and staffing to the greatest extent possible while enforcing social distancing.  See May 15 Order ¶ 8, at 5.

As compared to analogous activities, religious mass gatherings receive favorable treatment compared to secular mass gatherings that endanger the public health to a similar degree, like movie showings and concert venues.  See May 15 Order ¶ 1, at 6.  Activities that receive similar treatment,

are "nonessential retail businesses," which may operate, provided that they cap occupancy at twenty-five percent, enforce social distancing, and reduce staffing to the greatest extent possible. See May 15 Order ¶ 4, at 6.  The only other nonessential, secular activities that may receive favorable treatment are those that take place outside, like golf or tennis.  See May 15 Order ¶¶ 10-11, at 7.  Those activities do not, however, endanger the public health in a similar or greater degree than the indoor gatherings that Legacy Church wishes to conduct.  See FOF  ¶¶ 263-65, at 51-52. Accordingly, the May 15 Order's restrictions apply to all secular conduct that is analogous to indoor religious mass gatherings.  Accordingly, it is generally applicable.  Because the May 15 Order is both neutral and generally applicable, and is strongly related to a compelling government interest, Legacy Church cannot plausibly claim that the May 15 Order violates the Free Exercise Clause.

## 2.    Legacy Church Cannot Plausibly Claim that the May 15 Order Violates the Freedom of Assembly Clause.

As with the April 11 Order, New Mexico did not impose the April 11 Order to suppress ideas.  Further, Legacy Church "does not dispute that the state has a compelling governmental interest in its response to COVID-19."  PI Motion at 7.  The question then, is whether Legacy Church can claim that the May 15 Order is not narrowly tailored, despite the "settled rule," In re Abbott, 2020 WL 1685929, at *1, that, "under the pressure of great dangers," constitutional rights may be restricted "as the safety of the general public may demand," Jacobsen v. Massachusetts, 197 U.S. at 29.

As the Court discusses in Section V, the May 15 Order is a time, place, and manner restriction.  It restricts mass gatherings for May 15 Order's duration.  See Antietam Battlefield KOA v. Hogan, No. CV CCB-20-1130, 2020 WL 2556496, at *10 (D. Md. May 20, 2020)("The

prohibition on large gatherings of individuals for the duration of the public health crisis is more akin to a time, place, and manner restriction."). The State may impose reasonable restrictions on the time, place, or manner of speech, provided that those restrictions are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative means of communication. See Ward v. Rock Against Racism, 491 U.S. at 791. The May 15 Order is content-neutral. "Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech'" or the regulated assembly's purpose. Ward v. Rock Against Racism, 491 U.S. at 791 (quoting Community for Creative Non–Violence, 468 U.S., at 293)(emphasis added in Ward v. Rock Against Racism). The public health risk that COVID-19 poses justifies the May 15 Order. "This justification . . . '[h]as nothing to do with content, and it satisfies the requirement that time, place, or manner regulations be content neutral." Ward v. Rock Against Racism, 491 U.S. at 792 (quoting Boos v. Barry, 485 U.S. 312, 320 (1988))(concluding that a regulation was content-neutral, because "[t]he principle justification for the sound-amplification guideline is the city's desire to control noise levels at bandshell events"); id. at 791 ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.").

The May 15 Order is also narrowly tailored. To be narrowly tailored, the restriction must not "burden substantially more speech than is necessary" to achieve a substantial government interest. Ward v. Rock Against Racism, 491 U.S. at 799. For a content-neutral time, place, or manner restriction, however, the State "need not [use] the least restrictive or least intrusive means" available. Ward v. Rock Against Racism, 491 U.S. at 798. The May 15 Order is more narrowly tailored, with respect to religion, than the April 11 Order. Whereas the April 11 Order prohibits

all religious gatherings, the May 15 Order allows houses of worship to conduct indoor services at twenty-five percent capacity, and outdoor services that maintain social distancing. The May 15 Order, accordingly, is not overbroad, because it permits religious gatherings to what the State may reasonably conclude is the greatest extent possible while protecting the public health. Permitting greater occupancy at indoor religious mass gatherings would, by definition, increase the risk that those gatherings present. While a greater occupancy restriction may be less restrictive, the Court cannot say, as a matter of law, that the twenty-five percent indoor limit burdens substantially more speech than is necessary to limit the spread of COVID-19. "It is always true, by definition, that the status quo is less restrictive than a new regulatory law. It is always less restrictive to do nothing than to do something. But 'doing nothing' does not address the problem Congress sought to address[.]" Ashcroft v. Am. Civil Liberties Union, 542 U.S. 656, 684 (2004)(Breyer, J., dissenting, joined by Rehnquist, C.J., and O'Connor, J.). The State need not choose between closing everything or closing nothing. As a content-neutral time, place, and manner restriction, the May 15 Order is thus narrowly tailored.

Finally, the May 15 Order leaves open substantial alternative channels of expression. "To determine whether alternative channels are adequate, courts assess in part the speaker's ability to reach his or her target audience." Evans v. Sandy City, 944 F.3d at 860. Although the May 15 Order restricts houses of worship, the May 15 Order does not completely foreclose Legacy Church, or likely any other house of worship, from reaching its target audience and associating to express religious belief. First houses of worship may broadcast their services via television or the internet. Second, for those members that lack television or internet, the May 15 Order does not restrict the number of events that houses of worship may hold each day, only each indoor event's occupancy. Third, houses of worship may hold drive-in and other outdoor services, provided that they comply

with social distancing rules.  See May 15 Order ¶ 5, at 6; COVID-Safe Practices at 29-30.  Of

course, none of these alternatives is as fulfilling as unencumbered, in-person religious services.

"That [a regulation may] reduce to some degree the potential audience for respondent's speech is

of no consequence, for there has been no showing that the remaining avenues of communication

are inadequate."  Ward v. Rock Against Racism, 491 U.S. at 802.  Accordingly, the May 15 Order,

as a matter of law, does not violate Legacy Church's Freedom of Assembly rights, and so

amendment to add claims against the May 15 Order would be futile.

### C.    LEGACY CHURCH CANNOT STATE A PLAUSIBLE CLAIM AGAINST THE JUNE 30 ORDER.

The Court next examines whether Legacy Church could amend the Complaint to allege a

plausible claim that the June 30 Order violate the First Amendment.  Although Secretary Kunkel

made a series of changes to the Public Health Orders throughout late May and June, see June 1

Order ¶ 1.u., at 5 (permitting, for the first time since the March 27 Order, restaurants to provide

indoor dining services at fifty percent capacity), the Court evaluates the June 30 Order, because it

presents the greatest disparity in its treatment of houses of worship and analogous secular conduct.

The June 1 Order and the subsequent Public Health Orders allow "[g]yms and similar

exercise facilities [to] operate at up to 50% of the maximum occupancy of any enclosed space on

the business's premises, as determined by the relevant fire marshal or fire department, but may not

conduct group fitness classes."  June 1 Order ¶ 8, at 7.  The June 1 Order, like the subsequent

Public Health Orders, allows "[p]ublic swimming pools [to] open but such facilities are limited to

lane-swimming and lessons with up to two students only.  Play and splash areas shall be closed.

Public swimming pools may not exceed 50% of their maximum occupancy."  June 1 Order ¶ 9,

at 7.  The June 30 Order maintains these restrictions, the mass gatherings restriction, and the

twenty-five percent occupancy restriction for non-essential businesses and houses of worship.  See June 30 Order ¶¶ 2, 4, 5, at 5-7.  The June 30 Order  also maintains the requirement that individuals wear a "mask or multilayer cloth face covering in public settings except when eating, drinking, or exercising."  June 12 Order ¶ 13, at 8.

1.      **The June 30 Order is Neutral and Generally Applicable, So Legacy Church Cannot Allege a Plausible Claim that the June 30 Order Violates the Free Exercise Clause.**

Like the Public Health Orders before it, religious animus does not motivate the June 30 Order, and the June 30 Order object is "something other than the infringement or restriction of religious practices.'"  Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 649-50. The June 30 Order is also facially neutral, because it does not "refer[] to a religious practice without a secular meaning discernible from the language or context."  Lukumi, 508 U.S. at 534.  Although the June 30 Order imposes different restrictions on restaurants and gyms than it does on houses of worship, it does so with secular meaning discernable from the language or context -- Secretary Kunkel asserts that those practices are less dangerous and more manageable at fifty percent capacity than are religious mass gatherings at fifty percent.  Nor does the June 30 Order "single[] out a religious practice for special burdens."  Lukumi, 508 U.S. at 559 (Scalia, J., concurring in part and concurring in the judgment, joined by Rehnquist, C.J.).  To the contrary, the most clearly analogous secular conduct -- movie showing and concert venues -- receive less favorable treatment than do religious mass gatherings.  Similarly, the June 30 Order permits outdoor, socially-distanced religious mass gatherings that it does not permit for outdoor, socially-distanced secular mass gatherings.  See June 30 Order ¶ 2, at 6; COVID-Safe Practices at 29-30.  Similarly, indoor religious gatherings are not "almost the only conduct subject to" restrictions, but rather one activity among many.  Lukumi, 508 U.S. at 535.  Because religious animus does not motivate the June 30

Order, and because it does not refer to religious practices without secular meaning, the June 30 Order is neutral.

The June 30 Order is also generally applicable.  A law is not generally applicable if it treats favorably secular conduct that is analogous to the restricted religious conduct.  See Lukumi, 508 U.S. at 543.  Conduct is analogous when it endangers a law's stated interests "in a similar or greater degree" than the burdened religious conduct.  Lukumi, 508 U.S. at 543.  Further, that a State provides secular exemptions from an otherwise generally applicable law that it does not provide to religious conduct does not render that law invalid, provided that those exemptions are categorical and consistent with the law's secular purpose.  See Axson-Flynn v. Johnson, 356 F.3d at 1298.  As the Court discussed above, Secretary Kunkel has plausibly demonstrated that the activities that the June 30 Order treats differently than indoor religious gatherings pose different health risk than indoor gatherings.  The June 30 Order treats religion favorably compared with its closest comparators, while affording favorable treatment only to activities that, in Secretary Kunkel and her experts' estimation, pose less of a threat to the public health.  Accordingly, the June 30 Order is subject to rational basis review.

Chief Justice Roberts, in his South Bay concurrence, expressed that his strike zone regarding the States' response to the COVID-19 pandemic is broad.  Chief Justice Roberts' concurrence reflects the longstanding principle that, during times of public crises, unelected judges are ill-equipped to second-guess public health officials' expertise.  See Jacobsen v. Massachusetts, 197 U.S. at 25-26.  When public health officials "'act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'"  South Bay, 140 S. Ct. at 1614 (quoting Marshall v. United States, 414 U.S. 417, 427 (1974)).  As the Supreme Court has made clear, the judiciary may invalidate such efforts "only" when they have "no real or substantial relation" to the

public health, or are "beyond all question, a plain, palpable invasion" of the First Amendment. Jacobsen v. Massachusetts, 197 U.S. at 31.  Here, the Court cannot say that the June 30 Order's differential treatment of restaurants, gyms, and religious gathering has no real or substantial relation to protecting public health.  See Jacobson v. Massachusetts, 197 U.S. at 30 ("It is no part of the function of a court . . . to determine which one of two modes was likely to be the most effective for the protection of the public against disease.").  The State may thus reasonably conclude that indoor mass gatherings, regardless of their expressive content, endanger the public health in a greater degree than certain secular conduct and so subject indoor mass gatherings to greater restrictions.  Lukumi, 508 U.S. at 543.  The Court cannot say that Secretary Kunkel has acted in an "arbitrary, unreasonable manner."  Jacobsen v. Massachusetts, 197 U.S. at 28. Accordingly, Legacy Church cannot state a plausible claim that the June 30 Order violates its Free Exercise rights.

**2.      Legacy Church Cannot State a Plausible Claim that the June 30 Order Violates its Freedom of Assembly Rights.**

As with the previous Public Health Orders, the June 30 Order serves a compelling interest and is unrelated to the suppression of ideas.  The June 30 Order is also a content-neutral time, place, and manner restriction that limits, among other activities, religious gatherings.  See Lighthouse Fellowship Church v. Northam, 2020 WL 2110416, at *5.  The question, then, is whether the June 30 Order is narrowly tailored.  As discussed above, the June 30 Order need not be the least restrictive means available to combat the spread the COVID-19.  "Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'"  Ward v. Rock Against Racism, 491 U.S. at 799 (quoting United States v. Albertini, 472 U.S. 675, 689 (1985)).

That a time, place, or manner restriction burdens some protected speech does not render the restriction too loosely tailored, provided that the restriction itself is content-neutral.  See Griffin v. Bryant, 30 F. Supp. 3d 1139, 1166 (D.N.M. 2014)(Browning, J.).  Instead, as "long as the means chosen are not substantially broader than necessary to achieve the government's interest, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative."  Am. Entertainers, L.L.C. v. City of Rocky Mount, N. Carolina, 888 F.3d 707, 715 (4th Cir. 2018)(citing Ward v. Rock Against Racism, 491 U.S. at 799).  "Thus, 'the scope of the restriction on speech must be reasonably, though it need not be perfectly, targeted to address the harm intended to be regulated.'"  iMatter Utah v. Njord, 774 F.3d 1258, 1266 (10th Cir. 2014)(quoting 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 529 (1996)(O'Connor, J., concurring)).

Here, the June 30 Order achieves a plausible balance between protecting the public health while permitting, to the greatest extent possible, religious gatherings. Although the Court and Legacy Church may have drawn a different line regarding houses of worship and restaurants, the "'validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interest should be promoted.'"  Evans v. Sandy City, 944 F.3d 847, 857 (10th Cir. 2019)(quoting Ward v. Rock Against Racism, 491 U.S. at 800). The June 30 Order "promotes a substantial government interest that would be achieved less effectively absent the regulation.'"  Ward v. Rock Against Racism, 491 U.S. at 799 (quoting United States v. Albertini, 472 U.S. at 689 (1985).  Although all indoor mass gatherings are dangerous, the June 30 Order affords indoor religious gatherings more favorable treatment than its closest comparators -- movie showings, concert venues, and lectures.  Further evidence of this narrow

tailoring is that, while indoor religious gatherings present heighted risk, and so are restricted, outdoor religious gatherings are permitted, thus allowing religious association to continue, in some form, minimally encumbered.  The June 30 Order is thus "targeted to address the harm intended to be regulated."  iMatter Utah v. Njord, 774 F.3d at 1266.

Similarly, the June 30 Order affords ample alternative means of communication.  The June 30 Order does not impermissibly "stifle [Legacy Church's] ability to communicate [its] message to [its] target audience."  Evans v. Sandy City, 944 F.3d at 857.  Legacy Church may conduct and broadcast its services.  It may hold as many gatherings each day as it wishes, provided that no gathering exceeds twenty-five percent.  Moreover, unlike the absolute numerical cap that the Supreme Court approved in South Bay, the June 30 Order's restrictions vary with the size of the room in which the services are held such that Legacy Church, which its relatively large member base, may correspondingly hold relatively large services.  Legacy Church may also hold drive-in services to the extent that its parking lots allow.  The June 30 Order thus leaves ample alternative channels of communication open.  Accordingly, the June 30 Order does not violate Legacy Church's Freedom of Assembly rights, and so Legacy Church cannot plausibly state a claim against the June 30 Order.

### D.   LEGACY CHURCH CANNOT PLAUSIBLY STATE A CLAIM AGAINST THE JULY 13 ORDER.

The July 13 Order rescinds permission for restaurants to offer indoor, dine-in services.  See July 9 Public Health Announcement at 1.  Accordingly, as of July 13, the secular activities that receive more favorable treatment than indoor religious gatherings are: (i) public and commercial swimming pools; and (ii) hotels and other lodging facilities.   See July 9 Public Health Announcement at 1.  Commercial and public swimming pools are limited to lane swimming, and

swimming lessons are capped at two socially distanced students.  See July 13 Order ¶ 9, at 7.

Hotels and other lodging facilities must, among other restrictions: limit room sharing to individuals

who live in the same household; reduce staff to the greatest extent possible; discontinue use of

communal saunas and exercise facilities; discontinue valet service; and remove all decorative

linens and self-serve items, like pens and personal coffee makers, from rooms.  See COVID-Safe

Practices at 22-23.  Although the July 13 Order does not alter the maximum occupancy for indoor

religious services, it is more narrowly drawn than the June 30 Order, because it does not afford

favorable treatment to restaurants.  Additionally, the July 13 Order expressly permits outdoor

religious services.  See July 13 Order ¶ 2, at 6.  As with the previous Public Health Orders, Legacy

Church cannot state a plausible First Amendment claim against the July 13 Order.

> ### 1.     Legacy Church Cannot State a Plausible Free Exercise Claim Against the July 13 Order.

As with the previous Public Health Orders, there is no evidence that Secretary Kunkel has

acted "because of, not merely in spite of," the July 13 Order's suppression of religious practice.

Lukumi, 508 U.S. at 540.  Similarly, to the extent that the July 13 Order treats religious conduct

differently than it does swimming pools and hotels, it does not do so "without a secular meaning

discernable from [its] language or context."  Lukumi, 508 U.S. at 533.  The July 13 Order is thus

neutral with respect to religion.  Further, although the worsening coronavirus outbreak caused

Secretary Kunkel to revoke exemptions for some activities -- like restaurants and gyms -- the July

13 Order maintains the June 30 Order's solicitousness of religion, maintaining the twenty-five

percent occupancy limit while closing analogous activities like movie showings and concerts.  The

July 13 Order treats indoor religious gatherings more equally than does the June 30 Order, because

it presents fewer exemptions for conduct that is arguably analogous.  Hotels and lodging facilities

are likely not analogous to indoor religious services, because hotels do not involve large, indoor congregations in the same room or enclosed space.  As for gyms, Secretary Kunkel avers that indoor religious services endanger the public health to a greater degree than do gyms.  See July 10 Tr. at 63:18-65:10 (Kunkel).  As the Tenth Circuit has held, a secular exemption does not "automatically" compel a religious exemption, provided that the secular exemption does not endanger the asserted interest in a similar or greater degree than does the restricted religious conduct.  Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 651.  Because Secretary Kunkel asserts that gyms do not endanger the public health in a similar or greater degree than indoor religious services endanger the public health, the July 13 Order does not need to treat the two activities identically.  Further, under the July 13 Order Legacy Church remains free to exercise each of the other aspects of its faith that it has asserted: it may hold its small group ministries, maintain its food bank, and continue its children's programs.  Accordingly, the July 13 Order is both neutral and generally applicable.  Because it is undisputed that the July 13 Order is rationally related to a compelling government interest, Legacy Church cannot state a plausible Free Exercise claim against the July 13 Order.  Accordingly, amending the Complaint to add a Free Exercise claim against the July 13 Order would be futile.

> **2.      Legacy Church Cannot State a Plausible Claim that the July 13 Order Violates its Freedom of Assembly Rights.**

As with the previous Public Health Orders, the July 13 Order is a content-neutral time, place, and manner restriction.  Although New Mexico's COVID-19 outbreak has worsened since the June 30 Order, the July 13 Order maintains the June 30 Order's favorable treatment regarding religious gatherings, both indoor and outdoor.  While Secretary Kunkel has concluded that the worsening outbreak requires greater restrictions, she does not impose those new restrictions on

religious gatherings.  Amid the worsening outbreak, Legacy Church remains free to hold as many indoor services as it wishes, provided that those services' occupancy does not exceed twenty-five percent.  Legacy Church remains free to broadcast its services and express its message.  It remains free to hold outdoor services that are not subject to the twenty-five percent occupancy restriction, provided that its members practice social distancing.  Legacy Church remains free to hold its numerous community-service ministries, like food drives and counseling.  The July 13 Order thus affords ample alternative means for Legacy Church to communicate its message and celebrate its faith with its members.  Amid the worsening outbreak, a less restrictive framework would undoubtedly be less effective in slowing COVID-19's spread.  The July 13 Order's restrictions on Legacy Church's association rights are valid, because they "are not substantially broader than necessary to achieve the government's interest."  Ward v. Rock Against Racism, 491 U.S. at 800. Moreover, the July 13 Order removes, almost entirely, the favorable treatment that the June 30 Order affords some non-analogous secular activities.  Accordingly, Legacy Church cannot assert a plausible claim that the July 13 Order violates its Freedom of Assembly rights.

## IX.   THE COURT DOES NOT GRANT LEGACY LEAVE TO AMEND THE COMPLAINT.

Rule 15(a) provides that a party may amend his or her pleading as a matter of right within twenty-one days of serving it and within twenty-one days of the service of a response pleading. See Fed. R. Civ. P. 15(a).  Otherwise, the party must obtain the opposing parties' consent or the court's leave -- which should be "freely give[n] . . . when justice so requires" -- to amend his or her pleading.  Fed. R. Civ. P. 15(a)(2).  Finally, if a party seeks to amend his or her pleading after the time for seeking leave for pleading amendments has passed under a scheduling order, then, in addition to meeting rule 15(a)(2)'s requirements, he or she must satisfy rule 16(b)(4)'s good-cause

requirement.  See Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n, 771 F.3d 1230, 1240 (10th

Cir. 2014)("After a scheduling order deadline, a party seeking leave to amend must demonstrate

(1) good cause for seeking modification under Fed. R. Civ. P. 16(b)(4) and (2) satisfaction of the

Rule 15(a) standard.").  Here, the Court has not entered a scheduling order or set deadlines for

amendments to pleadings, but the time period for amendments of right has elapsed, because more

than twenty-one days have elapsed since Secretary Kunkel served the MTD.  See Fed. R. Civ. P.

15(a) advisory committee notes to the 2009 amendments (noting that "the right to amend once as

a matter of course terminates 21 days after service of a motion under Rule 12(b), (e), or (f)").  The

Court concludes, however, that amendment of the Complaint would be futile.  Accordingly, the

Court does not grant Legacy Church leave to amend the Complaint.

Legacy Church has not formally moved for leave to amend, but requests, in the MTD

Response, that the Court grant it leave to amend.  See MTD Response at 7.  Rule 15 (a) does not

provide any specific procedure for obtaining leave to amend, but a party typically seeks leave to

amend "by a motion addressed to the court's discretion," and a motion to amend, "as is true of

motions generally, is subject to the requirements of Rule 7(b)."  Wright & Miller, Fed. Practice &

Procedure § 1485 (3d ed.).  Accordingly, the motion to amend must set forth with particularity the

relief or order requested, and the grounds supporting the application.  See Fed. R. Civ P. 7(b)(1).

Moreover, the Local Rules provide that the motion to amend must attach the proposed amended

pleadings.  See D.N.M.LR-Civ. 15.1 ("A proposed amendment to a pleading must accompany the

motion to amend.").  Here, Legacy Church asserts that the "additional factual allegations" that it

includes in the MTD Response "offer another dimension to its claims in its original Complaint."

MTD Response at 7.  Legacy Church alleges that the Second Smothermon Declaration shows "the

myriad ways" that the April 11 Order "impacts [Legacy Church's] religious expression and

assembly, beyond its large group services," and the subsequent Public Health Orders "further dilute the purported general applicability and non-neutral treatment of religious enterprises versus commercial ones." MTD Response at 7. Although Legacy Church does not attach its proposed amended complaint, as D.N.M.LR-Civ. 15.1 requires, the Court concludes that Legacy Church has provided sufficient notice of its proposed amendments for the Court to determine whether amendment would be futile. From Legacy Church's arguments in its MTD Response, the Court can determine that Legacy Church does not seek to add new causes of action or defendants, but rather new factual allegations to cure the Complaint's deficiencies, and this minimal amendment reduces prejudice to Secretary Kunkel, who is already on notice about the contours of Legacy Church's asserted rights.

An amendment is "futile" if the pleading, "as amended, would be subject to dismissal." In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80 (citing TV Commc'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1028 (10th Cir. 1992)). When determining whether amendment would be futile, the issue is "'not whether [the] plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims.'" Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002)(quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). Amendment would be futile. As the Court has discussed, none of the Public Health Orders violate Legacy Church's First Amendment rights. The Supreme Court has instructed that public health officials are entitled considerable leeway in fashioning the response to COVID-19 pandemic. See South Bay, 140 S. Ct. at 1613-14 (Roberts, C.J., concurring). The Court cannot say, as a matter of law, that Secretary Kunkel has exceeded the "broad limits" that the Constitution permits. South Bay, 140 S. Ct. at 1613-14 (Roberts, C.J., concurring). The Court has evaluated each of the Public Health Orders and has concluded that none violate Legacy

Church's First Amendment rights.  Accordingly, the Court denies Legacy Church's request for leave to amend the Complaint.

**IT IS ORDERED** that: (i) the Verified Emergency Motion for a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunctive Relief, filed April 14, 2020 (Doc. 9), is denied; (ii) the Motion for Leave to File Amicus Curiae Brief and Proposed Amicus Curiae by Proposed Amicus the Becket Fund for Religious Liberty in Support of Plaintiff, filed April 17, 2020 (Doc 17), is granted; (iii) the Motion to Dismiss Plaintiff's Original Complaint, Request for Temporary Restraining Order, and Permanent Injunction, filed April 27, 2020 (Doc. 33), is granted; (iv) the Unopposed Motion of Americans United for Separation of Church and State for Leave to File Amicus Curiae Brief in Opposing to Plaintiff's Motion for Preliminary Injunction and in Support of Defendant's Motion to Dismiss, filed May 6, 2020 (Doc. 44), is granted; and (v) the Opposed Motion Seeking Leave to Allow Secretary Kunkel to Testify Telephonically or Through Audiovisual means at the July 10, 2020 Preliminary Injunction Hearing, filed July 8, 2020 (Doc. 75), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Colin Hunter
Jordy Stern
Diego Esquibel
The Barnett Law Firm, P.A.
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Nicholas M. Sydow
  Civil Appellate Chief
Office of the New Mexico Attorney General
Albuquerque, New Mexico

     *Attorneys for Defendant State of New Mexico*

Matthew L. Garcia,
  Chief General Counsel to Governor Michelle Lujan Grisham
Jonathan J. Guss
  Deputy General Counsel to Governor Michelle Lujan Grisham
Santa Fe, New Mexico

     *Attorneys for Defendant Kathyleen Kunkel*


A. Blair Dunn
Western Agricultural Resource and Business Advocates, LLP
Albuquerque, New Mexico

--and--

Mark L. Rienzi
William J. Haun
Peter M. Torstensen, Jr.
The Becket Fund for Religious Liberty
Washington, D.C.

     *Attorneys for Amicus Curiae the Becket Fund for Religious Liberty*


Alex J. Luchenitser
Richard B. Katskee
Sarah Goetz
Americans United for Separation of Church and State
Washingon, D.C.

     *Attorneys for amicus Americans United for Separation of Church and State*